Page 1

 1               IN THE UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4

 5   MICHAEL STOPKA,                )
     MARILYN STOPKA, and            )
 6   CHATEAU ARLINGTON, LLC,        )
               Plaintiffs,          )
 7                                  )
        vs.                         ) No. 10 CV 6034
 8                                  )
     AMERICAN FAMILY MUTUAL         )
 9   INSURANCE COMPANY, INC., a     )
     Wisconsin Corporation,         )
10             Defendant.           )

11

12           The deposition of TINA BASCH, called for

13   examination pursuant to the Rules of Civil

14   Procedure for the United States District Courts

15   pertaining to the taking of depositions, taken

16   before Tasha Olivo, Certified Shorthand Reporter of

17   the State of Illinois, at 123 North Wacker Drive,

18   Suite 1800, Chicago, Illinois, on the 7th day of

19   September, 2011, at the hour of 2:16 p.m.

20

21

22

23   Reported by:  Tasha Olivo, CSR, RPR

24   License No.:  084-004420

                                        Exhibit A

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 2

1 APPEARANCES:
2    MECKLER, BULGER, TILSON, MARICK & PEARSON
3    BY: MR. CHRISTOPHER S. HENNESSY
4    123 North Wacker Drive, Suite 1800
5    Chicago, Illinois 60606
6    (312) 474-7900
7    christopher.hennessy@mbtlaw.com
8       Representing the Plaintiffs;
9
10   PRETZEL & STOUFFER, CHTD.
11   BY: MS. SUZANNE M. CROWLEY
12   One South Wacker Drive, Suite 2500
13   Chicago, Illinois 60606
14   (312) 346-1973
15   scrowley@pretzel-stouffer.com
16      Representing the Defendant.
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2 WITNESS                    EXAMINATION
3 TINA BASCH
4    By Mr. Hennessy                5
5
6
7          E X H I B I T S
8 NUMBER                  MARKED FOR ID
9 BASCH Deposition Exhibit
10    No. 1                 5
11    No. 2                 7
12    No. 3                 16
13    No. 4                 16
14    No. 5                 27
15    No. 6                 48
16    No. 7                 50
17    No. 8                 53
18    No. 9                 53
19    No. 10                54
20    No. 11                55
21    No. 12                65
22    No. 13                67
23
24

Page 4

1           (Witness sworn.)
2    MR. HENNESSY: Could you please state and spell
3 your first and last name.
4    THE WITNESS: Tina Basch, T-i-n-a, B-a-s-c-h.
5    MR. HENNESSY: Let the record reflect that this
6 is the deposition of Tina Basch, designated
7 30(b)(6) witness for American Family, on the issues
8 identified in the notice subject to the Federal
9 rules.
10      Before we get into the paper, we'll talk
11 about depositions generally.
12      Have you given a deposition before?
13   THE WITNESS: No.
14   MR. HENNESSY: There's a couple ground rules we
15 should run through. Your attorney probably told
16 you these things already.
17      The court reporter is taking down the
18 things we're each saying. The court reporter can
19 only take down words as opposed to shrugs or things
20 that sound like words but aren't like uh-huh. So
21 as best as we can, try to articulate words that the
22 court reporter can transcribe and not speak over
23 each other when we are -- when I'm either asking a
24 question or you are answering a question.

Page 5

1      Off the record for a second.
2         (Discussion off the record.)
3    MR. HENNESSY: In addition, there may be times
4 where I ask a question and your attorney objects to
5 my question so there would be another person
6 talking. Try and let each individual person talk
7 before we pick back up again.
8    THE WITNESS: Okay.
9    MR. HENNESSY: All right. Does that all make
10 sense?
11   THE WITNESS: Yes.
12   MR. HENNESSY: We'll have the first document
13 which I'll have marked as Exhibit 1.
14        (Whereupon, BASCH Deposition
15         Exhibit No. 1 was marked for
16         identification.)
17        TINA BASCH,
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20        EXAMINATION
21 BY MR. HENNESSY:
22   Q. I'm handing you a document which has been
23 marked as Exhibit 1.
24      Have you seen this document before?

2 (Pages 2 to 5)

Electronically signed by Tasha Olivo (101-332-676-5946)                              93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 6

1    A.   Yes.
2    Q.   This is called a 30(b)(6) notice, and I'm
3  sure your attorney has explained to you what a
4  30(b)(6) notice means.  It's a designation under
5  the Federal rules where a company selects a person
6  to speak on behalf of the company and so the
7  deposition testimony of that individual is as if,
8  in this case, American Family is doing the talking.
9  You have been designated as the person to speak on
10  the issues identified on Page 2 of the deposition
11  rider.
12    A.   Yes.
13    Q.   Do you understand that that's the subject
14  of your testimony today?
15    A.   Yes.
16    Q.   Okay.  So I know it can get a little
17  tricky.  During the course of the questioning, if I
18  ever say you, I don't really mean you, Tina Basch.
19  I mean American Family --
20    A.   Yeah.
21    Q.   -- unless I suggest otherwise because the
22  deposition is focusing on questions directed at
23  American Family.  You're just the person who's
24  answering them.

Page 7

1       Does that make sense?
2    A.   Yes, it does.
3    Q.   So you have had a chance then to review
4  Page 2 of Exhibit 1, the rider and the matters of
5  examination.
6    A.   Yes.
7    Q.   And you reviewed that before today or
8  either this morning for example?
9    A.   Yes.
10    Q.   And are you prepared to provide testimony
11  on behalf of American Family on each of the issues
12  designated in Paragraphs 1 through 5 on Page 2 --
13    A.   Yes.
14    Q.   -- of Exhibit 1?
15    A.   Yes.
16    MR. HENNESSY:  Let the record reflect that I
17  received a call from counsel for Augustine Custom
18  Homes, John McGuirk yesterday who indicated that he
19  would not be attending today's deposition.
20       All right.  The next item we'll have
21  marked as Exhibit 2.
22              (Whereupon, BASCH Deposition
23               Exhibit No. 2 was marked for
24               identification.)

Page 8

1  BY MR. HENNESSY:
2    Q.   Handing you a document which has been
3  marked by the court reporter as Exhibit 2, have you
4  seen this document before?
5    A.   No, I have not.
6    Q.   The document which has been marked as
7  Exhibit 2, which is American Family Mutual
8  Insurance Company's responses to Plaintiff's first
9  request for production of documents, a series of
10  questions to American Family requesting that
11  certain documents be produced.
12    A.   Okay.
13    Q.   You have not seen this, and so I take it
14  you did not have a role in preparing answers to
15  this; is that correct?
16    A.   None.
17    Q.   If we could go back to Exhibit 1 for a
18  minute, please, Page 2 of Exhibit 1, the first
19  paragraph within matters of examination, the search
20  or searches conducted by or on behalf of American
21  Family for documents responsive to Plaintiff's
22  first request for production of documents, how are
23  you able to testify concerning -- how are you able
24  to provide testimony on behalf of American Family

Page 9

1  concerning search or searches conducted by American
2  Family for documents responsive having not seen the
3  request themselves?
4    A.   We received a request for documentation in
5  lieu of the names provided in Section 2 of the
6  rider which we pulled electronic information from
7  the e-mail systems in terms of Mr. Hayes and
8  e-mails sent back and forth between Section B and G
9  on here.
10    Q.   You received a request from whom?
11    A.   Our Claims Legal Department.
12    Q.   An individual within Claims Legal?  A
13  person?
14    A.   Yes.
15    Q.   Who would that be?
16    A.   That would be Robert Steffel.
17    Q.   Could you spell his name, please.
18    A.   S-t-e-f-f-e-l.
19    MS. CROWLEY:  And, for the record, I'll just
20  caution the witness not to get into any substantive
21  discussions with Mr. Steffel.  You obviously can
22  get into the fact that she was -- a request was
23  made her, but anything more than that I wouldn't
24  allow under the attorney/client privilege.

3 (Pages 6 to 9)

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052
Electronically signed by Tasha Olivo (101-332-676-5946)                                      93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 10

1  BY MR. HENNESSY:
2      Q.  Mr. Steffel is an attorney --
3      A.  Yes.
4      Q.  -- at American Family?
5          And do you recall when that request was
6  made?
7      A.  March of 2011.
8      Q.  So we'll go back to Page 2 of Exhibit 1
9  then.  You were indicating, if I'm correct,
10 regarding names which appear within Paragraph 2 of
11 Page 2; is that correct?
12     A.  Yes.
13     Q.  And a search that was conducted of the
14 individuals listed, A through G, on --
15     A.  A in conjunction with B through G.
16     Q.  Okay.  I'm not sure I follow that answer.
17     A.  Mr. Hayes, his e-mails to Mr. Saletri,
18 Mr. Andersen, Mr. Gribble, and so on.
19     Q.  Was a search conducted for e-mail
20 involving Mr. -- I'll pronounce it Saletri, but
21 we'll call it S-a-l-e-t-r-i, irrespective of the
22 pronunciation.
23         Was a search conducted of e-mail to or
24 from Mr. Saletri irrespective of whether it

Page 11

1  included Mr. Hayes?
2      A.  No.  It was if it came in relation to
3  Mr. Hayes.
4      Q.  Was -- we'll go down the list.  Was a
5  search for e-mail to or from Mr. Jim R. Andersen
6  searched for irrespective of whether it included
7  Mr. Hayes?
8      A.  No.  It was in relation to Mr. Hayes.
9      Q.  Same question with respect to Mr. Gribble,
10 Mr. Thompson, Terri Rosenberger, or Alice Smith,
11 was a search conducted for e-mail to or from any of
12 these individuals related to the subject matter
13 identified in the text of Paragraph 2 irrespective
14 of if that message was sent to or from Mr. Hayes?
15     A.  No.  It was in relation to Mr. Hayes only.
16     Q.  Let's talk a little bit about your title,
17 you individually within American Family.
18         What is your title specifically?
19     A.  Information technology security director.
20     Q.  And what does having that -- what are your
21 job duties?  What does that entail?
22     A.  I have many roles within the organization.
23 I am responsible for the protection of data as it
24 relates to customer information as well as company

Page 12

1  proprietary data as well.  I am responsible for
2  incident handling -- computer-related incident
3  handling as well as some investigatory work
4  associated with that.  I have responsibility for
5  security technology, threat monitoring, access
6  controls, audits, things of that nature.
7      Q.  And a staff of people that report to you?
8      A.  Yes.
9      Q.  So when you were talking about the request
10 that was made to you by Mr. Steffel, is that
11 something that you handled personally or is that
12 something that you designated people to handle?
13     A.  I have designated people to handle.
14     Q.  And that request was made to you --
15 without delving into the substance of your
16 discussions with Mr. Steffel, do you recall --
17 well, was it a request over the phone or was it a
18 request in e-mail or a request in writing?
19     A.  It was a request in e-mail.
20     Q.  And do you recall what exactly it is that
21 he asked you to look for?
22     MS. CROWLEY:  Again, I'll caution the witness.
23         You can, in a general sense, reveal what
24 was asked of you; but don't get into the substance

Page 13

1  of any of the information that Mr. Steffel may have
2  shared with you.
3      THE WITNESS:  He requested that we do a search
4  on e-mails to or from Mr. Hayes from the associated
5  people in Paragraph 2, and he provided a list of
6  claim numbers to search on as well.
7  BY MR. HENNESSY:
8      Q.  Do you recognize those claim numbers as
9  appearing within Paragraph 2 of Exhibit 1?
10     A.  Not by memory.
11     Q.  Did Mr. Steffel provide to you a copy of
12 Exhibit 1 as part of his request or was it a
13 paraphrase?
14     A.  I believe it was a paraphrase.
15     Q.  So we'll go back to Paragraph 2 again.
16 Let's just use Mr. Saletri as an example because
17 from what I understand your testimony was the same
18 regarding the witnesses identified in Paragraph 2B
19 through G in that e-mail regarding all of those
20 individuals was only searched to the extent it
21 included Mr. Hayes?
22     A.  Correct.
23     Q.  So I'll use Mr. Saletri as an example, but
24 correct me if he's somehow different than the other

Electronically signed by Tasha Olivo (101-332-676-5946)  93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 14

1  individuals.
2      Is it true then that e-mail could exist
3  from Mr. Saletri to someone else within American
4  Family about either of these two claim numbers and
5  your search wouldn't have included that?
6      MS. CROWLEY:  Object to speculation.
7      You can answer.
8      THE WITNESS:  If it had the claim numbers, we
9  would have found it.
10 BY MR. HENNESSY:
11     Q.  We'll get to the details of how you
12 searched, but you're suggesting at least that a
13 search was included by claim number --
14     A.  Yes.
15     Q.  -- within the e-mail.
16     If the claim number was not present in,
17 for example, the subject matter of an e-mail or the
18 body of an e-mail, would your search have located
19 an e-mail from Mr. Saletri to someone else at
20 American Family, not Mr. Hayes, regarding the same
21 subject matter without the claim number being
22 designated?
23     A.  No.
24     Q.  When the search was conducted did you

Page 15

1  give -- did you individually, Tina Basch, handle
2  any of the search?
3      A.  No.
4      Q.  When you gave instructions to those who
5  did the search, do you recall the parameters you
6  provided to them to conduct the search?
7      A.  No.  It was the parameters that
8  Mr. Steffel provided.
9      Q.  Well, you indicated that part of the
10 search would have included the claim numbers; is
11 that correct?
12     A.  Mm-hmm.  Yes.
13     Q.  And I take it then the name Mr. Hayes or
14 Mr. Hayes' e-mail address would have been included
15 within the search, correct?
16     A.  Yes.
17     Q.  Any other designation, name, word,
18 anything else that would have been included in the
19 search besides the name Mr. Hayes, an e-mail
20 address associated with Mr. Hayes, or the claim
21 numbers that Mr. Steffel provided to you?
22     A.  No.
23     Q.  Did your instructions to search include
24 the name Stopka, S-t-o-p-k-a?

Page 16

1      A.  Not that I recall.
2      Q.  Did your search include Goose Lake?
3      A.  No.
4      Q.  Did your search include the word fire?
5      A.  Not that I recall.
6      Q.  The search that included Mr. Hayes, would
7  it have been a search limited to his e-mail address
8  or just his name could have appeared anywhere
9  within there?
10     A.  It would have been both.
11     Q.  So we have a search that includes
12 Mr. Hayes and the claim numbers and that's it,
13 correct?
14     A.  I believe so.  Yes.
15     Q.  You brought something in this morning --
16 I'm sorry this afternoon.  We'll have these marked.
17          (Whereupon, BASCH Deposition
18          Exhibit Nos. 3 & 4 were marked
19          for identification.)
20 BY MR. HENNESSY:
21     Q.  There were two documents you brought to
22 the deposition this afternoon, which we've had
23 copies of them made.  The documents themselves
24 appeared on two-sided paper.  The copies have been

Page 17

1  put to single-sided paper.
2      I hand you documents Exhibit 3 and 4 and
3  ask you to confirm that those are copies of what
4  you brought today.
5      A.  Yes, they are.
6      Q.  And we'll stick with No. 3 for right now.
7      What is the document that's been marked as
8  Exhibit 3?
9      A.  It's the information service record
10 retention schedule.
11     Q.  What does that mean?
12     A.  This is the electronic records retention
13 and paper retention of information within the
14 information systems, the computer systems.
15     Q.  So this is a guide -- is it guidelines for
16 the Information Services Department about how long
17 the duration of certain materials need to be kept?
18     A.  Yes.
19     Q.  I see on Page 1 of Exhibit 3 it indicates
20 last updated December 2010.
21     A.  Yes.
22     Q.  Is what's been marked as Exhibit 3 the
23 current operating retention schedule for American
24 Family?

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 18

1    A.   For Information Services, yes.
2    Q.   Correct, as indicated on this document.
3    A.   Yes.
4    Q.   In other words, this is the most recent
5  update?
6    A.   This is the most recent update.
7    Q.   Do you know if this is the Information
8  Services record retention schedule that was in
9  effect in September 2008?
10    A.   It has been modified since that time.
11    Q.   How has it been modified?
12    A.   Systems would have been added or if the
13  systems have been retired, they would have been
14  removed.
15    Q.   So which department or departments within
16  American Family are subject to this retention
17  schedule?  Is it companywide or is it only
18  Information Services?
19    A.   Exhibit 4 would be companywide.  Each
20  division would have their own retention schedule.
21  So Information Services has one.  Our Marketing
22  Department would have one.  Our Claims Department
23  would have one.
24       The electronic records are aligned to the

Page 19

1  division schedule as well.
2    Q.   What does that mean?
3    A.   So as the legal firm, you have a record
4  retention schedule here.  You tell your IT folks
5  how long that information needs to be retained.
6  That would match -- between the two schedules they
7  would match.
8    Q.   So we'll use American Family, for example.
9  You indicated that the Claims Department would have
10  its own retention schedule.
11    A.   Yes.
12    Q.   And so the dates provided within the
13  Claims Department's retention schedule or the
14  retention periods would match up with the
15  Information Services' retention schedule?
16    A.   Yes.
17    Q.   So we take a look at the very first line
18  on Exhibit 3, any records not listed on the
19  schedule, sort of a catchall provision?
20    A.   Yes.
21    Q.   The retention period is three years?
22    A.   Mm-hmm.  Yes.
23    Q.   So we wouldn't be in a situation where
24  claims would have a retention period of one year.

Page 20

1  The three years is going to be reflected.  It's
2  going to be all encompassing.
3    A.   Yes.
4    Q.   Within the first page of Exhibit 3 a
5  little bit further down we have a record type
6  e-mail, format electronic, and the retention period
7  indicates per corporate policy.
8       Do you see that?
9    A.   Yes.
10    Q.   Now, the per corporate policy, is that
11  what you referred to that is Exhibit 4?
12    A.   Correct.
13    Q.   So any reference within Exhibit 3 to per
14  corporate policy, that's Exhibit 4?
15    A.   Yes.
16    Q.   So Exhibit 3, for example, does -- would
17  not tell us how long e-mail is kept in and of
18  itself.  Exhibit 3 wouldn't tell us that.
19    A.   Exhibit 3 would not.
20    Q.   So now we take a look at Exhibit 4.  What
21  is Exhibit 4?
22    A.   Exhibit 4 is the record retention and
23  destruction policy for the company.  So it is the
24  corporate policy.

Page 21

1    Q.   Does Exhibit 4 as a corporate policy
2  govern, for lack of a better term, the manner in
3  which a department like Claims can write their own
4  policy?
5    A.   Yes.
6    Q.   Any individual division's policy has to be
7  consistent with Exhibit 4?
8    A.   Correct.
9    Q.   So Exhibit 4 -- well, a few questions.
10       I see a date -- I see a date on the last
11  page, Page 5 of 5 -- it looks like there might have
12  been an inadvertent extra page copied on mine, but
13  Page 5 of 5 underneath Paragraph G there's a date,
14  September 1, 2004.
15       Do you know what that date refers to?
16    A.   The original publication of this policy.
17    Q.   Has this policy, Exhibit 4, been modified
18  since that date?
19    A.   To my knowledge I do not know.
20    Q.   Is Exhibit 4 the current corporate
21  retention policy for American Family?
22    A.   Yes, it is.
23    Q.   Is Exhibit 4 the retention policy that was
24  in effect in September 2008?

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)          93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 22

1    A.   To the best of my knowledge, yes.
2    Q.   So within -- having not had the chance to
3  read through Exhibit 4, where within Exhibit 4 is
4  it going to tell us American Family's policy on the
5  retention of e-mail?
6    A.   Page 3 of 5, Section C.
7    Q.   So it's American Family's policy -- if I'm
8  reading this correctly, it's American Family policy
9  not only now, but as of September 2008, that e-mail
10 messages are deleted after 60 days?
11   A.   Yes.  In the inbox.
12   Q.   Where do they go when they're deleted from
13 the inbox?
14   A.   They're deleted.
15   Q.   I take it from -- is it fair then from a
16 review of Paragraph C that American Family's e-mail
17 system is Microsoft Outlook?
18   A.   Yes.
19   Q.   Does American Family have a policy that
20 governs the use of -- let me get a foundation
21 question first.
22        Are you familiar within Microsoft Outlook
23 of something called a personal folder or a PST
24 file?

Page 23

1    A.   Yes.
2    Q.   Does American Family have a policy with
3  respect to the use by its employees or personnel of
4  personal foldings or PST files?
5    A.   No.
6    Q.   There is no policy with respect to either
7  prohibiting it or encouraging it?
8    A.   No.
9    Q.   Are there personnel within American Family
10 that do use personal folders or PST files?
11   A.   Yes.
12   Q.   Back to Exhibit 1 again and the search
13 that was conducted for e-mail that we talked about,
14 would that search have included any personal
15 folders or PST files for any of the individuals
16 identified in Paragraph 2 of Page 2 of Exhibit 1?
17   A.   Yes.
18   Q.   Did that search reveal that any of the
19 individuals identified in Paragraph 2 use personal
20 folders?
21   A.   I do not know.  That search would have
22 been on Mr. Hayes' machine.  The PST is a local
23 file.
24   Q.   That search meaning a search for any PST

Page 24

1  files?
2    A.   Yes.
3    Q.   So the search conducted would have been a
4  general server?  Would that have been part of this
5  also?  The search collectively, would that have --
6  would it have included any kind of central server
7  location?
8    A.   It would have been the e-mail servers.
9    Q.   E-mail servers.  And it would have
10 included the personal machine for Mr. Hayes --
11   A.   Correct.
12   Q.   -- for any PST file?
13   A.   Correct.
14   Q.   Did it include the personal machines for
15 any PST files for any of the individuals listed B
16 through G in Paragraph 2?
17   A.   No, it did not.
18   Q.   Did the search yield any e-mail contained
19 in Mr. Hayes' PST file?
20   A.   Anything that was gathered was presented.
21   Q.   My question is different than that.  An
22 e-mail -- well, take a step back.
23        An e-mail could be located in one of two
24 places arguably, correct, either the server, the

Page 25

1  e-mail server, or within a personal file?
2    A.   Yes.
3    Q.   The server would include the inbox and the
4  sent items?
5    A.   Yes.
6    Q.   Even the deleted items, correct?
7    A.   Yes.
8    Q.   Personal folder -- the PST file is
9  something that's local to that user's computer?
10   A.   Yes.
11   Q.   Separate and apart from the server?
12   A.   Yes.
13   Q.   When an e-mail is printed, unless there's
14 a path that appears on the printed e-mail, there's
15 no way of knowing whether that e-mail was printed
16 off of the server or off of a PST file, correct?
17   A.   Correct.
18   Q.   But the appearance of an e-mail, a printed
19 e-mail -- setting aside a path that might appear at
20 the bottom, the appearance of a printed e-mail
21 would look the same whether it came out of your PST
22 file or off the server?
23   A.   Correct.
24   Q.   Is there any way of knowing which of the

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)          93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

1 e-mails produced from Mr. Hayes were e-mails from
2 the server and which ones were from his PST file?
3     A.  No.  Not to my knowledge.
4     Q.  So there's no way of knowing whether the
5 search from his PST file yielded anything?
6     A.  It would have had -- in a printed format,
7 no.  In a PST file, because they are local to the
8 machines, you make the assumption it's local to the
9 machines so, therefore, it's a PST file; but if I
10 were to print this, then, no, I would not know if
11 it was coming from the inbox or the PST box or
12 folder.
13     Q.  Was Mr. Hayes' PST file or files provided
14 to you in their electronic form?
15     A.  We took a copy of them in their electronic
16 form.
17     Q.  With respect to Exhibit 4, Paragraph C, an
18 e-mail and the retention policy for e-mail on
19 either the inbox or the sent items, is it the
20 policy of American Family that this retention
21 policy applies whether a claim is open or closed?
22     A.  Yes.
23     Q.  So if Claims personnel exchange e-mail
24 with respect to a claim, that e-mail, if it stays

1 in the inbox or sent items, is only sticking around
2 for 60 days?
3     A.  Correct.
4     Q.  Is there a policy either within Exhibit 4
5 or elsewhere of American Family that claims
6 personnel are to copy the substance of an e-mail
7 and save it in some other location when it relates
8 to an open claim?
9     A.  Not to my knowledge.
10             (Whereupon, BASCH Deposition
11              Exhibit No. 5 was marked for
12              identification.)
13 BY MR. HENNESSY:
14     Q.  Handing you a document which has been
15 marked as Exhibit 5, it's a group exhibit
16 consisting of documents.  In the lower right-hand
17 corner there's a Bates label or Bates range
18 indicated on Page 1, AF 00600 --
19     A.  Okay.
20     Q.  -- through the last page being AF 00645.
21 If you would like to verify that all the pages in
22 between are there, but I represent to you that it's
23 that range of documents contained in one group
24 exhibit.

1     A.  Okay.
2     Q.  So I would like to jump to the page
3 identified in the lower right-hand corner as 635 of
4 Exhibit 5.
5     A.  Okay.
6     Q.  The top half or so of this document
7 appears to be the cut and paste of an e-mail or two
8 saved in some other format or saved on some other
9 system; is that correct?
10     A.  That's what it appears to be.  Yes.
11     Q.  So -- and you're saying there's no policy
12 governing or requiring that personnel -- Claims
13 personnel specifically copy e-mail into some other
14 system such as what would be on 635 as a matter of
15 practice?
16     A.  I do not know.
17     Q.  Let's talk about some of the various
18 systems that exist.  We've talked about Outlook and
19 that's the e-mail system.
20     A.  Yes.
21     Q.  Oh, before we get to that, Exhibit 3 and
22 Exhibit 4 -- Exhibit 4 in particular actually, is
23 Exhibit 4 something that's circulated to all
24 American Family personnel?

1     A.  Yes.  It is available to everyone.
2     Q.  Available to them or provided to them?
3     A.  It is available on the company's intranet,
4 and I believe it is part of the ethics training.
5 This is all a portion of -- they have to go out and
6 review this information.
7     Q.  How is mail, physical mail, handled within
8 American Family?  Is it scanned into a system and
9 maintained electronically that way?  In other
10 words, which policy would be governing mail on
11 Exhibit 3, a letter that showed up in the mail?
12     A.  In what respect?  Any piece of mail coming
13 into the organization, what we do with it?
14     Q.  Basically.
15     A.  That's a good question.  We receive
16 thousands of articles of mail a day.
17     Q.  Let's talk about Claims in particular.
18     A.  Okay.
19     Q.  Claims personnel.  Mail comes into Claims
20 personnel, addressed to a Claims personnel at
21 American Family.
22     A.  Okay.
23     Q.  Is that piece of mail physically delivered
24 to that Claims person?

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 30

1    A.   No.
2    Q.   What happens?
3    A.   We have a little robot that goes around
4  the floors, and we have mail vents in that.  So the
5  mail will be put into a mail code location.
6  Someone in that area will pick that up.  It goes
7  around periodically throughout the day.  They will
8  pick up the mail and either that person will choose
9  to hand deliver it or they will put it in a mail
10  slot that's been designated for that person.
11    Q.   But, in the end, the Claims representative
12  would receive a -- the actual piece of paper, the
13  envelope, whatever it was that was mailed?
14    A.   Yes.
15    Q.   And in that respect what would be the
16  corporate retention policy that would apply to that
17  hand delivered piece of mail?
18    A.   That would be specific to the claims
19  retention schedule.
20    Q.   But it wouldn't be inconsistent with the
21  corporate policy, correct?
22    A.   It could be aligned with the corporate
23  policy, but it's a schedule.  It's a guideline.  I
24  do not believe that the corporate policy speaks

Page 31

1  specifically of paper mail pieces coming in.
2    Q.   Does Claims have -- so Claims has its own
3  printed retention schedule similar to the
4  Information Services' retention schedule?
5    A.   Yes.
6    Q.   Have you seen that printed document?
7    A.   No.
8    Q.   The -- so a piece of mail comes in related
9  to a claim, an open claim, does the claims
10  personnel have the option to scan that piece of
11  mail and save it into a system somewhere?
12    A.   You would have to speak to someone in
13  claims regarding that question.
14    Q.   And that would hold true then for the
15  retention policy applicable to that piece of paper;
16  is that correct?  I would have to speak to somebody
17  in Claims.
18    A.   Yes.  That's a business process.  They can
19  speak to business process.
20    Q.   Let's go back to Exhibit 5 --
21    A.   Okay.
22    Q.   -- what you happen to have open, so flip
23  to the first page of Exhibit 5.
24    A.   Okay.

Page 32

1    Q.   And on the lower left-hand side there's a
2  path identified.  It begins with http on AF 00600
3  of Exhibit 5.
4    MS. CROWLEY:  You're talk about the http?
5    MR. HENNESSY:  Correct.
6  BY MR. HENNESSY:
7    Q.   You see the path identified there that
8  begins with HTTP?
9    A.   Yes.
10    Q.   What does that designation mean to you?
11    A.   That tells me the system that this
12  information is located on.
13    Q.   And what system is that?
14    A.   The ICS system.
15    Q.   What is the ICS system?
16    A.   It is a Claims system.
17    Q.   Is it a software system run by individuals
18  to input information regarding a claim?
19    A.   Yes.
20    Q.   Is it proprietary or is it commercially
21  available?
22    A.   I believe it is proprietary.
23    Q.   So ICS means something specific to
24  American Family?

Page 33

1    A.   Yes.
2    Q.   Who creates a file within ICS?
3    A.   Claims.
4    Q.   Anybody within Claims?
5    A.   I do not know.
6    Q.   Who manages the ICS -- trying to find
7  terminology we can both understand.  I mean, I'd
8  like to know is it centrally stored someplace?  Is
9  there one server that holds all of the ICS?
10    A.   It is a centralized system that is held
11  within the corporate data centers.
12    Q.   Where are those located?
13    A.   In Madison, Wisconsin.  So they will be
14  multiple boxes to provide the processing power that
15  it may need.
16    Q.   Multiple boxes meaning what?
17    A.   Servers.
18    Q.   Does the -- and what would be the
19  terminology that you would use to designate or to
20  describe this path that appears on the bottom of
21  Page 1 of Exhibit 5?  What would you call that?
22    A.   I would call that the document address.
23    Q.   Okay.  Document address.  We can use that.
24    In looking at the document address, does

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                      93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 34

1  that identify to you on which severer this
2  particular information is located?
3     A.  No.
4     Q.  Does the document address identify to you
5  which file this relates to or which claim it
6  relates to?
7        What is this designation telling you?
8     A.  So this designation is telling me -- this
9  address is telling me the system name which ICS.
10  There's a directory path within that system, which
11  is also called ICS.  It's in the subdirectory
12  called claims with a document type of view image
13  and then the document identification number.
14     Q.  Within ICS are there other divisions
15  besides Claims?
16     A.  I don't believe so.
17     Q.  Is your -- is the -- not your.  Is the
18  Information Services Department responsible for
19  managing the ICS system?
20     A.  Supporting the ICS system, yes.
21     Q.  Who manages the ICS system?
22     A.  Business would manage the application.
23  Information Services would support the uptime of
24  that system.

Page 35

1     Q.  Who can make additions to -- go back to
2  terminology again.
3        When someone opens up a -- you open up a
4  claim in ICS or do you open up a file in ICS?  How
5  would you designate that?  How is that designated?
6     A.  It would be both.  You would create
7  information within the system.  That would be done
8  by Claims.  You could also pull or read information
9  that is in the system.  That would also be done by
10  Claims.
11     Q.  But the information which is put in
12  there -- which is put within ICS, how is it
13  segregated?  Is it segregated by claim number or is
14  it segregated by some other designation?
15     A.  It appears based on the information in
16  Exhibit 5 that it's designated by claim number.
17  There's metadata in here that I'm sure they can
18  search on as well.
19     Q.  When a folder within ICS or a file within
20  ICS is opened up under a given claim number, who
21  can make additions to or changes to the information
22  contained on that claim?
23     A.  I do not know.  We would have to look at
24  the access controls.

Page 36

1     Q.  Access controls meaning?
2     A.  Who has the authority to review and look
3  at the information.
4     Q.  Who can delete information from or a file
5  that's been created within ICS?
6     A.  Again, I would have to look at the access
7  controls to make that determination.
8     Q.  What are online notes?
9     A.  Pertaining to what?
10     Q.  Claims.  We'll take a look at within
11  Exhibit 5 -- let me find the page.
12        First we'll look at AF 00642.  There's an
13  entry in the -- let me take that back.
14     A.  Okay.
15     Q.  First of all, this appears to be a
16  different document obviously then the first
17  document we were looking at, Page 1 of Exhibit 1.
18  In the upper left-hand corner it indicates ICS,
19  notes for claim with a number sign.
20        Do you see that?
21     A.  Yes.
22     Q.  What does this appear to you to be,
23  AF 00642?
24     A.  This appears to be notes that were taken

Page 37

1  based on additional information coming in.
2     Q.  And this -- is this screen capture -- I
3  mean, how do you print this out from ICS?
4     A.  I would have to get the complete details
5  on how to print out of ICS to provide you.
6     Q.  There's an entry on the bottom third of
7  the page.  It's the second from the bottom.
8  Entered 2009, dash, 09, dash, 30.  Created by
9  Susan M. Kinate, K-i-n-a-t-e, comments, questions,
10  and it starts with the word Jerry.
11     A.  Yes.
12     Q.  And within that first sentence, can you
13  document in OLN.
14        Do you see that?
15     A.  Yes.
16     Q.  Do you know what that is, OLN?
17     A.  I do not.
18     MS. CROWLEY:  Are you talk about the letters,
19  OLN?
20     MR. HENNESSY:  Correct.
21     MS. CROWLEY:  Okay.
22  BY MR. HENNESSY:
23     Q.  Now, please turn to Page 00640, the second
24  entry from the top dated entered 2010, dash, 07,

Electronically signed by Tasha  Olivo (101-332-676-5946)                           93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 38

1  dash, 06, 155428, do you see that one?
2      Do you see that entry, second from the
3  top?
4      A.  This one.  Yes.
5      Q.  Note for file supervisory, entered by
6  SMK 013.
7      Do you see that?
8      A.  Yes.
9      Q.  And then there's -- in the text there, see
10  online notes.
11      Do you see that in the text in that entry?
12      A.  Okay.
13      Q.  Do you know what that's referring to?
14      A.  No, I do not.
15      Q.  Is it the policy of American Family that
16  when a new claim is opened, would that claim be
17  created -- within a folder or file, whatever
18  designation you want to give to it, be created
19  within ICS?
20      A.  I believe so.  Yes.
21      Q.  Is that a policy that is written anywhere?
22      A.  I would have to go back to the Claims
23  Division to find out.
24      Q.  The search that you've talked about that

Page 39

1  you conducted or that people within your department
2  conducted for e-mail communication, did that search
3  also include within ICS?
4      A.  No, it did not.
5      Q.  Is there any -- so we talked about e-mail
6  and Outlook and we talked about ICS.  Is there any
7  other electronic place where data or information
8  may be stored at American Family with respect to a
9  claim?
10      A.  I do not know.
11      Q.  Is there a written policy anywhere at
12  American Family regarding the retention of records
13  when there is ongoing litigation?
14      A.  Yes.  I did not bring it today, but we do
15  have a hold policy.
16      Q.  Are you familiar with the hold policy?
17      A.  I am.  And I know we just communicated
18  that to the company within the last six months.
19      Q.  You mean it's a new policy?
20      A.  We had a communication campaign around
21  records preservation and legal holds.
22      Q.  Who can ask for a legal hold?
23      A.  The Legal Department.
24      Q.  Is a legal hold the only type of hold that

Page 40

1  exists in American Family?
2      A.  Yes.
3      Q.  When a new employee starts at American
4  Family they're given an e-mail address at
5  amfam.com?
6      A.  Yes.
7      Q.  And does all @amfam.com e-mail get routed
8  through the same e-mail server, exchange server?
9      A.  Yes.
10      Q.  And that server is physically located in
11  Madison?
12      A.  Yes.
13      Q.  Is that server backed up?
14      A.  Yes.
15      Q.  With what frequency?
16      A.  I would say nightly.
17  MS. CROWLEY:  I'm sorry?
18  THE WITNESS:  Nightly.
19  BY MR. HENNESSY:
20      Q.  And how is it backed up?  Is it a full
21  backup?  Is it differential?  What kind of backup?
22      A.  I don't know.  I would have to go and
23  look.
24      Q.  If a -- go back to Exhibit 4, the policy

Page 41

1  on Page 3 with respect to e-mail regarding Outlook
2  folders, inboxes, and sent items, the retention for
3  messages there is 60 days otherwise they are
4  automatically deleted, correct?
5      A.  Yes.
6      Q.  Now, that deletion take places from the
7  server that holds all e-mail at amfam.com?
8      A.  Yes.
9      Q.  And that's something that's designated --
10  it's just times on a given day where it just cleans
11  everything out?
12      A.  That is my understanding.  Yes.
13      Q.  If I read the policy here correctly,
14  though, it does not apply to anything contained in
15  deleted items, although I'm trying to see what this
16  talks about, preset the Outlook to delete items.
17      So unless the user cleans out their own
18  deleted items, it also is deleted in 60 days; is
19  that correct?
20      A.  Yes.
21      Q.  When the e-mail server is backed up, in
22  what medium is it backed up?  Tapes?  Disks?
23      A.  I believe it's tapes.
24      Q.  And how long are the tapes kept?

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

Electronically signed by Tasha  Olivo (101-332-676-5946)                                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 42

1    A.  I believe 30 days.
2        Backups are kept for 32 days.
3    Q.  What is this that you're referring to?
4    A.  The backups.
5    Q.  No.  The document that you're referring
6  to.
7    A.  These were my notes in terms of chronology
8  so that I had the right details to provide you.
9    Q.  Okay.  Is that something that you reviewed
10  for the purposes of preparing for your deposition
11  today?
12    A.  It's something that we put together.
13    Q.  We being?
14    A.  My team.
15    Q.  So that's something that was created by?
16    A.  A member of my team.
17    MR. HENNESSY:  Okay.  Can we get copies of that
18  made?
19    MS. CROWLEY:  She didn't know if she was going
20  to need it.  That's why.  It's a cheat sheet.  It's
21  a cheat sheet.
22    MR. HENNESSY:  We'll have this copied.
23        Do you want to use the washroom or
24  anything like that?

Page 43

1        (Recess taken.)
2  BY MR. HENNESSY:
3    Q.  So we were talking about something -- I
4  know you were referring to the notes.  In terms of
5  the -- I think we were talking about the deleting
6  of records.
7    A.  We were talking about backups.
8    Q.  Backups.  So backups are kept?
9    A.  32 days.
10    Q.  32 days.  And so -- and that's sort of
11  like a rolling --
12    A.  Yes.
13    Q.  -- process.  So you just get rid of a
14  tape, so we've got -- we know we've got at least a
15  month's worth of information at any given time.
16    A.  Yes.
17    Q.  If an e-mail that's subject to the
18  deletion policy, the 60-day deletion policy, was
19  deleted automatically sometime during that 32-day
20  period, it should show up at least on one of the
21  backups, correct?
22    A.  Yes.
23    Q.  So it would be in an inbox on one day, and
24  even if it was deleted the next day, it would still

Page 44

1  be in an inbox?
2    A.  It would be out of their inbox on their
3  computer, but it would be on tape.  So even though
4  it's gone -- so when someone goes into their e-mail
5  account, it would be gone.
6    Q.  Correct.  Subject to the 60-day?
7    A.  Subject to the 60-day deletion policy.
8    Q.  Okay.
9    A.  But if we had to, I could recover it
10  within that 32-day window.
11    Q.  The search that was conducted for the
12  e-mail that we talked about for Exhibit 1, did any
13  of that search include any backups of the server?
14    A.  Yes, it did.
15    Q.  And which one did it include?
16    A.  The included our e-mail system backup
17  tapes.
18    Q.  So that's the same 32 days worth of tapes?
19    A.  Yes.
20    Q.  So at or about whatever day you -- the
21  search started, it included the server and the
22  condition the server was in at that time plus
23  32 days prior?
24    A.  Plus they did a review of 32 days prior.

Page 45

1    Q.  Back to Exhibit 5 again, if you could
2  please turn to AF 00614, a few questions here.
3        One, we have on the bottom third of 614,
4  which appears to carry over onto 615 and 616, looks
5  like an original message, James Saletri to
6  Jim Andersen.
7        Do you see that there?
8    A.  Yes.
9    Q.  Subject line, HDR?
10    A.  Yes.
11    Q.  The search that you conducted that we
12  talked about for e-mail, Mr. Hayes is neither the
13  from nor the to.
14        Do you see that?
15    A.  Yes.
16    Q.  And the subject line is not indicated as
17  the claim number -- either of the claim numbers or
18  Mr. Hayes, correct?
19    A.  Yes.
20    Q.  Would the search that you conducted have
21  found this message?
22    A.  Question, at the very top of the page
23  where it says C02968, high damage review liability,
24  do you know what that's from?

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 46

1    Q.   614 appears to be a capture from
2  something, but included within that there's
3  actually what appears to be two e-mails. There's
4  one at the top, Andersen to Saletri, and then the
5  one I was specifically asking about at the bottom
6  was Saletri to Andersen.
7        So my question to you is whether this
8  e-mail, which would appear to be an e-mail from
9  Saletri to Andersen, two names which appear in
10 Paragraph 2 on Page 2 of Exhibit 1 --
11   A.   So our search would not have found these
12 because these were outside the window, if they were
13 in the inbox.
14   Q.   Outside of the window?
15   A.   Outside of the 60-day retention policy.
16   Q.   Understood, but this e-mail could have
17 been on a PST file someplace and your search would
18 not have located it?
19   A.   No.
20   Q.   Because your search did not include PST
21 files for individuals Saletri and Andersen?
22   A.   Correct. And this does not reference any
23 of the claim information that we were given or
24 Mr. Hayes.

Page 47

1    Q.   At the bottom of Page AF 614, the
2  left-hand column we have another I think you were
3  calling it a document address. That's what we were
4  referring to on the designation of where a document
5  might be.
6    A.   Mm-hmm.
7    Q.   Is that a fair -- do you want to use that
8  term again?
9    A.   Yes.
10   Q.   So here at the bottom of 614 we have a
11 document address that begins with a D, colon.
12       Do you see that?
13   A.   Yes.
14   Q.   Do you know -- and then there's something
15 that's obviously a longer path that's indicated
16 here. We have dots, ellipses, and then other
17 e-mail to manager with a number to follow.
18       Do you see that?
19   A.   Yes.
20   Q.   Do you know where this other e-mail to
21 manager was saved?
22   A.   No, I do not.
23   Q.   Or where this -- I mean, D typically is a
24 drive of some kind, correct?

Page 48

1    A.   Correct.
2    Q.   It could be a disk. It could be a hard
3  drive designation. It's a drive of some kind?
4    A.   Correct.
5    Q.   Do you know where this drive is located?
6    A.   No, I do not because it could be mapped to
7  anywhere.
8    Q.   Did your search include a D drive of any
9  kind?
10   A.   Not to my knowledge. I would need more
11 information than what's contained in this page.
12   Q.   Such as?
13   A.   I don't -- I don't know what system this
14 came from. I don't know how this was put together,
15 if someone did a cut and paste.
16       (Discussion off the record.)
17   MR. HENNESSY: So whatever number we're up to
18 now.
19            (Whereupon, BASCH Deposition
20            Exhibit No. 6 was marked for
21            identification.)
22 BY MR. HENNESSY:
23   Q.   I'm going to hand you a document which has
24 been marked as Exhibit 6. Can you identify what

Page 49

1  this document is.
2    A.   This is a document that was created for
3  myself to give me the chronology of the events
4  pertaining to this suit.
5    Q.   Did --
6    MS. CROWLEY: As it pertain to the search.
7    THE WITNESS: The search. Yes.
8  BY MR. HENNESSY:
9    Q.   Did you create this document?
10   A.   No. A member of my staff did.
11   Q.   And who is that?
12   A.   Michael Kleckner.
13   Q.   K-l-e-c-k-n-e-r?
14   A.   Yes.
15   Q.   And this is a document that you --
16 Exhibit 6 is a document that you reviewed in
17 preparation of your testimony today?
18   A.   Yes.
19   Q.   And within Exhibit 6 is there anything
20 which appeared to you to be inaccurate?
21   A.   No.
22   Q.   We were talking about information that you
23 would need to help you figure out where
24 Document 614 contained within Exhibit 5 came from.

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 50

1    Did we finish up your answer there?
2    A.  Yes.
3    Q.  The search that you conducted that we
4  talked about with respect to Exhibit 1, that
5  included the server, that included 32 days worth of
6  backup for the server, and that it included an
7  electronic version of Mr. Hayes' personal PST file,
8  correct?
9    A.  Yes.
10   Q.  Did it also include the ICS system?
11   A.  No.
12   Q.  Is it the practice of American Family to
13 have its employees print e-mails for their
14 retention someplace else?
15   MS. CROWLEY:  Object to scope.  I'm sorry.  The
16 form of the question.  I think it goes beyond the
17 scope of your rider.
18   But you can answer the question over that
19 objection.  I know.  I'm getting tired.
20   THE WITNESS:  No.
21       (Whereupon, BASCH Deposition
22       Exhibit No. 7 was marked for
23       identification.)
24

Page 51

1  BY MR. HENNESSY:
2    Q.  You've been handed a document which is
3  marked Exhibit 7.  It appears to be a printed
4  e-mail -- an exchange of e-mail actually.  There's
5  an e-mail below a second one; is that fair?
6    A.  Yes.
7    Q.  And the date of the message at the top
8  September 10, 2010, correct?
9    A.  Yes.
10   Q.  If this -- and it appears to be a message
11 from Gerald Hayes of American Family, which is one
12 of the names from the rider, correct?
13   A.  Yes.
14   Q.  So this e-mail from Mr. Hayes at some
15 point in time would have appeared in Mr. Hayes'
16 sent items, just like the e-mail below it would
17 have appeared at some point in time in his inbox,
18 correct?
19   A.  Yes.
20   Q.  And 60 days from September 10, 2010,
21 unless Mr. Hayes did something to move this -- the
22 e-mail at the top of Exhibit 7 would have been
23 deleted?
24   A.  Yes.

Page 52

1    Q.  60 days from September 10 being roughly
2  November 10.  Your search was conducted after
3  November 10, correct?
4    A.  Correct.
5    Q.  So this suggests to you that this e-mail
6  would have been something kept in Mr. Hayes' PST
7  file which you would have searched?
8    A.  Say that again.
9    Q.  Well, subject to the 60-day automatic
10 deletion policy, if your search is conducted more
11 than 60 days after the date of mail, it wouldn't
12 have been in his inbox and it wouldn't have been in
13 his sent items, right?
14   A.  Correct.
15   Q.  It wouldn't have been in the deleted
16 items, right?
17   A.  Correct.
18   Q.  But we have it and it's been printed which
19 means it came from the PST file?
20   A.  That would be a logical assumption.  Yes.
21   Q.  Was there any other place it could have
22 been?
23   A.  Not to my knowledge.
24   Q.  Mr. Hayes did not provide his PST file in

Page 53

1  printed form.  You testified that a copy of it was
2  made.  It existed electronically.
3    A.  Correct.
4    Q.  In other words, AF 444 exists within
5  American Family electronically in some format?
6    A.  Yes.
7        (Whereupon, BASCH Deposition
8        Exhibit Nos. 8 & 9 were marked
9        for identification.)
10 BY MR. HENNESSY:
11   Q.  Handing you two documents which have been
12 marked Exhibit 8 and Exhibit 9.  Exhibit 8 Bates
13 Number AF 00195 appears to be nonletterhead version
14 of a letter dated October 8, 2008; is that a fair
15 characterization?
16   A.  Yes.
17   Q.  Okay.  And Exhibit 9, AF 00065, appears to
18 be the same letter except on letterhead and with a
19 little bit of handwritten in the middle of it or an
20 underline of words?
21   A.  Okay.
22   Q.  Is that fair?
23   A.  Yes.
24   Q.  On the upper left-hand side of Exhibit 8

14 (Pages 50 to 53)

Electronically signed by Tasha  Olivo (101-332-676-5946)                                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 54

1  there is a number designation begins with CCD.
2      A.   Yes.
3      Q.   Do you know what that means?
4      A.   No.
5      Q.   On the upper left-hand side of Exhibit 9
6  there's a similar -- not exactly the same, a
7  similar number letter designation, CCD.
8          Do you see that?
9      A.   Yes.
10     Q.   Do you know what that means?
11     A.   No, I do not.
12     Q.   Do either of those appear to be any
13  designation used by American Family in the
14  maintenance of its records?
15     A.   I do not know.
16              (Whereupon, BASCH Deposition
17              Exhibit No. 10 was marked for
18              identification.)
19  BY MR. HENNESSY:
20     Q.   I'm handing you a document marked
21  Exhibit 10, a multipage document that begins
22  AF 00646 and ends AF 00664 and all numbers pages in
23  between.
24     A.   Okay.

Page 55

1      Q.   Do you recognize the document marked
2  Exhibit 10?
3      A.   No, I do not.
4      Q.   Does Exhibit 10 appear to be something
5  that's maintained within the ICS system?
6      A.   I do not know.
7      Q.   We were talking about Exhibit 5 and the
8  document address which appeared at the bottom of
9  Page 1 of Exhibit 5.
10         Every time a document is printed from ICS,
11  does the document address show up in the lower
12  left-hand corner?
13     A.   I cannot say for sure, but based on the
14  information in the exhibit I would say yes.
15              (Whereupon, BASCH Deposition
16              Exhibit No. 11 was marked for
17              identification.)
18  BY MR. HENNESSY:
19     Q.   Handing you a document which has been
20  marked Exhibit 11, it appears to be a draft or a
21  nonletterhead version of a letter, correct?
22     A.   It appears so, yes.
23     Q.   And the letter is dated August 20, 2010,
24  from Gerald Hayes of American Family.

Page 56

1      A.   Yes.
2      Q.   Where would this document be stored or
3  retained or saved within American Family?
4      A.   I do not know.
5      Q.   When you conducted the search that we
6  talked about pursuant to Paragraph 2 of Exhibit 1
7  and the instructions you were provided, did that
8  search yield drafts of letters such as it appears
9  in Exhibit 11?
10     A.   If it was in the e-mail system, then it
11  would have.
12     Q.   So --
13     A.   Whether it's in a PST file or on the
14  system itself, it would have.
15     Q.   So the search was limited to Outlook in
16  one form or another; is that fair?
17     A.   Yes.
18     Q.   Did the search -- do American Family
19  employees have access to Microsoft Word or some --
20     A.   Yes.
21     Q.   -- similar type -- yes, they do?
22     A.   Yes.
23     Q.   Did the search you conducted for
24  communications or electronic information include

Page 57

1  Word documents?
2      A.   No, it did not.
3      Q.   The -- is there a written policy governing
4  the retention of Word documents on a central server
5  by American Family?
6      A.   It would fall subject to the corporate
7  retention policy.
8      Q.   And I'm not familiar -- I mean, I looked
9  at it a couple times, but do you know where within
10  here the corporate retention policy governs or
11  talks about Word documents?
12     A.   It would fall subject under the
13  Information Services' record retention schedule,
14  all records, the very first box.
15     Q.   I'm sorry.  So we're back to Exhibit 3
16  then?
17     A.   We're back to Exhibit 3.
18     Q.   Okay.
19     A.   Any records not listed on this schedule,
20  it would fall subject to a three-year retention
21  period if it resided on a centralized server or
22  storage device.
23     Q.   The individual personnel at American
24  Family have Microsoft Word or Office running on

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 58

1 their computers, correct?
2    A. Yes.
3    Q. And if it's running off of -- documents
4 are stored or saved to a central server?
5    A. No. Not always.
6    Q. The option exists to save them to a
7 central server?
8    A. The option does exist. Yes.
9    Q. The option exists to save it to your C
10 drive.
11    A. Correct.
12    Q. To your individual user computer.
13    A. Correct.
14    Q. If it is saved to a central server, it's
15 subject to this three-year retention policy?
16    A. Yes.
17    Q. So we should -- anything saved to the
18 central server which is an Word of Office
19 document -- we'll include Excel in there as well --
20 as of September 2011, we should have documents as
21 far back as September 2008, correct?
22    A. I would go under the assumption, yes.
23    Q. Is there a written policy governing
24 document retention where an individual employee is

Page 59

1 supposed to or required to keep copies of their
2 work on a central server and thus subject to the
3 three-year retention policy?
4    A. No.
5    Q. If an individual employee saves something
6 to their C drive, their individual computer, how
7 does the document policy -- document retention
8 policy address that situation?
9    A. It does not.
10    Q. Did you ask for or were you provided with
11 a copy of Mr. Hayes's C drive or the entirety of
12 his computer?
13    A. We have his hard drive stored in a vault.
14    Q. But the search was not of the entire hard
15 drive. It was only the Outlook component of it?
16    A. Correct.
17    Q. And that holds true for all the other
18 individuals listed in Paragraph 2 of Page 2 of
19 Exhibit 1?
20    A. No.
21    Q. Your searches did not include -- they were
22 limited to Outlook for these individuals. It
23 didn't include Microsoft Office.
24    A. Correct.

Page 60

1    Q. And thus we go back to Exhibit 11 again,
2 which appears to be a draft -- a nonletterhead
3 draft of a letter prepared by Mr. Hayes sent or to
4 be sent to Mr. Pearson dated August 20, 2010.
5    If this document was saved on the server,
6 the central server, on or about August 20, 2010,
7 your search wouldn't have found this, right?
8    A. Correct, because we searched e-mail. We
9 searched Outlook.
10    Q. Was the hard drive that you just talked
11 about that's in the safe, was that pulled out of a
12 desktop or a laptop?
13    A. I don't know. I would have to go and
14 check.
15    Q. Do you know how long --
16    A. Hold on. I can tell you. It was a
17 laptop.
18    Q. Do you know how long Mr. Hayes was using
19 that laptop?
20    A. No, I do not.
21    Q. Do you know if Mr. Hayes was using that
22 laptop in September 2008?
23    A. No, I do not.
24    Q. Did anybody ever ask Mr. Hayes if he had a

Page 61

1 different laptop in September 2008?
2    A. Not to my knowledge.
3    Q. Did anybody ask Mr. Hayes if he had a
4 desktop in 2008?
5    A. Not to my knowledge.
6    Q. Did anybody ask Mr. Hayes if he used a
7 desktop at any time since 2008?
8    A. Not to my knowledge.
9    Q. So we have one hard drive that came out of
10 a laptop?
11    A. That was assigned to him, yes.
12    Q. Do you know when it was assigned to him?
13    A. I could get that information. I don't
14 have it with me.
15    Q. Have you -- go back a second, Exhibit 2.
16    I know you testified that you -- I
17 understand that you said you have not seen
18 Exhibit 2. I just want to direct you to the
19 response to Paragraph 1. Midway through there's a
20 range -- a Bates range identified AF 0001 to
21 AF 00883.
22    Do you see that?
23    A. Yes.
24    Q. Have you ever reviewed documents --

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 62

1  besides today, have you ever reviewed documents
2  which comprised that entire range of documents?
3       Has anyone ever provided to you 884 pieces
4  of paper with those numbers on them sequentially
5  for you to look at?
6     A.  To me specifically as Tina Basch or to me
7  as American Family?
8     Q.  To you, Tina Basch.
9     A.  No.
10    Q.  The ICS folder or file or however --
11 whatever term you want to use to designate the
12 ICS -- the portion of ICS designated to this claim?
13    A.  Yes.
14    Q.  File or folder?
15    A.  File.
16    Q.  The ICS file still exists?
17    A.  To my knowledge, yes.
18    Q.  Is that because it's an open claim or...
19    A.  I would -- I would say there's probably a
20 hold on it, so it would exist for that.  It would
21 also exist because it's an open file.
22    Q.  And the notes which appear, as an example,
23 at least within Exhibit 5, Pages 639, as an
24 example, 640, as an example, those -- ICS notes for

Page 63

1  claim, are these saved in the same file?
2     A.  They would be -- it appears to be with the
3  same file or associated to that file.
4     Q.  And, likewise, those similarly still
5  exist?
6     A.  Yes.
7     Q.  As part of the search that was
8  conducted -- and when I refer to the search, you
9  know what I'm talking about, correct?
10    A.  Yes.
11    Q.  As part of the search that was conducted
12 were any of the individuals identified within
13 Paragraph 2A through G, were any of them contacted
14 by you, Tina Basch, or anybody that you designated
15 to complete the search to determine what paper
16 electronic records they had in their possession?
17    A.  Not to my knowledge.
18    Q.  And the only people that carried out the
19 search, that was you and the team of people
20 assigned to you.  Those were the only individuals
21 within American Family that conducted this search?
22    A.  I had members of another team as part of
23 the information gathering.
24    Q.  Which team was that?

Page 64

1     A.  The E-Mail Team.  The E-Mail Support Team.
2     Q.  Is the E-Mail Support Team within this
3  Information Services Department?
4     A.  Yes.  Yes.
5     Q.  Was there a different support team or
6  services team, not the E-Mail Support Team, that's
7  also within Information Services that was helping
8  you?
9     A.  Members of the Desktop Team as well.
10    Q.  So we have a Desktop Team.  We have an
11 E-Mail Support Team.  Anything else?
12    A.  And my team.
13    Q.  And who is that?
14    A.  That would be Information Security.
15    Q.  And then the Desktop Team, E-Mail Support
16 Team, and Information Security Team are all under
17 the umbrella of Information Services?
18    A.  Yes.
19    Q.  Did anybody from American Family besides
20 Information Services conduct a search for
21 information as that -- as that phrase is described
22 in Exhibit 1, Page 2, Paragraph 2?
23    A.  Claims Legal would have as well.
24    Q.  What was the extent of the search

Page 65

1  conducted by Claims Legal?
2     A.  I do not know.
3     MS. CROWLEY:  I'll object to the extent it
4  involves attorney/client privilege.
5  BY MR. HENNESSY:
6     Q.  Did anybody from Information Services as a
7  part of their conducting of the search contact any
8  of the individuals identified on Page 2,
9  Paragraph 2, of Exhibit 1 to determine what records
10 were in their possession?
11    A.  No.
12    MS. CROWLEY:  Asked and answered.
13    Go ahead.
14    THE WITNESS:  No.
15 BY MR. HENNESSY:
16    Q.  At what point did -- or did it ever come
17 to your attention that there was e-mails sent by
18 and sent to Mr. Hayes that American Family no
19 longer has a record of?
20    A.  Not to my knowledge.  I don't know.
21         (Whereupon, BASCH Deposition
22          Exhibit No. 12 was marked for
23          identification.)
24

17 (Pages 62 to 65)

Page 66

BY MR. HENNESSY:
1
2   Q.  I'll hand you a document that's been
3   marked as Exhibit 12.  It appears to be an e-mail
4   from Jerry Wolowicki to Gerald Hayes copied to
5   Mike Stopka.
6       Do you see that?
7   A.  Yes.
8   Q.  And it would appear to be an e-mail that
9   was printed by Mike Stopka because that's the name
10  that appears in the upper left-hand corner
11  underneath (sic) the solid black line.
12      Is that your familiarity with printed
13  e-mail from Outlook?
14  A.  Yes.
15  Q.  So it's an e-mail to Gerald Hayes dated
16  April 6, 2009, documented at -- or a document
17  identified as STP 00235, dash, A.
18  A.  Okay.
19  Q.  And, I mean, we can both look through the
20  AF 0001 to AF 00883, the documents produced by
21  American Family, to confirm this, but the document
22  marked as Exhibit 12 does not appear within those
23  pages.
24  A.  Okay.

Page 67

1   Q.  So there's an e-mail received by
2   Gerald Hayes that would then appear to no longer be
3   kept by American Family.
4   A.  So a few things.  One, Gerald Hayes'
5   e-mail address is not associated.  When the name
6   appears in quotes, that's just text.  I don't have
7   an associated e-mail with Mr. Hayes.  I don't have
8   any header information stating that this was
9   actually even sent to Mr. Wolowicki.  I don't have
10  any header information to speak to that even
11  Mr. Stopka received this.  So I cannot say.
12  Q.  Okay.
13          (Whereupon, BASCH Deposition
14          Exhibit No. 13 was marked for
15          identification.)
16  BY MR. HENNESSY:
17  Q.  Handing you a document which has been
18  marked Exhibit 13, Bates STP 00469.  It appears to
19  be two e-mails.  The first an e-mail from
20  Mr. Wolowicki to Gerald Hayes copying Mike Stopka
21  dated March 19 and above that an e-mail from
22  March 20 from Gerald Hayes revealing an e-mail
23  address of ghayes@amfam.com to Jerry Wolowicki,
24  subject, Stopka fire loss, text, slight change in

Page 68

1   plans.  I'll be there early afternoon.
2   A.  Okay.
3   Q.  And, again, it would appear that this was
4   an e-mail printed by Mr. Wolowicki given the bold
5   letters at the top of the page underneath the --
6   above the first line, typical for printing of an
7   e-mail from Outlook, correct?
8   A.  Yes.
9   Q.  So this would appear to be an e-mail from
10  Mr. Hayes at ghayes@amfam.com to a Mr. Wolowicki,
11  correct?
12  A.  Yes.
13  Q.  And so the issue associated with
14  Mr. Hayes' e-mail address in quotes on Exhibit 12
15  doesn't appear to be an issue here.  In fact, this
16  is an e-mail that would have been sent by Mr. Hayes
17  as his e-mail address is revealed on Exhibit 13,
18  correct?
19  A.  Yes.
20  Q.  And so, similarly, with respect to
21  Exhibit 12, we can go through AF 00001 to AF 00883
22  to determine whether Exhibit 13 exists within that
23  and it doesn't.
24      And so I'll ask you the question.  This

Page 69

1   would appear to be an e-mail sent by Mr. Hayes that
2   American Family no longer has record of.
3   A.  Yes.  That's possible.
4   Q.  Do you have an explanation for why
5   American Family no longer has a record of
6   Exhibit 13 as sent by Mr. Hayes?
7   A.  It fell outside of the 60-day retention
8   policy and was deleted.
9   Q.  And otherwise it also doesn't appear
10  within Mr. Hayes' PST file?
11  A.  If he did not save it, it would not appear
12  there.
13  Q.  Go back to Exhibit 1.  This has our list
14  of our names here.
15  A.  Okay.
16  Q.  That's this one.
17  A.  Okay.
18  Q.  I want to make sure I understand your
19  testimony today on behalf of American Family.
20      It's not your testimony that e-mail from
21  the individuals listed, 2B through 2G, doesn't
22  exist; it's your testimony that e-mail from
23  individuals of 2B through 2G did not fall within
24  your search unless it had Mr. Hayes name in it.

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 70

1    A.  Correct.
2    Q.  The maintenance of the ICS system is
3  outside the scope of your knowledge as a witness?
4    A.  Yes.
5    Q.  The entry of information into the ICS
6  system similarly is outside the scope of your
7  knowledge as a witness?
8    A.  Correct.
9    Q.  The retention policy applicable to the ICS
10  system is outside of your knowledge as a witness?
11    A.  From a business process standpoint, yes.
12    Q.  I'm not sure I understand that.
13    A.  So the business of Claims as a division,
14  as an entity, they have a set -- they have their
15  schedule of data retention.  Okay.  From an IS
16  perspective, which is aligned, I have scope there.
17  I do not from a business process standpoint.
18    Q.  So --
19    A.  So if the business says retain for five
20  years, IS must make sure our systems maintain for
21  five years.  I'm not coming back from an IS
22  perspective saying, no, two years.  The business
23  tells me.  It's a business process.
24    Q.  Okay.  Are you -- specifically that

Page 71

1  business process applicable to claims, that's
2  outside the scope of your --
3    A.  Yes.
4    Q.  -- knowledge as a witness?
5    A.  Yes.
6    Q.  And so the specific policy with respect to
7  those -- the retention of those ICS records or the
8  claim notes in ICS is similar then, outside of your
9  scope of knowledge as a witness?
10    A.  Yes.
11    Q.  Apart from -- apart from -- Outlook is a
12  part of Microsoft Office, so let's lump out looking
13  at Office, you know, Word, Excel, everything
14  associated with Office.
15    A.  Okay.
16    Q.  That would include Outlook.
17        Apart from Microsoft Office and the ICS
18  system, is there any other place where information
19  would be stored or kept by American Family?
20    A.  The ICS is the repository for information
21  regarding claims, so I would say no.  If we're
22  taking Office products off the table, so we're not
23  looking at Microsoft Word or Excel or anything, I
24  would say no.  It would all be in ICS.

Page 72

1    Q.  Well, we've seen some example of where it
2  appeared as though somebody might have taken --
3  might have cut and pasted from an Outlook e-mail
4  into ICS, right?
5    A.  Correct.
6    Q.  But that would be a user election?
7    A.  Correct.
8    Q.  We don't have a policy on that?
9    A.  Correct.
10    Q.  So that's an example of something that at
11  one point in time existed in two places?
12    A.  Yes.
13    Q.  So we have the Office universe and we have
14  the ICS universe.  My question is is there anything
15  else.  Is there any other place?
16    A.  Not to my knowledge.
17    Q.  So if you were going to attempt to locate
18  all information regarding a specific claim by claim
19  number or by some other definitive designation, you
20  would be searching the server?
21    A.  I would be searching e-mail server; I
22  would be searching the local PC or laptop for a PST
23  file; I would be searching the ICS system; and if
24  we throw in the Microsoft Word products, the

Page 73

1  product or Excel, I would search the hard drives of
2  the local machines.
3    Q.  Well, in order to comprehensively search
4  Office, you would have to include the server as
5  well, right?  I mean, isn't there a server --
6    A.  It would be your home directory or your
7  Word doc.  So it could be on a server, a storage
8  device.  Yes.
9    Q.  So you would have to search that as well?
10    A.  Yes.
11    Q.  So you would be searching the server for
12  both e-mail and Office -- in other words, Office
13  not Outlook, right?
14    A.  Yeah.
15    Q.  And then it would be searching local
16  computers either for a PST file or the C drive or
17  just the local drive to see whether anything was
18  saved --
19    A.  Yes.
20    Q.  -- of an Office product, not Outlook, on
21  the individual computer.
22    A.  Yes.
23    Q.  And then you'd also be searching the ICS
24  system.

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha  Olivo (101-332-676-5946)                    93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 74

1    A.   Yes.
2    Q.   And that would be a comprehensive search
3  for all communications associated with a particular
4  claim?
5    A.   Define communications.
6    Q.   E-mail.  Letter.
7    A.   Okay.
8    Q.   Would you agree that a letter is
9  communication?
10   A.   After the act of sending it, yes.
11   Q.   And would it encompass a draft of a
12 letterer?
13   A.   That's a document.  If it -- it may have a
14 format of a letter, but it's a document.  That's
15 not a communication until it's sent.
16   Q.   The are you familiar with the phrase
17 electronically stored information?
18   A.   Yes.
19   Q.   What does electronically stored
20 information mean to you?
21   A.   It means information stored in a digital
22 format.
23   Q.   The draft letter before it is sent before
24 it becomes a communication under your definition,

Page 75

1  would that qualify as electronically stored
2  information?
3    A.   Yes.
4    Q.   Did the search conducted as set out in
5  Exhibit 1 include a search for all electronically
6  stored information?
7    A.   Not by my team.
8    Q.   Was that search conducted by a different
9  team?
10   A.   I would have to validate with the Legal
11 Claims Department.
12   Q.   Meaning?
13   A.   I don't know.  I would have to ask them.
14   Q.   Apart from -- I may have asked this
15 already, and I apologize if I did.
16       Apart from your team and the Legal Claims
17 or Claims Legal Team, did any other team conduct a
18 search for electronically stored information?
19   A.   No.
20   Q.   The setting aside temporarily at least --
21 I'm not asking you to disclose -- at this point in
22 time I'm not asking you to disclose the substance
23 of any e-mail communication you had with
24 Mr. Steffel.  My question is about the fact of

Page 76

1  communication and not the substantive of the
2  communication.  Okay?
3        The request that you talked about that you
4  received in e-mail from Mr. Steffel, did you
5  receive more than one request from him?
6    A.   I believe there were two.  One was the
7  original request to search the names and that was
8  in March; and then subsequently there was a request
9  to add, I believe, two or three additional names as
10 it related to communications with Mr. Hayes and
11 that was in July.
12   Q.   In your responses to Mr. Steffel -- did
13 you respond to those messages from Mr. Steffel?
14   A.   My team did.
15   Q.   Somebody within the group?
16   A.   Somebody within my organization responded
17 acknowledging the request and then began taking
18 action on doing the search.
19   Q.   Were you -- you were -- were you
20 individually the recipient?
21   A.   No, I was not.
22   Q.   The e-mail from Mr. Steffel, did it come
23 only to Tina Basch or did --
24   A.   No, it did not.

Page 77

1    Q.   -- it go to other people as well?
2    A.   It went to a member of my staff,
3  Mr. Kleckner.
4    Q.   Who then made you aware of it?
5    A.   Yes.
6    Q.   By forwarding the message to you?
7    A.   By conversation in a meeting.
8    Q.   The e-mail requests -- the e-mail exchange
9  between Mr. Steffel or anyone in Claims Legal and
10 your team, whoever would encompass your team, have
11 those e-mails --
12   A.   I have not seen those e-mails.
13   Q.   Are you aware if they have been retained
14 or if they have been deleted subject to the
15 deletion policy?
16   A.   I do not know at this time.
17   Q.   Did your team receive messages from
18 anybody else in Claims Legal besides Mr. Steffel on
19 this subject?
20   A.   I do not know.  I know Claims Legal has an
21 individual that helps in the coordination of
22 gathering information.  I do not know the level of
23 involvement he had with us.
24   Q.   Back to Exhibit 4, the corporate retention

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)                          93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 78

1 policy, Page 4 of 5.
2     There are a series of bullet points
3 starting from the top. The first being all records
4 shall be retained for the periods required by
5 applicable State and Federal laws and regulations.
6     Do you see that?
7   A. Yes.
8   Q. What are the applicable periods of State
9 and Federal laws and regulations governing records
10 kept by American Family?
11   A. I do not know off the top of my head. I
12 would have to go look that up.
13   Q. At the bottom of Page 1 of Exhibit 4 there
14 is another document address.
15   A. Yes.
16   Q. This one that begins with
17 compass.amfam.com?
18   A. Yes.
19   Q. What is Compass?
20   A. That's our intranet site.
21   Q. Intranet?
22   A. Intranet.
23   Q. What is saved on the intranet site?
24   A. The intranet site is a resource to all

Page 79

1 employees and contractors for the latest
2 information, for divisional updates, all policies
3 and procedures, organizational structures. It
4 provides links to timekeeping systems for
5 managerial systems for performance reviews and
6 things of that nature, and it provides a link to
7 all training courses and things of that nature.
8 It's a resource to everyone at American Family.
9   Q. Information and documents governing the
10 day-to-day operation of the business?
11   A. Yes. So if I wanted to look up your
12 period required by applicable State and Federal
13 laws, I would go to Compass to search for that
14 information. If I could not find it for some
15 reason, I would then go to our Corporate Compliance
16 Department and ask them because at the very top of
17 Exhibit 4 it says it's basically the ownership of
18 the American Family Corporate Compliance Department
19 and Legal Division. They manage this document.
20   Q. We were talking a couple minutes ago about
21 electronically stored information, information
22 being stored in a digital format.
23   A. Yes.
24   Q. Does ICS fall within electronically stored

Page 80

1 information?
2   A. Yes.
3   Q. The requests that you received with
4 respect to the search was -- that was the -- the
5 basis by which you conducted the search, the
6 parameters used to conduct the search?
7   A. Yes.
8   Q. Trying to describe it in a way that you'll
9 understand what I'm saying, the criteria used for
10 the search, the sole source of that information was
11 contained in the communications from Mr. Steffel?
12   A. Yes.
13   MR. HENNESSY: I think those are all the
14 questions I have.
15   MS. CROWLEY: We'll reserve signature.
16   (Off the record at 4:27 p.m.)
17   FURTHER DEPONENT SAITH NAUGHT
18
19
20
21
22
23
24

Page 81

1     IN THE UNITED STATES DISTRICT COURT
2     NORTHERN DISTRICT OF ILLINOIS
3     EASTERN DIVISION
4 MICHAEL STOPKA, MARILYN   )
  STOPKA, and CHATEAU     )
5 ARLINGTON, LLC,       )
    Plaintiffs,     )
6               )
  vs.        ) No. 10 CV 6034
7               )
AMERICAN FAMILY MUTUAL  )
8 INSURANCE COMPANY, INC., a  )
  Wisconsin Corporation,    )
9     Defendant.     )
10     This is to certify that I have read the
11 transcript of my deposition taken in the
12 above-entitled cause by TASHA OLIVO, Certified
13 Shorthand Reporter, on September 7th, 2011, and
14 that the foregoing transcript accurately states the
15 questions asked and the answers given by me as they
16 now appear.
17
18     _____
         TINA BASCH
19
20 SUBSCRIBED AND SWORN TO
21 before me this _____ day
22 of _____, 2011.
23 _____
24     Notary Public

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

Electronically signed by Tasha Olivo (101-332-676-5946)        93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

Page 82

1　STATE OF ILLINOIS  )
2　　　　　　　　　　) SS:
3　COUNTY OF C O O K  )
4　　　I, TASHA OLIVO, Certified Shorthand
5　Reporter in the State of Illinois, do hereby
6　certify that heretofore, to-wit, on the 7th day of
7　September 2011, personally appeared before me TINA
8　BASCH, a witness in a certain cause now pending and
9　undetermined in the United States District Court,
10　Northern District of Illinois, Eastern Division,
11　wherein MICHAEL STOPKA, MARILYN STOPKA, and CHATEAU
12　ARLINGTON, LLC, are the Plaintiffs and AMERICAN
13　FAMILY MUTUAL INSURANCE COMPANY, INC., a Wisconsin
14　Corporation, is the Defendant.
15　　　I further certify that the said TINA BASCH
16　was by me first duly sworn to testify the truth,
17　the whole truth, and nothing but the truth in the
18　cause aforesaid; that the testimony then given by
19　said witness was reported stenographically by me in
20　the presence of said witness and afterwards reduced
21　to typewriting by Computer-Aided Transcription, and
22　the foregoing is a true and correct transcript of
23　the testimony so given by said witness as
24　aforesaid.

Page 83

1　　　　I further certify that the signature to
2　the foregoing deposition was not waived by counsel
3　for the respective parties.
4　　　　I further certify that the taking of this
5　deposition was pursuant to notice and that there
6　were present at the deposition the attorneys
7　hereinbefore mentioned.
8　　　　I further certify that I am not counsel
9　for nor in any way related to the parties to this
10　suit, nor am I in any way interested in the outcome
11　thereof.
12　　　　IN TESTIMONY WHEREOF, I have hereunto set
13　my hand and affixed my notarial seal this 12th day
14　of September, 2011.
15
16
17
18　　　_____
19　　　NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20
21
22
23
24

Page 84

1　　　McCORKLE COURT REPORTERS, INC.
　　　200 North LaSalle Street, Suite 300
2　　　　Chicago, Illinois  60601-2956
　　　　　　(312) 263-0052
3
　DATE:  September 12th, 2011
4
　PRETZEL & STOUFFER, CHTD.
5　ATTN:  MS. SUZANNE M. CROWLEY
　One South Wacker Drive, Suite 2500
6　Chicago, Illinois  60606
7　IN RE:  STOPKA, v. AMERICAN FAMILY
　　COURT NUMBER:  10 CV 6034
8　DATE TAKEN:  September 7th, 2011
　DEPONENT:  TINA BASCH
9
　Dear Ms. Crowley
10
　Enclosed is the deposition transcript for the
11　aforementioned deponent in the above-entitled
　cause.  Also enclosed are additional signature
12　pages, if applicable, and errata sheets.
13　Per your agreement to secure signature, please
　submit the transcript to the deponent for review
14　and signature.  All changes or corrections must be
　made on the errata sheets, not on the transcript
15　itself.  All errata sheets should be signed and all
　signature pages need to be signed and notarized.
16
　After the deponent has completed the above, please
17　return all signature pages and errata sheets to me
　at the above address, and I will handle
18　distribution to the respective parties.
19　If you have any questions, please call me at the
　above phone number.
20
21　Sincerely,
22　Margaret Setina　　　Court Reporter:
　Signature Department　Tasha Olivo, CSR, RPR
23　cc:  Mr. Hennessy
24

McCorkle Court Reporters, Inc.
Chicago, Illinois    (312) 263-0052

Electronically signed by Tasha  Olivo (101-332-676-5946)　　　　　　　　　93e06914-628b-4ff8-ac8a-2fbfeed0d7d8

**A**

able 8:23,23
above-entitled 81:12
84:11
access 12:5 35:24 36:1
36:6 56:19
account 44:5
accurately 81:14
acknowledging 76:17
act 74:10
action 76:18
actual 30:12
add 76:9
added 18:12
addition 5:3
additional 37:1 76:9
84:11
additions 35:1,21
address 15:14,20 16:7
33:22,23,24 34:4,9
40:4 47:3,11 55:8,11
59:8 67:5,23 68:14,17
78:14 84:17
addressed 29:20
AF 27:18,20 32:2 36:12
36:23 45:2 47:1 53:4
53:13,17 54:22,22
61:20,21 66:20,20
68:21,21
affixed 83:13
aforementioned 84:11
aforesaid 82:18,24
afternoon 16:16,22
68:1
ago 79:20
agree 74:8
agreement 84:13
ahead 65:13
Alice 11:10
aligned 18:24 30:22
70:16
allow 9:24
American 1:8 4:7 6:8
6:19,23 7:11 8:7,10
8:20,24 9:1 10:4
11:17 14:3,20 17:23
18:16 19:8 21:21 22:4
22:7,8,16,19 23:2,9
26:20 27:5 28:24 29:8
29:21 32:24 38:15
39:8,12 40:1,3 50:12
51:11 53:5 54:13
55:24 56:3,18 57:5,23
62:7 63:21 64:19
65:18 66:21 67:3 69:2
69:5,19 71:19 78:10
79:8,18 81:7 82:12
84:7

**amfam.com** 40:5,7 41:7
Andersen 10:18 11:5
45:6 46:4,6,9,21
answer 10:16 14:7 50:1
50:18
answered 65:12
answering 4:24 6:24
answers 8:14 81:15
anybody 33:4 60:24
61:3,6 63:14 64:19
65:6 77:18
apart 25:11 71:11,11
71:17 75:14,16
apologize 75:15
appear 10:10 25:19
36:22 46:8,9 54:12
55:4 62:22 66:8,22
67:2 68:3,9,15 69:1,9
69:11 81:16
appearance 25:18,20
APPEARANCES 2:1
appeared 16:8,24 49:20
51:15,17 55:8 72:2
82:7
appearing 13:9
appears 25:14 28:7,10
33:20 35:15 36:15,24
45:4 46:1,3 51:3,10
53:13,17 55:20,22
56:8 60:2 63:2 66:3
66:10 67:6,18
applicable 31:15 70:9
71:1 78:5,8 79:12
84:12
application 34:22
applies 26:21
apply 30:16 41:14
April 66:16
area 30:6
arguably 24:24
ARLINGTON 1:6 81:5
82:12
articles 29:16
articulate 4:21
aside 25:19 75:20
asked 12:21,24 65:12
75:14 81:15
asking 4:23 46:5 75:21
75:22
assigned 61:11,12
63:20
associated 12:4 13:4
15:20 63:3 67:5,7
68:13 71:14 74:3
assumption 26:8 52:20
58:22
attempt 72:17
attending 7:19

**attention** 65:17
ATTN 84:5
attorney 4:15 5:4 6:3
10:2
attorneys 83:6
attorney/client 9:24
65:4
audits 12:6
August 55:23 60:4,6
Augustine 7:17
authority 36:2
automatic 52:9
automatically 41:4
43:19
available 29:1,2,3
32:21
aware 77:4,13

**B**

B 3:7 9:8 10:15 24:15
back 5:7 8:17 9:8 10:8
13:15 23:12 24:22
31:20 35:1 36:13
38:22 40:24 45:1
57:15,17 58:21 60:1
61:15 69:13 70:21
77:24
backed 40:13,20 41:21
41:22
backup 40:21,21 44:16
50:6
backups 42:2,4 43:7,8
43:8,21 44:13
Basch 1:12 3:3,9 4:4,6
5:14,17 6:18 7:22
15:1 16:17 27:10
48:19 50:21 53:7
54:16 55:15 62:6,8
63:14 65:21 67:13
76:23 81:18 82:8,15
84:8
based 35:15 37:1 55:13
basically 29:14 79:17
basis 80:5
Bates 27:17,17 53:12
61:20 67:18
began 76:17
begins 32:2,8 47:11
54:1,21 78:16
behalf 6:6 7:11 8:20,24
69:19
believe 13:14 16:14
29:4 30:24 32:22
34:16 38:20 41:23
42:1 76:6,9
best 4:21 22:1
better 21:2
beyond 50:16

**bit** 11:16 20:5 53:19
black 66:11
body 14:18
bold 68:4
bottom 25:20 33:20
37:6,7 45:3 46:5 47:1
47:10 55:8 78:13
box 26:11 57:14
boxes 33:14,16
bring 39:14
brought 16:15,21 17:4
BULGER 2:2
bullet 78:2
business 31:18,19
34:22 70:11,13,17,19
70:22,23 71:1 79:10
B-a-s-c-h 4:4

**C**

C 22:6,16 26:17 58:9
59:6,11 73:16 82:3
call 7:17 10:21 33:21,22
84:19
called 1:12 5:18 6:2
22:23 34:11,12
calling 47:3
campaign 39:20
capture 37:2 46:1
carried 63:18
carry 45:4
case 6:8
catchall 19:19
cause 81:12 82:8,18
84:11
caution 9:20 12:22
cc 84:23
CCD 54:1,7
centers 33:11
central 24:6 57:4 58:4,7
58:14,18 59:2 60:6
centralized 33:10 57:21
centrally 33:8
certain 8:11 17:17 82:8
Certified 1:16 81:12
82:4
certify 81:10 82:6,15
83:1,4,8
chance 7:3 22:2
change 67:24
changes 35:21 84:14
characterization 53:15
CHATEAU 1:6 81:4
82:11
cheat 42:20,21
check 60:14
Chicago 1:18 2:5,13
84:2,6
choose 30:8

**CHRISTOPHER** 2:3
christopher.hennessy...
2:7
chronology 42:7 49:3
CHTD 2:10 84:4
circulated 28:23
Civil 1:13
claim 13:6,8 14:4,8,13
14:16,21 15:10,20
16:12 26:21,24 27:8
31:9,9 32:18 34:5
35:4,13,16,20,22
36:19 38:16,16 39:9
45:17,17 46:23 62:12
62:18 63:1 71:8 72:18
72:18 74:4
claims 9:11,12 18:22
19:9,13,24 21:3 26:23
27:5 28:12 29:17,19
29:19,20,24 30:11,18
31:2,2,9,13,17 32:16
33:3,4 34:12,15 35:8
35:10 36:10 38:22
64:23 65:1 70:13 71:1
71:21 75:11,16,17
77:9,18,20
cleans 41:10,17
closed 26:21
code 30:5
collectively 24:5
colon 47:11
column 47:2
come 65:16 76:22
comes 29:19 31:8
coming 26:11 29:12
31:1 37:1 70:21
comments 37:9
commercially 32:20
communicated 39:17
communication 39:2,20
74:9,15,24 75:23 76:1
76:2
communications 56:24
74:3,5 76:10 80:11
company 1:9 6:5,6
11:24 20:23 39:18
81:8 82:13
companywide 18:17,19
company's 8:8 29:3
Compass 78:19 79:13
compass.amfam.com
78:17
complete 37:4 63:15
completed 84:16
Compliance 79:15,18
component 59:15
comprehensive 74:2
comprehensively 73:3

comprised 62:2
computer 17:14 25:9
  44:3 58:12 59:6,12
  73:21
computers 58:1 73:16
Computer-Aided 82:21
computer-related 12:2
concerning 8:23 9:1
condition 44:22
conduct 15:6 64:20
  75:17 80:6
conducted 8:20 9:1
  10:13,19,23 11:11
  14:24 23:13 24:3 39:1
  39:2 44:11 45:11,20
  50:3 52:2,10 56:5,23
  63:8,11,21 65:1 75:4
  75:8 80:5
conducting 65:7
confirm 17:3 66:21
conjunction 10:15
consistent 21:7
consisting 27:16
contact 65:7
contacted 63:13
contained 24:18 27:23
  35:22 41:14 48:11
  49:24 80:11
contractors 79:1
controls 12:6 35:24
  36:1,7
conversation 77:7
COOK 83:19
coordination 77:21
copied 21:12 42:22 66:4
copies 16:23,24 17:3
  42:17 59:1
copy 13:11 26:15 27:6
  28:13 53:1 59:11
copying 67:20
corner 27:17 28:3
  36:18 55:12 66:10
corporate 20:7,10,14
  20:24 21:1,20 30:16
  30:21,22,24 33:11
  57:6,10 77:24 79:15
  79:18
Corporation 1:9 81:8
  82:14
correct 8:15 10:9,11
  13:22,24 15:11,15
  16:13 18:2 20:12 21:8
  24:11,13,24 25:6,16
  25:17,23 27:3 28:9
  30:21 31:16 32:5
  37:20 41:4,19 43:21
  44:6 45:18 46:22
  47:24 48:1,4 50:8

51:8,12,18 52:3,4,14
  52:17 53:3 55:21 58:1
  58:11,13,21 59:16,24
  60:8 63:9 68:7,11,18
  70:1,8 72:5,7,9 82:22
corrections 84:14
correctly 22:8 41:13
counsel 7:17 83:2,8
COUNTY 82:3 83:19
couple 4:14 57:9 79:20
course 6:17
courses 79:7
court 1:1 4:17,18,22 8:3
  81:1 82:9 84:1,7,21
Courts 1:14
create 35:6 49:9
created 36:5 37:8 38:17
  38:18 42:15 49:2
creates 33:2
criteria 80:9
Crowley 2:11 9:19
  12:22 14:6 32:4 37:18
  37:21 40:17 42:19
  49:6 50:15 65:3,12
  80:15 84:5,9
CSR 1:23 84:22
current 17:23 21:20
Custom 7:17
customer 11:24
cut 28:7 48:15 72:3
CV 1:7 81:6 84:7
C02968 45:23

**D**

D 3:1 47:11,23 48:8
damage 45:23
dash 37:8,8,24 38:1
  66:17
data 11:23 12:1 33:11
  39:7 70:15
date 21:10,10,13,15,18
  51:7 52:11 84:3,8
dated 37:24 53:14
  55:23 60:4 66:15
  67:21
dates 19:12
day 1:18 29:16 30:7
  41:10 43:23,24 44:20
  81:21 82:6 83:13
days 22:10 27:2 41:3,18
  42:1,2 43:9,10 44:18
  44:23,24 50:5 51:20
  52:1,11
day-to-day 79:10
Dear 84:9
December 17:20
Defendant 1:10 2:16
  81:9 82:14

Define 74:5
definition 74:24
definitive 72:19
delete 36:4 41:16
deleted 22:10,12,14
  25:6 41:4,15,18,18
  43:19,24 51:23 52:15
  69:8 77:14
deleting 43:5
deletion 41:6 43:18,18
  44:7 52:10 77:15
deliver 30:9
delivered 29:23 30:17
delving 12:15
department 9:11 17:16
  18:15,22,22 19:9 21:3
  34:18 39:1,23 64:3
  75:11 79:16,18 84:22
departments 18:15
Department's 19:13
deponent 80:17 84:8,11
  84:13,16
deposition 1:12 3:9 4:6
  4:12 5:14 6:7,10,22
  7:19,22 16:17,22
  27:10 42:10 48:19
  50:21 53:7 54:16
  55:15 65:21 67:13
  81:11 83:2,5,6 84:10
depositions 1:15 4:11
describe 33:20 80:8
described 64:21
designate 33:19 35:5
  62:11
designated 4:6 6:9 7:12
  12:12,13 14:22 30:10
  35:5,16 41:9 62:12
  63:14
designation 6:4 15:17
  32:10 34:7,8 35:14
  38:18 47:4 48:3 54:1
  54:7,13 72:19
desktop 60:12 61:4,7
  64:9,10,15
destruction 20:23
details 14:11 37:4 42:8
determination 36:7
determine 63:15 65:9
  68:22
device 57:22 73:8
different 13:24 24:21
  36:16 61:1 64:5 75:8
differential 40:21
digital 74:21 79:22
direct 61:18
directed 6:22
director 11:19
directory 34:10 73:6

disclose 75:21,22
Discussion 5:2 48:16
discussions 9:21 12:16
disk 48:2
Disks 41:22
distribution 84:18
District 1:1,2,14 81:1,2
  82:9,10
division 1:3 18:20 19:1
  38:23 70:13 79:19
  81:3 82:10
divisional 79:2
divisions 34:14
division's 21:6
doc 73:7
document 5:12,22,24
  8:2,4,6 17:7 18:2
  27:14 28:6 31:6 33:22
  33:23,24 34:4,12,13
  36:16,17 37:13 42:5
  47:3,4,11 48:23 49:1
  49:2,9,15,16,24 51:2
  54:20,21 55:1,8,10,11
  55:19 56:2 58:19,24
  59:7,7 60:5 66:2,16
  66:21 67:17 74:13,14
  78:14 79:19
documentation 9:4
documented 66:16
documents 8:9,11,21
  8:22 9:2 16:21,23
  17:2 27:16,23 53:11
  57:1,4,11 58:3,20
  61:24 62:1,2 66:20
  79:9
doing 6:8 76:18
dots 47:16
draft 55:20 60:2,3
  74:11,23
drafts 56:8
drive 1:17 2:4,12 47:24
  48:3,5,8 58:10 59:6
  59:11,13,15 60:10
  61:9 73:16,17 84:5
drives 73:1
duly 5:18 82:16
duration 17:17
duties 11:21

**E**

E 3:1,7
early 68:1
Eastern 1:3 81:3 82:10
effect 18:9 21:24
either 4:23 7:8 14:4
  23:6 24:24 26:19 27:4
  30:8 45:17 54:12
  73:16

election 72:6
electronic 9:6 17:12
  18:24 20:6 26:14,15
  39:7 50:7 56:24 63:16
  75:18 79:21,24
electronically 29:9 53:2
  53:5 74:17,19 75:1,5
  75:18 79:21,24
ellipses 47:16
employee 40:3 58:24
  59:5
employees 23:3 50:13
  56:19 79:1
enclosed 84:10,11
encompass 74:11 77:10
encompassing 20:2
encouraging 23:7
ends 54:22
entail 11:21
entered 37:8,24 38:5
entire 59:14 62:2
entirety 59:11
entity 70:14
entry 36:13 37:6,24
  38:2,11 70:5
envelope 30:13
errata 84:12,14,15,17
ethics 29:4
events 49:3
exactly 12:20 54:6
examination 1:13 3:2
  5:20 7:5 8:19
examined 5:19
example 7:8 13:16,23
  14:17 19:8 20:16
  62:22,24,24 72:1,10
Excel 58:19 71:13,23
  73:1
exchange 26:23 40:8
  51:4 77:8
exhibit 3:9 5:13,15,23
  7:4,14,21,23 8:3,7,17
  8:18 10:8 13:9,12
  16:18 17:2,8,19,22
  18:19 19:18 20:4,11
  20:13,14,16,18,19,20
  20:21,22 21:1,7,9,17
  21:20,23 22:3,23 23:12
  23:16 26:17 27:4,11
  27:15,15,24 28:4,21
  28:22,22,23 29:11
  31:20,23 32:3 33:21
  35:16 36:11,17 40:24
  44:12 45:1 46:10
  48:20,24 49:16,19,24
  50:4,22 51:3,22 53:8
  53:12,12,12,17,24
  54:5,17,21 55:2,4,7,9
  55:14,16,20 56:6,9

57:15,17 59:19 60:1
61:15,18 62:23 64:22
65:9,22 66:3,22 67:14
67:18 68:14,17,21,22
69:6,13 75:5 77:24
78:13 79:17
**exist** 14:2 28:18 58:8
62:20,21 63:5 69:22
**existed** 53:2 72:11
**exists** 40:1 53:4 58:6,9
62:16 68:22
**explained** 6:3
**explanation** 69:4
**extent** 13:20 64:24 65:3
**extra** 21:12
**e-mail** 9:7 10:19,23
11:5,11 12:18,19
13:19 14:2,15,17,18
14:19 15:14,19 16:7
20:6,17 22:5,9,16
23:13 24:8,9,18,22,23
25:1,13,14,15,18,19
25:20 26:18,18,23,24
27:6 28:7,13,19 39:2
39:5 40:4,7,8 41:1,7
41:21 43:17 44:4,12
44:16 45:12 46:8,8,16
47:17,20 51:4,4,5,14
51:16,22 52:5 56:10
60:8 64:1,1,2,6,11,15
66:3,8,13,15 67:1,5,7
67:19,21,22 68:4,7,9
68:14,16,17 69:1,20
69:22 72:3,21 73:12
74:6 75:23 76:4,22
77:8,8
**e-mails** 9:8 10:17 13:4
26:1,1 46:3 50:13
65:17 67:19 77:11,12

**F**

**fact** 9:22 68:15 75:24
**fair** 22:15 47:7 51:5
53:14,22 56:16
**fall** 57:6,12,20 69:23
79:24
**familiar** 22:22 39:16
57:8 74:16
**familiarity** 66:12
**Family** 1:8 4:7 6:8,19
6:23 7:11 8:7,10,21
8:24 9:2 10:4 11:17
14:4,20 17:24 18:16
19:8 21:21 22:8,19
23:2,9 26:20 27:5
28:24 29:8,21 32:24
38:15 39:8,12 40:1,4
50:12 51:11 53:5

54:13 55:24 56:3,18
57:5,24 62:7 63:21
64:19 65:18 66:21
67:3 69:2,5,19 71:19
78:10 79:8,18 81:7
82:13 84:7
**Family's** 22:4,7,16
**far** 58:21
**Federal** 4:8 6:5 78:5,9
79:12
**fell** 69:7
**figure** 49:23
**file** 22:24 23:23 24:12
24:19 25:1,8,16,22
26:2,5,7,9,13 33:2
34:5 35:4,19 36:4
38:5,17 46:17 50:7
52:7,19,24 56:13
62:10,14,15,16,21
63:1,3,3 69:10 72:23
73:16
**files** 23:4,10,15 24:1,15
26:13 46:21
**find** 33:6 36:11 38:23
79:14
**finish** 50:1
**fire** 16:4 67:24
**firm** 19:3
**first** 4:3 5:12,18 8:8,18
8:22 19:17 20:4 22:21
31:23 36:12,15,16
37:12 57:14 67:19
68:6 78:3 82:16
**five** 70:19,21
**flip** 31:22
**floors** 30:4
**focusing** 6:22
**folder** 22:23 25:8 26:12
35:19 38:17 62:10,14
**folders** 23:10,15,20
41:2
**foldings** 23:4
**folks** 19:4
**follow** 10:16 47:17
**follows** 5:19
**foregoing** 81:14 82:22
83:2
**form** 26:14,16 50:16
53:1 56:16
**format** 20:6 26:6 28:8
53:5 74:14,22 79:22
**forth** 9:8
**forwarding** 77:6
**found** 14:9 45:21 46:11
60:7
**foundation** 22:20
**frequency** 40:15
**full** 40:20

**further** 20:5 80:17
82:15 83:1,4,8

**G**

**G** 9:8 10:14,15 13:19
21:13 24:16 63:13
**gathered** 24:20
**gathering** 63:23 77:22
**general** 12:23 24:4
**generally** 4:11
**Gerald** 51:11 55:24
66:4,15 67:2,4,20,22
**getting** 50:19
**ghayes@amfam.com**
67:23 68:10
**give** 15:1 38:18 49:3
**given** 4:12 35:20 40:4
41:10 43:15 46:23
68:4 81:15 82:18,23
**go** 8:17 10:8 11:4 13:15
22:12 29:5 31:20 35:1
38:22 40:22,24 58:22
60:1,13 61:15 65:13
68:21 69:13 77:1
78:12 79:13,15
**goes** 30:3,6 44:4 50:16
**going** 20:1,2 22:4 42:19
48:23 72:17
**good** 29:15
**Goose** 16:2
**govern** 21:2
**governing** 28:12 29:10
57:3 58:23 78:9 79:9
**governs** 22:20 57:10
**Gribble** 10:18 11:9
**ground** 4:14
**group** 27:15,23 76:15
**guide** 17:15
**guideline** 30:23
**guidelines** 17:15

**H**

**H** 3:7
**half** 28:6
**hand** 17:2 30:9,17
48:23 66:2 83:13
**handed** 51:2
**handing** 5:22 8:2 27:14
53:11 54:20 55:19
67:17
**handle** 12:12,13 15:1
84:17
**handled** 12:11 29:7
**handling** 12:2,3
**handwritten** 53:19
**happen** 31:22
**happens** 30:2
**hard** 48:2 59:13,14

60:10 61:9 73:1
**Hayes** 9:7 10:17 11:1,3
11:7,8,14,15 13:4,21
14:20 15:13,14,19,20
16:6,12 23:22 24:10
24:19 26:1,13 45:12
45:18 46:24 50:7
51:11,14,15,21 52:6
52:24 55:24 60:3,18
60:21,24 61:3,6 65:18
66:4,15 67:2,4,7,20
67:22 68:10,14,16
69:1,6,10,24 76:10
**Hayes's** 59:11
**HDR** 45:9
**head** 78:11
**header** 67:8,10
**held** 33:10
**help** 49:23
**helping** 64:7
**helps** 77:21
**Hennessy** 2:3 3:4 4:2,5
4:14 5:3,9,12,21 7:16
8:1 10:1 13:7 14:10
16:20 27:13 32:5,6
37:20,22 40:19 42:17
42:22 43:2 48:17,22
49:8 51:1 53:10 54:19
55:18 65:5,15 66:1
67:16 80:13 84:23
**hereinbefore** 83:7
**heretofore** 82:6
**hereunto** 83:12
**high** 45:23
**hold** 31:14 39:15,16,22
39:24,24 60:16 62:20
**holds** 33:9 39:21 41:7
59:17
**home** 73:6
**Homes** 7:18
**hour** 1:19
**http** 32:2,4,8

**I**

**ICS** 32:14,15,23 33:2,6
33:9 34:9,11,14,19,20
34:21 35:4,4,12,19,20
36:5,18 37:3,5 38:19
39:3,6 50:10 55:5,10
62:10,12,16,24
70:2,5,9 71:7,8,17,20
71:24 72:4,14,23
73:23 79:24
**ID** 3:8
**identification** 5:16 7:24
16:19 27:12 34:13
48:21 50:23 53:9
54:18 55:17 65:23

67:15
**identified** 4:8 6:10
11:13 13:18 23:16,19
28:3 32:2,7 61:20
63:12 65:8 66:17
**identify** 34:1,4 48:24
**Illinois** 1:2,17,18 2:5,13
81:2 82:1,5,10 83:19
84:2,6
**image** 34:12
**inaccurate** 49:20
**inadvertent** 21:12
**inbox** 22:11,13 25:3
26:11,19 27:1 43:23
44:1,2 46:13 51:17
52:12
**inboxes** 41:2
**incident** 12:2,2
**include** 15:23 16:2,4
24:14 25:3 39:3 44:13
44:15 46:20 48:8
50:10 56:24 58:19
59:21,23 71:16 73:4
75:5
**included** 11:1,6 13:21
14:5,13 15:10,14,18
16:6 23:14 24:6,10
44:16,21 46:2 50:5,5
50:6
**includes** 16:11
**inconsistent** 30:20
**indicated** 7:18 15:9
18:2 19:9 27:18 45:16
47:15
**indicates** 17:19 20:7
36:18
**indicating** 10:9
**individual** 5:6 6:7 9:12
21:6 57:23 58:12,24
59:5,6 73:21 77:21
**individually** 11:17 15:1
76:20
**individuals** 10:14 11:12
13:20 14:1 23:15,19
24:15 32:17 46:21
59:18,22 63:12,20
65:8 69:21,23
**information** 9:6 11:19
11:24 13:1 17:9,13,14
17:16 18:1,7,18,21
19:5,15 29:6 31:4
32:12,18 34:2,18,23
35:7,8,11,15,21 36:3
36:4 37:1 39:7 43:15
46:23 48:11 49:22
55:14 56:24 57:13
61:13 63:23 64:3,7,14
64:16,17,20,21 65:6

67:8,10 70:5 71:18,20
72:18 74:17,20,21
75:2,6,18 77:22 79:2
79:9,14,21,21 80:1,10
**input** 32:18
**instructions** 15:4,23
56:7
**Insurance** 1:9 8:8 81:8
82:13
**interested** 83:10
**intranet** 29:3 78:20,21
78:22,23,24
**investigatory** 12:3
**involvement** 77:23
**involves** 65:4
**involving** 10:20
**irrespective** 10:21,24
11:6,13
**issue** 68:13,15
**issues** 4:7 6:10 7:11
**item** 7:20
**items** 25:4,6 26:19 27:1
41:2,15,16,18 51:16
52:13,16

**J**
**James** 45:5
**Jerry** 37:10 66:4 67:23
**Jim** 11:5 45:6
**job** 11:21
**John** 7:18
**July** 76:11
**jump** 28:2

**K**
**K** 82:3
**keep** 59:1
**kept** 17:17 20:17 41:24
42:2 43:8 52:6 67:3
71:19 78:10
**Kinate** 37:9
**kind** 24:6 40:21 47:24
48:3,9
**Kleckner** 49:12 77:3
**know** 6:16 18:7 21:15
21:19 23:21 26:10
28:16 33:5,8 35:23
37:16 38:13 39:10,17
40:22 42:19 43:4,14
45:24 47:14,20 48:5
48:13,14 50:19 54:3
54:10,15 55:6 56:4
57:9 60:13,15,18,21
61:12,16 63:9 65:2,20
71:13 75:13 77:16,20
77:20,22 78:11
**knowing** 25:15,24 26:4
**knowledge** 21:19 22:1

26:3 27:9 48:10 52:23
61:2,5,8 62:17 63:17
65:20 70:3,7,10 71:4
71:9 72:16
**K-i-n-a-t-e** 37:9
**K-l-e-c-k-n-e-r** 49:13

**L**
**label** 27:17
**lack** 21:2
**Lake** 16:2
**laptop** 60:12,17,19,22
61:1,10 72:22
**LaSalle** 84:1
**latest** 79:1
**laws** 78:5,9 79:13
**left-hand** 32:1 36:18
47:2 53:24 54:5 55:12
66:10
**legal** 9:11,12 19:3 39:21
39:22,23,24 64:23
65:1 75:10,16,17 77:9
77:18,20 79:19
**letter** 29:11 53:14,18
54:7 55:21,23 60:3
74:6,8,14,23
**letterer** 74:12
**letterhead** 53:18
**letters** 37:18 56:8 68:5
**let's** 11:16 13:16 28:17
29:17 31:20 71:12
**level** 77:22
**liability** 45:23
**License** 1:24
**lieu** 9:5
**likewise** 63:4
**limited** 16:7 56:15
59:22
**line** 19:17 45:9,16
66:11 68:6
**link** 79:6
**links** 79:4
**list** 11:4 13:5 69:13
**listed** 10:14 19:18
24:15 57:19 59:18
69:21
**litigation** 39:13
**little** 6:16 11:16 20:5
30:3 53:19
**LLC** 1:6 81:5 82:12
**local** 23:22 25:9 26:7,8
72:22 73:2,15,17
**locate** 72:17
**located** 14:18 24:23
32:12 33:12 34:2
40:10 46:18 48:5
**location** 24:7 27:7 30:5
**logical** 52:20

**long** 17:16 19:5 20:17
41:24 60:15,18
**longer** 47:15 65:19 67:2
69:2,5
**look** 12:21 19:17 20:20
25:21 35:23 36:2,6,10
36:12 40:23 62:5
66:19 78:12 79:11
**looked** 57:8
**looking** 33:24 36:17
71:12,23
**looks** 21:11 45:4
**loss** 67:24
**lower** 27:16 28:3 32:1
55:11
**lump** 71:12

**M**
**M** 2:11 37:9 84:5
**machine** 23:22 24:10
**machines** 24:14 26:8,9
73:2
**Madison** 33:13 40:11
**mail** 29:7,7,10,11,12,16
29:19,23 30:4,5,8,9
30:17 31:1,8,11 52:11
**mailed** 30:13
**maintain** 70:20
**maintained** 29:9 55:5
**maintenance** 54:14
70:2
**manage** 34:22 79:19
**manager** 47:17,21
**managerial** 79:5
**manages** 33:6 34:21
**managing** 34:19
**manner** 21:2
**mapped** 48:6
**March** 10:7 67:21,22
76:8
**Margaret** 84:21
**MARICK** 2:2
**MARILYN** 1:5 81:4
82:11
**marked** 3:8 5:13,15,23
7:21,23 8:3,6 16:16
16:18 17:7,22 27:11
27:15 48:20,24 50:22
51:3 53:8,12 54:17,20
55:1,16,20 65:22 66:3
66:22 67:14,18
**Marketing** 18:21
**match** 19:6,7,14
**materials** 17:17
**matter** 11:12 14:17,21
28:14
**matters** 7:4 8:19
**McCORKLE** 84:1

**McGuirk** 7:18
**mean** 6:18,19 17:11
19:2 32:10 33:7 37:3
39:19 47:23 57:8
66:19 73:5 74:20
**meaning** 23:24 33:16
36:1 75:12
**means** 6:4 32:23 52:19
54:3,10 74:21
**MECKLER** 2:2
**medium** 41:22
**meeting** 77:7
**member** 42:16 49:10
77:2
**members** 63:22 64:9
**memory** 13:10
**mentioned** 83:7
**message** 11:14 45:5,21
51:7,10 77:6
**messages** 22:10 41:3
76:13 77:17
**metadata** 35:17
**Michael** 1:5 49:12 81:4
82:11
**Microsoft** 22:17,22
56:19 57:24 59:23
71:12,17,23 72:24
**middle** 53:19
**Midway** 61:19
**Mike** 66:5,9 67:20
**mine** 21:12
**minute** 8:18
**minutes** 79:20
**Mm-hmm** 15:12 19:22
47:6
**modified** 18:10,11
21:17
**monitoring** 12:5
**months** 39:18
**month's** 43:15
**morning** 7:8 16:15
**move** 51:21
**multipage** 54:21
**multiple** 33:14,16
**Mutual** 1:8 8:7 81:7
82:13

**N**
**N** 3:1
**name** 4:3 9:17 15:13,17
15:19,24 16:8 34:9
66:9 67:5 69:24
**names** 9:5 10:10 46:9
51:12 69:14 76:7,9
**nature** 12:6 79:6,7
**NAUGHT** 80:17
**need** 17:17 33:15 42:20
48:10 49:23 84:15

**needs** 19:5
**neither** 45:12
**new** 38:16 39:19 40:3
**nightly** 40:16,18
**nonletterhead** 53:13
55:21 60:2
**North** 1:17 2:4 84:1
**Northern** 1:2 81:2
82:10
**Nos** 16:18 53:8
**notarial** 83:13
**notarized** 84:15
**Notary** 81:24 83:19
**Note** 38:5
**notes** 36:8,19,24 38:10
42:7 43:4 62:22,24
71:8
**notice** 4:8 6:2,4 83:5
**November** 52:2,3
**number** 3:8 14:13,16
14:21 34:13 35:13,16
35:20 36:19 45:17
47:17 48:17 53:13
54:1,7 72:19 84:7,19
**numbers** 13:6,8 14:4,8
15:10,21 16:12 45:17
54:22 62:4

**O**
**O** 82:3,3
**object** 14:6 50:15 65:3
**objection** 50:19
**objects** 5:4
**obviously** 9:21 36:16
47:15
**October** 53:14
**Office** 57:24 58:18
59:23 71:12,13,14,17
71:22 72:13 73:4,12
73:12,20
**Oh** 28:21
**Okay** 5:8 6:16 8:12
10:16 27:19 28:1,5
29:18,22 31:21,24
33:23 36:14 37:21
38:12 42:9,17 44:8
53:17,21 54:24 57:18
66:18,24 67:12 68:2
69:15,17 70:15,24
71:15 74:7 76:2
**Olivo** 1:16,23 81:12
82:4 84:22
**OLN** 37:13,16,19
**ones** 26:2
**ongoing** 39:13
**online** 36:8 38:10
**open** 26:21 27:8 31:9
31:22 35:3,4 62:18,21

**opened** 35:20 38:16
**opens** 35:3
**operating** 17:23
**operation** 79:10
**opposed** 4:19
**option** 31:10 58:6,8,9
**order** 73:3
**organization** 11:22
29:13 76:16
**organizational** 79:3
**original** 21:16 45:5
76:7
**outcome** 83:10
**Outlook** 22:17,22 28:18
39:6 41:1,16 56:15
59:15,22 60:9 66:13
68:7 71:11,16 72:3
73:13,20
**outside** 46:12,14,15
69:7 70:3,6,10 71:2,8
**ownership** 79:17

**P**

**page** 6:10 7:4,12 8:18
10:8,11 17:19 20:4
21:11,11,12,13 22:6
23:16 27:18,20 28:2
31:23 33:21 36:11,17
37:7,23 41:1 45:22
46:10 47:1 48:11 55:9
59:18 64:22 65:8 68:5
78:1,13
**pages** 27:21 54:22
62:23 66:23 84:12,15
84:17
**paper** 4:10 16:24 17:1
17:13 30:12 31:1,15
62:4 63:15
**paragraph** 8:19 10:10
11:13 13:5,9,15,18
21:13 22:16 23:16,19
24:16 26:17 46:10
56:6 59:18 61:19
63:13 64:22 65:9
**Paragraphs** 7:12
**parameters** 15:5,7 80:6
**paraphrase** 13:13,14
**part** 13:12 15:9 24:4
29:4 63:7,11,22 65:7
71:12
**particular** 28:22 29:17
34:2 74:3
**parties** 83:3,9 84:18
**paste** 28:7 48:15
**pasted** 72:3
**path** 25:14,19 32:2,7
33:20 34:10 47:15
**PC** 72:22

**Pearson** 2:2 60:4
**pending** 82:8
**people** 12:7,12,13 13:5
39:1 63:18,19 77:1
**performance** 79:5
**period** 19:21,24 20:6
43:20 57:21 79:12
**periodically** 30:7
**periods** 19:14 78:4,8
**person** 5:5,6 6:5,9,23
9:13 29:24 30:8,10
**personal** 22:23 23:4,10
23:14,19 24:10,14
25:1,8 50:7
**personally** 12:11 82:7
**personnel** 23:3,9 26:23
27:6 28:12,13,24
29:19,20,20 31:10
57:23
**perspective** 70:16,22
**pertain** 49:6
**pertaining** 1:15 36:9
49:4
**phone** 12:17 84:19
**phrase** 64:21 74:16
**physical** 29:7
**physically** 29:23 40:10
**pick** 5:7 30:6,8
**piece** 29:12,23 30:12,17
31:8,10,15
**pieces** 31:1 62:3
**place** 39:7 52:21 71:18
72:15
**places** 24:24 41:6 72:11
**Plaintiffs** 1:6 2:8 81:5
82:12
**Plaintiff's** 8:8,21
**plans** 68:1
**please** 4:2 8:18 9:17
37:23 45:2 84:13,16
84:19
**plus** 44:22,24
**point** 51:15,17 65:16
72:11 75:21
**points** 78:2
**policies** 79:2
**policy** 20:7,10,14,23,24
21:1,4,6,16,17,21,23
22:4,7,8,19 23:2,6
26:18,20,21 27:4
28:11 29:10 30:16,21
30:23,24 31:15 38:15
38:21 39:11,15,16,19
40:24 41:13 43:18,18
44:7 46:15 52:10 57:3
57:7,10 58:15,23 59:3
59:7,8 69:8 70:9 71:6
72:8 77:15 78:1

**portion** 29:5 62:12
**possession** 63:16 65:10
**possible** 69:3
**power** 33:14
**practice** 28:15 50:12
**preparation** 49:17
**prepared** 7:10 60:3
**preparing** 8:14 42:10
**presence** 82:20
**present** 14:16 83:6
**presented** 24:20
**preservation** 39:21
**preset** 41:16
**PRETZEL** 2:10 84:4
**print** 26:10 37:3,5
50:13
**printed** 25:13,14,15,18
25:20 26:6 31:3,6
51:3 52:18 53:1 55:10
66:9,12 68:4
**printing** 68:6
**prior** 44:23,24
**privilege** 9:24 65:4
**probably** 4:15 62:19
**Procedure** 1:14
**procedures** 79:3
**process** 31:18,19 43:13
70:11,17,23 71:1
**processing** 33:14
**produced** 8:11 26:1
66:20
**product** 73:1,20
**production** 8:9,22
**products** 71:22 72:24
**prohibiting** 23:7
**pronounce** 16:20
**pronunciation** 10:22
**proprietary** 12:1 32:20
32:22
**protection** 11:23
**provide** 7:10 8:24 13:11
33:14 37:5 42:8 52:24
**provided** 9:5 13:5 15:6
15:8,21 19:12 26:13
29:2 56:7 59:10 62:3
**provides** 79:4,6
**provision** 19:19
**PST** 22:23 23:4,10,15
23:22,24 24:12,15,19
25:8,16,21 26:2,5,7,9
26:11,13 46:17,20
50:7 52:6,19,24 56:13
69:10 72:22 73:16
**Public** 81:24 83:19
**publication** 21:16
**pull** 35:8
**pulled** 9:6 60:11
**purposes** 42:10

**pursuant** 1:13 56:6
83:5
**put** 17:1 30:5,9 35:11
35:12 42:12 48:14
**p.m** 1:19 80:16

**Q**

**qualify** 75:1
**question** 4:24,24 5:4,5
11:9 22:21 24:21
29:15 31:13 45:22
46:7 50:16,18 68:24
72:14 75:24
**questioning** 6:17
**questions** 6:22 8:10
21:9 37:9 45:2 80:14
81:15 84:19
**quotes** 67:6 68:14

**R**

**R** 11:5
**range** 27:17,23 61:20
61:20 62:2
**read** 22:3 35:8 41:13
81:10
**reading** 22:8
**really** 6:18
**reason** 79:15
**recall** 10:5 12:16,20
15:5 16:1,5
**receive** 29:15 30:12
76:5 77:17
**received** 7:17 9:4,10
67:1,11 76:4 80:3
**Recess** 43:1
**recipient** 76:20
**recognize** 13:8 55:1
**record** 4:5 5:1,2 7:16
9:19 17:9 18:8 19:3
20:5,22 48:16 57:13
65:19 69:2,5 80:16
**records** 17:12 18:24
19:18 39:12,21 43:6
54:14 57:14,19 63:16
65:9 71:7 78:3,9
**recover** 44:9
**reduced** 82:20
**refer** 63:8
**reference** 20:13 46:22
**referred** 20:11
**referring** 38:13 42:3,5
43:4 47:4
**refers** 21:15
**reflect** 4:5 7:16
**reflected** 20:1
**regarding** 10:10 13:18
13:19 14:20 31:13
32:18 39:12 41:1

71:21 72:18
**regulations** 78:5,9
**related** 11:12 31:8
76:10 83:9
**relates** 11:24 27:7 34:5
34:6
**relation** 11:2,8,15
**removed** 18:14
**report** 12:7
**reported** 1:23 82:19
**reporter** 1:16 4:17,18
4:22 8:3 81:13 82:5
84:21
**REPORTERS** 84:1
**repository** 71:20
**represent** 27:22
**representative** 30:11
**Representing** 2:8,16
**request** 8:9,22 9:3,4,10
9:22 10:5 12:9,14,17
12:18,18,19 13:12
76:3,5,7,8,17
**requested** 13:3
**requesting** 8:10
**requests** 77:8 80:3
**required** 59:1 78:4
79:12
**requiring** 28:12
**reserve** 80:15
**resided** 57:21
**resource** 78:24 79:8
**respect** 11:9 23:3,6
26:17,24 29:12 30:15
39:8 41:1 50:4 68:20
71:6 80:4
**respective** 83:3 84:18
**respond** 76:13
**responded** 76:16
**response** 61:19
**responses** 8:8 76:12
**responsibility** 12:4
**responsible** 11:23 12:1
34:18
**responsive** 8:21 9:2
**retain** 70:19
**retained** 19:5 56:3
77:13 78:4
**retention** 17:10,12,13
17:23 18:8,16,20 19:4
19:10,13,14,15,21,24
20:6,22 21:21,23 22:5
26:18,20 30:16,19
31:3,4,15 39:12 41:2
46:15 50:14 57:4,7,10
57:13,20 58:15,24
59:3,7 69:7 70:9,15
71:7 77:24
**retired** 18:13

**return** 84:17
**reveal** 12:23 23:18
**revealed** 68:17
**revealing** 67:22
**review** 7:3 22:16 29:6
36:2 44:24 45:23
84:13
**reviewed** 7:7 42:9 49:16
61:24 62:1
**reviews** 79:5
**rid** 43:13
**rider** 6:11 7:4 9:6 50:17
51:12
**right** 5:9 7:20 17:6 42:8
52:13,16 60:7 72:4
73:5,13
**right-hand** 27:16 28:3
**Robert** 9:16
**robot** 30:3
**role** 8:14
**roles** 11:22
**rolling** 43:11
**Rosenberger** 11:10
**roughly** 52:1
**routed** 40:7
**RPR** 1:23 84:22
**rules** 1:13 4:9,14 6:5
**run** 4:15 32:17
**running** 57:24 58:3

**S**

**S** 2:3 3:7
**safe** 60:11
**SAITH** 80:17
**Saletri** 10:17,20,24
13:16,23 14:3,19 45:5
46:4,6,9,21
**save** 27:7 31:11 58:6,9
69:11
**saved** 28:8,8 47:21 56:3
58:4,14,17 60:5 63:1
73:18 78:23
**saves** 59:5
**saying** 4:18 28:11 70:22
80:9
**says** 45:23 70:19 79:17
**scan** 31:10
**scanned** 29:8
**schedule** 17:10,23 18:8
18:17,20 19:1,4,10,13
19:15,19 30:19,23
31:3,4 57:13,19 70:15
**schedules** 19:6
**scope** 50:15,17 70:3,6
70:16 71:2,9
**screen** 37:2
**scrowley@pretzel-sto...**
2:15

**seal** 83:13
**search** 8:19 9:1 10:13
10:19,23 11:5,11 13:3
13:6 14:5,13,18,24
15:2,5,6,10,15,19,23
16:2,4,6,7,11 23:12
23:14,18,21,24,24
24:3,5,18 26:5 35:18
38:24 39:2 44:11,13
44:21 45:11,20 46:11
46:17,20 48:8 49:6,7
50:3 52:2,10 56:5,8
56:15,18,23 59:14
60:7 63:7,8,11,15,19
63:21 64:20,24 65:7
69:24 73:1,3,9 74:2
75:4,5,8,18 76:7,18
79:13 80:4,5,6,10
**searched** 11:6 13:20
14:12 52:7 60:8,9
**searches** 8:20 9:1 59:21
**searching** 72:20,21,22
72:23 73:11,15,23
**second** 5:1 37:7,23 38:2
51:5 61:15
**Section** 9:5,8 22:6
**secure** 84:13
**security** 11:19 12:5
64:14,16
**see** 17:19 20:8 21:10,10
32:7 36:20 37:14 38:1
38:2,7,9,11 41:15
45:7,14 47:12,18 54:8
61:22 66:6 73:17 78:6
**seen** 5:24 8:4,13 9:2
31:6 61:17 72:17 77:12
**segregated** 35:13,13,14
**selects** 6:5
**sending** 74:10
**sense** 5:10 7:1 12:23
**sent** 9:8 11:14 25:4
26:19 27:1 41:2 51:16
52:13 60:3,4 65:17,18
67:9 68:16 69:1,6
74:15,23
**sentence** 37:12
**Separate** 25:11
**September** 1:19 18:9
21:14,24 22:9 51:8,20
52:1 58:20,21 60:22
61:1 81:13 82:7 83:14
84:3,8
**sequentially** 62:4
**series** 8:9 78:2
**server** 24:4,6,24 25:1,3
25:11,16,22 26:2 33:9
40:8,8,10,13 41:7,21
44:13,21,22 50:5,6

57:4,21 58:4,7,14,18
59:2 60:5,6 72:20,21
73:4,5,7,11
**servers** 24:8,9 33:17
**service** 17:9
**services** 17:16 18:1,8
18:18,21 19:15 31:4
34:18,23 57:13 64:3,6
64:7,17,20 65:6
**set** 70:14 75:4 83:12
**Setina** 84:21
**setting** 25:19 75:20
**severer** 34:1
**shared** 13:2
**sheet** 42:20,21
**sheets** 84:12,14,15,17
**Shorthand** 1:16 81:13
82:4
**show** 43:20 55:11
**showed** 29:11
**shrugs** 4:19
**sic** 66:11
**side** 32:1 53:24 54:5
**sign** 36:19
**signature** 80:15 83:1
84:11,13,14,15,17,22
**signed** 84:15,15
**similar** 31:3 54:6,7
56:21 71:8
**similarly** 63:4 68:20
70:6
**Sincerely** 84:20
**single-sided** 17:1
**site** 78:20,23,24
**situation** 19:23 59:8
**six** 39:18
**slight** 67:24
**slot** 30:10
**Smith** 11:10
**SMK** 38:6
**software** 32:17
**sole** 80:10
**solid** 66:11
**somebody** 31:16 72:2
76:15,16
**someplace** 33:8 46:17
50:14
**sorry** 16:16 40:17
50:15 57:15
**sort** 19:19 43:10
**sound** 4:20
**source** 80:10
**South** 2:12 84:5
**speak** 4:22 6:6,9 31:12
31:16,19 67:10
**speaks** 30:24
**specific** 30:18 32:23
71:6 72:18

**specifically** 11:18 28:13
31:1 46:5 62:6 70:24
**speculation** 14:6
**spell** 4:2 9:17
**SS** 82:2
**staff** 12:7 49:10 77:2
**standpoint** 70:11,17
**started** 44:21
**starting** 78:3
**starts** 37:10 40:3
**state** 1:17 4:2 78:5,8
79:12 82:1,5
**states** 1:1,14 81:1,14
82:9
**stating** 67:8
**stays** 26:24
**Steffel** 9:16,21 10:2
12:10,16 13:1,11 15:8
15:21 75:24 76:4,12
76:13,22 77:9,18
80:11
**stenographically** 82:19
**step** 24:22
**stick** 17:6
**sticking** 27:1
**Stopka** 1:5,5 15:24 66:5
66:9 67:11,20,24 81:4
81:4 82:11,11 84:7
**storage** 57:22 73:7
**stored** 33:8 39:8 56:2
58:4 59:13 71:19
74:17,19,21 75:1,6,18
79:21,22,24
**STOUFFER** 2:10 84:4
**STP** 66:17 67:18
**Street** 84:1
**structures** 79:3
**subdirectory** 34:11
**subject** 4:8 6:13 11:12
14:17,21 18:16 43:17
44:6,7 45:9,16 52:9
57:6,12,20 58:15 59:2
67:24 77:14,19
**submit** 84:13
**SUBSCRIBED** 81:20
**subsequently** 76:8
**substance** 12:15,24
27:6 75:22
**substantive** 9:20 76:1
**suggest** 6:21
**suggesting** 14:12
**suggests** 52:5
**suit** 49:4 83:10
**Suite** 1:18 2:4,12 84:1,5
**supervisory** 38:5
**support** 34:23 64:1,2,5
64:6,11,15
**Supporting** 34:20

**supposed** 59:1
**sure** 6:3 10:16 35:17
55:13 69:18 70:12,20
**Susan** 37:9
**SUZANNE** 2:11 84:5
**sworn** 4:1 5:19 81:20
82:16
**system** 22:17 28:9,14
28:19 29:8 31:11
32:11,13,14,15,16,17
33:10 34:9,10,19,20
34:21,24 35:7,9 44:16
48:13 50:10 55:5
56:10,14 70:2,6,10
71:18 72:23 73:24
**systems** 9:7 17:14,14
18:12,13 28:18 70:20
79:4,5
**S-a-l-e-t-r-i** 10:21
**S-t-e-f-f-e-l** 9:18
**S-t-o-p-k-a** 15:24

**T**

**T** 3:7
**table** 71:22
**take** 4:19 8:13 15:13
19:17 20:20 22:15
24:22 36:10,13 41:6
**taken** 1:15 36:24 43:1
72:2 81:11 84:8
**talk** 4:10 5:6 11:16
28:17 29:17 32:4
37:18
**talked** 23:13 28:18
38:24 39:5,6 44:12
45:12 50:4 56:6 60:10
76:3
**talking** 5:6 6:8 12:9
43:3,5,7 49:22 55:7
63:9 79:20
**talks** 41:16 57:11
**tape** 43:14 44:3
**tapes** 41:22,23,24 44:17
44:18
**Tasha** 1:16,23 81:12
82:4 84:22
**team** 42:14,16 63:19,22
63:24 64:1,1,2,5,6,6,9
64:10,11,12,15,16,16
75:7,9,16,17,17 76:14
77:10,10,17
**technology** 11:19 12:5
**tell** 19:4 20:17,18 22:4
60:16
**telling** 34:7,8,9
**tells** 32:11 70:23
**temporarily** 75:20
**term** 21:2 47:8 62:11

**terminology** 33:7,19
35:2
**terms** 9:7 42:7 43:4
**Terri** 11:10
**testified** 5:19 53:1
61:16
**testify** 8:23 82:16
**testimony** 6:7,14 7:10
8:24 13:17 49:17
69:19,20,22 82:18,23
83:12
**text** 11:13 38:9,11 67:6
67:24
**thereof** 83:11
**things** 4:16,18,19 12:6
67:4 79:6,7
**think** 43:5 47:2 50:16
80:13
**third** 37:6 45:3
**Thompson** 11:10
**thousands** 29:16
**threat** 12:5
**three** 19:21 20:1 76:9
**three-year** 57:20 58:15
59:3
**throw** 72:24
**TILSON** 2:2
**time** 11:10 43:15 44:22
51:15,17 55:10 61:7
72:11 75:22 77:16
**timekeeping** 79:4
**times** 5:3 41:10 57:9
**Tina** 1:12 3:3 4:4,6 5:17
6:18 15:1 62:6,8
63:14 76:23 81:18
82:7,15 84:8
**tired** 50:19
**title** 11:16,18
**today** 6:14 7:7 17:4
39:14 42:11 49:17
62:1 69:19
**today's** 7:19
**told** 4:15
**top** 28:6 37:24 38:3
45:22 46:4 51:7,22
68:5 78:3,11 79:16
**to-wit** 82:6
**training** 29:4 79:7
**transcribe** 4:22
**transcript** 81:11,14
82:22 84:10,13,14
**Transcription** 82:21
**tricky** 6:17
**true** 14:2 31:14 59:17
82:22
**truth** 82:16,17,17
**try** 4:21 5:6
**trying** 33:6 41:15 80:8

**turn** 37:23 45:2
**two** 14:4 16:21 19:6
24:23 28:7 46:3,9
53:11 67:19 70:22
72:11 76:6,9
**two-sided** 16:24
**type** 20:5 34:12 39:24
56:21
**typewriting** 82:21
**typical** 68:6
**typically** 47:23
**T-i-n-a** 4:4

**U**

**uh-huh** 4:20
**umbrella** 64:17
**underline** 53:20
**underneath** 21:13
66:11 68:5
**understand** 6:13 13:17
33:7 61:17 69:18
70:12 80:9
**understanding** 41:12
**Understood** 46:16
**undetermined** 82:9
**United** 1:1,14 81:1 82:9
**universe** 72:13,14
**update** 18:5,6
**updated** 17:20
**updates** 79:2
**upper** 36:18 53:24 54:5
66:10
**uptime** 34:23
**use** 13:16,23 19:8 22:20
23:3,10,19 33:19,23
42:23 47:7 62:11
**user** 41:17 58:12 72:6
**user's** 25:9

**V**

**v** 84:7
**validate** 75:10
**various** 28:17
**vault** 59:13
**vents** 30:4
**verify** 27:21
**version** 50:7 53:13
55:21
**view** 34:12
**vs** 1:7 81:6

**W**

**Wacker** 1:17 2:4,12
84:5
**waived** 83:2
**want** 38:18 42:23 47:7
61:18 62:11 69:18
**wanted** 79:11

**washroom** 42:23
**way** 25:15,24 26:4 29:9
80:8 83:9,10
**went** 77:2
**we'll** 4:10 5:12 7:20
10:8,21 11:4 13:15
14:11 16:16 17:6 19:8
36:10,12 42:22 58:19
80:15
**we're** 4:18 48:17 57:15
57:17 71:21,22
**we've** 16:22 28:18
43:14,14 72:1
**WHEREOF** 83:12
**window** 44:10 46:12,14
**Wisconsin** 1:9 33:13
81:8 82:13
**witness** 3:2 4:1,4,7,13
5:8,11,18 9:20 12:22
13:3 14:8 40:18 49:7
50:20 65:14 70:3,7,10
71:4,9 82:8,19,20,23
**witnesses** 13:18
**Wolowicki** 66:4 67:9,20
67:23 68:4,10
**word** 15:17 16:4 37:10
56:19 57:1,4,11,24
58:18 71:13,23 72:24
73:7
**words** 4:19,20,21 18:4
29:10 53:4,20 73:12
**work** 12:3 59:2
**worth** 43:15 44:18 50:5
**wouldn't** 9:23 14:5
19:23 20:18 30:20
52:11,12,15 60:7
**write** 21:3
**writing** 12:18
**written** 38:21 39:11
57:3 58:23

**X**

**X** 3:1,7

**Y**

**Yeah** 6:20 73:14
**year** 19:24
**years** 19:21 20:1 70:20
70:21,22
**yesterday** 7:18
**yield** 24:18 56:8
**yielded** 26:5

**0**

**00001** 68:21
**0001** 61:20 66:20
**00065** 53:17
**00195** 53:13

**00235** 66:17
**00469** 67:18
**00600** 27:18 32:2
**00614** 45:2
**00640** 37:23
**00642** 36:12,23
**00645** 27:20
**00646** 54:22
**00664** 54:22
**00883** 61:21 66:20
68:21
**013** 38:6
**06** 38:1
**07** 37:24
**084-004420** 1:24
**09** 37:8

**1**

**1** 3:10 5:13,15,23 7:4
7:12,14 8:17,18 10:8
13:9,12 17:19 21:14
23:12,16 27:18 33:21
36:17,17 44:12 46:10
50:4 55:9 56:6 59:19
61:19 64:22 65:9
69:13 75:5 78:13
**10** 1:7 3:19 51:8,20
52:1,2,3 54:17,21
55:2,4 81:6 84:7
**11** 3:20 55:16,20 56:9
60:1
**12** 3:21 65:22 66:3,22
68:14,21
**12th** 83:13 84:3
**123** 1:17 2:4
**13** 3:22 67:14,18 68:17
68:22 69:6
**155428** 38:1
**16** 3:12,13
**1800** 1:18 2:4
**19** 67:21

**2**

**2** 3:11 6:10 7:4,12,21
7:23 8:3,7,18 9:5 10:8
10:10,11 11:13 13:5,9
13:15 23:16,16,19
24:16 46:10,10 56:6
59:18,18 61:15,18
64:22,22 65:8,9
**2A** 63:13
**2B** 13:18 69:21,23
**2G** 69:21,23
**2:16** 1:19
**20** 55:23 60:4,6 67:22
**200** 84:1
**2004** 21:14
**2008** 18:9 21:24 22:9

53:14 58:21 60:22
61:1,4,7
**2009** 37:8 66:16
**2010** 17:20 37:24 51:8
51:20 55:23 60:4,6
**2011** 1:19 10:7 58:20
81:13,22 82:7 83:14
84:3,8
**2500** 2:12 84:5
**263-0052** 84:2
**27** 3:14

**3**

**3** 3:12 16:18 17:2,6,8
17:19,22 19:18 20:4
20:13,16,18,19 22:6
28:21 29:11 41:1
57:15,17
**30** 37:8 42:1
**30(b)(6)** 4:7 6:2,4
**300** 84:1
**312** 2:6,14 84:2
**32** 42:2 43:9,10 44:18
44:23,24 50:5
**32-day** 43:19 44:10
**346-1973** 2:14

**4**

**4** 3:13 16:18 17:2 18:19
20:11,14,20,21,22
21:1,7,9,17,20,23
22:3,3 26:17 27:4
28:22,22,23 40:24
77:24 78:1,13 79:17
**4:27** 80:16
**444** 53:4
**474-7900** 2:6
**48** 3:15

**5**

**5** 3:4,10,14 7:12 21:11
21:11,13,13 22:6
27:11,15 28:4 31:20
31:23 32:3 33:21
35:16 36:11 45:1
49:24 55:7,9 62:23
78:1
**50** 3:16
**53** 3:17,18
**54** 3:19
**55** 3:20

**6**

**6** 3:15 48:20,24 49:16
49:19 66:16
**60** 22:10 27:2 41:3,18
51:20 52:1,11
**60-day** 43:18 44:6,7

|  |  |  |  |  |
|---|---|---|---|---|
| 46:15 52:9 69:7 |  |  |  |  |
| **6034** 1:7 81:6 84:7 |  |  |  |  |
| **60601-2956** 84:2 |  |  |  |  |
| **60606** 2:5,13 84:6 |  |  |  |  |
| **614** 45:3 46:1 47:1,10 49:24 |  |  |  |  |
| **615** 45:4 |  |  |  |  |
| **616** 45:4 |  |  |  |  |
| **635** 28:3,14 |  |  |  |  |
| **639** 62:23 |  |  |  |  |
| **640** 62:24 |  |  |  |  |
| **65** 3:21 |  |  |  |  |
| **67** 3:22 |  |  |  |  |

**7**

**7** 3:11,16 50:22 51:3,22
**7th** 1:18 81:13 82:6 84:8

**8**

**8** 3:17 53:8,12,12,14,24
**884** 62:3

**9**

**9** 3:18 53:8,12,17 54:5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL STOPKA, MARILYN STOPKA, and CHATEAU ARLINGTON, LLC | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 10-cv-6034 |
| | ) | Honorable John W. Darrah |
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, INC. a Wisconsin Corporation, | ) ) ) | Magistrate Martin C. Ashman |
| | ) | **JURY DEMANDED** |
| Defendant. | ) | |

### NOTICE OF RULE 30(b)(6) DEPOSITION

TO:  Suzanne M. Crowley, Esq.        cc:   John M. McGuirk, Esq.
     Michael A. Clarke, Esq.                HOSCHEIT, MCGUIRK, MCCRACKEN
     PRETZEL & STOUFFER, CHTD.                   & CUSCADEN PC
     One South Wacker Drive, Suite 2500     1001 East Main Street, Suite G
     Chicago, Illinois 60606                St. Charles, Illinois 60174

PLEASE TAKE NOTICE that on **July 8, 2011** at **10:00 AM**, we shall take the deposition of **American Family Mutual Insurance Company, Inc.** on the Matters of Examination designated in the attached Deposition Rider, pursuant to Fed. R. Civ. P. 30(b)(6). Said deposition shall proceed upon oral examination before an officer authorized by law to administer oaths, at the offices of Meckler Bulger Tilson Marick & Pearson LLP, 123 N. Wacker Drive, Suite 1800, Chicago, Illinois.

Respectfully submitted,

By: _____
     One of the Attorneys for Plaintiffs

Steven D. Pearson, Esq. (# 6190506) (steven.pearson@mbtlaw.com)
Christopher S. Hennessy, Esq. (# 6237293) (christopher.hennessy@mbtlaw.com)
MECKLER BULGER TILSON MARICK & PEARSON LLP
123 N. Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: (312) 474-7900
Facsimile: (312) 474-7898


EXHIBIT
BASCH
(1)
TO        9.7.11

## DEPOSITION RIDER

Pursuant to Fed. R. Civ. P. 30(b)(6), American Family Mutual Insurance Co., Inc. ("American Family") shall designate one or more officers, directors, or managing agents, or designate other persons, who will testify on its behalf regarding the following Matters of Examination, and shall identify those Matters of Examination on which each person so designated will testify.

## Matters of Examination

1.    The search or searches conducted by or on behalf of American Family for documents responsive to Plaintiffs' First Requests for Production of Documents;

2.    The search or searches conducted by or on behalf of American Family for email or electronic communication related to or involving in any way the claim arising out of the Sept. 10, 2008, fire which occurred at 10 Goose Lake Drive, Barrington Hills, Illinois ("the Fire"), including but not limited to any communications or records related to American Family Claim No. 00-221-121546-6329 or American Family Claim No. 00-221-129788 (collectively, "the Fire Claims") sent or received by each of the following individuals:

    a.    Gerald J. Hayes
    b.    James M. Saletri
    c.    Jim R. Andersen
    d.    Dwight E. Gribble
    e.    Sybil A. Thompson
    f.    Terri M. Rosenberger
    g.    Alice A. Smith

3.    To the extent not included #2 above, the search or searches conducted by or on behalf of American Family for all email or electronic communication from or to any employee of American Family related in any way to the Fire and/or the Fire Claims;

4.    The search or searches conducted by or on behalf of American Family for any other Electronically Stored Information as described in Fed. R. Civ. P. 34(a)(1)(A) related to the Fire and/or the Fire Claims;

5.    The document retention policy or policies of American Family with respect to documents, email, and Electronically Stored Information.

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher S. Hennessy, an attorney, certify that I served a copy of this Notice of Rule 30(b)(6) Deposition via U.S. Mail to all counsel listed above before the hour of 5:00 p.m. June 22, 2011.

Christopher S. Hennessy

M:\14185\discover\30b6 Dep Not.doc

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA and )
MARILYN STOPKA, )
)
Plaintiffs, ) Case No.: 10-CV-6034
)
v. )
) Judge Darrah
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC. )
a Wisconsin Corporation, )
)
Defendant. )

## AMERICAN FAMILY MUTUAL INSURANCE COMPANY, INC.'S RESPONSES TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS

NOW COMES the defendant, American Family Mutual Insurance Company, Inc., by its attorneys, PRETZEL & STOUFFER, CHARTERED, and for its Responses to plaintiff's First Requests for Production of Documents, states as follows:

1.    Please Produce any and all Documents or Other Material responsive to "Plaintiffs' First Set of Interrogatories to Defendant" or identified in any of your answers to those Interrogatories.

**RESPONSE:** **Defendant objects to the phrases "any and all documents" and "responsive" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 - AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.**

2.    Please produce any and all Documents or Other Material that You referred to or which you reviewed for purposes of answering "Plaintiffs' First Set of Interrogatories to Defendant."

-1-


EXHIBIT
BASCH
2

**RESPONSE:** Defendant objects to the phrases "any and all documents" and "reviewed" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 – AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

3. Please produce all Documents or Other Material of any kind You provided to or received from Miner & East related to the Project and/or the Fire.

**RESPONSE:** Defendant objects to the phrase "all documents or other material of any kind" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 - AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

4. Please produce all Documents or Other Material of any kind You provided to or received from Environmental Group Services, Ltd. related to the Project and/or the Fire.

**RESPONSE:** Defendant objects to the phrase "any documents or other material of any kind" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 - AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

5. Please produce all Documents or Other Material of any kind You provided to or received from Engineering Systems, Inc. related to the Project and/or the Fire.

**RESPONSE:** Defendant objects to the phrase "all documents or other material of any kind" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 - AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

6. Please produce any and all Documents or Other Material created or maintained by You with respect to Your assessment, investigation, and/or evaluation of the Fire at the Project, including documentation of all visits You made to the Project after the Fire.

**RESPONSE:** Defendant objects to the phrase "any and all documents or other material" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 - AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

7. Please produce all Documents or Other Material that You provided to or received from any other Person, company, or entity You consulted with or retained at any time for any purpose associated with or related to the Project or the Fire.

**RESPONSE:** Defendant objects to the phrase "all documents or other material" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant will produce documents bates AF 00001 – AF 00883. If additional documents are located, they will be produced in accordance with the applicable rules.

8. Please produce all Documents and Other Material -- including (but not limited to) all claims handling guidelines, procedures, manuals, or other manners or methods of instruction or direction -- You used, reviewed, consulted, evaluated, or considered when assessing or evaluating the loss or claim related to the Fire and the Project.

**RESPONSE:** Defendant objects to Request No. 8 because it does not seek relevant information or documents based upon the allegations contained in plaintiffs' First Amended Complaint. Further, defendant's response to Request No. 8 will not lead to relevant information. Defendant objects to the phrase "reviewed, consulted, evaluated or considered" as being vague, overly broad and unduly burdensome. Subject to and without waiving its objection, none.

9. Please produce all Documents and Other Material -- including (but not limited to) all treatises, trade publications, industry guidelines, and peer review journals -- You used, reviewed, consulted, evaluated, or considered when determining the steps necessary to ensure that the Remediation of the Project after the Fire was properly and fully completed.

**RESPONSE:** Defendant objects to Request No. 9 because it does not seek relevant information or documents based upon the allegations contained in plaintiffs' First Amended Complaint. Further, defendant's response to Request No. 9 will not lead to relevant information. Defendant objects to the phrase "reviewed, consulted, evaluated or considered" as being vague, overly broad and unduly burdensome. Subject to and without waiving its objection, none.

10. Please produce all Documents or Other Material of any kind evincing payments You made to any contractor, consultant, or other Person which substantiates Your assertion that the $2,000,000 in limits of the American Family policies are "close to being exhausted."

**RESPONSE:** Defendant objects to Request No. 10 because it does snot seek relevant information or documents based upon the allegations contained in plaintiffs' First Amended Complaint. Further, defendant's response to Request No. 9 will not lead to relevant information. Defendant objects to the phrase "all documents or other materials" as being vague, overly broad and unduly burdensome. Defendant objects to the term "assertion" because it misrepresents and mischaracterizes any statements by American Family. Subject to and without waiving these objections, defendant will produce documents bates AF 00001 - AF 00883.

11. Please produce the "releases" which You claim You forwarded to Plaintiffs.

**RESPONSE:** See documents bates AF 00001 - AF 00883.

12. Please produce all Documents or Other Material considered or reviewed and/or not previously listed which are in any way involved with or related to Your evaluation of the Project or the Fire.

**RESPONSE:** Defendant objects to the phrases "all documents or other materials" and "considered or reviewed" as they are overly broad and unduly burdensome. Subject to and without waiving this objection, defendant produces documents bates AF 00001 - AF 00883.

13. Please produce all policies of insurance – including (but not limited to) any D&O insurance, professional liability insurance, or any other insurance for extra contractual claims,

-4-

damages, or losses -- under which Gerald Hayes or any other representative of American Family

is or may be an insured and which may or could provide coverage for the negligence of Mr.

Hayes or any other representative of American Family in the performance of their duties related

to the Project or the Fire.

**RESPONSE: Defendants objects to this request because it does not seek relevant information or documents nor will defendant's response lead to relevant information or documents. Plaintiffs have not alleged malpractice by Mr. Hayes or that Mr. Hayes himself acted in a negligent manner.**

14.     To the extent not produced in response to any of the above Requests, please

produce any photographs, images, recordings, voice-mail messages, electronic communications,

or other media of any kind or nature in Your possession or control -- in electronic, printed,

transcribed, or other form -- concerning or relating in any way to the Project or the Fire.

**RESPONSE: Defendant objects to the phrases "images, recordings, and other media" as being vague, overly broad and unduly burdensome. Subject to and without waiving this objection, defendant produces documents bates AF 00001 - AF 00883.**

Gerald Hayes
American Family Mutual Insurance Company

-5-

## VERIFICATION

STATE OF ILLINOIS    )
                     )
COUNTY OF COOK       )


Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.


_____

Gerald Hayes
American Family Mutual Insurance Company


Edward B. Ruff (6181332)
Suzanne M. Crowley (#6194835)
Michael A. Clarke (#06197032)
Pretzel & Stouffer, Chartered
One South Wacker Drive, Suite 2500
Chicago, IL 60606-4673
Telephone (312)346-1973Fax (312)346-8242
scrowley@pretzelstouffer.com
N:\wpdata\SCrowley\Stopka\Discovery\Request for Prod Resp.wpd

## Information Services Record Retention Schedule

<u>Contact</u>:

James Madden
Strategy & Planning Director
Information Services
Extension: 35294
jmadden@amfam.com

<u>Last updated</u>:  December 2010

| Record Type | Format | Retention Period |
|---|---|---|
| Any records not listed on this schedule | All | 3 years |
| Business modeling artifacts (RUP) | Paper and electronic | Life of the organizational unit plus 3 years, if created |
| CICS environments | Electronic | Life of the environment plus 3 years |
| Contract programmer time sheets | Paper | Life of the contract, plus 3 years |
| Contractor expenses | Electronic | Life of the contract, plus 3 years |
| Contractor staffing database | Electronic | Term of employment plus ten years |
| Data center floor plans | Paper and electronic | Current version only |
| Data center video logs | Video | 4 months |
| Databases:  Microman, MAD, Mapping/Oncall, Team Track, and Lotus Notes Contractor | Electronic | Current data plus 3 years |
| Email | Electronic | Per corporate policy |
| Employee time sheets (AES copy) | Paper | 1 year |
| External business partner contracts and service level agreements | Paper | Life of the contract, plus 3 years |
| General business documents | Paper and electronic | 3 years |
| General operating records | Paper and electronic | 3 years |
| General project records | Electronic | Life of the project plus 3 years |

*Continued on next page.*



**Information Services Record Retention Schedule (Page 2)**

| Record Type | Format | Retention Period |
|---|---|---|
| Management approval for exceptions to standards and policies | Electronic | Life of the exception plus 3 years |
| Mapping and on-call database | Electronic | Current version plus 3 years |
| Marketing technology vision | Electronic | Current version plus 5 years |
| Network configuration documentation | Electronic | Current version plus 3 years |
| Network disaster recovery template | Paper and electronic | Life of the network plus 3 years |
| Organizational handbook | Electronic | Current version plus 3 years |
| Outage reports | Electronic | 1 year |
| Photo images of network equipment and network diagrams | Paper and electronic | Life of the environment plus 3 years |
| Policies, standards, procedures, job aids, and best practices | Electronic | Current version plus 3 years |
| Problem logs | Electronic | 1 year |
| Problem reports | Electronic | 1 year |
| Restart/rerun instructions | Paper and electronic | Current version plus 3 years |
| Reusable component source code | Electronic | Life of the component plus 3 years |
| Reusable component subscriptions | Electronic | Life of the component plus 3 years |
| SE knowledge base of development and testing tool best practices | Electronic | Current version plus 3 years |
| Service level agreements (internal and external) | Paper and electronic | Current version only |
| SQL database (configuration information) | Electronic | Current version plus 3 years |
| Testing environments | Electronic | Life of the environment plus 3 years |
| Training environments | Electronic | Life of the environment plus 3 years |
| Training materials | Paper and electronic | Current version plus 3 years |

*Continued on next page.*

## Information Services Record Retention Schedule (Page 3)

| Record Type | Format | Retention Period |
|---|---|---|
| Vendor contact information | Paper and electronic | Life of the contract, plus 3 years |
| Vendor contracts | Paper and electronic | Life of the contract, plus 3 years |
| Vendor SLA's | Paper and electronic | Life of the contract, plus 3 years |
| Voice mail | Electronic | 60 days |
| Work orders | Electronic | Life of the system plus 3 years |
| System/Project Documentation: | | |
| System Architecture documentation | Electronic | Keep the most current version of the documentation. In cases where there is a requirement to keep data for a specified period of time, the architecture and design documents need to be kept for the same amount of time as these are needed to support understanding of the data. |
| Design Documentation - authorizations, and other technical specs | Paper and electronic | Keep all documentation that is related to functionality that is still supported. This is because these types of documents have a tendency to contain requirements information. |
| Design Documentation – general design docs, models and diagrams | Electronic | Keep the most current version of the documentation. In cases where there is a requirement to keep data for a specified period of time, the architecture and design documents need to be kept for the same amount of time as these are needed to support understanding of the data. |
| Deployment | Electronic | Keep the most current version of the documentation. |
| Development | Electronic | Keep the most current version of the documentation. |

| | | |
|---|---|---|
| Requirements – wireframes, use cases, usability test reports | Electronic | These types of documents are usually all-inclusive of the system. Keep the most current version of this documentation. |
| Requirements – business requirements, non-functional requirements, supplementary specs | Electronic | These types of documents usually address only the changes being made as part of a given project. Keep all documentation as it collectively provides a complete set of information. |
| General system doc | Electronic | Keep information related to the current state of the system. |
| Testing documentation | Electronic | Keep information related to the current state of the system. |
| Retired systems, components, or functionality documentation | Paper and electronic | When functionality is retired, I/S does not have a need to keep any documentation. However, we understand that there are certain situations where there are reasons to retain documentation. We recommend that these cases be identified by the business units and addressed in their retention policies. Examples – need to keep billing data for 7 years, or need to keep information on Variable Life products. If data needs to be kept, also keep the architecture and design doc and requirements that support that data. |

*American Family Corporate Compliance Department & Legal Division*

# Records Retention and Destruction Policy



American Family Mutual Insurance Company identifies the following as the benefits of and purposes for a company-wide uniform records and destruction policy:

- Manage, retrieve, and dispose of company records in an orderly fashion

- Comply with all state and federal laws and related regulations

- Reduce the high cost of records maintenance

- Ensure that no corporate records are destroyed or disposed of unless authorized by an approved retention schedule

As a result, American Family establishes the following records retention and destruction policy.

A.    General Requirements. American Family's Records Retention and Destruction Policy applies to all American Family subsidiaries, divisions, departments, units, and agencies, and covers all American Family business records.

For purposes of this policy, a "record" is a memorandum, report, or data compilation, in any form, of acts, events, conditions, or opinions, which is prepared and maintained in the ordinary course of American Family's business. "Record" as used throughout this policy includes all formats of information, including, but not limited to, paper, electronic, emails, voice mails, information on "C" or shared hard drives, web pages, compact disc, optical disc, floppy disc, film, magnetic tape, microfiche, or any other media.

Records that document the business of American Family should be saved pursuant to each division's record retention schedule in a file structure or medium, such as a paper document file or in an electronic file or folder designated as containing a record. All American Family records should, insofar as reasonably possible, be accurate, complete, precise, relevant, timely, appropriate for retention, properly organized and easily understandable.

Some information created by employees and agents is not a "record" for purposes of this policy. Information that has no business value to American Family need not be saved pursuant to company policy, and electronic copies of this information should not be retained on company systems for longer than 60-days. Examples of this type of information include, but are not limited to, the following:

- Information unrelated to the business of American Family, such as personal email correspondence, "junk" mail, or personal voice mail messages;

- Routine correspondence and notes that require no acknowledgment or follow-up, such as notes of appreciation, congratulations, letters of transmittal, and messages announcing the date and time of a meeting;

- Copies of inter-departmental or other American Family correspondence that have a copy

retained in the originating division's files;

- Draft copies and early versions of final documents (depending on applicable business needs or legal requirements, if any); and

- Other communications of inconsequential subject matter or for which no further reference will be required.

All records created by American Family employees and agents in the course of their duties on behalf of American Family should be retained for as long as they are required to meet the legal, administrative, and operational requirements of American Family, after which time they should be destroyed or transferred to archives for permanent retention. The final disposition of records, either destruction or transfer to archives, must be carried out according to the record retention schedule maintained by the division holding the records. In most cases, unless otherwise specified, retention periods begin when the latter of the following applies to the record: a) the date when a division closes a record, b) the date when the record becomes inactive, or c) the date when the division otherwise removes the record from regular use.

American Family encourages its employees to use electronic formats to manage and store information, provided that proper back-up measures are taken. Like any other records, electronic records must be accessible and maintained according to the division's record retention schedule, and must be deleted or destroyed when the retention period for that record has been met. Paper records may be destroyed in advance of the time identified in a division's record retention schedule only if all of the following conditions apply: 1) an electronic duplicate of the record exists and has been saved in the division's record keeping system; 2) if permissible under applicable state and federal laws; and 3) if there is no business need for maintaining a paper record.

If space permits, divisions should transfer inactive paper records to American Family's Record Retention Center for off-site storage to live out their retention life, thereby reducing storage costs. Divisions must use American Family's Records Transfer List (Form OA-01568) when sending paper records to the Record Retention Center. Before transfer, records must be separated and boxed by division personnel according to record series title and like retention period. Divisions must enter the "Date To Be Destroyed" on the Records Transfer List before transferring records, and must enter a destruction date consistent with the date for such record type as identified on the division's record retention schedule. Further, any special requirements concerning the destruction of the records must be noted on the Records Transfer List.

- **Cautionary Statement**. Documents that are not otherwise subject to retention may need to be retained because of unusual circumstances, such as litigation or government examination. Refer to the Exceptions section of this policy for additional requirements.

Some records are vital to American Family's operations and should never be destroyed. Vital records are those records essential to the resumption of business or operations, the recreation of the company's financial or legal position, or the protection of employee and policyholder rights. Further, for some records, destruction is not appropriate because there is an ongoing need for the information due to legal or financial requirements or as historic documentation. The retention period for these types of records must be designated as "Permanent" in a division's record retention schedule.

After specified minimum retention periods expire, records must be disposed of in a manner that is consistent with American Family's prescribed records and information management procedures. Refer to the "Information Handling Matrix" (http://compass/ets/securitypolicy/InfoHandling/Information%20Handling%20Matrix.doc) for requirements in that regard. Records containing sensitive or confidential information must be disposed of in a manner that ensures against disclosure of the information contained in the records.

B.     Duplicate Records. Duplicate files, duplicate copies, library materials, and stocks of obsolete forms or pamphlets originally intended for distribution are not considered to be records. Duplicates or non-record convenience copies of records should be destroyed when they cease to be useful, and should **never** be kept longer than the record itself.

C.     Email and Voice Mail. Email and voice mail have assumed an ever-increasing role in the day-to-day communications of American Family employees. The use of email and voice mail, as a recorded medium, carries with it all the responsibilities set forth in this records retention and destruction policy document. American Family provides email and voice mail to employees to conduct the business of the company and, in so doing, expects employees to manage and protect records resulting from email and voice mail communications. Unmanaged and unidentified email and voice mail records residing on American Family computers and telephone system pose a threat to the company's ability to document and reconstruct business and decision-making processes.

It is American Family's policy that email messages, including any attachments, may be stored in Outlook Today folders for "Inbox" and "Sent Items" only up to 60 days. Any emails in those folders will be automatically deleted after 60 days.[1] Each user may elect to pre-set the Outlook Today "Deleted Items" folder so emails in this folder will delete upon exiting Outlook Today. If the pre-set function is not used, email messages in the Outlook Today "Deleted Items" folder will be automatically deleted after 60 days. Likewise, employees shall not retain voice mail messages within the telephone system for longer than 60 days. Email and voice mail messages that need to be retained for longer than 60 days must be stored or recorded in a file structure or medium such as Local Outlook folders, floppy discs, or other electronic files.

D.     Administration. The Compliance Division shall be responsible for maintaining master copies of all division record retention schedules. The Compliance Division shall also be responsible, together with the Education Division, for providing periodic training on this policy to appropriate American Family personnel. The Internal Audit Division shall be responsible for monitoring compliance with this policy.

The Compliance Division and Corporate Legal will review, revise, and update this policy as needed. In addition, changes in this policy necessitated by changes in laws or regulations, or necessitated by exceptions to this policy, will be communicated directly to the division vice presidents, who shall cause appropriate changes to be made in the retention schedules of their respective divisions.

The Compliance Division and Corporate Legal will be responsible for interpreting any portions of this policy or a division's record retention schedule as they may apply to specific situations.

E.     Division Requirements. Each division's record retention schedule provides a list of

many records for that division, and prescribes the periods of authorized retention for those records. Retention schedules are based upon the legal and business needs of the particular divisions, and may be revised as necessary to comply with changing legal requirements; to address business needs; to include a newly created record series; or to delete a record series no longer useful or necessary. All revisions must be promptly reported to the Corporate Compliance Director, who will then update the master copy of the division's record retention schedule.

Responsibility for maintaining current, complete, and accurate individual division record retention schedules is vested in the division vice presidents, subject to the following requirements:

- All records shall be retained for the periods required by applicable state and federal laws and regulations.

- Adequate records shall be developed within each division to document compliance with all relevant laws and regulations.

- The privacy and security of records shall be appropriately secured.

- Any record not specifically listed on a division's record retention schedule should be retained for three (3) years, and then destroyed. This requirement will appear on all division record retention schedules.

    o For agents, records not subject to the "Addendum to Endorsement No. 12 and Document Retention Exhibit" should be retained for no more than three (3) years.

    o Different retention requirements, as defined by the Broker/Dealer, apply to all Associated Persons of the Broker/Dealer, including Registered Representatives.

- When establishing retention periods different from the general three-year requirement, all records shall be retained for a period of time that will reasonably assure the availability of those records when needed.

- Records vital to the ongoing operation of American Family shall be identified and appropriately safeguarded.

- Destruction of records shall take place only in compliance with individual division record retention schedules in order to avoid any inference that any document was destroyed in anticipation of or as a result of a specific issue, concern, or problem.

- Any records of any kind maintained in individual offices, at home, or at any offsite location are subject to these policies and procedures, and shall be maintained consistent with these requirements.

- Any and all legal questions related to a division's record retention requirements must be directed to the division's appropriate Corporate Legal contact.

For those records that are not transferred to American Family's Record Retention Center, each division shall maintain a Records Destruction Log (Form LGL-24126) to verify that records have been destroyed consistent with and as dictated by the division's record retention schedule. All log information shall be retained by the individual divisions for one (1) year after the destruction of any record listed on the log sheet. This electronic form can be found in the company's on-line Forms Library.

F.      Exceptions.  A record shall not be destroyed if any litigation, claim, negotiation, audit, market conduct examination, or other action involving the record is initiated before the expiration of a retention period for the record as set forth in the relevant division's record retention schedule.

When litigation, examinations, or other unusual circumstances arise, the Compliance Division or the Legal Department will notify the appropriate divisions and direct that relevant categories of documents be labeled for retention until further notice. Further, if, for any reason, a division becomes aware of any unusual circumstance, including, but not limited to, litigation or regulatory investigations, necessitating the retention of a record beyond the prescribed period, that division shall immediately notify and consult with the Compliance Division or the Corporate Legal Department.

Records subject to exceptions shall be retained until the completion of the action and the resolution of all issues that arise from it.  Notification in that regard will come from either the Compliance Division or the Legal Department.

Other exceptions may be warranted, depending on the circumstances.  Requests for exceptions from this policy must be submitted to the Compliance Division for approval before implementation.  In order to obtain an exception from this policy, the requesting division must have a program ready to implement upon approval that will assure compliance with the objectives of this policy at least as effectively as this policy.

G.      Contact Information.  Use the Compliance Division electronic mailbox (CorporateCompliance@amfam.com) for general questions about American Family's Records Retention and Destruction Policy and for specific questions about the rules described above. Contact the division's appropriate Corporate Legal representative for answers to questions seeking information on or for recommendations on specific divisional retention periods.

09.01.2004

---

[1] Different requirements apply to all Associated Persons of the Broker/Dealer, including Registered Representatives.