IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA and )
MARILYN STOPKA, )
 )
       Plaintiffs, )
 )
vs. ) No. 10 CV 6034
 )
AMERICAN FAMILY MUTUAL, )
INSURANCE COMPANY, INC., )
a Wisconsin corporation, )
 )
       Defendant. )
-------------------------------)
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., )
 )
       Third-Party Plaintiff, )
 )
vs. )
 )
AUGUSTINE CUSTOM HOMES, INC.; )
and ANDERSEN & FIENE, LTD., )
 )
       Third-Party Defendants. )

    The Deposition of MICHAEL J. STOPKA, called as a witness on behalf of the Defendant and Third-Party Plaintiff, pursuant to the Federal Rules of Civil Procedure, taken before Deborah S. Molinaro, a Notary Public within and for the State of Illinois, at Suite 2500, One South Wacker Drive, Chicago, Illinois, on Wednesday, January 26th, 2011, commencing at the hour of 10:40 o'clock a.m.



*Carole Glass Reporting Co.*
*Serving Chicagoland Since 1974*
312/315-7711 ♦ glassreportingco@aol.com

Exhibit A

MICHAEL J. STOPK
January 26, 2011

Page 18

1    A  It's waiting for this case to be
2  resolved. It's a construction loan and it's
3  interest only, and it's near completion.
4    Q  We're going to have another deposition.
5  I'm just trying to define parameters on damages
6  though. But what in your mind remains to be done
7  before occupancy can be undertaken?
8    A  Remediate the smoke smell and the char
9  embers and putting the house back to where it was
10  prior to the fire, No. 1.
11       No. 2, because of the fire, the
12  stairs which are coming in from Indonesia, they
13  had to be delayed, and that's a work in progress;
14  doors, meaning the front and back door, which are
15  being fabricated, and some miscellaneous
16  woodwork.
17    Q  When you say smoke smell, char, and
18  ember, any other remediation steps that you
19  believe in general are outstanding other than
20  those two areas which we'll cover in another
21  deposition, but I'm just trying to get a
22  parameter?
23    A  From the fire, we have leaks yet that as
24  we speak have to be fixed.

Page 19

1       When they, Miner & East, did the
2  skylights on the front entry of the house,
3  according to the general contractor and the sub,
4  it was never set correctly, and it's leaking yet.
5  So it's our third time. We're trying to fix
6  that.
7       We're still trying to remediate
8  where there was fire damage on the patios for
9  leaks, which I'm trying to rectify because it's
10  starting to hurt the drywall and the wood in the
11  house. So this will be Phase 3 of doing that.
12    Q  Anything else, any other general areas?
13    A  I mean, there's some cabinets that are
14  still coming in, but that's in process. I'm sure
15  there's something I'm missing.
16    Q  Right. I was just trying to limit it to
17  general areas regarding remediation. I
18  understand stairs, doors, front and back,
19  miscellaneous woodwork and cabinets may not
20  necessarily be a remediation. I'm just trying to
21  get general areas as far as remediation.
22    A  So you're talking about --
23    Q  Let me just finish the question.
24    A  I'm sorry.

Page 20

1    Q  And I understand. You're being very
2  helpful. I'm trying to get to a point where I
3  just understand the general topic areas.
4       If we talk about remediation, you
5  mentioned smoke smell, char embers, skylights
6  near the entryway, and you said something about a
7  patio leak which may be causing some problems
8  with drywall. Any other general remediation
9  areas that you can think of as you sit here now?
10    A  To understand the question, are you
11  talking about in the future or things that have
12  happened since December of 2009 and now? I mean,
13  because there was a lot of remediation that went
14  through that process.
15    Q  That remain now.
16    A  The big one is the smoke smell that's
17  been there since the fire.
18    Q  And as far as the cause of the smoke
19  smell, who would best be able to speak to the
20  cause of that, do you know?
21    A  At this point?
22    Q  Yes, sir.
23    A  The forensic analysis.
24    Q  Got it.

Page 21

1       So you would defer to them as to the
2  cause, is that correct?
3    A  Yes.
4    Q  And that was Forensic Analytical, is that
5  correct?
6    A  Yes.
7    Q  Okay. And just so I have a general idea
8  of the char-ember issue, you mentioned that?
9    A  Yes.
10    Q  Where are you speaking of regarding the
11  char-ember issue, just so I have a general
12  understanding of that?
13    A  It would be the attic area in general.
14  It could be multiple areas. I mean, I did not do
15  the analysis.
16    Q  Again, I'm not trying to limit you in any
17  way, but who would best be able to speak to that?
18    A  The exact location, it would be the
19  forensic people.
20    Q  Very good.
21       So whatever char or embered area
22  remains, that would, as far as you're concerned,
23  be best answered by experts other than yourself?
24  That would be someone from Forensic Analytical,

6 (Pages 18 to 21)

Page 22

1  is that correct?
2      MR. PEARSON: Objection. Form of the
3  question.
4          You can answer.
5      THE WITNESS: Repeat. I'm sorry?
6      MR. PEARSON: You can answer the
7  question.
8      MR. RUFF: Do you need the question read
9  back, sir?
10     THE WITNESS: Please do.
11
12     (Question read as follows:
13     "Q Very good.
14        So whatever char or embered area
15     remains, that would, as far as
16     you're concerned, be best answered
17     by experts other than yourself?
18     That would be someone from Forensic
19     Analytical, is that correct?")
20
21 BY MR. RUFF:
22   Q And maybe my question was a bit choppy
23 because I was hearing an objection, and you and I
24 were kind of talking at the same time. Let me

Page 23

1  just try and get it a little bit clearer for both
2  of us.
3         As far as the cause and the area of
4  where the char and ember is currently that
5  remains as far as a remediation issue, the entity
6  best able to respond to that would be Forensic
7  Analytical, is that fair, sir?
8    A Repeat the question. Sorry.
9    Q I was trying to be clear.
10   A I know. I know, but I think it was a
11 little bit different than the first time.
12
13     (Question read as follows:
14     "Q And maybe my question was a bit
15     choppy because I was hearing an
16     objection, and you and I were kind
17     of talking at the same time. Let
18     me just try and get it a little bit
19     clearer for both of us.
20       "As far as the cause and the
21     area of where the char and ember is
22     currently that remains as far as a
23     remediation issue, the entity best
24     able to respond to that would be

Page 24

1     Forensic Analytical, is that fair,
2     sir?")
3
4      THE WITNESS: You said the word "cause."
5  So the question was the cause. The cause is from
6  the fire caused by Complete Flashing, so I could
7  easily answer that. The embers and the smoke
8  smell is caused by the fire.
9         So your question was cause. The
10 cause is the fire by Complete Flashing.
11 BY MR. RUFF:
12   Q And where that ember does exist today,
13 are you the person that would best be able to
14 speak to that or would be Forensic Analytical?
15   A Forensic Analytical.
16   Q Very good.
17        The skylight issue never set
18 correctly, who advised you of that or is that
19 something you observed?
20   A That would be Complete Flashing told me
21 that, your client, or American Family's client
22 told me that.
23   Q That the skylight was never set
24 correctly?

Page 25

1    A When Miner & East came in to secure the
2  building, they hammered and compromised all the
3  skylights. And Complete Flashing, who did the
4  work on the roof both times, said that the reason
5  that it's still leaking today was that it wasn't
6  correctly done, and that has to be fixed to put
7  the house back to where it was.
8    Q And that was someone from Complete
9  Flashing that indicated that to you?
10   A Yes.
11   Q Do you know who it was from Complete
12 Flashing?
13   A It would be Mark, and I don't have the
14 spelling of his last name. I apologize.
15   Q Can you give the phonetic?
16   A It's R something. Sorry. I know him as
17 Mark.
18   Q That's fine.
19        When you say skylights, is it more
20 than one?
21   A There's three.
22   Q And is it all in the front entrance area?
23   A Correct.
24   Q I mean, I've seen photos, but I haven't

**Page 66**

1  yes.
2  Q And if there was any potential need to
3  have your own coverage, you would have expected
4  either Mr. Wolowicki or Mr. Praxmarer to obtain
5  that for you, true?
6  A Repeat the question, please.
7
8       (Question read as follows:
9       "Q And if there was any potential
10      need to have your own coverage, you
11      would have expected either
12      Mr. Wolowicki or Mr. Praxmarer to
13      obtain that for you, true?")
14
15     THE WITNESS: When you say "coverage," do
16  you mean where there would be a shortfall? I
17  mean, coverage means many things. I mean, so
18  would I have expected if there was a shortcoming,
19  you know, in the policies, that was their job.
20  BY MR. RUFF:
21  Q You would have anticipated that if you
22  needed your own coverage that Mr. Wolowicki or
23  Mr. Praxmarer would have obtained that for you,
24  true?

**Page 67**

1  A Yes.
2  Q And in fact, was there coverage placed
3  for you through Nationwide?
4  A Yes.
5  Q And were you advised that that coverage
6  would have included a fire loss?
7  A I was never advised what was included in
8  the policy.
9  Q With respect to --
10 A I mean --
11 Q Did you expect Mr. Wolowicki or
12 Mr. Praxmarer to review the other policies of
13 insurance in place on the property? And when I
14 say the "property," you know I'm talking about
15 10 Goose Lake, correct?
16 A I would expect that they knew what Todd's
17 policy was being the general contractor.
18 Q Do you know if a request for an insurance
19 review was made on September 10, 2008?
20 A I knew Jerry was asking our attorney and
21 other insurance professionals, you know. But to
22 say the actual date or actually who he spoke to,
23 I can't say.
24 Q How do you know that Mr. Wolowicki was

**Page 68**

1  asking for --
2  A Because we --
3  Q Let me just finish.
4  A Sorry.
5  Q -- an insurance review on September 10,
6  2008?
7  A Because we talked about it that, you
8  know, Jerry is my business agent for a better
9  term, and that he needed to talk to other
10 insurance people to get more knowledge.
11 Q Very good. Was that something that was
12 discussed on the 10th, what you're relating?
13 A The 10th, the day of the fire, very
14 little was discussed on the 10th.
15     And if it was discussed, obviously,
16 you know, when you brought back the 10th, I mean,
17 what it does to me. The morning I'm okay, but
18 the 10th I can't recall anything.
19 Q Are you finished?
20 A Yes.
21 Q Okay. What you do recall is that at some
22 point you and Mr. Wolowicki had a discussion
23 about getting an insurance review, is that
24 correct?

**Page 69**

1  A What do you mean by an insurance review?
2  Q Find out what coverage you had in place,
3  who would respond.
4  A We talked about that review of the
5  situation, yes.
6  Q Okay. And although you don't recall the
7  exact day, you recall that that discussion did
8  occur, true?
9  A I recall that Jerry said that he had to
10 find out more information about the policies --
11 Q And that --
12 A -- or policy.
13 Q I didn't mean to interrupt you.
14 A That's it.
15 Q Okay. And that's when he indicated to
16 you that in fact he would contact I think you
17 said your attorney, is that right?
18 A If I'm correct, yes.
19 Q And your attorney at that juncture, was
20 that Mr. Drost?
21 A The firm is Drost Kivlahan, but I would
22 have no idea who he had contacted. It would be
23 conjecture.
24 Q So at this particular juncture, did you

18 (Pages 66 to 69)

Page 70

1  have a regular law firm that you went to? Was
2  Drost the regular law firm?
3     A  Drost is our regular law firm, yes.
4     Q  Was there one person there that was your
5  contact, sir?
6     A  We had multiple contacts based on the law
7  that's being considered, be it intellectual
8  property, residential. So I can't say who Jerry
9  would have spoken to at the firm.
10    Q  But that firm was somewhat your go-to
11 firm at that particular juncture?
12    A  For normal type business day-to-day, you
13 know, meat and potatoes, yes.
14    Q  And there may be one of the partners or
15 principals or someone in that firm you would be
16 directed to, to answer a general question that
17 you had on a day-to-day basis, is that correct?
18    A  Myself or Jerry, yes.
19    Q  And if we look on this bill, it says it
20 was submitted. It's an invoice. The date is
21 October 10, 2008, and it's sent to you at Design
22 Toscano, correct, sir?
23    A  Correct.
24    Q  And it indicates that there were some

Page 71

1  type of three-quarters of an hour discussion or
2  request at least on September 10, 2008,
3  indicating potentially a contact with
4  Mr. Wolowicki. Does that sound right?
5     A  That's what it says. You know, Wolowicki
6  would have spoken to him actually. If it's the
7  10th, then he probably called from the fire site.
8     Q  And that would have probably been based
9  upon a discussion, although you can't recall it
10 specially right now, between you and
11 Mr. Wolowicki, is that correct?
12    A  Your question before was covering the
13 insurance policy. I can't possibly say that. I
14 mean, I would guess on the 10th I could tell that
15 that was George Drost, and he probably was just
16 talking to him that the house was on fire.
17 Because, you know, I've worked with George as
18 long as I've worked with Jerry. And I would be
19 hard pressed that we were talking about insurance
20 reviews, you know.
21       I was on my knees crying during the
22 six hours to see my life dream burning up in
23 front of me. You know, talking about insurance
24 reviews and talking about what we do next, you

Page 72

1  know, it wouldn't have been even in the picture
2  of what we were talking about on the 10th, you
3  know.
4     Q  What may have happened on the 10th is you
5  had indicated that Mr. Wolowicki or he may have
6  indicated to you some discussion about making
7  sure that there would be some insurance response
8  to this, is that fair?
9        MR. PEARSON: Let me just interpose an
10 objection.
11       You're free to respond to the
12 question other than disclosing any information
13 that was communicated to Mr. Wolowicki by your
14 counsel over which we claim privilege. So I just
15 want to caution you not to divulge any such
16 communications.
17       THE WITNESS: And I can't divulge
18 anything because I don't know what was covered in
19 the conversation, so.
20 BY MR. RUFF:
21    Q  Well, I didn't even get to that
22 conversation yet, so I think we're getting ahead
23 of ourselves.
24       But essentially all I want to know

Page 73

1  is the discussion between you and Mr. Wolowicki.
2  Might it have been as simple as: Mr. Wolowicki,
3  get whatever information is necessary or take
4  whatever steps are necessary to ensure we have
5  coverage for this?
6     A  It's as simple as I can't say. I don't
7  recall because I was just concerned that my house
8  is burning up, I mean.
9     Q  Would this, just looking at this invoice,
10 indicate to you that you must have had some basic
11 discussion with Mr. Wolowicki concerning
12 insurance on the 10th?
13    A  No. I know George personally, you know,
14 for 15 years. And, you know, for conjecture it
15 could have been: Please tell George that my
16 house is burning up to a pulp. It could have
17 been as simple as that. So I can't say what he
18 would have spoken to George about.
19       I mean, I would envision that since
20 George is my client all these years and he's seen
21 my life dream to build this house, you know, I
22 don't think it would be a callous moment to say:
23 Let's look at our insurance policies and saying
24 hey, Mike's house is burning up. We're going to

19 (Pages 70 to 73)

MICHAEL J. STOPK
January 26, 2011

Page 82

1  you about that before, and you started to relate
2  that. You did have a discussion with Mark on the
3  10th?
4     A  Yes.
5     Q  And I know you started to relate at least
6  a portion of that. I don't know if you related
7  it all. Can you tell me what he said to you and
8  what you said to him?
9     A  He was sorry. He said, "I don't know how
10 to make it up to you." I mean, he was giving me
11 his condolences, and he explained how it
12 happened.
13    Q  What did he say as far as how it
14 happened?
15    A  One of his people or it could have been
16 him, I don't remember, the individual was up on
17 the gutter with the blowtorch and started the
18 rafters on fire and that the fire kept on
19 spreading. And they called the fire department
20 as fast as they could.
21    Q  And then what did you say to him?
22    A  You know, I forgave him.
23    Q  He did indicate to you that he reported
24 it to his insurance carrier?

Page 83

1     A  I can't recall.
2     Q  How did you know that on the 11th you
3  were going to meet with, you mentioned Gerry
4  Hayes, how did you know that?
5     A  I'd be conjecturing, but I assumed Jerry
6  Wolowicki orchestrated it.
7     Q  Did you know that you were going to meet
8  with Mr. Hayes before you came out there or was
9  it just that you were going to meet with Complete
10 Flashing's carrier?
11    A  I can't recall if I knew the name or who
12 was going to be there. I mean --
13    Q  On the -- I'm sorry. Are you finished?
14    A  Yeah. It might have been communicated to
15 me on the 10th, but I can't possibly remember
16 anything from the 10th.
17    Q  And you said you arrived at approximately
18 8 a.m. on the 11th?
19    A  Right.
20    Q  Okay. Were you the first to arrive or
21 were there other already people there?
22    A  I think other people were there.
23    Q  Do you know who was there, sir?
24    A  Luke would have been there; Wolowicki, of

Page 84

1  course; our person that Luke had our policy,
2  which would have been Chris Mason; and Gerry
3  Hayes. There might have been someone else there
4  but I can't say. I don't recall.
5     Q  So all of these people were there before
6  you arrived?
7     A  Some people were there before I arrived.
8     Q  Okay.
9     A  And Wolowicki was there, of course. Oh,
10 my God.
11    Q  And at some point, all of the people you
12 mentioned: Mr. Praxmarer, Mr. Wolowicki,
13 Mr. Mason, Mr. Hayes, and yourself had a meeting
14 there, is that correct?
15    A  Yes.
16    Q  Anybody else that was involved in the
17 meeting?
18    A  I could conjecture. It would be only
19 conjecture. I can't remember anybody else.
20    Q  Was Todd Augustine there?
21    A  Oh, yes. Todd was there. Thank you,
22 please, yes.
23    Q  And I don't want you to conjecture, but
24 is there anybody else that could possibly have

Page 85

1  been there?
2     A  Well, the guys from Miner & East could
3  have been there, but I can't say. It would be
4  conjecture because, again, it's still 24 hours.
5     Q  Who was your main contact, if you recall,
6  from Miner & East?
7     A  I wouldn't recognize anybody. We're
8  getting ahead, but Todd Augustine did all the
9  communications -- or Todd and Hayes would have
10 communicated with them.
11    Q  Sir, did you keep any notes or log as it
12 related to the fire or to the events regarding
13 the fire?
14    A  I kept all the e-mails, which you got
15 100 percent of those.
16    Q  Okay. Did your wife keep any kind of
17 diary or log or anything like that?
18    A  Similar e-mails. You would have to ask
19 her though.
20    Q  But as far as you know, other than the
21 e-mail traffic, there was no specific diary or
22 log that either you or she kept?
23    A  No. If you count pictures that we have,
24 all the pictures, in the process. But during the

22 (Pages 82 to 85)

MICHAEL J. STOPF
January 26, 2011

Page 86

1 fire, actually I didn't take many pictures
2 because, you know.
3   Q  I'm talking about a written recordation.
4   A  No. There's nothing, you know.
5   Q  How about Jerry Wolowicki? Did he keep
6 any kind of notes? For instance, were any notes
7 taken by him on September 11th?
8   A  You'd have to ask him.
9   Q  You don't know as you sit here now?
10  A  No. I mean, he wrote e-mails. I can't
11 say if he took notes.
12  Q  Do you recall him like with any pad of
13 paper or anything like?
14  A  At the meeting he would have had a
15 notepad, yes.
16  Q  So there probably are notes that
17 Mr. Wolowicki would have kept contemporaneously,
18 is that correct?
19  A  You mean from the meeting?
20  Q  From meetings.
21  A  He would have had it on the 11th, you
22 know.
23  Q  How long did the meeting with the
24 individuals that you've mentioned here, how long

Page 87

1 did it last? Mr. Wolowicki has 3.0 listed there.
2   A  I would guess meeting Hayes, hour and a
3 half, two hours.
4   Q  And some of that time that, he,
5 Mr. Wolowicki, would have been there would have
6 been not only in meeting with Mr. Hayes but --
7   A  Todd also.
8   Q  And you?
9   A  And Luke.
10  Q  Okay. Was there any discussion with
11 Todd, Luke, Mr. Wolowicki, and yourself outside
12 the presence of Mr. Hayes?
13  A  I'd have to assume so, but I can't say
14 for sure. I mean, my God, you know.
15  Q  The purpose of today is to exhaust your
16 memory, okay? If you don't recall, that's fine.
17  A  Okay.
18  Q  But what I have to be concerned about is
19 you say something that, you know, at later date,
20 at trial or whatever that I failed to cover here,
21 so that's what I'm trying to do here. And if we
22 exhaust it, that's fine.
23  A  Okay.
24  Q  Were you going to say something?

Page 88

1   A  I don't recall the full meeting, you
2 know.
3   Q  Was there a meeting with Mr. Hayes and
4 the other individuals first and then a separate
5 meeting with your representatives?
6   A  I can't recall exactly how the meeting
7 transpired.
8   Q  Where did the meet taking place? I know
9 it was at the premises, but was there some place
10 to sit or talk?
11  A  No. We were standing in front of the
12 house. I remember that.
13  Q  Do you know if Mr. Hayes was taking any
14 notes?
15  A  I can't recall.
16  Q  How about Mr. Mason?
17  A  I can't recall.
18  Q  How about Mr. Augustine?
19  A  I can't recall.
20  Q  How about Mr. Praxmarer?
21  A  I can't recall.
22  Q  Okay. Was your wife present at all?
23  A  No.
24  Q  And I know I may be jumping ahead a

Page 89

1 little bit, but did most of the discussions, if
2 it was between Mr. Hayes and yourself and your
3 wife, was your wife involved in any of those or
4 would that have been primarily you?
5   A  It would be primarily me.
6   Q  Do you recall, for instance, any
7 particular meetings that your wife may have had
8 with Mr. Hayes?
9   A  If I'm correct, I think she met him once,
10 could have been twice. I know at least once.
11  Q  All right. What was covered in that
12 first meeting? And I know I'm asking you to kind
13 of recall a lot, but to the best of your
14 recollection.
15  A  You know, in all the haze I just -- haze,
16 not Hayes -- I remember, you know, Hayes looking
17 at me and saying, "Mike, my job is to put this
18 house back to exactly where it was 5 minutes
19 before the fire," almost like a sincere look he
20 says, and that made me feel good, you know.
21  Q  Was there any kind of estimate -- go
22 ahead.
23  A  It's something you remember that burns
24 into you, you know.

23 (Pages 86 to 89)

glassreportingco@aol.com
312-315-7711

MICHAEL J. STOPI
January 26, 2011

Page 90

1  Q  Was there any kind of estimate made as to
2  how much it would cost to do that, to put it in
3  that order?
4  A  At that point?
5  Q  Yes.
6  A  No.
7  Q  What did Mr. Mason say at the meeting, if
8  anything?
9  A  I can't remember exactly what was
10 discussed, you know, with him at that meeting. I
11 mean, I got the e-mails after. But, I mean, you
12 know, given my state, I mean, I'm still this
13 shook up that day, two days. I'm not the type of
14 person that remembers as much, but these two days
15 is why Wolowicki was there to make sure that I
16 got through this, you know.
17 Q  As you sit here now, do you recall
18 anything that anybody said? I know you related
19 one statement attributable to Mr. Hayes. Do you
20 recall anything else that anybody else said
21 during this approximately one-half to two-hour
22 meeting?
23 A  I mean, to say exactly, no, I can't say
24 for sure.

Page 91

1  Q  And again, I'm not asking you exactly.
2  I'm asking you is there anything in general you
3  remember anybody else saying at this meeting?
4  A  I can't recall exactly. I don't want to
5  say if I can't recall completely.
6  Q  And I'm asking generally. You can't
7  recall anything else that was generally stated at
8  that one-and-a-half to two-hour meeting other
9  than what you've already indicated, is that
10 correct?
11 A  It was the gathering of information from
12 Hayes and I would assume Mason. But Hayes I
13 remember pretty vehemently -- vehement is the
14 wrong word -- clearly.
15 Q  And when you say "gathering of
16 information," what are you talking about, what do
17 you mean?
18 A  The house and how it's going to be locked
19 down, cleaned up -- not cleaned up. You know, I
20 know the name but Miner & East getting involved.
21 Hayes was bringing the Miner & East people in.
22 Q  Did he mention that name?
23 A  I wouldn't have known the name then, but
24 I know the name now.

Page 92

1  Q  Okay. And when you say locked down, did
2  he tell you what he was talking about --
3  A  I can't say --
4  Q  Let me just finish the question.
5  A  Sorry.
6  Q  -- about locking down?
7  A  That's my words, but it's trying to make
8  the house weatherproof.
9  Q  Did he say how that would be done?
10 A  I can't recall.
11 Q  Was there any discussion by Mr. Mason as
12 to how he, on behalf of -- you understood him to
13 represent Nationwide, correct?
14 A  Yes.
15 Q  As to how he would respond if Nationwide
16 responded?
17 A  To say exactly, I can't recall exactly.
18 Q  Generally.
19 A  It would have to be discussed, you know.
20 It didn't have to be decided then, you know,
21 which policy we went with. Jerry Wolowicki --
22       You're asking me at this time. I
23 can't remember if it was there or, you know, two
24 weeks later.

Page 93

1  Q  Uh-huh.
2  A  So I can't say.
3  Q  Okay. And you mentioned something about
4  which policy would respond. I'm not trying to
5  put words in your mouth. I thought that's the
6  word you used.
7  A  Some time in the future. You asked what
8  Chris Mason was asking us if we would be using
9  their policy, and that would be some time 5 days
10 later, 10 days later. It's in his letter.
11 Q  And when you say "using their policy,"
12 you are talking about Chris Mason generally
13 making some kind of statement like that, is that
14 correct?
15 A  Repeat the question.

16     (Question read as follows:
17     "Q And when you say "using their
18     policy," you are talking about
19     Chris Mason generally making some
20     kind of statement like that, is
21     that correct?")

22 THE WITNESS: Some time. It doesn't mean

24 (Pages 90 to 93)

Page 94

1 at this meeting, but you know, if we were going
2 to, you know, make a claim.
3 BY MR. RUFF:
4    Q And when you say "make a claim," that
5 would be a claim against Nationwide, correct?
6    A At some point in the future, yes.
7    Q Okay. At least at this juncture,
8 Mr. Mason was inquiring as to whether or not --
9    A The juncture being on the 11th to
10 answer --
11    MR. PEARSON: Let him finish his question
12 first.
13 BY MR. RUFF:
14    Q Let's back up because I think I know
15 where you're going.
16    At some point early on Mr. Mason was
17 inquiring as to whether or not you would be
18 asking the Nationwide policy to respond, is that
19 correct?
20    A Yes. That would be in the letter that he
21 sent to us.
22    Q Right. I'll get to that in a minute.
23    MR. PEARSON: Counsel, let me know when
24 would be a good time for you to break.

Page 95

1    MR. RUFF: Now is fine.
2    MR. PEARSON: Okay.
3    MR. RUFF: This is no marathon.
4    MR. PEARSON: No, no. I didn't want to
5 break at a time that didn't make sense for you.
6
7    (Discussion off the record.)
8
9    (The deposition was adjourned at
10    12:40 p.m. to 1:26 p.m.,
11    January 26, 2011.)
12
13    MR. RUFF: What's the last question and
14 answer, please?
15
16    (Record read as requested:
17    "Q Let's back up because I think I
18    know where you're going.
19    "At some point early on
20    Mr. Mason was inquiring as to
21    whether or not you would be asking
22    the Nationwide policy to respond,
23    is that correct?
24    "A Yes. That would be in the

Page 96

1    letter that he sent to us.")
2
3 BY MR. RUFF:
4    Q In that first meeting, did Mr. Hayes
5 indicate what the limits of the American Family
6 policy was?
7    A Did not.
8    Q Okay. Did anybody ask what the limits of
9 the American Family policy were?
10    A Did not.
11    Q If you need to look at Exhibit 3, please
12 go ahead.
13    A Okay.
14    Q Did you ever inquire of Mr. Wolowicki
15 what was determined regarding coverage?
16    A Repeat the question.
17    MR. RUFF: Can you read it back?
18
19    (Question read as follows:
20    "Q Did you ever inquire of
21    Mr. Wolowicki what was determined
22    regarding coverage?")
23
24    THE WITNESS: Yes, that there was

Page 97

1 insurance from Complete Flashing.
2 BY MR. RUFF:
3    Q Did you ever learn that the coverage was
4 $2 million?
5    A Not at that point, no.
6    Q Okay. But at some point by December --
7 let's just get it out here, the December e-mails
8 and letter.
9    I'm jumping ahead a little bit just
10 to try to save time.
11    A Sure.
12    MR. RUFF: I think these are the same,
13 but they're different Bates numbers.
14    MS. CROWLEY: They could be, yes.
15
16    (Deposition Exhibits Nos. 4 through
17    6 were marked for identification as
18    of 1-26-11.)
19
20    MR. RUFF: Sir, they're different Bates
21 numbers. Exhibit 4 is 225-A. Exhibit 5 is 973,
22 but I think they're the same e-mail. And Exhibit
23 No. 6 is a letter which we'll get to.
24    And if you look at Exhibit No. 4

25 (Pages 94 to 97)

Page 98

1 first, what Bates number is that? I just handed
2 it to you upside down.
3     MS. CROWLEY: 225.
4     MR. RUFF: 225.
5     MR. PEARSON: 225-A, I think is what I
6 asked for.
7
8     (Discussion off the record.)
9
10 BY MR. RUFF:
11     Q   You received this e-mail, correct?
12     A   Yes.
13     Q   Can you tell us the progress of
14 discussions? It says here:
15         "The Insured have decided to seek
16         indemnification on their fire loss from
17         American Family Insurance. The Insured
18         have been collecting directly from
19         American Family for the repairs and other
20         costs attributable to the fire. Please
21         contact me if you have any further
22         questions."
23         This is an e-mail from Mr. Wolowicki
24 to Mr. Mason, and it's dated December 2, 2008,

Page 99

1 correct?
2     A   Yes.
3     Q   And do you recall this e-mail?
4     A   Yes, I do.
5     Q   Okay. Was Mr. Mason inquiring as to
6 whether or not you were going to allow Mr. Hayes
7 and American Family to continue to reimburse for
8 the fire loss?
9     A   I mean, Jerry is telling Mr. Mason that
10 Hayes has done everything that he said he was at
11 that point. So I mean, it's not a question of
12 Mason. It's Jerry saying this, not Mason.
13     Q   Right. Had Mr. Mason been inquiring as
14 to whether or not which policy you wanted to
15 receive coverage from?
16     A   You'd have to ask Jerry on that because
17 Jerry's the main contact. We were cc'd.
18     Q   Okay. Did you know at this juncture that
19 the American Family policy was a $2 million
20 limit?
21     A   I'd say no.
22
23     (Deposition Exhibit No. 7 was marked
24     for identification as of 1-26-11.)

Page 100

1 BY MR. RUFF:
2     Q   Sir, I will show you Exhibit No. 7.
3     A   Sure.
4     Q   And the Bates number on that document I
5 just handed to you is on the bottom right.
6     MR. PEARSON: It's STP168-A.
7 BY MR. RUFF:
8     Q   You received that letter, correct?
9     A   Yes.
10     Q   Okay. You at least knew as of
11 September 16, 2008 -- and I'll just read it to
12 you.
13     A   Sure.
14     Q   "It is our understanding that American
15 Family carries $2 million liability coverage
16 limits." Do you see that?
17     A   Yes.
18     Q   It indicates before that just in that
19 same paragraph a little bit above that:
20         "As a summary of our meeting,
21         American Family Insurance (liability
22         insurance carrier for Complete Flashings)
23         verbally indicated that they are
24         accepting full liability for the damages

Page 101

1         caused by their client and are willing to
2         take the lead on your home repairs."
3         Did I read that correctly?
4     A   Yes.
5     Q   Did you understand that to be the case?
6     A   That they were taking the lead on it?
7     Q   Yes.
8     A   Yes.
9     Q   "At that time, you indicated that you
10 would like American Family Insurance to
11 coordinate the emergency services effort and
12 would like to discuss your options with your
13 attorney and financial advisor regarding pursuit
14 of indemnification (pursuit of claim from your
15 first party homeowners policy or on your own with
16 the third party liability policy). It is our
17 understanding that American Family carries
18 $2 million in liability coverage limits."
19         Do you see that?
20     A   I see it.
21     Q   So you knew at this juncture that
22 American Family's coverage limits were $2 million
23 for Complete Flashings, true?
24     A   I don't remember reading that line. I

26 (Pages 98 to 101)

MICHAEL J. STOPK
January 26, 2011

### Page 114

1 damages are actually greater than that? Just sue
2 him? Or did you say: Is there any other policy
3 that responds?
4     A  We never talked about the other policies.
5     Q  Did you ever intend to give up any rights
6 against Allied if the damages were greater than
7 2 million?
8     A  Honestly, I didn't have that conversation
9 about giving up rights with Wolowicki.
10    Q  If we look at the --
11        MR. PEARSON: Could we take a break?
12       MR. RUFF: Sure.
13
14       (A break was taken at 1:48 p.m. to
15        1:52 p.m., after which the
16        following proceedings were had:)
17
18       MR. RUFF: What's the question
19 that's pending?
20
21       (Question read as follows:
22        "Q Did you ever intend to give up
23        any rights against Allied if the
24        damages were greater than

### Page 115

1        2 million?")
2
3 BY MR. RUFF:
4     Q  Let me go back, and maybe this will
5 refresh your recollection, sir. If we look at
6 the November 21, 2008 letter, okay? And I
7 believe that's Exhibit 8.
8     A  Right here. Right.
9     Q  This is from Mr. Mason to yourself and
10 your wife. It indicates:
11       "Per our conversation of 11/17/08,
12        you indicated that you are very close
13        to making a decision regarding your fire
14        loss which occurred on 9/10/08. During
15        the course of our conversation, you
16        indicated that you have allowed American
17        Family Insurance to begin some of the
18        dwelling demolition while American
19        Family, the structural engineers, and
20        your contractor work together to create
21        an accurate damage repair estimate."
22       Are you with me so far?
23    A  Yes, sir.
24    Q  "You also indicated that they have begun

### Page 116

1 indemnifying you for the interest that you are
2 incurring as a result of your construction loan."
3 Is that correct?
4     A  Correct.
5     Q  "Finally, you indicated that you would be
6 meeting with your attorney and Jerry Wolowicki
7 this week to make your final decision regarding
8 your source of indemnification on this loss,"
9 correct?
10    A  I would be meeting with Jerry, probably
11 not my attorney.
12    Q  All right. Very good, and I'll cover
13 that.
14       Who would the attorney be at this
15 particular juncture?
16    A  I don't know. I don't recall.
17    Q  It was somebody after Mr. Drost, is that
18 correct?
19    A  I can't say that. I'm not sure who Jerry
20 was working with.
21    Q  But in any event, after Jerry had a
22 meeting with the attorney, then you would have
23 had a meeting with Jerry?
24    A  Yes, sir.

### Page 117

1     Q  Okay. And it appears as if Allied is
2 pushing to make some kind of decision, obviously
3 let American Family be the lead in this, correct,
4 so that they could sit in the back?
5     A  They're trying to have us make us a
6 decision, not necessarily American, but they
7 wanted us to make a decision.
8     Q  They wanted you make the decision, let
9 American Family go first, and then they sit in
10 the background. That's what appears to be the
11 whole tenor of this, correct?
12    A  The tenor is that they're trying to make
13 a decision -- repeat the question.
14    Q  The tenor of this is such that Allied
15 wants to be able to sit in back while allowing
16 American Family to take the lead in accepting
17 responsibility for their insured, true?
18    A  True.
19    Q  Okay. Obviously they'd like to sit back,
20 have somebody else respond to the loss, and that
21 person go first, true?
22    A  I can't speak for Mason, but I would
23 assume that's true.
24    Q  And so what he's trying to do here, as we

**Page 118**

1 indicate in a number of letters, he's trying to
2 have you in consultation with Mr. Wolowicki and
3 Mr. Wolowicki and the attorney come to a decision
4 in that regard, true?
5   A  True.
6   Q  And it indicates here:
7       "You indicated you are heavily
8     favoring collection directly from
9     American Family at this time," right?
10   A  True.
11   Q  So Mr. Wolowicki had the meeting with the
12 attorney, although you can't recall who that
13 attorney is right now?
14   A  Right. No, I can't.
15   Q  And as a result of that meeting that
16 Mr. Wolowicki had with the attorney, then he
17 would have recommended, he, Mr. Wolowicki, would
18 have recommended something to you, correct?
19   A  Correct.
20   Q  Did Mr. Wolowicki recommend that you
21 allow American Family to take the lead, but you
22 weren't going to give up any rights should
23 American Family's limits become exhausted?
24   A  True.

**Page 119**

1   Q  So, in other words, you don't know. You
2 hope, everybody hopes, that the damages could be
3 as small as possible, but if they do become
4 greater than $2 million, you weren't going to
5 limit your rights in any respect against Allied
6 or anybody else, true?
7     MR. PEARSON: Let me just interpose an
8 objection. Your earlier line of questioning --
9 the timing of when the $2 million issue in the
10 witness' mind has not been established. It's the
11 merging of these that I'm having some trouble
12 with.
13     So if you could rephrase the
14 question, I'd appreciate it.
15     MR. RUFF: Let me just have the question
16 back. We'll see.
17
18     (Question read as follows:
19     "Q So, in other words, you don't
20     know. You hope, everybody hopes,
21     that the damages could be as small
22     as possible, but if they do become
23     greater than $2 million, you
24     weren't going to limit your rights

**Page 120**

1     in any respect against Allied or
2     anybody else, true?")
3
4     MR. RUFF: Let's go with that question.
5 We can work on a time frame.
6     MR. PEARSON: But you earlier asked him
7 to assume his understanding with respect to the
8 $2 million limits and then asked the second part
9 of that question.
10     So that's just the reason for my
11 objection.
12     MR. RUFF: Understood.
13     MR. PEARSON: Go ahead.
14     MR. RUFF: Do you want the question back
15 again so that you fully understand it.
16     THE WITNESS: Please do.
17     MR. RUFF: Okay.
18
19     (Question read as follows:
20     "Q So, in other words, you don't
21     know. You hope, everybody hopes,
22     that the damages could be as small
23     as possible, but if they do become
24     greater than $2 million, you

**Page 121**

1     weren't going to limit your rights
2     in any respect against Allied or
3     anybody else, true?")
4
5     THE WITNESS: The phrase: I would never
6 limit my rights in any way, I mean, but not
7 necessarily mean it was framed with the
8 $2 million, so.
9     MR. RUFF: I don't know what that means.
10 BY MR. RUFF:
11   Q  r. Wolowicki was going to the lawyers to
12 get some kind of analysis on the coverage, is
13 that fair?
14   A  Yes.
15   Q  Okay. And you're not sure if it was in
16 November. It could have been January, but at
17 some point Mr. Wolowicki or Jerry, somebody
18 advises you that there's $2 million, correct?
19   A  Correct.
20   Q  It was never your intent that if all
21 American Family had was 2 million in coverage
22 that you were not going to limit yourself to that
23 2 million. You wanted to keep all options open,
24 correct?

31 (Pages 118 to 121)

Page 134

1  A  Yes.
2  Q  And these asterisks and circles, if we
3  were to look at the original, was that done on or
4  about November 3rd, in other words,
5  contemporaneous?
6  A  I can't say for sure.
7  Q  Do you believe so?
8  A  I believe so.
9  Q  Okay. Why is it that you circled it and
10 asterisked it?
11 A  Because that's when the house started to
12 be rebuilt. Because prior to that, Hayes was
13 taking care of it, and Todd was looking for a
14 turnover. I mean, I wanted my house rebuilt, and
15 this is the date that Todd started, you know,
16 really building the house again.
17     Before that, that was remediation,
18 you know, getting the thing cleaned up, you know,
19 working on it. You know, you asked me before the
20 date in November when things started. This is
21 when my house started to get rebuilt.
22 Q  Very good. So let's just read it, and
23 you've already indicated what it was. But I'll
24 just put it in the record.

Page 135

1  A  Sure.
2  Q  This is a November 3rd e-mail from
3  yourself to Mr. Hayes -- excuse me, from Todd
4  Augustine to Mr. Hayes where you're cc'd, your
5  wife is cc'd, and Jerry Wolowicki is cc'd, is
6  that correct?
7  A  Correct.
8  Q  Okay. And it's sent at 11:56 a.m.,
9  correct?
10 A  Yes.
11 Q  And it says:
12     "Mr. Hayes, A brief note to advise
13     you that as of today, November 3, 2008, I
14     have taken back the project at 10 Goose
15     Lake Drive. My carpenters have started
16     the process of replacing the damaged
17     materials within the home. We will do as
18     much as possible to the inside before
19     removing any of the temporary roofing and
20     tarps. There will obviously be
21     additional work that your contacts will
22     need to care for at the appropriate
23     time."
24     Is that correct?

Page 136

1  A  Correct.
2  Q  All right. So at this particular
3  juncture, this is when your person,
4  Mr. Augustine, takes back control, is that
5  correct?
6  A  Yes.
7  Q  So actually the carpenters were working
8  back to reconstruct your home, is that correct?
9  A  Correct.
10 Q  And as far as the person in charge of the
11 project at this particular juncture, that would
12 have reverted to Mr. Augustine as of this date,
13 true?
14 A  Correct.
15 Q  And Mr. Hayes on behalf of American
16 Family and their insured, Complete Flashing, had
17 completed the remediation as of this juncture?
18 A  No, not completed they turned it over to
19 them. There was still work being done.
20 Q  Okay. What kind of work was being done
21 as far as remediation?
22 A  You'd have to ask Todd exactly, but in a
23 general sense, there was still cleanup going
24 on. I mean, prior to this Todd really didn't get

Page 137

1  into the project, and I don't think he was
2  formally a GC yet at that point.
3      But, you know, there was still stuff
4  going on. This was the big day when they started
5  actually bringing the lumber out and rebuilding
6  the house.
7  Q  And did you know Miner & East's role on
8  the project?
9  A  Yeah, basically. I mean, they were to
10 clean the house and close it from the weather and
11 remediate all the smoke issues. That's how it
12 was expressed to me from Hayes.
13     At this point Hayes was telling
14 me -- I say Hayes. When we met, Hayes explained
15 it to me that's what they were doing and also
16 then through Jerry, because Jerry had more
17 conversations with Hayes.
18 MR. PEARSON:  Can I suggest something
19 just so the record is clear?
20 MR. RUFF:  Sure.
21 MR. PEARSON:  Either refer to
22 Mr. Wolowicki or Mr. Hayes.
23 THE WITNESS:  I know. I'll try to do
24 that.

35 (Pages 134 to 137)

Page 158

1 word that he'd get rid of the smoke smell, and
2 that he's never been in a position in any of his
3 years in the insurance business of getting rid of
4 the smoke smell. And he swore that he would get
5 rid of it, and each time he did something to
6 remediate the smell. But that was to cover that
7 and get the document, that document signed, and
8 get the last check, and then we were to be
9 finished.
10    Q What do you understand the amount in
11 disagreement was at that last meeting?
12    A Jerry could tell you.
13    Q Jerry Wolowicki?
14    A Wolowicki. But there was a last draw
15 amount, and that draw amount is on the sworn
16 statement. So that was the last number, you
17 know. It was some number that was above the two.
18    Q And do you know how much it was above the
19 two?
20    A I can't tell you. Wolowicki would have
21 to tell you.
22    Q If we look at that last document, which
23 indicates 193 calculation versus calculation of
24 Mr. Hayes which was 931 but reversing 27, it

Page 159

1 seems to be a difference of about 98,000. Does
2 that sound about right?
3    A It sounds about right, but Wolowicki
4 truly would be better at answering that.
5    Q And what happened at that juncture when
6 it appeared to be 100,000 above the $2 million
7 policy limit?
8    A We were going to get the last draw above
9 that, and that's why we had the statement. And
10 that's where he saw Complete Flashing on it.
11      So that last draw in that December
12 meeting was the amount, and I can't tell you
13 above the $2 million. I can't tell you, but it
14 was definitely above it. Jerry's the best to
15 answer it, you know, but I think it was 100,000
16 over plus.
17    Q And what was the response from Mr. Hayes
18 at that juncture then?
19    A The only issue was that Complete Flashing
20 was getting paid.
21    Q How much was the Complete Flashing
22 portion of that, if you recall?
23    A I'd have to look at it, but it's not like
24 the lion's share of it. If you want me to guess,

Page 160

1 $20,000, somewhere in that area, 20, 15, 30.
2    Q But was there any indication by Mr. Hayes
3 that absent that 20,000 he was going to pay above
4 the policy limits?
5    A That last draw was above, as I understand
6 it. It was above the 2 million.
7    Q And did Mr. Hayes have a check made out
8 or ready to be paid or what? How was that going
9 to be handled?
10    A Yes.
11    Q So what was the check amount that was
12 ready to be paid?
13    A Going back from my memory, it's 128 or
14 134. It's on the statement, the sworn statement,
15 that Todd and myself -- not myself, but Todd put
16 together.
17    Q And essentially 20,000 of that was
18 approximately the Complete Flashing?
19    A Approximately. I can't tell you the
20 exact number, but there is an exact number. I
21 just don't have it in front of me.
22    Q And Jerry would be better, Jerry
23 Wolowicki would be better to answer that
24 question?

Page 161

1    A Yes. He knows the final payment to
2 Complete Flashing.
3    Q And that was going to be a complete
4 release then of the entire policy and Complete
5 Flashing?
6    A Yes. As long as the verbiage was in
7 there about the fire -- or the smoke, excuse me,
8 smell.
9      If I'm correct at this point, there
10 still was ozone blowers trying to get rid of the
11 smoke smell as we were sitting at that meeting.
12
13      (Deposition Exhibit Group No. 15 was
14      marked for identification as of
15      1-26-11.)
16
17 BY MR. RUFF:
18    Q If we look at Group Exhibit 15, it's
19 Bates No. STP307 through 314, release for 1,965
20 in the original, and then there's changes made to
21 that as we go through this, is that correct?
22    A Correct.
23    Q It was going to be $2 million, is that
24 correct?

41 (Pages 158 to 161)

Page 162

1  A  Correct.
2  Q  And the writing in here is whose?
3  A  I can't say positively, but it would be
4  my attorney.
5  Q  That would be Mr. O'Connor?
6  A  I can't say for sure.
7  Q  Most likely?
8  A  Most likely.
9  Q  Is it Jerry Wolowicki's?
10 A  No, Jerry would never write that.
11 Q  Okay. And then was it Mr. O'Connor that
12 this release was sent to for the changes to be
13 made?
14 A  Yes.
15 Q  And these obviously came from Mr. Hayes,
16 these releases?
17 A  Yes.
18 Q  Okay. And if we look down at the third
19 page in 309, 310, 311, 312, 313, and 314 all
20 appear to be --
21 A  Identical.
22 Q  -- identical. Except on 314, it
23 indicates Client's Copy at the top?
24 A  Yes.

Page 163

1  Q  So were a number of these copies made?
2  You signed a number of copies, and then one was
3  to be retained as your copy?
4  A  I can't say where it came from. I guess
5  it would be Wolowicki's.
6  Q  Is that your signature there?
7  A  Yes.
8  Q  And is that your wife's signature?
9  A  Yes, it is.
10 Q  And is this the release that you brought
11 with you to the meeting?
12 A  Yes.
13 Q  And the 2 million that's reflected in
14 here, was that to reflect that some payment like
15 you said 128 or 134, you don't recall.
16 A  Right.
17 Q  Some of that would have about been above
18 2 million, but that was going to be reflected in
19 a reversal of charges. Is that how you
20 understood it?
21 A  Yes.
22 Q  And what amount out of the 127 or 134 did
23 you understand was going to result in a reversal
24 of charges?

Page 164

1  A  You'd have to ask Jerry.
2  Q  We saw in here a figure of --
3  MR. PEARSON: I'm sorry. Which Jerry?
4  THE WITNESS: Jerry Wolowicki
5  BY MR. RUFF:
6  Q  We saw in here a $27,000 reversal. Do
7  you see that?
8  A  Yes.
9  Q  Was that going to be the $27,000
10 reversal?
11 A  The 27,000, what does that mean?
12 Q  In other words, if we look at the
13 2 million total, even though it was going to be
14 above 2 million, was it the 27 that was going to
15 be the reverse?
16 A  I can't say.
17 Q  That would be something that
18 Mr. Wolowicki would know?
19 A  Yes.
20 Q  And what date was this signed?
21 A  I am going to give you a range.
22 Q  Okay.
23 A  May of 2009.
24 Q  Okay. I thought we were using December

Page 165

1  of '09.
2  A  The Same document if I'm correct, unless
3  Jerry had it resigned.
4  Q  When you say Jerry had it --
5  A  Jerry Wolowicki.
6  Q  What do you mean he had it resigned?
7  A  You asked if it's the same document. I'm
8  quite sure it's the same document that we had for
9  the meetings that Jerry had with Hayes to settle
10 this.
11 Q  So it's your understanding that this
12 document would be exchanged in December of '09 at
13 a meeting with Mr. Hayes in return for a check of
14 approximately 127 or 134?
15 A  In the December time frame, yes. In the
16 May time frame, it was much more.
17 Q  Right. Could it have been the 190 we
18 were seeing, that difference?
19 A  No, it would have been more than that.
20 Q  How much?
21 A  I can't say. Jerry could tell you. He
22 did all the negotiations.
23 Q  All right. So it was more in May, but
24 then the final number came down to the 134 or

Page 170

1  sorry.
2      Hayes is responding in December --
3  it's going into Christmas holidays -- that he's
4  going to Madison. And he said, "It's coming.
5  It's coming. It's coming. It's coming. They're
6  looking at it. They're coming."
7      At one point I remember that there
8  was a meeting in -- again, this is going through
9  Wolowicki -- that there was a meeting in Rockford
10  with all the management from Madison and that it
11  should be resolved. And I think it was on a
12  Saturday, and he said, "This will get resolved."
13      And Jerry Wolowicki is asking Gerry
14  Hayes, you know, "When are we going to resolve
15  this? When are we going to resolve it?"
16      And then it just stopped and went
17  dead, no communications. And Gerry Hayes,
18  according to Jerry Wolowicki, wouldn't return his
19  calls anymore. And there was no more written
20  communication after the e-mails that you have,
21  and then we hired counsel.
22  Q  Are you having discussions with Gerry
23  Hayes or is this communiques that are coming
24  through Mr. Wolowicki?

Page 171

1  A  Through Wolowicki.
2  Q  The last discussion you have with
3  Mr. Hayes is December of '09?
4  A  Yes.
5  Q  And so whatever further discussions that
6  occur are with Mr. Wolowicki?
7  A  And through e-mails. So Jerry is talking
8  to him, and I'm seeing the e-mails from Hayes.
9  Q  And whatever is in the e-mails in that
10  communication during that particular period of
11  time they are, but basically anything verbal at
12  that juncture is between --
13  A  Jerry Wolowicki. I had very little
14  verbal with Gerry Hayes. It was mostly through
15  Jerry Wolowicki. We had our meetings.
16  Q  What is the status regarding the odor at
17  this juncture?
18  A  It's still there. It's lessened during
19  the cold because I have the temperature down to
20  50 degrees. But as soon as the temperature gets
21  back up, it's strong.
22      People who walk in smell it.
23  Realtors told me it's an issue if I'm ever in a
24  position to have to sell it. I understand why

Page 172

1  it's there now. Before, I mean -- yes, it still
2  has an odor. And if you came into it and we
3  raised the temperature up and had some humidity
4  in the house, you'd smell it all the way down to
5  the first floor.
6  Q  And what is your understanding as to why
7  it's in there now? You said: I have an
8  understanding as to why it's in there now.
9  A  To my amazement, when the forensic guys
10  came in, that a lot of fire embers and the fire
11  particulate was still in a certain area of the
12  house. It was supposed to be removed.
13      Through the process, there were
14  multiple times. I mean, I would tell Jerry, I
15  said, "It smells of smoke." The electrician
16  would come out and pull out some insulation, you
17  know, between some joists that were up there and
18  all these embers came out. I said, "Well, God
19  bless it. That's why it smells right over here."
20      Another time in the attic, it
21  smells, and Hayes says, "Well, it's probably
22  because the fireplace has to be encapsulated."
23  So he encapsulated it. It smells like smoke
24  because there's still burnt wood in the house.

Page 173

1  Q  Have you been told how that needs to be
2  taken care of?
3  A  I don't know. That's why -- I don't
4  know.
5  Q  Okay. You talked about the construction
6  loans and all that on the house. What equity do
7  you have in the house currently, the house and
8  the land? I mean, if you could give me what's
9  mortgaged and what isn't.
10  A  The mortgage at Old Second is I think
11  2 point, give or take 2.9, okay? There's still I
12  think 15,000 to go to it. There's additional
13  costs that I have to pay because some of the
14  costs that are involved with this, out of
15  pocket. You know, equity in this market, you're
16  asking me for a real estate opinion, I mean.
17  Q  I mean, what do you think the value of
18  the home is now?
19  A  Four point five.
20      MR. RUFF: Anything else?
21      Let's take a break.
22      MR. PEARSON: Okay.
23
24

44 (Pages 170 to 173)