1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, LLC, )
   Plaintiff, ) No. 10 CV 6034
)
vs. )
)
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., a )
Wisconsin Corporation, )
   Defendant. )

The deposition of DANIEL J. DOWELL, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Tasha Olivo, Certified Shorthand Reporter of the State of Illinois, at 123 North Wacker Drive, Suite 1800, Chicago, Illinois, on the 17th day of January, 2012, at the hour of 12:58 p.m.

Reported by: Tasha Olivo, CSR, RPR
License No.: 084-004420

23

1    BY MR. HENNESSY:

2        Q.  The court reporter has handed you a

3    document marked for the purposes of the deposition

4    as Exhibit 3.  A single page.

5            Do you see that?

6        A.  Yes.

7        Q.  What is this document?

8        A.  This is our job ticket that we would make

9    out when we were going to start a project.

10       Q.  Do you recognize the handwriting on

11   Exhibit 3?

12       A.  That's my handwriting.

13       Q.  In looking at the date on Exhibit 3, does

14   that refresh your recollection on when Miner & East

15   was first contacted?

16       A.  It's got to be in the neighborhood of

17   September 11th.  I don't know what the exact date

18   was that I received the call.  I may -- typically I

19   make these tickets out soon after I'm contacted or

20   I know what we're going to be doing.  So this might

21   have been a week later or a day later or the same

22   day.  I'm not sure.

23       Q.  If I tell you that the -- I think the

24   parties are all in agreement that the fire occurred

24

1 on September 10 of 2008. It appears as though you

2 were contacted as soon as the next day.

3    A. I mean, if the fire was on the 10th --

4    Q. Yes.

5    A. -- and this is dated the 11th, I would

6 think that I got contacted in that time period.

7 Yes.

8    Q. And this document, Exhibit 3, which you

9 described as a job ticket, is this the starting

10 point of a contract?

11    A. No. It's just an interoffice document

12 that we use to set up a job.

13    Q. It indicates in Exhibit 3 that it's a

14 contract with American Family Insurance.

15      Do you see that?

16    A. Correct. We call that -- well, it says

17 contract with, but that's just -- that's who we

18 will be invoicing.

19    Q. And then the work to be done, fire damage,

20 emergency repairs, that's as you've described in

21 terms of going out to the site and working on

22 immediate emergency-type work.

23    A. That's correct. I mean, emergency

24 services or emergency repairs is kind of a generic

1 term for whatever you might need to do following a

2 fire loss or water loss.

3    Q. Also indicated within here are a couple

4 names, demolition, Robinette, and electrical,

5 Continental.

6    Do you see that?

7    A. I do.

8    Q. What -- for the purposes of this document

9 what are those references to?

10    A. That we would know who the demolition

11 contractor was, which was Robinette. I believe

12 they were already on site. And Jerry Hayes

13 mentioned that they might need some electrical

14 work, so we marked down if we were going to be

15 asked to bring an electrician in, that we would

16 bring in Continental Electric.

17    Q. So Miner & East did not select Robinette

18 as the demolition contractor?

19    A. That's correct. They were engaged before

20 we were.

21    Q. But Miner & East acted on the project as

22 general contractor for this work with Robinette as

23 a sub to Miner & East; is that correct?

24    A. You know, in a way. We essentially were

32

1 you reduce the scope of work between American

2 Family and Miner & East to any form of a written

3 contract?

4     A. No, we did not.

5     Q. In this instance you did not?

6     A. In this instance we did not.

7     Q. Why is that?

8     A. It was what we considered emergency work,

9 hurry up, let's try to put a roof on this place and

10 try to stop the building from any further damage.

11 There was immediacy to it.

12     Q. In other situations would you have reduced

13 the scope of the agreement to a written contract?

14     A. Most of the time in what we call emergency

15 services work it's just -- it's done verbally.

16 There's verbal agreements. This is an everyday

17 occurrence in the industry. When there's a

18 restoration done, then many times there's a scope

19 of work that is developed for the reconstruction.

20     Q. When did you first -- you, Dan Dowell, not

21 Miner & East employees generally -- when did you

22 first arrive at the Goose Lake project?

23     A. I would have to look at my calendar. I

24 would assume it was shortly -- maybe the next day

33

1   after I was contacted. Within a day or two I would
2   assume.
3       Q.  Would you -- would Miner & East have sent
4   crews out there to start work without you first
5   going out there?
6       A.  That's happened many times. Sure.
7       Q.  Do you recall if that occurred here?
8       A.  I don't recall whether my superintendent
9   went there first or I went there first. I think
10  that I went there first.
11      Q.  This -- the discussion you had with
12  Jerry Hayes about the scope of work, is it a
13  relatively brief discussion?
14      A.  On the telephone?
15      Q.  Yes.
16      A.  Yes. Yeah. That was brief. That was
17  brief. He just told me basically what the
18  situation was and could I come out there and take a
19  look.
20      Q.  And it was him inquiring about
21  Miner & East's availability to take on this job?
22      A.  Correct.
23      Q.  And you telling him that Miner & East
24  could take on this job?

1    A.  Correct.

2    Q.  Did you subsequently have a lengthier

3    discussion with him?

4    A.  I believe the next step was we all met out

5    at the site, and there was a lot of people there.

6    Q.  Do you know any of the people that were

7    there besides --

8    A.  It was myself and Jerry Hayes and I

9    believe Robinette was there, Tom Stahr.

10   Q.  Rob?

11   A.  Robinette, Tom Stahr, S-t-a-h-r. That's

12   who I believe was out there from Robinette. And

13   then I believe I probably had my superintendent

14   meet us out there also. I don't know if he was

15   there the first day, but my superintendent would

16   have been there also.

17   Q.  Who is that?

18   A.  Bill Suerth, S-u-e-r-t-h.

19   Q.  Anyone else?

20   A.  Brian of Brouwer Brothers was on site.

21   I'm not sure who else was there. It was just -- we

22   were focused on talking with Jerry.

23   Q.  And tell me about that discussion.

24   A.  Pretty simplistic discussion. You know,

1    Dan, take a look at what we've got here; what do

2    you think we can do to try to stop water from

3    getting in the house.

4       Q.   By this point the fire was certainly all

5    extinguished, correct?

6       A.   Correct.

7       Q.   And Robinette is already in the process of

8    doing demolition?

9       A.   Correct.

10      Q.   Do you know how far along in their

11   demolition process they were?

12      A.   I don't.  I just know they had crews there

13   and equipment and there was activity.  Exactly how

14   far they had gotten with anything, I'm not sure.

15      Q.   With this modified arrangement between

16   Miner & East and Robinette with Robinette still

17   invoicing Miner & East, what would you or your --

18   what would Miner & East have done to check or

19   monitor what it was that Robinette was doing?

20      A.   I mean, basically our function was again,

21   to put a temporary roof or something to try to

22   protect this house and to try to stop further

23   damage.  So the interactions between Miner & East

24   and Robinette was to try to work in concert to try

42

1   their guys were there. I don't know how they match

2   up. They might have been doing some work after our

3   carpenters were done.

4     Q. You mentioned something about an engineer

5   being -- a structural engineer being around.

6     A. Yes.

7     Q. Do you recall who that structural engineer

8   was?

9     A. It was ESI, Engineering Systems

10   Incorporated. I believe it was Gus Domel.

11         (Whereupon, DOWELL Deposition

12         Exhibit No. 4 was marked for

13         identification.)

14   BY MR. HENNESSY:

15     Q. You've been handed a document which has

16   been marked as Exhibit 4 for the purposes of

17   today's deposition.

18     Do you recognize this document?

19     A. I do.

20     Q. And what do you recognize this document to

21   be?

22     A. This was a report prepared by ESI for

23   American Family regarding the fire.

24     Q. Did you -- did Miner & East have an

1  opportunity to review this report during the course

2  of Miner & East performing work on the project?

3      A.  That, I do not know.  I can't recall if I

4  got this afterwards or during or at the end.  I

5  can't remember, but I definitely remember seeing

6  it.

7      Q.  Would any of the information or evaluation

8  contained in Exhibit 4 have influenced or impacted

9  the work Miner & East was performing on the

10  project?

11      A.  Yes.  I believe that, you know, while we

12  were doing the -- what I would call the selective

13  demolition, while Robinette was doing selective

14  demolition and we were starting to put a temporary

15  roof on.  I believe American Family is who

16  contacted ESI.  We did not -- they were engaged to

17  look at the situation to make sure that what we

18  were doing was structurally sound.

19      Q.  And when you say what we were doing, do

20  you mean Miner & East or Miner & East and

21  Robinette?

22      A.  Miner & East and Robinette.

23      Q.  And does Exhibit 4 provide an answer to or

24  conclusion regarding whether what Miner & East and

1   The moisture meters are indicating that there's

2   just too much moisture and they've identified

3   something that can't remain.

4       A.  Okay.

5       Q.  Does Brouwer Brothers remove physically?

6       A.  Not necessarily.  I mean, if it's

7   something -- if it's something soft like drywall or

8   something that they could remove and deal with,

9   carpeting -- typically Brouwer Brothers only

10  removes drywall and carpeting, ceiling tiles,

11  things like that, more lightweight.  Any heavy --

12  more heavy demolition would be done by a demolition

13  contractor.

14      Q.  When Miner & East was working on the

15  project, were they taking direction in terms of the

16  scope of their work from anybody except

17  Jerry Hayes?

18      A.  I would say Jerry was the lead.  I mean,

19  we were all there.  He was the one that called all

20  of us.  I would say Jerry was the lead; but, I

21  mean, we had input.  He basically told us what he

22  was trying to achieve, which was to try to protect

23  the house from further damage; and then we tried

24  to, you know, as a team achieve that.

84

1 contractor.

2 Q. And was that the first you learned that

3 the property had been rebuilt?

4 A. Yes.

5 Q. Now, you've told us that the involvement

6 that your company had with Robinette in this case

7 was different in that you didn't exchange -- in

8 that Miner & East didn't engage Robinette; is that

9 correct?

10 A. That is correct.

11 Q. And is that the primary difference?

12 A. Yeah. They were -- I mean, we've know

13 them already. I mean, we've known Robinette for

14 years, but they were already on site when we got

15 there. So we worked with them because they were

16 all mobilized.

17 Q. And, generally speaking, in a job that

18 you're involved in as a general contractor, you

19 would engage the subs, right?

20 A. Yes.

21 Q. So it's different in the respect that that

22 was done outside -- outside your authority, so to

23 speak?

24 A. Yeah. They were already engaged before we

1   got there.

2       Q.  And the scope of their work had already

3   been determined between them and apparently

4   Mr. Hayes; is that right?

5       A.  They had started work.  Yeah.  They had

6   kind of a direction already.

7       Q.  Well, Mr. Hayes and Robinette had

8   discussed what Robinette's scope of their work was;

9   is that right?

10      A.  I mean, I wasn't present when they first

11  met and first talked about the scope of the work,

12  so I can't say.

13      Q.  Understood.

14          But you didn't tell Robinette what their

15  scope of the work was.

16      A.  No.  Only as it affected our work.

17      Q.  Meaning how it impacted on your ability to

18  put the roof on?

19      A.  Correct.

20      Q.  It had nothing to do with their scope of

21  the work with respect to removal of lumber or

22  drywall or mechanicals or anything of that nature?

23      A.  Removal of mechanicals, no.  I know that

24  they were removing drywall.  I was aware that they

1    Q. And in a normal case where you would

2    engage the subcontractor, you would be more

3    involved in terms of whether they were performing

4    the work -- the scope of the work under that

5    subcontract; is that accurate?

6    A. That's true. Yes. I would have been more

7    involved. Yes.

8    Q. And you said when you were coordinating

9    with them, what did you mean by that?

10    A. Well, you're on the site and there's a

11    beam or something that's in the way of us trying to

12    put a piece of our temporary roof on. We would

13    talk with the Robinette superintendent and say,

14    hey, that piece of lumber has to come out in order

15    for us to put our rafters in to put the roof on.

16    So things like that.

17    Q. Okay. And normally, if I got your

18    testimony right, if you had engaged the

19    subcontractor, there would -- as between your

20    company and that sub, there would be a 10 percent

21    for overhead and a 10 percent for profit?

22    A. Right.

23    Q. And in this case you didn't charge the

24    overhead because Jerry Hayes had already engaged