**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, L.L.C., )
    Plaintiffs, )
   vs. )  Case No. 10 CV 6034
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., )
a Wisconsin Corporation, )
    Defendant. )

    The deposition of JEROME WOLOWICKI, called
for examination pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before CHRISTINE M. PINA, a notary public within
and for the County of Will and State of Illinois,
at One South Wacker Drive, Suite 2500, Chicago,
Illinois, on January 5, 2012 at the hour of
10:15 o'clock a.m.

Reported by:  CHRISTINE M. PINA, CSR, RPR
License No.:  084-003785

**Page 2**

1  APPEARANCES:
2    MECKLER, BULGER, TILSON, MARICK & PEARSON
3    BY: MR. STEVEN D. PEARSON
4      and
5      MR. CHRISTOPHER S. HENNESSY
6    123 North Wacker Drive, Suite 1800
7    Chicago, Illinois 60606
8    (312) 474-7900
9    steven.pearson@mbtlaw.com
10   christopher.hennessy@mbtlawcom
11     on behalf of the Plaintiffs;
12  PRETZEL & STOUFFER, CHTD.
13    BY: MR. EDWARD B. RUFF, III
14      and
15      MR. JAMES G. GILLINGHAM
16      and
17      MS. SUZANNE M. CROWLEY
18    One South Wacker Drive, Suite 2500
19    Chicago, Illinois 60606
20    (312) 346-1973
21    eruff@pretzel-stouffer.com
22    jgillingham@pretzel-stouffer.com
23    scrowley@pretzel-stouffer.com
24    ***and***

**Page 3**

1  APPEARANCES: (Continued)
2
3    JAMES M. HOFFMAN & ASSOCIATES
4    BY: MR. MICHAEL M. MORDINI
5    203 North LaSalle Street, Suite 2150
6    Chicago, Illinois 60601
7    (312) 629-8866
8    mmordini@amfam.com
9     on behalf of American Family Mutual
10     Insurance Company, Inc.,
11
12  HOSCHEIT, MCGUIRK, MCCRACKEN & CUSCADEN
13    BY: MR. JOHN M. MCGUIRK
14    1001 East Main Street, Suite G
15    Saint Charles, Illinois 60174-2203
16    (630) 513-8700
17    jmc@hmcpc.com
18     on behalf of Augustine Custom Homes.
19
20  ALSO PRESENT:
21    Michael Stopka
22
23
24

**Page 4**

1        I N D E X
2  WITNESS         EXAMINATION
3  JEROME WOLOWICKI
4    By Mr. Ruff       7
5    By Mr. Pearson    181
6    By Mr. McGuirk    225
7    Further By Mr. Ruff   230
8      E X H I B I T S
9  NUMBER        IDENTIFICATION
10  Wolowicki Exhibit
11    No. 1        14
12    No. 2        67
13    No. 3        99
14    Nos. 4 and 5    102
15    Nos. 6 and 7    104
16    Nos. 8 and 9    109
17    No. 10      115
18    No. 11      120
19    Nos. 12 and 13   122
20    No. 14      138
21    No. 15      156
22    No. 16      163
23    Nos. 17, 18 and 19  166
24    No. 20      176

1 (Pages 1 to 4)

1 written contract on behalf of the Stopkas with
2 American Family related to the fire of
3 September 10, 2008, true?
4    A. A contract? No.
5    Q. You're not aware of the Stopkas ever
6 entering into any contract with American Family
7 related to the fire of September 10, 2008, true?
8    A. Not to my knowledge.
9    Q. There certainly is no written contract
10 related to the fire of September 10, 2008 that
11 you've entered into with American Family, true?
12    A. True.
13    MR. PEARSON: Asked and answered.
14    THE WITNESS: Yes.
15    MR. PEARSON: Do you need a break?
16    MR. RUFF: I want to ask one more.
17 BY MR. RUFF:
18    Q. Sir, you knew within a week after the fire
19 that American Family had a two million dollar
20 policy limit related to their coverage on a primary
21 umbrella basis for Complete Flashings, their
22 insured on the premise, true?
23    A. No.
24    Q. Do I need to get out the letters that show

65

1    Q. The September 16, 2008 letter was from
2 Mr. Mason?
3    A. Yes.
4       (Whereupon, Wolowicki
5       Deposition Exhibit No. 2 was
6       marked for identification.)
7 BY MR. RUFF:
8    Q. Reiterating that American Family had a two
9 million dollar in liability coverage limits,
10 correct?
11    A. Well, no, that's not the way I read it.
12    Q. It says here it's our understanding that
13 American Family carries two million in liability
14 coverage limits; did I read that correctly?
15    A. But that's not what it --
16    Q. Did I read that correctly?
17    A. No. Well, if you want to re-read it. I'm
18 sorry.
19    MR. RUFF: No. I'm going to let you read it
20 for the record.
21    THE WITNESS: It is our understanding that
22 American Family carries two million in liability
23 coverage limits. That did not tell me that there
24 was two million dollars in limits.

67

1 that you did?
2    A. Yes.
3    Q. You need to get those out?
4    A. Yes.
5    Q. You knew that they did have it at some
6 point, true?
7    A. Yes.
8    MR. RUFF: Get me the September 16 letter.
9 Actually, there's Mr. Stopka's exhibit.
10 September 16, 2008, it was marked STP168A.
11    THE WITNESS: Is this the letter that was
12 attached to your subpoena?
13    MR. RUFF: Yes.
14    THE WITNESS: It's right there.
15    MR. PEARSON: We're trying to figure out the
16 number on it.
17    THE WITNESS: Good thing I brought that.
18    MR. RUFF: Well, I have it here, but we were
19 trying to figure out this number. I couldn't
20 figure out the number.
21 BY MR. RUFF:
22    Q. The September 16 letter is from Allied to
23 the Stopkas, true?
24    A. Wait. I'm sorry.

66

1 BY MR. RUFF:
2    Q. First of all, you did read that correctly,
3 it is our understanding --
4    A. I read the words that are on that paper.
5    Q. Mr. Mason learned that as a result of
6 meetings at the site with you?
7    A. I don't know how he learned it.
8    Q. This was disclosed by Mr. Hayes prior to
9 September 16, 2008, true?
10    A. Wait. It was disclosed?
11    Q. That American Family carried two million
12 in liability coverage limits, true?
13    MR. PEARSON: Disclosed to who?
14    MR. RUFF: To him.
15    THE WITNESS: No.
16 BY MR. RUFF:
17    Q. You were certainly aware by September 16th
18 that American Family carried two million in
19 liability coverage limits, true?
20    A. No.
21    Q. You never saw a copy of this?
22    A. I didn't see the Certificates of
23 Insurance.
24    Q. No, no, no. Sir, you never saw a copy of

68

17 (Pages 65 to 68)

1  this?
2      A.  Chris Mason doesn't work for
3  American Family.
4      Q.  Sir, you never saw this, true, is that
5  what you're saying, or you did?
6      A.  I saw it.
7      Q.  So, you saw it on or about September 16,
8  2008, true?
9      A.  Yes.
10     Q.  And you knew that that statement or
11 representation had been made prior to that time,
12 true?
13     A.  I knew that those words had been put on
14 the piece of paper.
15     Q.  No, no, no.  You knew that the statement
16 had been made by Mr. Hayes representing
17 American Family that American Family by
18 September 16, 2008 had disclosed that
19 American Family carried two million in liability
20 coverage limits, true?
21     MR. PEARSON:  Can I have the question back,
22 please?
23
24
                                                    69

1      American Family were one primary and one umbrella?
2      A.  No.
3      Q.  Did he make that statement?
4      A.  No.
5      Q.  He didn't make it in your presence?
6      A.  Not in my presence.
7      Q.  Where do you think Mr. Mason got this
8  information?
9      MR. PEARSON:  Objection, form, calls for
10 speculation.
11     THE WITNESS:  I have no idea.
12 BY MR. RUFF:
13     Q.  You don't know if that was stated to
14 Mr. Mason by Mr. Hayes in your presence that there
15 were two million in limits, is that true?
16     MR. PEARSON:  Objection, asked and answered.
17     THE WITNESS:  I've already answered the
18 question.
19     MR. RUFF:  No, no, no.  It's a little
20 different.  Try it.
21     THE WITNESS:  Okay.  What's the question?
22
23
24
                                                    71

1      (Whereupon, the record was read as
2      requested as follows: You knew that the
3      statement had been made by Mr. Hayes
4      representing American Family that
5      American Family by September 16, 2008 had
6      disclosed that American Family carried two
7      million in liability coverage limits,
8      true?)
9  THE WITNESS:  No.
10 BY MR. RUFF:
11     Q.  So, this was the first time you learned
12 this was on September 16th?
13     MR. PEARSON:  Objection, form.
14     THE WITNESS:  You said that Mr. Hayes had said
15 it.
16     MR. RUFF:  Right.
17     THE WITNESS:  Nowhere did I see that Mr. Hayes
18 made the statement.  He hadn't made the statement
19 to me.  Some insurance agent or employee writes a
20 letter and puts these words in it, to me that means
21 nothing at all.
22 BY MR. RUFF:
23     Q.  Had Mr. Hayes made the statement by
24 September 16, 2008 that the limits for
                                                    70

1      (Whereupon, the record was read as requested as
2      follows: You don't know if that was stated to
3      Mr. Mason by Mr. Hayes in your presence that
4      there were two million in limits, is that
5      true?)
6  MR. PEARSON:  Objection, form.
7  THE WITNESS:  I know that in my presence
8  Mr. Hayes never made that statement to Mr. Mason.
9  BY MR. RUFF:
10     Q.  When you got this letter on September 16,
11 2008, did you question whether or not the fact
12 there were two million in limits?
13     A.  I was told that there weren't.
14     Q.  That there weren't two million in limits?
15     A.  I was told that the house would be
16 renovated and rebuilt regardless of what the costs
17 would be.
18     MR. RUFF:  See, you're going way beyond what
19 the question is.  Let's try my question.
20     THE WITNESS:  Okay.
21
22
23
24
                                                    72

18 (Pages 69 to 72)

1 (Whereupon, the record was read as requested as
2 follows: When you got this letter on
3 September 16, 2008, did you question whether or
4 not the fact there were two million in limits?
5 A. I was told that there weren't. Q. That
6 there weren't two million in limits?)
7 MR. RUFF: It sounds like it got garbled in
8 there.
9 BY MR. RUFF:
10 Q. When you received this letter of
11 September 16, 2008, did you question whether or not
12 there were, in fact, two million in limits or did
13 you seek clarification on that at all?
14 A. No.
15 Q. So, you didn't dispute the fact that there
16 were two million in limits, true?
17 MR. PEARSON: Objection, form.
18 THE WITNESS: True.
19 BY MR. RUFF:
20 Q. And there was never any agreement by
21 American Family that they would ever pay beyond
22 their limits of two million, true?
23 MR. PEARSON: Objection, form, misstates his
24 testimony.

73

1 best of my recollection. On September 11, it would
2 have been I believe September 11 that that
3 conversation was had between Gerry Hayes and
4 myself.
5 BY MR. RUFF:
6 Q. During that conversation, Mr. Hayes said
7 that American Family would -- limits were two
8 million dollars and that they would pay beyond two
9 million, is that true?
10 A. He did not say that it was two million
11 dollars.
12 MR. RUFF: Let's try my question.
13 (Whereupon, the record was read as
14 requested as follows: During that
15 conversation, Mr. Hayes said that American
16 Family would -- limits were two million
17 dollars and that they would pay beyond two
18 million, is that true?)
19 THE WITNESS: No.
20 BY MR. RUFF:
21 Q. Did Mr. Hayes specifically say on
22 September 11 that they would pay beyond their two
23 million dollars in limits?
24 A. No.

75

1 THE WITNESS: False.
2 BY MR. RUFF:
3 Q. Did you ever communicate with anyone
4 regarding the loss other than Mr. Hayes for
5 American Family?
6 A. For American Family?
7 MR. RUFF: Yes.
8 THE WITNESS: No.
9 BY MR. RUFF:
10 Q. Did Mr. Hayes ever make a definitive
11 statement that American Family would pay beyond
12 their two million dollars limits?
13 A. Yes.
14 Q. When did he say that American Family would
15 pay beyond their two million in limits?
16 A. Many times.
17 MR. RUFF: Give me the first.
18 THE WITNESS: I don't have the dates.
19 BY MR. RUFF:
20 Q. You don't know when it was said?
21 A. It was a continuing --
22 MR. RUFF: Give me the first.
23 THE WITNESS: If the loss was on the 10th, I
24 believe we met with him on the 11th; that's the

74

1 Q. Did he ever say that?
2 A. Yes.
3 MR. RUFF: Let me go back. Can I have the
4 previous question and answer?
5 (Whereupon, the record was read as
6 requested as follows: Did Mr. Hayes
7 specifically say on September 11 that they
8 would pay beyond their two million dollars
9 in limits? A. No. Q. Did he ever say
10 that? A. Yes.)
11 BY MR. RUFF:
12 Q. So, at some point after September 11, 2008
13 Mr. Hayes specifically said that American Family
14 had two million dollar limits and would pay beyond
15 that, is that true?
16 A. Yes.
17 Q. What date?
18 A. I don't recall.
19 Q. When, at all?
20 A. Some time after September 10.
21 MR. RUFF: Well, you said it didn't happen on
22 the 11th.
23 THE WITNESS: Well, some time after
24 September 11.

76

19 (Pages 73 to 76)

BY MR. RUFF:

1   BY MR. RUFF:
2     Q. And when, you don't know?
3     A. Some time middle to fall-ish of 2009.
4     Q. So, you would agree that in 2008 no oral
5   contract was entered into by you for the Stopkas
6   with American Family to pay beyond the two million
7   dollar limits, true?
8     MR. PEARSON: Objection, form.
9     THE WITNESS: Can you, please, repeat that
10   question?
11     (Whereupon, the record was read as requested as
12     follows: So, you would agree that in 2008 no
13     oral contract was entered into by you for the
14     Stopkas with American Family to pay beyond the
15     two million dollar limits, true?)
16     THE WITNESS: The agreement with Gerry Hayes
17   was --
18     MR. RUFF: No, no, no, no, no. No, no.
19     MR. PEARSON: Finish your answer.
20     MR. RUFF: It's a yes or no, and then, I'll
21   decide to take it from there.
22     MR. PEARSON: If you haven't finished your
23   answer, you can finish your answer, and then,
24   Mr. Ruff will ask you a question.

77

1     THE WITNESS: Can you repeat the question?
2     (Whereupon, the record was read as requested as
3     follows: So, you would agree that in 2008 no
4     oral contract was entered into by you for the
5     Stopkas with American Family to pay beyond the
6     two million dollar limits, true?)
7     THE WITNESS: No.
8     MR. RUFF: And now we have to get his answer
9   before because now he's contradicting himself.
10       (Whereupon, the record was
11       read as requested as follows:
12       And when, you don't know? A.
13       Some time middle to fall-ish
14       of 2009.)
15   BY MR. RUFF:
16     Q. Based upon that particular answer that was
17   just read mid to fall 2009, we can safely say that
18   no oral contract was entered into between you on
19   behalf of the Stopkas and Mr. Hayes in 2008
20   regarding paying beyond the policy limits of two
21   million dollars, true?
22     A. I can't answer the question.
23     Q. You just don't know?
24     A. I don't know.

78

1     Q. So, you cannot definitively state and
2   you're not going to state in the court in 2008 we
3   had this discussion, and Mr. Hayes agreed to pay on
4   behalf of American Family specifically using the
5   words beyond the two million dollar policy limits,
6   true?
7     A. That statement I could not make.
8     Q. You say that some time in mid 2009 to fall
9   of 2009 he specifically said those words; is that
10   what you're saying?
11     A. Specifically said those words?
12     MR. RUFF: Yes.
13     THE WITNESS: No.
14   BY MR. RUFF:
15     Q. So, Mr. Hayes never said that
16   American Family will pay beyond its two million
17   dollar policy limit, true?
18     A. Those words, true.
19     Q. And no such confirmation was made in
20   writing that Mr. Hayes had made an oral agreement
21   to pay beyond the two million dollar policy limit,
22   true?
23     A. True.
24     Q. At no point did you ever offer as

79

1   consideration for American Family's payment that
2   you would forgo suing Complete Flashings on behalf
3   of Mr. Stopka, true?
4     A. Can you ask that question again?
5     (Whereupon, the record was read as requested as
6     follows: At no point did you ever offer as
7     consideration for American Family's payment
8     that you would forgo suing Complete Flashings
9     on behalf of Mr. Stopka, true?)
10     THE WITNESS: False.
11   BY MR. RUFF:
12     Q. When did you tell Mr. Hayes that you would
13   forgo suing Complete Flashings in consideration for
14   American Family paying beyond its policy limits?
15     A. It would have been in 2009.
16     Q. So, in 2009 you specifically said I'll
17   give up suing Complete Flashings if American Family
18   pays beyond its two million dollar policy limit;
19   you used those words?
20     A. No.
21     Q. So, again, go back. You never offered as
22   consideration for American Family paying beyond its
23   two million dollar policy limit that the Stopkas
24   would forgo suing Complete Flashings, true?

80

20 (Pages 77 to 80)

1   A.  Those words, true.
2   Q.  So, no such promise was ever given by the
3   Stopkas, as far as you know, to forgo suing
4   Complete Flashings in exchange for American Family
5   paying beyond its two million dollar policy limit
6   either oral or in writing, true?
7   MR. PEARSON:  Objection, form.
8   THE WITNESS:  No.  In my world of non-legalese,
9   it's called a release.  And was there the wording
10  of lawsuits given up and this and that?  It was a
11  release; that's what was discussed between
12  Gerry Hayes and myself.
13  BY MR. RUFF:
14  Q.  And that was never finalized, right, the
15  release was never finalized?
16  A.  That is correct.
17  Q.  I'm talking about an actual agreement
18  though.  No agreement was entered into oral or in
19  writing between you representing the Stopkas and
20  Mr. Hayes representing American Family that in
21  consideration for not suing Complete Flashings,
22  American Family would pay beyond its policy limits
23  of two million dollars, true?
24  A.  True.

81

1   Q.  And you never confirmed any such oral
2   agreement via letter or email, true?
3   A.  True.
4   Q.  In fact, the releases were always in the
5   negotiating stage, true?
6   A.  True.
7   Q.  Once you knew that American Family only
8   had two million dollars in policy limits, you knew
9   that if American Family only had two million
10  dollars in policy limits, you better not give your
11  claim up to Allied, correct?
12  A.  No.
13  Q.  Did you, sir, ever waive or give the
14  Stopkas' claim up related to Allied?
15  A.  Allied?  Allied being --
16  Q.  A division of Nationwide.
17  A.  And nationwide being the --
18  Q.  The homeowners' insurance.
19  A.  The homeowners'.  All right.  Did we ever
20  sign a release to them?
21  MR. RUFF:  Why don't you use my words.
22  THE WITNESS:  I'm sorry.  We're just first --
23  I'm trying to get straight in my mind who Allied
24  and Nationwide is.

82

1   MR. RUFF:  Very good, and that's a valid
2   question.  And if you didn't understand that --
3   THE WITNESS:  That's why I was asking.
4   MR. RUFF: -- you did exactly what I asked you
5   to do at the beginning.
6   THE WITNESS:  Ask for clarification.
7   MR. RUFF:  We're on full sink on that one.
8   THE WITNESS:  Good.  We're making progress.
9   MR. RUFF:  We are.  I'm working right through
10  the jury instructions.
11  THE WITNESS:  Great.
12  BY MR. RUFF:
13  Q.  Sir, did you on behalf of the Stopkas ever
14  give up the Stopkas' claim against their own
15  homeowners'?
16  A.  Allied and Nationwide?
17  MR. RUFF:  Yes, sir.
18  THE WITNESS:  No.  No.
19  BY MR. RUFF:
20  Q.  You always kept that in your back pocket
21  knowing that if there were two million dollar
22  limits for American Family, you could always make
23  your claim regarding any overages to Allied, true?
24  A.  No.

83

1   Q.  You said --
2   A.  I mean I never looked at it being in my
3   front pocket and my back pocket.  I mean --
4   MR. RUFF:  I shouldn't use those terms.  Those
5   were sort of --
6   THE WITNESS:  Did we reserve maybe the
7   possibility in the future?
8   BY MR. RUFF:
9   Q.  There's a better word.  You always
10  reserved your rights against Allied should the
11  limits of American Family top out, true?
12  A.  Yes.
13  Q.  So, you never refrained from doing
14  anything regarding Allied based upon any
15  representations by Mr. Hayes; you always retained
16  your rights or reserved your rights against Allied,
17  true?
18  A.  Yes.
19  Q.  Now, was that something you thought of
20  based upon your own professional knowledge,
21  training, and experience or did you obtain advice
22  in that regard?
23  A.  You're asking me -- this is not a yes or
24  no question, right?  I can explain to you --

84

21 (Pages 81 to 84)

```
 1      Q.  Let me do it this way.  You said before
 2   you always reserved your rights related to Allied,
 3   is that fair?
 4      A.  Yes.  Yes.
 5      Q.  Therefore, you didn't give up any rights
 6   related to Allied, true?
 7      A.  True.
 8      Q.  And you weren't refrained or stopped from
 9   doing anything as to Allied based upon any
10   representation made by Mr. Hayes, true?
11      A.  True.
12      Q.  In other words, you weren't relying upon
13   Mr. Hayes' comment or any statements to your
14   detriment or to the Stopkas' detriment as it
15   related to Allied, true?
16      A.  True.
17      Q.  As we stand today as a representative of
18   the Stopkas related to the fire loss of
19   September 10, 2008, as far as you're concerned did
20   you give up any rights related to making any claims
21   against Allied?
22      A.  No.
23      Q.  So, as far as you're concerned today, to
24   the extent that this lawsuit for Mr. Stopka is a
                                                        93
```

```
 1   complete and abject failure, you get nothing out of
 2   it, okay, as far as you're concerned whatever
 3   claims can be made related to Allied that are
 4   validly covered under the policy can still be made,
 5   true?
 6      MR. PEARSON:  Objection, form.  You can answer.
 7      THE WITNESS:  Yes.  True.
 8   BY MR. RUFF:
 9      Q.  Now, very early on you received some
10   advice from counsel related to insurance coverage,
11   true?
12      A.  Can you be more specific?
13      MR. RUFF:  I can pull out the letters if you
14   want me to.
15      THE WITNESS:  When you say counsel --
16   BY MR. RUFF:
17      Q.  I'm talking about legal counsel.  Did you
18   on behalf of the Stopkas obtain some legal
19   consultation regarding insurance coverage?
20      A.  Legal consultation.  Did I talk to an
21   attorney?
22      MR. RUFF:  Yes, sir.
23      THE WITNESS:  Made him aware of the fire?
24      MR. RUFF:  Yes, sir.
                                                        94
```

```
 1      THE WITNESS:  Yes.
 2   BY MR. RUFF:
 3      Q.  And that was Mr. O'Connor?
 4      A.  I don't recall if it was John O'Connor or
 5   his partner George Drost.
 6      Q.  I thought you went to George first and he
 7   might have directed you to Mr. O'Connor?
 8      A.  I think I would have gone to George
 9   because I was mainly calling him because of his
10   personal friendship with Mike because I wanted to
11   make him aware of the tragedy.
12      Q.  As far as the eventual consultation with
13   either Mr. Drost or Mr. O'Connor, did you obtain
14   some information along the lines of what we've been
15   discussing regarding insurance coverage and keeping
16   your options open?
17      A.  At that time, no, not that I recall.
18      Q.  Did you have Mr. O'Connor look over the
19   policies at all?
20      A.  Not that I recall.
21      Q.  Did you consult with any counsel when you
22   were receiving these letters -- these serial
23   letters from Mr. Mason regarding Allied saying
24   that?
                                                        95
```

```
 1      A.  You mean these letters?
 2      Q.  Yes.  There were a series of them; you
 3   recall that, right?
 4      A.  I recall getting letters, but I don't
 5   recall passing it on to the attorneys.
 6      Q.  Whether you passed it on or not, did you
 7   seek counsel regarding the affect of those letters,
 8   in other words, are we giving anything up here?
 9      A.  Not that I recall.
10      Q.  You spoke with an attorney Jim Kopriva?
11      A.  The name doesn't ring a bell.
12   Jim Kopriva?
13      Q.  Well, the only one you spoke to you said
14   was an insurance representative, an insurance agent
15   of some sort?  You said you were having cocktails
16   with him.
17      A.  Oh, with a friend of mine, yes.
18      Q.  And that person advised you not to give up
19   any rights regarding anybody, right?
20      A.  Right.
21      Q.  But you weren't going to do that anyway,
22   right, based upon your --
23      A.  I didn't think so, right.  That would have
24   been my --
                                                        96
```

24 (Pages 93 to 96)

1   MR. RUFF: Yes, sir.
2   THE WITNESS: Yes. That's correct.
3   BY MR. RUFF:
4   Q. Are you aware of which rooms it was in?
5   A. Once again, it was more of the upstairs
6   areas of the home with I think some in the lowest
7   level, also.
8   Q. Do you have any understanding as to what
9   the cause of the smoke smell was?
10   A. The fire.
11   Q. I understand that, but I mean as to why it
12   remained.
13   A. Well, some of it was due to the charred
14   materials, some of it was due to less than adequate
15   spraying of whatever material they used to try to
16   cover up the areas that were burned. And that
17   remained because everything that was burned or
18   smoke wasn't necessarily removed. So, the
19   remediation job wasn't 100 percent done.
20   (Whereupon, Wolowicki
21   Deposition Exhibit Nos. 8 and
22   9 were marked for
23   identification.)
24
                                                    109

1   MR. RUFF: When you're finished reviewing
2   Exhibits 8 and 9, will you tell me when you're
3   ready?
4   THE WITNESS: Ready.
5   BY MR. RUFF:
6   Q. You agree this is the same email, sir, 218
7   and 1088, Exhibits 8 and 9?
8   A. It appears to be.
9   Q. One has some kind of marking on it, it
10   appears to have been made by maybe a pencil or some
11   writing instrument, is that correct?
12   A. Well, I mean I look at it and, for
13   instance, where it says subject, it says 10 Goose
14   Lake on one; on the other, it -- so, formatting is
15   different. So, is it the same email? It appears
16   to be, but I really quite honestly -- I see
17   inconsistencies and differences. So, is it the
18   same email? I don't know.
19   Q. I don't think the substance is different.
20   I think the formatting may be different; agreed?
21   A. If you want, I can sit here and proof the
22   entire thing.
23   So, the format is different. Okay. They
24   appear to be the same.
                                                    110

1   MR. RUFF: Yes. I think they are, it's just a
2   different format --
3   THE WITNESS: Yes.
4   MR. RUFF: -- maybe with somebody's different
5   computer printing.
6   THE WITNESS: It could be.
7   BY MR. RUFF:
8   Q. But I do see something hand drawn or like
9   a circle or something around Exhibit 9 I believe it
10   is?
11   A. Eight.
12   Q. Eight. Is that correct?
13   A. There's something there. I don't know.
14   Q. Is that yours?
15   A. There's no way I could tell if that's
16   mine.
17   Q. With respect to --
18   A. There's nothing here that would definitely
19   suggest to me that it is. It could be; I don't
20   know.
21   Q. It's fair to say that this is an accurate
22   representation that as of November 3 Mr. Augustine
23   had taken back the project?
24   A. November 3, 2008.
                                                    111

1   Q. Is that correct?
2   A. Yes.
3   Q. And that was the person that was
4   originally retained by or the entity that was
5   retained by the Stopkas?
6   A. Todd Augustine was the original general
7   contractor on the building of the home.
8   Q. And so by November 3 his general
9   contracting was starting again, correct?
10   A. Reinstated, correct.
11   Q. Reinstated is a better word. Is that
12   true?
13   A. Yes.
14   Q. And by this time, he had taken back the
15   project, correct?
16   A. On November 3.
17   Q. Is that correct?
18   A. Yes.
19   Q. If you need to, we can go to your billing,
20   but apparently you had made a walk of the project
21   with Mr. Augustine and the Stopkas and Mr. Hayes by
22   that particular point, true?
23   A. Yes.
24   Q. And it was agreed that at this point the
                                                    112

28 (Pages 109 to 112)

1 carpenters under the direction of Mr. Augustine
2 would begin the process of replacing the damaged
3 materials within the home, true?
4     A. Yes.
5     Q. So, if there was charred material that was
6 not replaced, that would have been under the
7 auspices or lead of Mr. Augustine at this juncture,
8 true?
9     MR. PEARSON: Objection, form.
10    THE WITNESS: No, because that process
11 continued for quite some time.
12 BY MR. RUFF:
13    Q. Understood. But at this point as of
14 November 3, if something charred either
15 structurally or esthetically or odorifically needed
16 to be removed, it was under the direction of
17 Mr. Augustine at this point and his discretion to
18 take it out, leave it in, true?
19    A. No.
20    MR. PEARSON: Objection, form.
21    MR. MCGUIRK: Objection, form.
22 BY MR. RUFF:
23    Q. Why not?
24    A. Because the process really was bifurcated

                                                    113

1 and the restoration, the analysis of smell of smoke
2 and charred materials, trying to get all the
3 moisture out of the house, all of that process
4 remained under the supervision, the authority of
5 Gerry Hayes. And the recon -- and even while Todd
6 was starting the reconstruction, there was still a
7 certain amount of even teardown and, you know,
8 they -- you know how carpenters are, nobody in that
9 trade or in that business does everything
10 100 percent. The whistle blows at 3:00, they
11 leave, they're suppose to come back another day to
12 finish it and they don't. So, there was still a
13 continuation of things that needed to be ripped
14 out, removed, or they would identify later that
15 yeah, that's still pretty charred, we better remove
16 that one. So, that stuff was still pretty much
17 being taken care of by Gerry Hayes as well as
18 trying to dry the house out, get rid of the smoke
19 smell. As Gerry kept on saying, I've been doing
20 this a lot of years, and I will get rid of these
21 problems.
22    Q. But if you or Mr. Stopka or Mr. Augustine
23 based upon his knowledge, training, and experience
24 said that that particular piece that's charred, I

                                                    114

1 don't like it, it's got to come out, no question it
2 would have been removed, true?
3     A. Whether it would have been removed or
4 discussed, based on the magnitude discussed with
5 Gerry Hayes, I don't know that. That's kind of
6 supposition or guesswork.
7     Q. But if Mr. Augustine says I don't like
8 that structurally or esthetically, that's got to
9 come out, that would have come out, true?
10    A. Yes.
11    Q. So, Mr. Augustine had input, actually a
12 final say to say if that charred piece remains, I
13 want it out, he had the final say in that regard,
14 true?
15    MR. PEARSON: Objection, form.
16    THE WITNESS: Yes.
17         (Whereupon, Wolowicki
18          Deposition Exhibit No. 10 was
19          marked for identification.)
20 BY MR. RUFF:
21    Q. Sir, I showed you the two letters from
22 Nationwide, the April 26, 2011 letters. Do you
23 recall those, sir?
24    A. Wasn't there one letter?

                                                    115

1     Q. Well, they're the same letter, but one had
2 your markings on it; do you recall that?
3     A. So, one letter, but two versions?
4     Q. Yes. Agreed.
5     A. I do remember that, yes.
6     Q. And that was April 26?
7     A. Can I peek?
8     MR. RUFF: You can. Any time you want to look
9 at a document, you tell me.
10    THE WITNESS: I want to look at a document.
11    THE WITNESS: There you go.
12    THE WITNESS: April 26, 2011.
13 BY MR. RUFF:
14    Q. And we see that a short time after
15 Meckler, Bulger through Mr. Hennessy responds,
16 true?
17    A. Yes.
18    Q. You were Carbon Copied on this. Do you
19 want to take a look at it?
20    A. Can I, please?
21    MR. RUFF: Yes. As I said before, take your
22 time.
23    THE WITNESS: Okay. I've got the general drift
24 of it.

                                                    116

1  it have been cheaper to have torn the entire
2  structure down and started from scratch rather than
3  spending the hundreds of thousands of dollars doing
4  it piecemeal, try to clean it up, and then, rebuild
5  from there. That's where I said the question was
6  being asked by Todd Augustine, by myself, and by
7  some of the trades.
8    Q.  I don't know what that means, but it has
9  nothing to do with my question, okay? My question
10  relates to the two million dollar figure, okay, and
11  we see still in 2009 you're working toward the
12  2,000 -- two million dollar figure, excuse me, not
13  2,000.
14    Did you have an understanding in September
15  of 2008 that the repairs would be less than the
16  American Family policy limits of two million?
17    A.  No.
18    Q.  Did you have any understanding that they'd
19  be greater than that?
20    A.  It could.
21    Q.  So, you knew that was a possibility from
22  the get-go that the repairs could be greater than
23  two million dollars, is that true?
24    A.  Yes.

129

1    Q.  And that is why you never ever gave up any
2  rights to Allied because if the money from
3  American Family were to run out, you still had
4  another pot to go into, true?
5    A.  No.
6    Q.  The reason for keeping the matter open
7  against Allied was if there was no other coverage,
8  you would at least have Allied, true?
9    A.  No.
10    Q.  Well, why did you keep Allied open then?
11    A.  Because there was nothing to be gained by
12  releasing them.
13    Q.  If the matter is greater than two million,
14  it's greater than American Family's coverage, you
15  have that pot to go to, true?
16    A.  I had no concern that the pot -- that
17  there wasn't going to be enough money because I was
18  told by Gerry Hayes there would be enough money
19  regardless of whether it was up or over -- I mean
20  under or over.
21    Q.  We've already gone through that. This is
22  a very specific question --
23    A.  Okay.
24    Q.  -- regarding keeping the Allied policy

130

1  open, okay?
2    The reason that you didn't waive any
3  rights regarding Allied was because if it was
4  exceeded, if the coverage was exceeded, you would
5  always have that right, true?
6    MR. PEARSON: Objection, form.
7    THE WITNESS: Yes.
8  BY MR. RUFF:
9    Q.  And that is why you were working all
10  along under the assumption that two million even in
11  late 2009 was the limit for American Family, true?
12    MR. PEARSON: Objection, form.
13    THE WITNESS: No.
14  BY MR. RUFF:
15    Q.  When Mr. Augustine took a look at the --
16  you said in November of 2008, took back the project
17  and said that the costs may be extensive, did he
18  indicate that the coverage of American Family of
19  two million may not be enough?
20    A.  No.
21    Q.  Did anybody?
22    A.  Not that I recall.
23    Q.  Once you learned of the two million dollar
24  limit from American Family, did you ever say to

131

1  Mr. Hayes what if we reach the two million dollar
2  limit?
3    A.  We had that conversation many times.
4    Q.  And you've already told me Mr. Hayes never
5  made a promise to go beyond the two million, true?
6    A.  No. I said he did.
7    Q.  Did he ever say don't worry about it,
8  American Family will pay beyond its two million
9  dollar limits?
10    A.  Yes.
11    Q.  When did he say that? I asked you that at
12  the beginning and you said no.
13    MR. PEARSON: Objection, mischaracterizes his
14  testimony.
15    THE WITNESS: I don't remember you ever asking
16  me that question.
17  BY MR. RUFF:
18    Q.  When did Mr. Hayes say that
19  American Family will not be bound by its two
20  million dollar limit?
21    A.  Will not be bound, he never said that.
22    Q.  So, that is the same, that is your
23  testimony now. He never said --
24    A.  No. He did, but he didn't --

132

33 (Pages 129 to 132)

1 and said the remediation process is complete,
2 correct?
3    A. I can't answer the question.
4    Q. You would have expected him to do a
5 thorough --
6    A. I would have expected.
7    Q. -- review?
8    A. Yes.
9    Q. And there were no concerns voiced either
10 that you're aware of in writing or by Mr. Augustine
11 when the walk-thru was performed, true?
12    A. Not that I recall.
13    Q. And there were no concerns voiced by
14 Mr. Stopka after that walk-thru that you can recall
15 now, true?
16    A. Oh, there were a lot of concerns.
17    Q. Regarding the remediation?
18    A. Yes.
19    Q. Is there anything in writing, first of
20 all, that reflects that?
21    A. In writing, no.
22    Q. So, was this expressed to Gerry Hayes?
23    A. Yes.
24    Q. What were those concerns?

141

1 discussions when those concerns about the wood were
2 raised?
3    A. Well, there was many tradesmen in the
4 building, and from time to time Todd would be
5 called over to discuss with those trades what was
6 going on. I can't say for certain when he was
7 called away what we were talking about when he was
8 gone; I don't recall.
9    Q. Mr. Stopka made the walk-thru with Todd?
10    A. Yes.
11    Q. So, there would be nothing that would have
12 prevented him from -- him, Mr. Stopka, from saying
13 anything to Mr. Augustine about any of these
14 concerns you raise now, true?
15    A. True.
16    Q. Were there any specific concerns after the
17 walk-thru that you raised to Mr. Hayes?
18    A. Money.
19    MR. RUFF: I'm talking about the status of the
20 walk-thru.
21    THE WITNESS: Of the house you're saying?
22    MR. RUFF: Yes.
23    THE WITNESS: Yes. As far as the moisture in
24 the walls, things like mildew, what happens if we

143

1    A. Things like the amount of moisture in the
2 building and was enough of the charred and smoke
3 damaged wood removed, should more support beams
4 have been removed and replaced, the window. I mean
5 there was a lot of issues that would unfold or
6 become known as time progressed.
7    Q. Eventually all of those issues were
8 resolved other than the smoke, correct, the smoke,
9 the odor?
10    A. I believe so.
11    Q. With respect to the voicing of those
12 concerns, whatever those concerns were by
13 Mr. Stopka specifically related to any structural
14 like wood or whether or not structural beams or
15 wood should be removed, Mr. Augustine was present
16 when that discussion occurred?
17    A. I don't recall.
18    Q. You don't recall him being --
19    A. Well, I mean when Mike and I were talking,
20 I don't recall if Todd was next to us or not.
21    Q. Was this discussion where Mr. Stopka was
22 raising his concerns at the end of the meeting?
23    A. Beginning, end.
24    Q. So, was Mr. Augustine present during those

142

1 find more burnt materials, leaks. That was a major
2 concern was the leaks in the roof since the roof
3 was the major area of the house.
4 BY MR. RUFF:
5    Q. And this was all discussed on the
6 walk-thru after the walk-thru?
7    A. Well, it wasn't -- it was a walk-thru for
8 others, but not for Gerry Hayes.
9    Q. But it was after the walk-thru had been
10 completed, true?
11    A. During and after.
12    Q. But all of this occurred before
13 Todd Augustine takes back the project, true?
14    A. The -- what all took place?
15    Q. The walk-thru.
16    A. The walk-thru took place prior to Todd's
17 taking back the house.
18    Q. And any of these concerns, did you
19 contemporaneously reduce to writing?
20    A. No. Photographs, but not writing.
21    Q. What photographs did you have that aren't
22 produced?
23    A. No, not my photographs, but I thought Mike
24 possibly was taking photographs. Maybe not.

144

36 (Pages 141 to 144)

|   |   |
|---|---|
| 1   MR. STOPKA: (No audible answer.) | 1   THE WITNESS: Right. There's been leaks and |
| 2   THE WITNESS: No, you didn't take them? Oh, I | 2   there have been things that have needed to be |
| 3   thought you said you were going to, but I guess we | 3   repaired and repaired again because they hadn't |
| 4   didn't have photographs then. | 4   been done correctly before. |
| 5   BY MR. RUFF: | 5   BY MR. RUFF: |
| 6   Q.   And there's no indication that | 6   Q.   What specifically other than smoke or |
| 7   Mr. Augustine indicated that the remediation was | 7   odor? |
| 8   inappropriate or had to be repeated or rectified in | 8   A.   Well, I'm saying that the house wasn't |
| 9   certain areas after November 3, 2008, true? | 9   brought back to the position it was prior to the |
| 10   A.   I don't remember when the engineering | 10   fire. |
| 11   study was done. And there was some additional work | 11   Q.   Other than smoke or odor which you have |
| 12   that needed to be done, and I don't recall whether | 12   said in writing and your attorneys have said in |
| 13   that was before or after that date. | 13   writing is the only issue that remained, what other |
| 14   Q.   The question I have though is after | 14   as far as the structure itself remains? |
| 15   November 3, 2008, do you have any indication | 15   A.   At this time? |
| 16   covered in writing first from Mr. Augustine that he | 16   Q.   No, at -- yes, okay, as of this time. |
| 17   was dissatisfied with the remediation? | 17   Are you looking at Mr. Stopka for answers? |
| 18   A.   No. | 18   A.   No. |
| 19   Q.   Anything verbally? | 19   Q.   Why are you looking at him? |
| 20   A.   Yes. | 20   A.   I was looking over there. |
| 21   Q.   When? | 21   Q.   You've never looked at him when he shook |
| 22   A.   Throughout the process. In construction | 22   his head yes or no to any answers to any questions? |
| 23   there's always bad surprises. | 23   A.   No. What other costs remain? Your |
| 24   Q.   Was any of this reduced to writing? | 24   question -- |
| 145 | 147 |
| 1   A.   No. | 1   Q.   Other than smoke. You have said this is |
| 2   Q.   What specifically about the remediation | 2   resolved other than smoke and your attorney said |
| 3   work was not done correctly that Mr. Augustine | 3   it's resolved other than smoke, was that a true |
| 4   expressed to you? | 4   statement? |
| 5   A.   Well, once again, many leaks in the roof, | 5   MR. PEARSON: Object to form. |
| 6   in the floors, more tile and different materials | 6   THE WITNESS: My recollection is that there |
| 7   that were ruined and had to be replaced. I mean it | 7   were still costs that -- |
| 8   was -- hope had been present that the stuff would | 8   BY MR. RUFF: |
| 9   be salvaged, and it was being discovered on an | 9   Q.   Are the costs that you're talking about |
| 10   ongoing basis that things just didn't -- they | 10   structurally related to the building itself? Not |
| 11   weren't going to survive the loss, the fire. | 11   some other kind of costs. |
| 12   Q.   Eventually all of that was rectified, | 12   A.   And you're saying structurally are you |
| 13   correct? | 13   including in there materials? |
| 14   A.   Yes. | 14   Q.   Yes. |
| 15   Q.   And paid for by American Family, true? | 15   A.   Tile? |
| 16   A.   False. True and false. I mean -- | 16   Q.   Yes. |
| 17   Q.   The only thing that remained according to | 17   A.   Things of that nature? |
| 18   you and your attorneys was the odor, correct? | 18   Q.   Yes, sir. |
| 19   A.   I believe there's more costs, additional | 19   A.   All right. My recollection, there's still |
| 20   costs, that have been incurred that still have not | 20   some costs out there that relate to getting the |
| 21   been paid. | 21   house back to the point it was to be -- or it was |
| 22   MR. RUFF: I'm talking about the concerns | 22   prior to the fire. |
| 23   raised by Mr. Augustine, you said leaks, tile, | 23   Q.   So, when you and your attorneys make the |
| 24   those types of things, construction. | 24   statement that this is substantially in the |
| 146 | 148 |

37 (Pages 145 to 148)

1   A.  I didn't say that.
2   Q.  So, what, in fact, was being negotiated
3  was the full amount of the policy limits, the cap
4  on what American Family could pay, true?
5   MR. PEARSON: Objection, form.
6   THE WITNESS: No.
7  BY MR. RUFF:
8   Q.  Then you're saying it's just a coincidence
9  that the two million dollars appears, true?
10   A.  No.
11   Q.  So, you're not saying it's just a
12  coincidence?
13   A.  I'm saying it's not true.
14   Q.  The two million dollars is not
15  coincidence?
16   MR. PEARSON: Objection, form.
17   THE WITNESS: I'm saying it's not true, that
18  that was not the number that we were negotiating
19  at.
20  BY MR. RUFF:
21   Q.  Who wrote the two million?
22     If Mr. Stopka says that's his writing,
23  would you disagree with that?
24   A.  I don't know.  If he says it's his

153

1   A.  I believe so.
2   Q.  Who was that attorney?
3   A.  It would have been, I believe,
4  John O'Connor.
5   Q.  Could this be John O'Connor's writing?
6   A.  It could be.
7   Q.  Did you have any disagreements with what
8  was written in by Mr. O'Connor and signed by the
9  Stopkas?
10   A.  Yes.
11   Q.  What?
12   A.  Amounts, additional wording for future
13  expenses and testing that would be needed, and
14  there were lots of changes that still needed to be
15  done.
16   Q.  Did you commit that to writing at all?
17   A.  All discussion with Gerry Hayes.
18   Q.  So, the answer to my question -- did you
19  commit that to writing at all?
20   A.  No.
21   Q.  Did you make any changes on any of the
22  releases?
23   A.  No.
24   Q.  Why did you allow the Stopkas to sign it

155

1  writing, then I guess it's his writing.
2   Q.  Do you know if it is or isn't?
3   A.  And Mr. Stopka wasn't the one doing the
4  negotiating.
5   Q.  Who was?
6   A.  I was.
7   Q.  So, you were doing the negotiations.  Did
8  you obtain the signatures of the Stopkas?
9   A.  Yes, I did.
10   Q.  When you obtained the signatures of the
11  Stopkas, did you have someone put this information
12  that's written in here prior to them signing?
13   A.  I don't remember.
14   Q.  If this is in your records, why do we see
15  their signature on the copy that has the insertion
16  of these terms?
17   A.  I don't know.
18   Q.  Again, just some kind of coincidence?
19   A.  No, I didn't say that.
20   Q.  Did any attorney revise the release as we
21  see here?
22   A.  I don't recall.
23   Q.  Did you consult with an attorney
24  concerning the release?

154

1  with the changes made by their attorney without the
2  additions you say should be in there?
3   A.  Because many of my clients sign many
4  things and give them to me for safekeeping while
5  the final adjustments are being made.
6     (Whereupon, Wolowicki
7     Deposition Exhibit No. 15 was
8     marked for identification.)
9  BY MR. RUFF:
10   Q.  Sir, with respect to damages in this case,
11  do you have any intimate knowledge of any of these
12  other than Wolowicki & Associates?
13   A.  You say intimate knowledge?
14   Q.  Yes.  Can you back them up?
15   A.  Most of these expenses are
16  construction-related which means then they go
17  through the draw statement.  So, that would be
18  where the backup would be found.
19   Q.  So, getting back to my question, are you
20  the one that would be able to talk about these?
21   A.  It depends on what the question is.
22   Q.  What was $344 for security for?
23   A.  Probably the installation and -- no, I
24  wouldn't have that --

156

39 (Pages 153 to 156)

1    Q.   Would you be able to talk to any of these
2  particular items that are listed here?
3    A.   In general terms.
4    Q.   In specific terms?
5    A.   No.
6    Q.   Are the backup for these items in your
7  file that you brought with you today?
8    A.   I would say the backup was never in my
9  possession because they're the bills and -- so, the
10  answer is "no".
11    Q.   If we go to Page 1, is the only item that
12  you would be able to speak to in any detail is the
13  claim for $36,479, Wolowicki & Associates?
14    A.   No.  Then there's the construction loan
15  interest.
16    Q.   What is that from and to?  Can you pull it
17  out of your file so we can discuss that?
18    A.   It would be from December of 2009 to the
19  time that this letter was written.
20    Q.   Why are you claiming that as -- is the
21  construction loan interest still being paid?
22    A.   Yes.
23    Q.   Why is that?
24    A.   Because the house isn't complete.

157

1    A.   That is a situation where the materials
2  have not been completed.
3    Q.   And that's nothing to do with
4  American Family, true?
5    A.   True.
6    Q.   So, let's cross that one out.  Let's go to
7  unpaid draws of amounts for post-fire construction
8  work.  Is that something other than this
9  itemization attached, the 254?
10    A.   Right.  The 254, the third item, is this
11  list on the third page.
12    Q.   Which you can't speak to in specific
13  detail, true?
14    A.   That's correct.
15    Q.   So, what is the unpaid draw amounts?
16    A.   Those were draws on work that was done or
17  being done to bring the house back to the point
18  that it was at prior to the fire.
19    Q.   Is this unpaid draw amounts post-December
20  of '09?
21    A.   Yes.
22    Q.   How is that American Family's
23  responsibility?
24    A.   Because Gerry Hayes had said that they

159

1    Q.   Whose fault is that?
2    MR. PEARSON:  Objection, form.
3    THE WITNESS:  These expenses haven't been paid.
4  BY MR. RUFF:
5    Q.   But if that's because Mr. Stopka couldn't
6  get the material in or Todd Augustine couldn't
7  complete the material, how is that
8  American Family's responsibility?
9    A.   That's not what I'm saying is incomplete.
10    Q.   So, this is not necessarily the
11  construction loan interest, it's just an item, but
12  it's not really related to this lawsuit, true?
13    MR. PEARSON:  Objection, form.
14    THE WITNESS:  It is related to the lawsuit.
15    MR. RUFF:  I just gave you the opportunity and
16  you punted on it.
17  BY MR. RUFF:
18    Q.   It's not an item that's related to a claim
19  against American Family, true?
20    A.   Yes, because they didn't bring the house
21  back to the --
22    Q.   You told me that there were stairways not
23  in and there were items that -- that's construction
24  progress, true?

158

1  would bring the house back to the point it was
2  prior to the fire.  They would pay all costs.
3    Q.   Is this related, again, to the material
4  not getting there on time?
5    A.   No.
6    Q.   What is this specifically related to?
7    A.   Once again, getting the house back to the
8  point it was --
9    Q.   What is it specifically related to?
10    A.   That's the costs.
11    Q.   I don't want any general that I can't
12  cross-examine on.  I want to know what specifically
13  is it related to?
14    A.   I don't have the draw statements in front
15  of me.
16    Q.   So, you don't know?  Can you get those
17  out, please?
18    A.   I don't have the draw statements.
19    Q.   Are you the one that would speak to that?
20    A.   It would be, I believe, Todd Augustine.
21    Q.   So, you would not be the one that would
22  talk about the unpaid draw amounts, is that
23  correct?
24    A.   Correct.

160

40 (Pages 157 to 160)

1　the number was constantly changing anyway. So,
2　this was just something that he felt he could get
3　from the home office to get a settlement made, and
4　he felt that a settlement was something that
5　American Family would be very interested in even
6　paying a premium or money over and above the loss.
7　BY MR. PEARSON:
8　　Q.　Well, when you say the number was
9　changing, was the two million dollar number
10　changing or was the number that Mr. Hayes
11　represented had been spent in remediating the loss
12　changing?
13　　A.　The loss was changing.
14　　Q.　So, in other words, the delta between the
15　dollars spent to remedy the loss and this two
16　million dollar amount is what had been changing?
17　　A.　Correct.
18　　Q.　At the time of your discussions with
19　Mr. Hayes regarding the release and the numbers
20　that are reflected in Exhibit 17, 18, and 19
21　relating to this two million dollar number, was
22　Mr. Hayes committing to undertake any other
23　obligations in addition to the payment of the two
24　million dollar amount?

189

1　　A.　Sure. Yes.
2　　Q.　Why were you concerned about that?
3　　A.　Because we had been finding it all along,
4　and every time it rained, the smell of smoke would
5　reappear very strongly. And as they started to
6　look into other areas of the house, they were
7　finding charred debris and things of that nature,
8　areas that weren't sprayed over with whatever the
9　chemical was that they used. I mean so they were
10　finding that things hadn't been done 100 percent,
11　so it wouldn't surprise any of us if more of that
12　was found in the future, and certainly the smoke
13　smell was occurring constantly.
14　　Q.　The smoke smell you had specific
15　discussions with Mr. Hayes about, correct?
16　　A.　Correct.
17　　Q.　And Mr. Hayes represented to you that he
18　would eliminate that no matter what it took, is
19　that correct?
20　　A.　He said he handled it many times in his
21　career, and this is something he assured us would
22　be taken care of 100 percent to the Stopkas'
23　satisfaction.
24　　Q.　At the time of those discussions did

191

1　　A.　Yes. Regardless of when, he would make
2　sure that American Family continued whatever
3　remediation was necessary as far as any smoke or
4　fire damage, and that they would bring the house
5　back to its original state prior to the fire. So,
6　it was those promises that he was making, not
7　dollars necessarily, but just whatever it's going
8　to take and regardless of when it's going to need
9　to be incurred, it will be taken care of. And he's
10　been doing it for years, and we can trust him and
11　this will be taken care of.
12　　Q.　Are you familiar with the term latent
13　damage?
14　　A.　No.
15　　Q.　If there were fire-related damage in the
16　house that was hidden behind walls, not observable
17　to the naked eye, I'm going to refer to that as
18　latent damage; do you understand that?
19　　A.　Okay.
20　　Q.　Did you have any concern as you were
21　negotiating with Mr. Hayes for resolution of this
22　loss that there may be latent damage that either
23　you or Mr. Augustine or the Stopkas were unaware
24　of?

190

1　anyone know what the actual cause of that smoke
2　smell was other than the fact there had been a very
3　large fire at this home?
4　　A.　I don't recall. I think it was subsequent
5　to that when the forensic analysts came in that
6　actual areas were found to have been not properly
7　treated.
8　　Q.　You said in your prior answer a short
9　while ago that things were being found during the
10　course of reconstruction. Who was making those
11　discoveries?
12　　A.　Todd Augustine and Mike Stopka.
13　　Q.　Were those brought to the attention of
14　Mr. Hayes?
15　　A.　Yes.
16　　Q.　How were they brought to Mr. Hayes'
17　attention?
18　　A.　Telephone calls.
19　　Q.　What did Mr. Hayes say, as best you can
20　recall?
21　　A.　He would keep sending people out to try to
22　rectify it. And even with the fans and the heaters
23　and everything, I mean he kept at it trying to
24　solve the moisture problem, also. So, he would

192

48 (Pages 189 to 192)

1    keep reacting to whatever concerns and complaints
2    we had.
3         Q.   Now, let me direct your attention to
4    Exhibit No. 2 which I have the original of.  I
5    wasn't provided a copy, so I'm just going to put it
6    in front of you.
7         A.   Okay.
8         Q.   That's the September 16, 2008 letter from
9    Mr. Mason.  Do you recall that letter?
10        A.   Yes.
11        Q.   Mr. Ruff asked you some questions about
12   that; do you recall those questions?
13        A.   Yes.
14        Q.   He specifically directed your attention to
15   the line from Mr. Mason that reads it is our
16   understanding that American Family carries two
17   million in liability coverage limits; do you see
18   that?
19        A.   Yes.
20        Q.   At no time did anyone at American Family
21   ever make such a statement to you either orally or
22   in writing, isn't that true?
23        A.   Yes.
24        Q.   When you received this letter, and

193

1    Mr. Ruff asked you questions about it, you in words
2    or substance said you didn't pay much attention to
3    that; do you recall that testimony?
4         A.   Yes.
5         Q.   Why did you not pay attention to that
6    statement?
7         A.   Because from day one Gerry Hayes had
8    continued advise us that the house would be put
9    back to its condition prior to the fire.
10        Q.   Did you rely on that advice from
11   Mr. Hayes?
12        A.   Yes.
13        Q.   Did the Stopkas rely on that advice from
14   Mr. Hayes?
15        A.   Yes.
16        Q.   And did Chateau Arlington rely on that
17   advice from Mr. Hayes?
18        A.   Yes.
19        Q.   Did either you, the Stopkas, or Chateau
20   Arlington ever waiver in any way, shape, or form
21   from reliance on that representation from
22   Mr. Hayes?
23        A.   No.
24        Q.   When you got the letter from Mr. Mason,

194

1    did you ask Mr. Hayes any questions about this two
2    million dollar limit?
3         A.   No.
4         Q.   Why not?
5         A.   This was a letter from Mason to the
6    Stopkas.  I didn't see where Mr. Hayes had to be
7    brought into this letter.  I mean it was between
8    separate insurance companies, and I don't believe I
9    was in a position or Mike or Marilyn to have to
10   hand this over to Gerry Hayes and say, you know,
11   what do you think; no need to.
12        Q.   Did you find it unusual that a different
13   insurance company was communicating with you about
14   a policy limit that American Family itself had not
15   communicated with you on?
16        A.   It was a little strange, but he was
17   pressuring us all along to make a decision and
18   let's move on.
19        Q.   He being Mr. Mason?
20        A.   Yes.
21        Q.   Why was he pressuring you to make that
22   decision?
23        A.   I don't know.  I don't know what his
24   motives were, but he was very anxious to have us

195

1    make a decision.
2         Q.   Do you think he wanted to know whether he
3    was in the loss or not in the loss?
4         A.   Probably.  That would be my guess.
5         Q.   When Mr. Hayes showed up with his
6    contractors and his truck on the site, was there
7    any question in your mind about who was taking
8    control of the situation?
9         A.   He already had taken control.
10        Q.   Let me direct your attention to Exhibit 8
11   and 9 which are the emails from Mr. Augustine.  Do
12   you have those in front of you?
13        A.   Yes.
14        Q.   Was there an issue raised by Mr. Hayes as
15   to who was going to be the general contractor on
16   the project post-fire?
17        A.   Yes.
18        Q.   Describe that issue, if you would, please.
19        A.   From the second, third day, he recommended
20   that the Stopkas hire Miner & East to do not only
21   the demolition but then the rebuild of the house.
22   And the reason he said he was making that
23   recommendation was because he had worked with
24   Miner & East on some other substantial fire losses

196

49 (Pages 193 to 196)

1    A.  Well, certainly Todd Augustine, and I
2 believe I probably would have talked with a few
3 other builders that I know, that I respect and get
4 their feedback and their input, and certainly the
5 engineering firm and the architect that Mike and
6 Marilyn used.  And I would have put a team together
7 to do an evaluation of which was the best way to
8 go.
9    Q.  When did you get any sense that Mr. Hayes
10 was reneging on his promise to you?
11    A.  When he stopped showing up for meetings,
12 and he was unable to come across with monies that
13 he had promised and he started to say that he was
14 having difficulties with his home office.
15    Q.  Did he say what those difficulties were?
16    A.  No.  He just said that -- well, there
17 was -- he educated me as far as there's loss costs
18 and there's administrative costs, and you can put
19 some costs in this bucket and others here.  And he
20 thought he would have no difficulty putting certain
21 costs into the admin so that it wouldn't go against
22 the loss.  And so he was promising that the dollars
23 would be there to complete the project even though
24 time was still passing quickly, and then, he just

201

1 bottom line is don't worry, the house is going to
2 be rebuilt and it will be back to where it was and
3 all the smell and everything will be gone.
4    Q.  When you say the bottom line, is that the
5 bottom line that Mr. Hayes related to you?
6    A.  Yes.
7    Q.  From where you sat advising the Stopkas
8 and Chateau Arlington, did it matter to you where
9 those dollars came from within American Family's
10 accounting system?
11    A.  Not at all.
12    Q.  Why not?
13    A.  Because what mattered was one thing, and
14 that was the house being brought back to its
15 original state and whatever other problems were new
16 that existed would be also taken care of.  And what
17 bookkeeping and what internal matters and affairs
18 American Family has, that's none of my concern.
19    Q.  Now, turn to Exhibit 14, if you would.
20 You were asked about these various releases and
21 testified you don't recognize the handwriting on
22 them, correct?
23    A.  Correct.
24    Q.  You do recognize the signature on some of

203

1 sort of disappeared.
2    Q.  When you say dollars wouldn't go against
3 the loss, are you referring to the amount that had
4 been paid to date that was being applied against
5 this two million dollar amount that's reflected in
6 your notes?
7    A.  I'm sorry.  Could you repeat the question?
8    Q.  Sure.  When you say that Gerry Hayes was
9 making representations to you about moving numbers
10 around, is that the explanation for the different
11 numbers that are reflected in your handwritten
12 notes, Exhibits 17, 18, 19 for example, with regard
13 to amounts that were being taken off the two
14 million dollar amount?
15    A.  Right.  I mean because in his email to me
16 he had indicated that although there was obviously
17 one fire, there were two different accounts set up
18 on the ledgers of American Family.  I never quite
19 understood why, but he was just saying that it was
20 from his perspective or from his standpoint better
21 to put certain dollars to one of the accounts
22 versus the other account and other dollars,
23 expenses would go just to admin costs.  And that he
24 was taking care of all those details, and the

202

1 them, correct?
2    A.  Yes.
3    Q.  And the signatures are of Mike and Marilyn
4 Stopka, correct?
5    A.  Correct.
6    Q.  Did you obtain those signatures?
7    A.  Yes.
8    Q.  Why did you obtain them?
9    A.  Because they were doing a lot of traveling
10 and weren't available, and we were hopeful that
11 we'd be able to come to an agreement with
12 American Family and Gerry Hayes.  And they didn't
13 want the signatures being an issue, so they signed
14 and said let's make sure we get the agreement we
15 need, and then, we're ready to go.
16    Q.  So, the Stopkas gave you these releases
17 signed, you held them, correct?
18    A.  Yes.
19    Q.  And then you carried on your negotiations
20 with Mr. Hayes, is that right?
21    A.  Correct.
22    Q.  Describe what happened in those
23 negotiations.
24    A.  Everything -- I mean the whole payout

204

51 (Pages 201 to 204)

1  process, I mean, you know, he would -- I mean it
2  was even very strange. We never even had to go
3  through the outside C.P.A. firm for them to check
4  our numbers. He just would sit down with me and go
5  through it, he would approve it, he would give us
6  the check, we'd send it to the title company, and
7  the payment would be made. Draw after draw after
8  draw after draw, everything he promised he would
9  come across with. And then when we came down to
10  talking about bringing this to a conclusion and
11  that he really wanted to get this loss taken care
12  of and completed and American Family would be
13  willing to pay us for that and get this to be a
14  closed case.
15      Q. And that was Mr. Hayes' idea?
16      A. Yes.
17      Q. Mr. Hayes provided you with these releases
18  for signature?
19      A. Yes.
20      Q. So, after you received the releases and
21  obtained signatures from Mr. and Mrs. Stopka, what
22  happened in the negotiation with Mr. Hayes?
23      A. Things started to slow down, and he
24  wasn't -- he kept on going, saying he had to talk

205

1  to his bosses, and there was some changing of some
2  wording or something. And they weren't getting
3  back to us as far as the changes that they wanted,
4  and then, I said once you give us the final
5  document that you guys are comfortable with, then
6  we'll make our changes. But that just --
7      Q. That never happened, right?
8      A. That never happened.
9      Q. And Mr. Hayes ultimately stopped
10  communicating with you, is that correct?
11      A. Correct.
12      Q. When did that occur?
13      A. Late 2009.
14      Q. Prior to his last communication with you,
15  did he warn you that he was no longer going to be
16  in a position to make good on his promises?
17      A. He said that he had encountered
18  difficulties at headquarters and that the changes,
19  the things he had hoped to have accomplished,
20  didn't take place.
21      Q. Did he tell you what those problems were
22  that he had encountered?
23      A. No. The only thing he did make us aware
24  of was the issue with Complete Flashings, I

206

1  believe.
2      Q. What was that issue?
3      A. That was every time we'd make a draw --
4  obviously there would be a list of all of the subs
5  who were getting paid. And on the draw statements,
6  Complete Flashings was identified as being paid,
7  and Gerry Hayes never saw that -- well, if he did,
8  he didn't say anything. And then when we had one
9  of our possibly last meetings with Gerry Hayes, all
10  of a sudden he -- I said hey, Complete Flashings,
11  what are they getting paid for? He said well,
12  they've been getting paid all along, and he
13  turned -- he was very upset, and he said that that
14  was going to be a problem.
15      Q. Did he tell you why that was going to be a
16  problem?
17      A. He said something about that an insured
18  can't get paid by an insurance company on a loss
19  that it caused.
20      Q. Did he tell you what affect that was going
21  to have on the settlement?
22      A. He said it was going to cause a problem.
23      Q. Was that the last communication you had
24  with Mr. Hayes?

207

1      A. Pretty much, yes. I mean I might have
2  called him on one or two occasions, but I mean that
3  was really the end of our pretty much regular
4  communication. I mean it was -- not many days that
5  would pass that he and I weren't talking and
6  exchanging emails and things of that nature.
7      Q. The draws that you describe that regularly
8  went on post the fire up to this time you've just
9  described, who arranged for the mechanism for those
10  draws?
11      A. Todd Augustine, Mike Stopka, and myself.
12      Q. Was Mr. Hayes involved in those draws?
13      A. Only to the extent of coming to my office,
14  me handing the document to him, and then, him
15  writing out a check.
16      Q. So, he would actually write the check in
17  person at your office?
18      A. Either he would do it in person or if he
19  forgot the checkbook that day, he would go home, do
20  it at his house, come back the next day, and drop
21  it off at my office.
22      Q. Let me ask you to take a look at
23  Exhibit 11, if you would, please. Exhibit 11 is
24  the Chubb Personal Insurance proposal. It's bate

208

52 (Pages 205 to 208)

BY MR. RUFF:

Q. Do you recall counsel asking you questions about Gerry Hayes moving money from expenses to coverage under the policy; do you recall those questions?

A. Yes.

Q. The whole reason for that was because you're dealing with a two million dollar policy limit, true?

A. I have no idea.

Q. Because your position makes no sense whatsoever that you'd no nothing about the two million dollar policy limit unless you did know something about the two million dollar policy limit, and the reason that this is important is because you know it has to be under the two million dollar cap, true?

MR. PEARSON: Is that a question or is it your speech because you save it for the jury, okay? Do you understand the question?

THE WITNESS: Yes.

MR. PEARSON: Okay. You can answer.

THE WITNESS: No.

237

BY MR. RUFF:

Q. Isn't it true that you knew about the two million dollar policy limit the whole time, and that's why throughout the life of dealing with Gerry Hayes you were trying to work under the two million dollar policy limit?

A. No.

Q. You said the reason that Mr. Stopka is not occupying the building or it's not completed is because of lack of funds, right?

A. No. I said there's many reasons.

MR. RUFF: No. You said lack of funds, I took down the quote. You said there's a lack of funds.

THE WITNESS: My recollection is lack of funds, materials aren't there.

BY MR. RUFF:

Q. And we've established that none of that is related to American Family, but what lack of funds is there that the home is not being completed?

A. I think you would have to ask him.

Q. So, you understand that Mr. Stopka has a lack of funds to complete the home, is that correct?

A. That's my understanding, yes.

238

Q. The lack of funds has nothing to do with American Family, true?

MR. PEARSON: Objection, form.

THE WITNESS: I don't know that.

BY MR. RUFF:

Q. The reason materials are not there, the project is not finished comes really down to a lack of funds by Mr. Stopka; it has nothing to do with American Family, correct?

A. No.

Q. He does have a lack of funds to complete the project though, correct?

A. To my understanding, yes.

Q. You had a number of questions posed to you by counsel regarding Allied's position; do you recall that?

A. No.

Q. Mr. Pearson asked you a number of questions about Allied and their coverage; do you recall that?

A. Allied and their coverage? I don't recall those questions.

Q. Sir, it's still your testimony that you were not going to give up any rights whatsoever in

239

2008 regarding Nationwide or Allied, true? Not your rights, I mean the Stopkas' rights.

A. True.

Q. You would agree that there's documentation prior to December of 2008 that you, in fact, knew of a two million dollar policy limit by American Family for Complete Flashings, true?

A. Prior to December of what?

MR. RUFF: 2008.

THE WITNESS: If you consider a letter from Nationwide documentation, then I would say yes.

BY MR. RUFF:

Q. And you knew that if, in fact, that two million dollars was, in fact, accurate and that if the costs to remediate the home exceeded two million dollars that you still needed to keep your options open, keep the Stopkas' options open regarding Allied, true?

A. No. I wasn't concerned about that letter.

Q. But you wanted to keep the options open regarding Allied, true?

A. No.

Q. You didn't?

A. I just didn't want to give anything up.

240

60 (Pages 237 to 240)

## Jerry Wolowicki

**From:** Jerry Wolowicki [Jerry@wolowicki.com]
**Sent:** Tuesday, December 02, 2008 10:15 AM
**To:** 'masonc12@nationwide.com'
**Cc:** 'Marilyn Stopka'; 'Mike Stopka'; 'luke@corkillinsurance.com'
**Subject:** Claim Number 91 12 20 038141 09102008 01

Dear Mr. Mason:
I am writing to you on behalf of Mr. and Mrs. Michael Stopka. The insured have decided to seek indemnification on their fire loss from American Family Insurance.
The insured have been collecting directly from American Family for the repairs and other costs attributable to the fire.
Please contact me if you have any further questions.

Jerome J. Wolowicki
847-348-3300

12/2/2008



STP00973



# AMERICAN FAMILY INSURANCE GROUP

5209 RIB MOUNTAIN DRIVE • WAUSAU WI 54401 • PHONE: 800-260-1369
Mailing Address: PO BOX 530 • SCHOFIELD WI 54476-0530

00-221-129788
00-221-121546

## CAUTION - READ THIS RELEASE CAREFULLY
### Release for Property Damages only.

FOR THE SOLE CONSIDERATION OF One Million Nine Hundred Sixty Five Thousand Dollars & 00/100 ($1,965,000.00) receipt of which I acknowledge, I fully and forever release and discharge Complete Flashings Inc. and American Family Insurance Company their heirs, administrators, executors, successors and assigns, and all other persons and organizations who are or might be liable, from all claims for all property damages including but not limited to interest on any property damage settlement which I sustained as the result of an occurrence which occurred on or about September 10, 2008 at or near 10 Goose Lake Road, Barrington, Illinois.

By executing this release, I intend and agree that this release applies to all of my property damage claims arising from said accident, present and future.

I acknowledge the sum paid shall not be construed as an admission of any liability by any of the parties released.

I agree that if more than one person has executed this release, the consideration paid shall apply jointly to all such persons. All other provisions shall apply separately to each such person. The word "person" as used in this paragraph includes natural persons, firms, associations, organizations and corporations.

I further agree that any claim of whatever kind or nature the above named parties might have or hereafter have growing out of the above accident, is hereby expressly reserved to them.

I understand this release contains the entire agreement between the parties. I have carefully read this Release, and know the contents, and I sign as my own free act.

Signed and Sealed at _____   _____, 20_____
                                      (City, State)                                   (Month Day)

In the Presence of Witnesses Signed Below:         **CAUTION: READ BEFORE SIGNING,**
                                                    **THEN SIGN BELOW**


_____        as to _____ (Signature)


_____        as to _____ (Signature)

/s



STP00307

**AMERICAN FAMILY INSURANCE**

## AMERICAN·FAMILY·INSURANCE·GROUP

5209 RIB MOUNTAIN DRIVE • WAUSAU WI 54401 • PHONE: 800-260-1369
Mailing Address: PO BOX 530 • SCHOFIELD WI 54476-8530

00-221-129788
00-221-121546

### CAUTION - READ THIS RELEASE CAREFULLY
Release for Property Damages only.

*as insurer of ~~Aluminum~~ Complete Flashings Inc*

*P2 100,000*

*Two*

FOR THE SOLE CONSIDERATION OF ~~One Million Nine Hundred Sixty Five Thousand~~ Dollars & 00/100 ($~~1,965,000.00~~) receipt of which I acknowledge, I fully and forever release and discharge Complete Flashings Inc. and American Family Insurance Company their heirs, administrators, executors, successors and assigns, ~~and all other persons and organizations who are or might be liable~~, from all claims for all property damages including but not limited to interest on any property damage settlement which I sustained as the result of an occurrence which occurred on or about September 10, 2008 at or near 10 Goose Lake Road, Barrington, Illinois.

*against Complete Flashings Inc and American Family Insurance Company as insurer Complete Flash Inc.*

By executing this release, I intend and agree that this release applies to all of my property damage claims arising from said accident, present and future.

I acknowledge the sum paid shall not be construed as an admission of any liability by any of the parties released.

I agree that if more than one person has executed this release, the consideration paid shall apply jointly to all such persons. All other provisions shall apply separately to each such person. The word "person" as used in this paragraph includes natural persons, firms, associations, organizations and corporations.

I further agree that any claim of whatever kind or nature the above named parties might have or hereafter have growing out of the above accident, is hereby expressly reserved to them.

I understand this release contains the entire agreement between the parties. I have carefully read this Release, and know the contents, and I sign as my own free act.

Signed and Sealed at _____      _____, 20____
                        (City, State)                    (Month Day)

In the Presence of Witnesses Signed Below:          **CAUTION: READ BEFORE SIGNING,
                                                      THEN SIGN BELOW**

_____    as to _____ (Signature)

_____    as to _____ (Signature)

STP00308

FOR SETTLEMENT PURPOSES ONLY
5/9/11

## ITEMIZATION OF ADDITIONAL FIRE-RELATED EXPENSES

| DESCRIPTION | AMOUNT |
|---|---|
| Property Taxes | $ 23,740 |
| Electrical | 17,750 |
| Plumbing Fixtures/Faucet | 25,894 |
| Landscaping | 12,617 |
| Marble & Stone Damage Repair | 16,450 |
| Roofing | 22,580 |
| Construction Insurance | 32,832 |
| Copper Gutters | 12,000 |
| Replacement Appliances | 6,061 |
| Utilities | 7,662 |
| Carpentry | 22,714 |
| Dumpsters | 3,492 |
| Homeowner's Assoc. Dues | 5,050 |
| Painting | 4,960 |
| Broken Marble Sink | 6,500 |
| Attic Stairs | 2,400 |
| Glass & Mirror | 1,819 |
| Replace Gyperete | 1,735 |
| Roof Leaks | 4,319 |
| Masonry Work | 7,800 |
| Cleaning | 6,279 |
| Tile Installation | 3,371 |
| Alarm System | 2,360 |
| Lumber | 2,285 |
| Insulation | 797 |
| General Labor | 400 |
| Stained Glass Windows | 375 |
| Security | 344 |
| TOTAL | $254,586 |