**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, LLC, )
    Plaintiffs, ) No. 10 CV 6034
     )
  vs. )
     )
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., a )
Wisconsin Corporation, )
    Defendant. )

      The videotaped deposition of GERALD HAYES,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before Tasha Olivo, Certified Shorthand
Reporter of the State of Illinois, at 123 North
Wacker Drive, Suite 1800, Chicago, Illinois, on the
7th day of March, 2012, at the hour of 11:43 a.m.

Reported by: Tasha Olivo, CSR, RPR
License No.: 084-004420

**Page 2**

1  APPEARANCES:
2    MECKLER BULGER TILSON MARICK & PEARSON
3    BY: MR. CHRISTOPHER S. HENNESSY and
4      MR. STEVEN D. PEARSON
5    123 North Wacker Drive, Suite 1800
6    Chicago, Illinois 60606
7    (312) 474-7900
8    christ.hennessy@mbtlaw.com
9    steve.pearson@mbtlaw.com
10      Representing the Plaintiffs;
11
12    PRETZEL & STOUFFER, CHTD.
13    BY: MR. EDWARD B. RUFF, III,
14      MR. JAMES G. GILLINGHAM, and
15      MS. SUZANNE M. CROWLEY
16    One South Wacker Drive, Suite 2500
17    Chicago, Illinois 60606
18    (312) 346-1973
19    eruff@pretzel-stouffer.com
20    jgillingham@pretzel-stouffer.com
21    scrowley@pretzel-stouffer.com
22    Representing American Family Mutual
23    Insurance Company, Inc.;
24

**Page 3**

2  APPEARANCES (CONTINUED):
3    HOSCHEIT, McGUIRK, McCRACKEN & CUSCADEN
4    BY: MR. JOHN M. McGUIRK
5    1001 East Main Street, Suite G
6    St. Charles, Illinois 60174-2203
7    (630) 513-8700
8    jmc@hmcpc.com
9      Representing Augustine Custom Homes.
10
11  ALSO PRESENT:
12    Mr. Michael Stopka

**Page 4**

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| GERALD HAYES | |
| By Mr. Pearson | 7 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| Plaintiff Deposition Exhibit | |
| No. 23 | 115 |
| No. 24 | 116 |
| No. 25 | 119 |
| No. 26 | 121 |
| No. 27 | 125 |
| No. 28 | 126 |
| No. 29 | 132 |
| No. 30 | 137 |
| No. 31 | 140 |
| No. 32 | 150 |
| No. 33 | 153 |
| No. 34 | 156 |
| No. 35 | 159 |
| No. 36 | 159 |
| No. 37 | 163 |

1    A.  Yes.
2    Q.  Okay.  So if at times today if I ask you a
3  question along the lines of to tell the members of
4  the jury this or that, you'll understand why I'm
5  doing that.  Okay?
6       Is that fair?
7    A.  Yes.
8    Q.  Okay.  If you need to take a break at any
9  time, just let me know.  I understand you need to
10  get up and stretch, so as long -- I would ask not
11  to take a break while a question is pending.  Just
12  let me know and I'll be happy to accommodate that.
13  Okay?
14    A.  Okay.
15    Q.  I'll be asking you a series of questions.
16  The difference in this disposition from the
17  30(b)(6) deposition is I'm asking these questions
18  in your individual capacity, asking for what
19  Jerry Hayes knows, doesn't know, recalls, doesn't
20  recall.  Okay?  So I'm asking you for your personal
21  understanding, belief, knowledge with respect to
22  the facts that are relevant to this case.
23       Fair enough?
24    A.  Fair enough.
                                              9

1    A.  Project manager.
2    Q.  What are your duties and responsibilities
3  as project manager for ServiceMaster?
4    A.  Respond to leads, sell leads, complete the
5  estimate, reach an agreement with the insurance
6  carriers as to cost of repair, and then turn it
7  over to our construction department.
8    Q.  And do you work out of your home or are
9  you at their location?
10    A.  At the --
11    Q.  In Lisle?
12    A.  In Downers Grove.
13    Q.  Okay.  Not far from your home, I take it?
14    A.  No.
15    Q.  Are you married, sir?
16    A.  Yes.
17    Q.  And how long have you been married?
18    A.  1970.
19    Q.  Okay.  Any children?
20    A.  Three.
21    Q.  Tell me about your children.  What are
22  their names?
23    A.  Rebecca, Brian, and Timothy.
24    Q.  Is it Brian or Timothy that work -- worked
                                              11

1    Q.  If you understand -- don't understand one
2  of my questions, tell me.  If you answer my
3  question, I will -- I will assume that you've
4  understood the question.
5       Is that fair?
6    A.  Fair enough.
7    Q.  Okay.  Sir, you --
8       (Whereupon, Ms. Crowley
9        entered the proceedings at
10        this time.)
11    MR. PEARSON:  Hello.
12  BY MR. PEARSON:
13    Q.  Are you currently taking any medications
14  that would prevent your ability to give full,
15  complete, truthful testimony?
16    A.  No.
17    Q.  Where do you currently reside?
18    A.  6819 Meadowcrest Drive, Downers Grove,
19  Illinois 60516.
20    Q.  How long have you resided there?
21    A.  Five plus years.
22    Q.  Who are you currently employed by?
23    A.  ServiceMaster.
24    Q.  In what capacity?
                                              10

1  or works for Brouwer Brothers?
2    A.  Brian.
3    Q.  Does Brian still work for Brouwer
4  Brothers?
5    A.  Yes.
6    Q.  In what capacity?
7    A.  He is a -- I think probably the same title
8  as mine -- project manager or salesman.  I -- I
9  don't a hundred percent understand or know.
10    Q.  Where does Brian reside?
11    A.  Lombard.
12    Q.  And what office of Brouwer Brothers does
13  he work for?
14    A.  Alsip.
15    Q.  And I'm sorry if I asked this.  Do you
16  know how long he's been there?
17    A.  I think at least ten years.
18    Q.  Who is representing you today at this
19  deposition?
20    A.  Mr. Ruff and Mr. -- Jim.
21    MR. RUFF:  Gillingham.
22    THE WITNESS:  Gillingham.
23  BY MR. PEARSON:
24    Q.  Who's paying for that representation?
                                              12

                          3  (Pages 9 to 12)

1    Q.   Once a reserve was posted by your upper
2  management on a claim, did you have authority to
3  adjust the claim within that reserve authority?
4    A.   I don't know that there is a direct
5  correlation between reserves and settling claims.
6    Q.   That's what I'm asking.  So you know what
7  a reserve is?
8    A.   Obviously.
9    Q.   Can you describe that for the members of
10  the jury, please.
11    A.   Reserve is an amount of money that you
12  anticipate is going to be paid out on a claim and
13  depending -- I think it's the department of
14  insurance says that reserves have to be set within
15  45 days of notification of a claim.
16    Q.   And when we're talking about reserves
17  here, I'm referring to it in the context of
18  third-party liability claims.  Was it different for
19  first-party liability claims?
20    A.   No.
21    Q.   Okay.  You understand, don't you, that in
22  a third-party liability setting you have expense
23  reserves or loss adjustment reserves and then also
24  indemnity reserves, fair?
                                              25

1    A.   I'm not sure that that's the case.
2    Q.   Okay.  So let's -- then let's take a step
3  back.
4       You would agree, wouldn't you, that in a
5  third-party liability policy there is the indemnity
6  obligation under the policy?  Right?
7    A.   Correct.
8    Q.   And there is also a supplementary payments
9  obligation under the policy.  Are you familiar with
10  that?
11    A.   I'm not sure I understand what
12  supplementary payments are.
13    Q.   Okay.  Third-party liability policy would
14  obligate the insurer -- in this case
15  American Family -- to hire a lawyer to defend
16  American Family's insured.  Are you with me?
17    A.   Yes.
18    Q.   And the cost of hiring that lawyer are in
19  addition to the limits of indemnity obligation.
20  Are you with me?
21    A.   Yes.
22    Q.   Those are supplemental payments?
23    A.   Yes.
24    Q.   So we're on the same page?
                                              26

1    A.   Yes.
2    Q.   So those supplementary payments such as
3  lawyer fees and also investigative costs and
4  adjustment costs are all what I consider
5  supplementary payments.  Would you agree with that?
6    A.   Yes.
7    Q.   So those amounts in a third-party
8  liability context, there's no limit on the policy
9  to those amounts that could be expended to resolve
10  a claim.  Would you also agree with that?
11    A.   Yes.
12    Q.   So you could have, for example, a
13  $2 million policy that costs $10 million to adjust
14  and defend and resolve.  Would you agree?
15    A.   Yes.
16    Q.   So back to reserve setting in American
17  Family, did American Family in the third-party
18  liability context set reserves solely for indemnity
19  recoveries or did they also have reserves for
20  supplementary payment obligation?
21    A.   Strictly for indemnity.
22    Q.   How were supplementary payment expenses
23  accounted for?
24    A.   As incurred.
                                              27

1    Q.   Did you have any limitation on your
2  authority to incur supplemental payment
3  obligations?
4    A.   We had to ask for authority to hire
5  engineers, accountants, that type of thing.
6    Q.   Who would you receive that authority from?
7    A.   Jim Saletri.
8    Q.   Was there a monetary authority level that
9  applied to your ability to expend or obligate the
10  company to expend supplementary payment?
11    A.   No.
12    Q.   So your practice was to get authority from
13  your supervisor, correct?
14    A.   To hire an accountant, an engineer,
15  et cetera.
16    Q.   What if you needed to hire a lawyer to
17  defend an insured?
18    A.   We -- that was -- would have been done by
19  legal, if -- if you need outside counsel.
20    Q.   So the -- we've established that the
21  reserves American Family set were limited to
22  indemnity reserves on -- in a third-party liability
23  context, correct?
24    A.   Correct.
                                              28

McCorkle Litigation Services, Inc.
Chicago, Illinois   (312) 263-0052

1  stands for what?
2      A.  Property Loss Research Bureau.
3      Q.  Which is a first-party organization,
4  correct?
5      A.  No.  It's a supportive -- support
6  operation for the insurance companies.  A lot of
7  your larger carriers are members of the PLRB.
8      Q.  And how long have you held a license with
9  them?
10     A.  State of Illinois, adjusters don't have
11 licenses.
12     Q.  You -- what -- the certifications -- and I
13 misspoke.  You said you've received some
14 certifications from them?
15     A.  Well, I took all the credit hour
16 classes --
17     Q.  Okay.
18     A.  -- but I didn't really need to, with the
19 exception of just general -- you know, I wanted to
20 further my general education in claims in
21 construction.
22     Q.  In the thirty years you've been employed
23 in the business, how many of those classes have you
24 taken?

                                              49

1      A.  Well, they're three-day seminars, and I've
2  taken at least ten of them.
3      Q.  Ten three-day seminars?
4      A.  Yeah.  There's also -- PLRB also has some
5  just one-day seminars.  I've probably had a couple
6  dozen of those.
7      Q.  Then -- I'm sorry.  I cut you off.
8      A.  Oh, in-house training at the different
9  insurance companies, they all had classes for claim
10 handling and such.
11     Q.  Let's talk about the training at American
12 Family.  What did you receive there?
13     A.  Oh, we had half-day classes and -- no.  We
14 had -- the first class we had was a three-day in
15 St. Joe, and that was reviewing adjustment
16 procedures.  Then after that there were -- you
17 know, half day class here, day classes there.  Some
18 were taught by attorneys that come in.  Some were
19 taught by engineers that would come in.
20 Accounting -- accountants for business interruption
21 claims.  So we received a lot of -- you know.
22     Q.  How did you receive your training on
23 American Family's corporate policies and
24 procedures?

                                              50

1      A.  Never had a formal class for that.
2      Q.  Were you -- were you provided copies of
3  those written -- in written form?
4      A.  No.
5      Q.  Never?
6      A.  I don't believe so.  No.
7      Q.  Okay.  Are you aware of a conflicts of
8  interest policy that the company has?
9      A.  Yes.
10     Q.  You were never provided a copy of that?
11     A.  Oh, yeah.
12     Q.  Oh, okay.  So you have been provided
13 written policies and procedures by the company?
14     A.  Conflict of interest, yes.
15     Q.  And you were always aware of that?
16     A.  Yes.
17     Q.  And did you get that immediately upon your
18 initial employment with American Family?
19     A.  Uh-huh.  And then every year.
20     Q.  What did you understand the conflicts of
21 interest policy to apply to?  What was its purpose?
22     A.  To stop adjusters from being crooked.
23     Q.  Were you terminated for violating that
24 policy?

                                              51

1      A.  Yes.
2      Q.  Okay.  Did you agree with that
3  termination?
4      A.  No.
5      Q.  Why not?
6      A.  Because the fact that I wrote checks to
7  contractors, I didn't feel that was any different
8  than writing checks to attorneys, engineers,
9  accountants.  You know, if they performed the
10 services, I felt that they should be paid.
11     Q.  Had you been told prior to your
12 termination not to do that?
13     A.  Yes.
14     Q.  And -- but you did it anyway?
15     A.  Yes.
16     Q.  Why did you think you were entitled to do
17 that?
18     A.  I had a separate -- different set -- or I
19 was given more latitude when Jim Anderson was my
20 divisional versus when Sue Kinate came on board.
21 She was a, you know, I dot and T crosser, and she
22 wanted me to rein in what my -- you know, my
23 procedures that I'd previously been allowed.
24     Q.  So fair that you believed you had the

                                              52

13  (Pages 49 to 52)

1    A.  I don't know.
2    MR. RUFF:  He said a year plus.
3    MR. PEARSON:  Yeah.  That's -- I'm just trying
4  to see if I could refresh his recollection.
5    THE WITNESS:  I really...
6  BY MR. PEARSON:
7    Q.  Do you know if Ms. Kinate had any
8  supervisory authority for decisions in relation to
9  the Stopka claim at any time?
10    A.  Prior to taking over Anderson's job?
11    Q.  I'm actually trying to figure out as best
12  we can when she came on board.
13    A.  Well, you took her deposition.  I'm sure
14  it's in there.
15    Q.  I'm asking you for your recollection.
16    A.  I have no idea.
17    Q.  So you don't know if Ms. Kinate had any
18  responsibility for any aspect of the Stopka claim,
19  true?
20    A.  Well, of course when she took over.
21    Q.  Okay.  So you --
22    A.  I'm not going to commit to a date that I
23  don't know.
24    Q.  That's fair.  That's why I asked the

57

1  question that way.
2    A.  Well, no, but you continue to ask the
3  question.
4    Q.  Actually, I didn't, sir.
5    A.  Okay.
6    Q.  You know, I -- I asked you dates first,
7  and you said you couldn't answer dates.  So then I
8  asked --
9    MR. RUFF:  No.  That's not correct.  He said a
10  year plus and then you tried to make it two years.
11  BY MR. PEARSON:
12    Q.  There's nothing tricky about this.  I'm
13  simply trying to figure out now if she was involved
14  in this claim.
15    A.  Obviously, yes, she was involved in the
16  claim --
17    Q.  Okay.
18    A.  -- but that was -- you should just ask
19  that question.
20    Q.  I get to ask them -- the way this works, I
21  get to ask them in the order that I want to ask
22  them and if you can answer --
23    A.  Have at it.
24    Q.  -- you'll tell me that.  Okay?

58

1    A.  Have at it.
2    Q.  You're good with that?
3    A.  Yeah.
4    Q.  Okay.  Good.
5    So you -- is it your testimony here today
6  under oath that you were not terminated from
7  American Family because of anything to do with this
8  claim?
9    A.  Correct.
10    Q.  Okay.  No way, shape, or form?
11    A.  No.
12    Q.  You deny that completely?
13    A.  Yes.
14    Q.  You didn't -- and you did nothing wrong in
15  relation to this claim; is that right?
16    A.  Correct.
17    Q.  And isn't it a fact, sir, that shortly
18  after the fire you made representations to
19  Mr. Wolowicki and Mr. Stopka that you would see to
20  it that their home -- that the Stopka home was
21  restored to its prefire condition just as it had
22  been five minutes prior to the fire?
23    A.  Yes.
24    Q.  You did make those representations?

59

1    A.  Yes.
2    Q.  You don't deny that?
3    A.  No.
4    Q.  You don't qualify that in any way, shape,
5  or form, did you?
6    A.  Up to policy limits.
7    Q.  Did you ever use those words?
8    A.  Yeah.
9    Q.  You did?
10    A.  Yes, I did.
11    Q.  To who?
12    A.  To Mr. Wolowicki for sure.
13    Q.  When?
14    A.  Sometime shortly after being introduced to
15  Mr. Wolowicki.
16    Q.  And who was present when you made that
17  statement?
18    A.  Mr. Wolowicki and myself.  Possibly
19  Mr. Stopka.  I don't remember.
20    Q.  And when did that -- when did that
21  conversation take place?
22    A.  As I just told you, sometime shortly after
23  I was introduced to Mr. Wolowicki.
24    Q.  Do you recall a date?

60

15  (Pages 57 to 60)

1    A.   Mitigate the damages.  Yeah.
2    Q.   Right.  Okay.
3         And by mitigating the damages, you're
4    trying to mitigate both damage to the structure
5    itself as well as interior finishes, fair?
6    A.   Yes.
7    Q.   Did you assume control over that portion
8    of this loss?
9    A.   Of the mitigation?
10   Q.   Yes, sir.
11   A.   At -- through Mr. Stopka's architect's
12   direction, yes.
13   Q.   Who was that?
14   A.   His architect.  I don't remember his name.
15   Q.   And when you say through Mr. Stopka's
16   architect's direction, can you elaborate?
17   A.   He came in and made a drawing and made a
18   determination of what portions of the building had
19   to be demolished and restored.
20   Q.   Okay.  Before we get to that point, I
21   want -- I want to take this in steps.  Okay?
22        What's your first time on the site, if you
23   recall?  Was it the day of the fire?
24   A.   Day after the fire.

73

1    Q.   Okay.  So September 11th of 2008, do you
2    recall that?  I don't want to put dates in your
3    mind.
4    A.   If that was the day after the fire, yes.
5    Q.   Okay.  I'll represent that to you.
6         Tell me what you recall about that day,
7    your first visit to the site.
8    A.   Well, I got a call coming out of downtown
9    Chicago from one of the other adjusters in our
10   unit.  Mr. Saletri was out of the office, so he was
11   tasked with assigning claims for the day.  And he
12   said, well, Jerry we have an extensive loss,
13   third-party claim, on a real expensive home in
14   Barrington.  This has got your name all over it.
15   Can you take this claim?  I said, yeah.
16        So he gave me what limited claim
17   information he had at the time.  I contacted either
18   Mr. Stopka or Mr. Wolowicki -- I don't remember
19   which at this point -- and made arrangements to
20   come out and meet them within an hour of receiving
21   the claim.
22   Q.   So when you arrived at the site, what did
23   you -- what do you recall seeing?
24   A.   I pulled up to a structure -- I mean, a

74

1    very nice home, a large home, with a portion of the
2    roof burnt off and water damage down -- you know,
3    from the roof down, portion of walls in danger of
4    collapsing.  Met with Mr. Stopka, Mr. Wolowicki,
5    the adjuster for Mr. Stopka's homeowner's company.
6    I think there was a representative of the
7    Barrington Fire Department there; and there may
8    have been other people, but those are who I
9    remember at this point.
10   Q.   Okay.  Tell me everything you recall about
11   conversations that you participated in that day on
12   the site.
13   A.   Well, we talked about liability.  It was
14   pretty clear that our insured had already agreed
15   with everybody, the fire department, the fire
16   investigators, as to the cause of the fire; and so
17   it appeared liability was pretty clear-cut.
18   Q.   Was there ever an issue in your mind with
19   respect to liability on the part of your insured?
20   A.   In this claim?
21   Q.   Yes, sir.
22   A.   No.
23   Q.   To whom did you communicate your
24   acceptance of responsibility for your insured?

75

1    A.   Either Mr. Stopka or Mr. Wolowicki.  I
2    don't remember which.
3    Q.   How did you communicate it?
4    A.   Basically said that I was from
5    American Family; based on the statements already
6    taken from our insured by the fire department, it's
7    pretty clear-cut that -- you know, that we're --
8    that we're going to be responsible for the damages
9    here.
10   Q.   Okay.  And do you believe that occurred on
11   that -- the day that you first appeared on the
12   site?
13   A.   Yes.
14   Q.   Was there any discussion with anyone at
15   that time about limits that were applicable to your
16   insured?
17   A.   I believe the only coverage I was aware of
18   at that time was the million dollar liability
19   policy.
20   Q.   Did you know enough at that time based on
21   what you witnessed and -- I take it you -- did you
22   go inside the house?
23   A.   Oh, yeah.
24   Q.   And you were accompanied by the -- one of

76

19  (Pages 73 to 76)

1 fire captain or fire personnel?
2     A.  I don't particularly remember that.
3     Q.  You don't remember that.  Okay.
4     A.  No.
5     Q.  But you remember fire personnel still
6 being there?
7     A.  Oh, yeah.  There was either an
8 investigator or some type of officer there doing
9 his, you know, post fire investigation or whatever.
10     Q.  You walked through the site.  You saw what
11 you saw.  Was there any doubt in your mind, given
12 what you saw at that point, that the total value of
13 this loss exceeded a million dollars?
14     A.  I hadn't -- no.  I didn't have enough --
15 enough information at that time to make that -- to
16 make the determination that it was, in fact, over a
17 million dollars.
18     Q.  What was missing from what you saw?
19     A.  Well, I didn't have a Ouija board.  I had
20 a lot of parts to put together to make a
21 determination.
22     Q.  Did you know what the value of the -- the
23 constructed value of the home was at this point in
24 time?

                                                    77

1     A.  I don't believe so.
2     Q.  Okay.  When was the decision made with
3 respect to the retention of Miner & East to protect
4 the site?
5     A.  Well, the first company that was contacted
6 was Robinette because we had to clear the deck and
7 get it ready for a contractor to build a temporary
8 roof enclosure.
9     Q.  Who contacted them?
10     A.  Myself.
11     Q.  And how was Robinette selected?
12     A.  They're one of the few demolition
13 contractors, if not the only one, that has an
14 emergency response division that's capable of
15 coming out to provide shoring as well as demolition
16 to help stabilize buildings.  I'd used them quite a
17 bit on collapses and fires in the past.
18     Q.  Did you discuss Robinette's retention with
19 anyone else?
20     A.  Mr. Wolowicki and Mr. Stopka.
21     Q.  Did you -- was your discussion you telling
22 them that's who you had retained or was it
23 different than that?
24     A.  Well, it started out with the homeowner

                                                    78

1 adjuster saying that he had a company on the way
2 out to board up -- to tarp the roof, and I had took
3 one look at the roof and said, well, you're way
4 over your skis here.  Or I thought to myself that
5 he was way over his skis, that this thing was
6 certainly not some -- you know, within the
7 abilities of a board-up service, that this was --
8 so when the board-up truck showed up, the guy
9 looked out the window and said, whoa, nothing I
10 could do here and drove away.
11         So that, I think, cemented the -- or gave
12 the Stopkas and Wolowicki a feeling that possibly
13 this -- their homeowner adjuster was, you know, a
14 little bit above what he knew.  This loss was above
15 his abilities.
16     Q.  Okay.  So how did Robinette then get
17 retained?
18     A.  Then I proposed that I would like to bring
19 in Robinette, Miner & East to stabilize the
20 building.  Once we had it stabilized, then I'd
21 bring in a drying contractor to dry the building
22 and prevent mold growth and that type of thing.
23     Q.  And you -- it's true, isn't it, that as
24 part of your proposal to Mr. Stopka and

                                                    79

1 Mr. Wolowicki you explained to them that you had
2 substantial expertise in dealing with fire losses
3 of this magnitude?
4     A.  Yes.
5     Q.  And you made that representation to them
6 in conjunction with your recommendation that these
7 contractors be hired?
8     A.  Yes.
9     Q.  Okay.  You hired them, correct?
10     A.  Yes.
11     Q.  Okay.  Did either Miner & East, Robinette,
12 or Brouwer Brothers provide any budgets or
13 estimates to you in advance of their work?
14     A.  No.  Mitigation is typically labor and
15 materials.
16     Q.  Plus override?
17     A.  Because of the size of the loss, I allowed
18 Miner & East to put a 10 percent profit margin on
19 Robinette's bill because they were -- they were
20 directing Robinette after we had gotten the
21 direction from the Stopka architect.
22     Q.  Miner & East was directing Robinette?
23     A.  Robinette, yes.
24     Q.  So -- just again for the benefit of the

                                                    80

1    And the winter of -- when I was with RGA, I got a
2 call on Christmas Eve like about ten o'clock at
3 night that this roof had partially collapsed and
4 the City was out there wanting to demo -- demolish
5 the building.
6      So I got ahold of Gus Domel from
7 Engineering Systems and I got ahold of Campbell
8 Roof Truss and we got the building stabilized and
9 we got the City to relax and let us, you know, talk
10 about repairing the building.
11      At that point I started negotiating repair
12 costs with Miner & East, and they actually did the
13 repairs to the building.
14    Q. How long had you had experience working
15 with Miner & East at the time of the Stopka fire?
16    A. Twenty years.
17    Q. How many jobs did you work with them on?
18    A. Forty, fifty.
19    Q. Larger losses or all kinds?
20    A. Primarily larger losses.
21    Q. Did -- does any of this refresh your
22 recollection that you may have recommended or
23 suggested Miner & East to Mr. Stopka or Mr. --
24    A. For the permanent repairs?

89

1    Q. Yes, sir.
2    A. No. I don't think so.
3    Q. Again, you don't deny that. You just
4 don't recall it.
5    A. I don't recall it.
6    Q. Okay. How about Robinette, how long did
7 you work with them?
8    A. Probably at least ten years.
9    Q. On about how many projects?
10    A. Fifteen, twenty.
11    Q. Also larger?
12    A. Oh, yeah.
13    Q. Larger where you would need demolition?
14    Q. Or stabilization.
15    Q. Or stabilization.
16    A. Yes.
17    Q. More collapse losses or fire or a mix of
18 both?
19    A. Both.
20    Q. Because the dynamics are basically the
21 same?
22    A. We'd use them on large fires as well when
23 the fire department needed portions of the building
24 unearthed so they can do their cause and origin.

90

1    We'd bring them in to move debris and help the fire
2 department sift through looking for things.
3    Q. Are stabilization -- excuse me. Forgive
4 me. I'm getting over a bit of the flu so I'm
5 losing my voice, which you'll probably be happy to
6 hear, but -- are stabilization costs in connection
7 with a fire situation in a third-party context
8 considered indemnity expenses or -- or supplemental
9 payments?
10    A. Indemnity.
11    Q. Why is that?
12    A. Well, because you're mitigating the
13 damages. You're -- you're helping to stabilize the
14 building to prevent further damages. So it's a
15 direct cost of repair.
16    Q. Did you ever explain that to either
17 Mr. Stopka or Mr. Wolowicki?
18    A. Mr. Wolowicki.
19    Q. Okay. When did you explain that?
20    A. From the very beginning.
21    Q. Did you also explain to Mr. Wolowicki from
22 the very beginning that the cost of construction --
23 additional construction loan interest would be
24 covered by American Family?

91

1    A. Yes.
2    Q. And was that handled as an indemnity
3 expense or as a supplemental payments obligation?
4    A. Indemnity.
5    Q. Why?
6    A. Directly related to the loss.
7    Q. Did anyone with American Family question
8 the handling of that aspect of the loss?
9    A. No.
10    Q. Did anyone at American Family ever
11 question any aspect of your handling of this loss?
12    A. No.
13    Q. How about Brouwer Brothers, how long have
14 you been doing work with them?
15    A. 20-plus years.
16    Q. How many projects?
17    A. If they did 10 a year for 20 years, 200.
18    Q. For water --
19    A. Water, smoke.
20    Q. Mold?
21    A. Might have done one or two little mold
22 things for me. Not a lot.
23    Q. Who did you use for mold?
24    A. Well, a lot of the policies exclude mold,

92

23 (Pages 89 to 92)

1 so there was not -- if there's mold that's directly
2 related to a fire, you know, it comes out as part
3 of the demolition. If you're talking about just a
4 purebred mold claim, a lot -- most of the policies
5 exclude that.
6     Q. Actually, sticking with the circumstances
7 here where you've got a home that was drenched in
8 order to extinguish a fire and there's a risk of
9 mold down the road --
10     A. Well, that's why we bring in a drying
11 contractor, to try to dry out the home as quickly
12 as possible to make sure -- you know, try to
13 prevent mold issues down the road.
14     Q. So that was Brouwer Brothers?
15     A. Yes.
16     Q. And they -- fair to say Brouwer Brothers,
17 Robinette, Miner & East, these were your go-to
18 contractors in these areas we've been discussing?
19     A. For larger losses, yeah. However, we also
20 use ServiceMaster and American Cleaning on large
21 losses as well.
22     Q. ServiceMaster and American Cleaning would
23 effectively perform the same services as Brouwer
24 Brothers?

93

1     A. Yes.
2     Q. How did your son get his job at Brouwer
3 Brothers?
4     A. He was working for -- right out of college
5 he went to work as an insurance adjuster for --
6 their offices were there in Lombard -- Ohio
7 Casualty I think. And when they hired him, they
8 promised him training and they, you know, kept,
9 well, we're -- you know, next year, next month,
10 whatever.
11     So finally he got fed up with the
12 insurance adjusting business, and I knew at the
13 time that Brouwer Brothers was looking for
14 somebody, so I suggested he go over there and
15 apply.
16     Q. Did you ever disclose your son's
17 employment by Brouwer Brothers to anyone at
18 American Family?
19     A. Mm-hmm.
20     Q. When?
21     A. Day one.
22     Q. Who?
23     A. Jim Anderson; Jim Saletri; earlier than
24 that, Dave Penebaker.

94

1     THE COURT REPORTER: Dave who?
2     THE WITNESS: Penebaker, P-e-n-e-b-a-k-e-r, I
3 believe.
4 BY MR. PEARSON:
5     Q. So is this another example of you made
6 disclosure of this to your former managers, but
7 when a new manager came in, that -- that former
8 disclosure was not acceptable?
9     A. Yeah.
10     MR. RUFF: Object to the foundation or the form
11 of that.
12     Go ahead.
13     THE WITNESS: Yes.
14 BY MR. PEARSON:
15     Q. The new sheriff had a different set of
16 rules to play by?
17     A. Yes.
18     Q. Would you like to take a break?
19     A. No. I'm fine.
20     MR. PEARSON: Are you -- are you okay?
21     THE VIDEOGRAPHER: Yeah. Fine.
22 BY MR. PEARSON:
23     Q. When you disclosed it to Mr. Anderson,
24 Saletri, Penebaker did they say they were okay with

95

1 that, with -- and by that I mean with you having a
2 business relationship with Brouwer Brothers?
3     A. I don't know that I would refer to it as a
4 business relationship. They were a vendor that I
5 used.
6     Q. They were a go-to vendor.
7     A. Right.
8     Q. Well, that's -- that's -- you would agree
9 that's a business relationship.
10     A. Well, I think that has some other
11 connotations to it, but go ahead.
12     Q. I -- you regularly used Brouwer Brothers
13 as your -- one of your go-to vendors for purposes
14 of water, smoke remediation, correct?
15     A. Yes.
16     Q. When you disclosed to Mr. Anderson,
17 Mr. Saletri, and Mr. Penebaker that your son was
18 working for Brouwer Brothers, did they -- did they
19 agree that was acceptable?
20     A. Yes.
21     Q. How did they communicate that?
22     A. They just said, you know, make sure that
23 you don't use them any more than you would somebody
24 else.

96

24 (Pages 93 to 96)

1    Q.   What was her reaction?
2    A.   Fell on deaf ears.  It wasn't her problem.
3    Q.   And did he tell you that was just company
4  policy?
5    A.   Yes.
6    Q.   Why were you -- is it your testimony that
7  you were then ultimately terminated because you
8  refused to adhere to that policy?
9    A.   Yes.
10    Q.   And that -- that and that alone?
11    A.   Yes.
12    Q.   Okay.  And you believe that termination
13  was wrongful?
14    A.   Yes.
15    Q.   What did you do about that, anything?
16    A.   Nothing.
17    Q.   Why not?
18    A.   I'm 63 years old.  I don't -- no
19  disrespect to anybody in this room, but what am I
20  going to do?  Make some other attorney rich?  No.
21  I move on.  As I told Sue the day she fired me, I'm
22  63 years old.  I've never been fired.  Now I've got
23  something else to add to my list.
24    Q.   And what did she say?

                                                  101

1    A.   She got all upset.  I said, Sue, relax.
2  I'm just joking.  Trying to lighten the atmosphere.
3    Q.   Tell me about your experience with
4  eradicating smoke and char smell from a burned
5  building.
6    A.   Through my entire career and especially
7  the last 10 to 15 years the eradication of smoke
8  has been very successful from an odor standpoint
9  due to some process and new chemicals that are out
10  there.
11        However, I always tell people on the front
12  end, you know, we can get rid of 99 percent of the
13  smoke, but the 1 percent that's up here you're
14  going to have to deal with because people -- I
15  mean, they're traumatized and they feel that they
16  really do smell smoke.
17        You go out there and say, well, where?
18  They say, well, right here.  I say, I'm not here to
19  argue with you.  I don't smell it, but whatever.
20  And then we would address those situations.  We
21  bring somebody back in, reclean an area, and
22  sometimes that helped the -- the mental anguish.
23    Q.   What -- when did the issue, to your
24  knowledge, of smoke and char smell in the Stopka

                                                  102

1  residence first surface?
2    A.   I don't think I understand the question.
3    Q.   Do you recall that becoming an issue in
4  connection with the Stopka loss?
5    A.   Yes.
6    Q.   When do you recall that?
7    A.   After Mr. Augustine took the project back
8  over and started doing the repairs.  He called at
9  one point and said, hey, we tore into this area
10  over here and we found actually some char fill out.
11        So I sent back Brouwer Brothers, and there
12  was a little pocket, you know, that had been
13  missed; and so we treated that area, and I said,
14  you know, any other problems, please let me know.
15    Q.   And were you called back for that purpose?
16    A.   I think at least once or twice after that.
17    Q.   And after each of those calls did you then
18  call out the Brouwer Brothers, have them come back
19  in?
20    A.   And address the areas.  Towards the end I
21  was -- you know, I thought it was more of a mental
22  anguish issue than actual -- I couldn't smell it,
23  but, again, I've been at this 30-some odd years.
24  I'm not sure if my nose is the best.

                                                  103

1    Q.   As you sit here today, is that what you
2  think this issue is all about is a mental anguish
3  issue?
4    A.   Towards the end of the smoke issue, yeah,
5  I believe it was.
6    Q.   And do you continue to believe that today?
7    A.   Yeah.  Why would I change my --
8    Q.   Just rounding out the question here.
9  Don't know what you may have learned or not learned
10  since that point in time.
11        So when you say towards the end, what made
12  you conclude this was not a real issue?
13    A.   Well, because we'd go out towards the end
14  and we just couldn't find anything.  They were
15  insistent that there was a smoke odor, so we would,
16  you know, re-treat the area.
17    Q.   Did you ever make -- give assurances to
18  Mr. Stopka or Mr. Wolowicki that you would address
19  the smoke/char odor to their satisfaction?
20    A.   Yes.
21    Q.   How did you communicate that?
22    A.   Verbally.
23    Q.   Okay.  What did you tell them?
24    A.   That we would get rid of the smoke odor.

                                                  104

                              26 (Pages 101 to 104)

```
 1      Q.  Without -- you didn't qualify that in any
 2  way, shape, or form?
 3      A.  Well, I gave them the 1 percent standard
 4  Jerry Hayes answer.
 5      Q.  Okay.  Which is the -- the mental anguish
 6  piece that you described?
 7      A.  Right.  Right.
 8      Q.  Okay.  So do I understand then that the
 9  dispute, as you understand it, with respect to
10  eradicating a smoke and char smell isn't about
11  American Family's policy limits, it's rather about
12  whether there is, in fact, a smoke and char smell?
13      A.  Right.
14      Q.  Okay.  So you --
15      A.  Within the policy limits.
16      Q.  Well, that's -- okay.  So we just kind of
17  went around the horn on that.
18      MR. RUFF:  No.  He just answered it.
19      MR. PEARSON:  No.  I -- I just want to make
20  sure I understand the answer.
21  BY MR. PEARSON:
22      Q.  So you -- when did you give the assurance
23  to Mr. Wolowicki that you would eradicate the smoke
24  and char smell?
                                                    105
```

```
 1  policy limits?
 2      A.  Just to give them peace of mind, to let
 3  them know that there was enough money available to
 4  resolve these issues.
 5      Q.  So did you tell them that there was enough
 6  money available to resolve the smoke and char
 7  smell?
 8      A.  I said there was $2 million, and I believe
 9  that that's enough money to resolve the issues.
10  Yes.
11      Q.  And it's your testimony that when you gave
12  those assurances to Mr. Wolowicki and Mr. Stopka,
13  it was always in conjunction with the limits on the
14  policy?
15      A.  Yes.
16      Q.  No hesitation.  You -- you state that
17  affirmatively?
18      A.  Mm-hmm.  Yes.
19      MR. PEARSON:  Let's take a break.
20      THE VIDEOGRAPHER:  This marks the end of Tape
21  Number 1.  The time is 2:11 p.m.  We're off the
22  record.
23          (Recess taken.)
24      THE VIDEOGRAPHER:  This marks the beginning of
                                                    107
```

```
 1      A.  When they agreed to let us do the
 2  mitigation work.
 3      Q.  Okay.  Very early on?
 4      A.  Mm-hmm.
 5      THE VIDEOGRAPHER:  Counsel, less than ten
 6  minutes remaining on the tape.
 7      MR. PEARSON:  Sure.
 8  BY MR. PEARSON:
 9      Q.  And when you gave them that assurance,
10  that was in connection with your vast experience in
11  accomplishing just that, right?
12      A.  Yes.
13      Q.  Okay.  And there was no discussion at that
14  point in time, was there, about policy limits?
15      MR. RUFF:  Objection.  Foundation.  Misstates.
16      Go ahead.
17  BY MR. PEARSON:
18      Q.  If I misstate it, tell me.
19      A.  Everything is always predicated on policy
20  limits, so I don't understand -- I don't think I
21  understand your question.
22      Q.  Well, if you weren't worried about policy
23  limits from a total insurance loss, why would you
24  have been talking to Mr. Stopka or Wolowicki about
                                                    106
```

```
 1  Tape Number 2.  The time of 2:25 p.m. we're on the
 2  record.
 3  BY MR. PEARSON:
 4      Q.  Mr. Hayes, you would agree, wouldn't you,
 5  that with regard to the work for which you engaged
 6  Miner & East, Brouwer Brothers, and Robinette
 7  Construction, you both hired and controlled those
 8  contractors?
 9      A.  I hired them.  They were under the control
10  of the architect.
11      Q.  What architect?
12      A.  Again, Mr. Stopka's architect.
13      Q.  When is it that you contend Mr. Stopka's
14  architect became involved in this process?
15      A.  Within the first couple weeks.  He was the
16  one that determined damages or scope of -- area of
17  damages.
18      Q.  Was that the architect or a structural
19  engineer?
20      A.  He was an architect.  Maybe he was a
21  structural engineer as well.
22      Q.  And when you say that the -- this
23  architect was involved, how was the architect
24  involved in that process?
                                                    108
```

27 (Pages 105 to 108)

1    agency visits as well.
2        Q.   Okay.
3        A.   So I'm not sure exactly what his title
4    was.
5        Q.   And Jim Saletri we know --
6        A.   Right.
7        Q.   -- who he is?
8             Read the first paragraph at the top to
9    yourself, please.
10       A.   Okay.
11       Q.   By October 25, 2008, in response to
12   Ms. Zielke's request, you had given her your best
13   bottom-line estimate that you were going to exhaust
14   the 2 million in coverage, fair?
15       A.   Yes.
16       Q.   Do you recall that?
17       A.   I typed it.  I have to recall it.
18       Q.   Well, other than what you're looking at,
19   does this -- seeing this e-mail, does that refresh
20   your recollection about your conclusion in this
21   regard?
22       A.   I don't think I understand your question.
23       Q.   Other than seeing this e-mail, the --
24       A.   Right.

                                              161

1        Q.   -- words on this e-mail, does this refresh
2    your recollection, as you sit here today, that as
3    of October 25, 2008, you had made a determination
4    based on your years of experience that the Stopka
5    loss was going to exhaust the limits of coverage
6    available to Complete Flashings?
7        A.   That's what I say.
8        Q.   Did you communicate that to anyone other
9    than Ms. Zielke?
10       A.   Yeah.
11       Q.   Outside of American Family.
12       A.   Not that I'm aware of.
13       Q.   Why not?
14       A.   Responding to an e-mail.
15       Q.   So -- so if nobody asked you, Mr. Hayes,
16   what do you think the total exposure for this loss
17   is going to be, you did not believe you had any
18   obligation to communicate either to your insured or
19   to the claimant that you believed as of October 25,
20   2008, this loss would exhaust the available
21   coverage?
22       A.   I don't understand your question.
23       Q.   You've just told me that as of October 25,
24   2008, you reached the conclusion this loss was

                                              162

1    going to exhaust Complete Flashings' coverage,
2    correct?
3        A.   Yes.
4        Q.   Do you believe you had any obligation to
5    disclose that conclusion to anyone outside of
6    American Family?
7        A.   If -- if it arose that we exceeded it,
8    yes.
9        Q.   Well, you -- you are concluding here as of
10   October 25, 2008, you have an insurance total loss,
11   aren't you?
12       A.   No.  Here I'm trying to tell an agent that
13   we could, in fact, reach the $2 million limits.
14   That's basically what I'm telling the agent.
15       Q.   Well, you don't say could.  You say in
16   fact based on your 35 years of experience, we will
17   most likely exhaust the $2 million?
18       A.   Well, most likely, but I don't know that
19   for a fact at this point.
20            MR. PEARSON:  37.
21                 (Whereupon, Plaintiff
22                 Deposition Exhibit No. 37 was
23                 marked for identification.)
24

                                              163

1    BY MR. PEARSON:
2        Q.   Exhibit 37 is a one-page e-mail from
3    Daniel Dowell at Miner & East to you referring to
4    the e-mail at the top.
5        A.   Okay.
6        Q.   This is an example, is it not, of you
7    coordinating contractors you're directing with
8    contractors that Mr. Augustine has working on the
9    project going forward?  Is it not?
10       A.   No.
11       Q.   What is this?
12       A.   It says, thanks for getting the check out
13   so fast.  We finished the rest of the roof
14   demolition and installed another section of
15   temporary roof.  The owner's general contractor
16   wants to install the OSB sheeting on the second
17   floor, so we'll stay out of that piece of the job.
18            He's telling me that he's coordinated with
19   Todd and that Todd's going to do the replacement of
20   the -- the torn out OSB sheeting that we took out
21   because it was waterlogged.
22       Q.   And who is directing Miner & East in
23   relation to this determination, you or
24   Mr. Augustine?

                                              164

41 (Pages 161 to 164)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA and )
MARILYN STOPKA, )
    Plaintiffs, )
    -vs- ) No. 10 CV 6034
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., a )
Wisconsin Corporation )
    Defendant. )

    The videotaped deposition of GERALD HAYES, part two, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before LIZA MARIE REGAN, a notary public within and for the County of Cook and State of Illinois, at 123 North Wacker Drive, Suite 1800, Chicago, Illinois, on the 7th day of March, 2012, at the hour of 4:04 p.m.

Reported By: Liza Marie Regan, CSR, RPR
License No.: 084-002477

179

---

1 APPEARANCES (Continued):
2     HOSCHEIT, McGUIRK, McCRACKEN &
3     CUSCADEN, P.C.,
4     BY: MR. JOHN M. McGUIRK,
5     1001 East Main Street, Suite G
6     Saint Charles, Illinois 60174
7     (630) 513-8700
8         Representing Augustine Custom Homes,
9
10 ALSO PRESENT:
11     Mr. Michael Stopka,
12     Mr. Steven Zieverink, Videographer.
13
14
15
16
17
18
19
20
21
22
23
24

181

---

1 APPEARANCES:
2     MECKLER, BULGER, TILSON, MARICK &
3     PEARSON, LLP,
4     BY: MR. STEVEN D. PEARSON and
5         MR. CHRISTOPHER S. HENNESSY,
6     123 North Wacker Drive, Suite 1800
7     Chicago, Illinois 60606
8     (312) 474-7900
9         Representing the Plaintiffs,
10
11     PRETZEL & STOUFFER, CHTD.,
12     BY: MR. EDWARD B. RUFF, III,
13         MS. SUZANNE M. CROWLEY and
14         MR. JAMES G. GILLINGHAM,
15     One South Wacker Drive, Suite 2500
16     Chicago, Illinois 60606
17     (312) 346-1973
18         Representing American Family Mutual
19         Insurance Company, Inc.,
20
21
22
23
24

180

---

1              I N D E X
2 WITNESS             EXAMINATION
3 GERLAD HAYES
4     By Mr. Pearson (Continued)    183
5     Mr. McGuirk           205
6     Mr. Ruff              215
7     Mr. Pearson (Further)      230
8     Mr. Ruff (Further)       233
9
10            E X H I B I T S
11 NUMBER           MARKED FOR ID
12 Hayes Deposition Exhibit
13     No. 45              185
14     No. 46              187
15     No. 47              190
16     No. 48              192
17     No. 49              193
18     No. 50              195
19     No. 51              199
20
21
22
23
24

182

---

1    Q.   Is that who you're referring to?
2    A.   Yes.
3    Q.   All right.
4        Now, later on, you say brought in Joe
5    Goetz from Brouwer Brothers.
6        Do you see that?
7    A.   Yes.
8    Q.   And does that refresh your recollection as
9    to when they came in?
10   A.   Yes.
11   Q.   Okay.
12       When did they come on the job?
13   A.   Oh, no, it doesn't tell me exactly when.
14   It just says we also brought in Joe Goetz.
15   Q.   There was a lot of water to -- to
16   remediate on the site, correct?
17   A.   Oh, yes.
18   Q.   All right.
19       At the time you wrote this report, it says
20   to date, we've paid Brouwer Brothers $102,875.66.
21   All that is left is to do the -- the -- the Kilz?
22   Is it the Kilz?  Is that how you say that?
23   A.   Kilz.
24   Q.   Okay, the Kilz.

211

1    Q.   Okay.
2        What -- what are you referring to?
3    A.   Building weathered in, building dried out,
4    ready to go back and start reconstructing.
5    Q.   Okay.
6        And --
7    THE VIDEOGRAPHER:  Sorry.  There's less than
8    five minutes.
9    BY MR. MCGUIRK:
10   Q.   And the Kilz -- the Kilz is one of those
11   methods used by Brouwer Brothers to treat -- to
12   treat char and -- and --
13   A.   Not char.
14   Q.   What is it used for?
15   A.   To encapsulate smoke once it's been
16   cleaned and debrided but not char.
17   Q.   What do they do to -- with the char?
18   A.   Char is torn out.
19   Q.   Okay.
20       And that was the responsibility, in this
21   case, of Robinette, correct?
22   A.   Yes.
23   Q.   And did they use also some sort of ozone
24   deodorizers on this site?

213

1        And that's a sealant that you put on the
2    frame, right?
3    A.   Right.
4    Q.   Okay.
5        So as of January 6, 2009, the Kilz still
6    needed to be done?
7    A.   Yes.  Apparently, we needed some type of
8    heat so that the Kilz would not freeze.
9    Q.   All right.
10       And that Kilz would have been applied by
11   which contractor?
12   A.   Brouwer Brothers.
13   Q.   Now, in -- in your experience in
14   remediating fires, when -- when you refer to --
15   to mediation which -- which you've done at this
16   deposition, what -- what processes are you
17   referring to?
18   A.   I don't think -- I don't understand your
19   question.
20   Q.   You earlier said that when Todd Augustine
21   retook the work, the mediation had been completed?
22   A.   Remediation.
23   Q.   Remediation?
24   A.   Right.

212

1    A.   At some point, they brought in ozone
2    machines to try to reduce the smoke odor issue.
3    Q.   Is that what was brought in these times
4    that reports were made to you about smoke?
5    A.   I don't know which -- at which point they
6    were brought in but they were brought in.
7    Q.   Okay.
8        And those are different than the drying
9    machines that you bring in?
10   A.   Oh, yes.  Yeah.  Yeah, you can't -- no can
11   be in the house when those are in.
12   Q.   Todd Augustine had no responsibilities
13   regarding remediation on this site; is that
14   accurate?
15   A.   Yes.
16   Q.   Who was the job superintendent for Miner
17   and East?
18   A.   I don't know.
19   Q.   Who was the job superintendent for
20   Robinette?
21   A.   I think his name is -- I know his first
22   time is Tom.  I believe his last name is Star.
23   Q.   And how about Brouwer Brothers?
24   A.   Joe Goetz.

214

9 (Pages 211 to 214)

1  ever any objection voiced by Mr. Wolowicki or
2  Mr. Stopka about them?
3     A.  No.
4     Q.  Was there any objection or complaint about
5  their work ever voiced by Mr. Augustine?
6     A.  No.
7     Q.  If there was a complaint or an objection,
8  was it addressed?
9     A.  Yes.
10    Q.  You were asked the question about
11 $370,220.
12       Do you recall that?
13    A.  Yes.
14    Q.  Okay.
15       You said you didn't believe it was paid
16 because you knew there were $8,000 still left?
17    A.  Yes.
18    Q.  So American Family continued to pay even
19 though they did not obtain a release?
20    A.  Yes.
21    Q.  Why?
22    A.  To attempt to resolve the claim.
23    Q.  Did you stuff costs into the supplemental
24 payments in order to get around the $2 million
                                                    227

1  limit?
2     A.  No.
3     Q.  Were you asked to do that by
4  Mr. Wolowicki?
5     A.  No.
6     Q.  Would you have done that?
7     A.  No.
8     Q.  Was it done on this case?
9     A.  No.
10    Q.  With respect to the requests to admit,
11 admit that Jerry Hayes told the Stopkas that
12 American Family would restore the Goose Lake
13 residence to the condition it was in before the
14 fire, was the reason you denied that because of the
15 fact that in any way that that can be construed to
16 exceed the policy -- or an agreement to exceed the
17 policy limits, that is why you denied that?
18    MR. PEARSON:  Objection, form.
19    THE WITNESS:  Yes.
20    MR. RUFF:  Okay.
21 BY MR. RUFF:
22    Q.  It says admit that American Family alone
23 made the decision to retain contractor Robinette to
24 complete demolition work.
                                                    228

1        Was that also -- did you at least advise
2  Mr. Wolowicki in representation of the Stopkas that
3  you were going to bring that person in?
4     A.  Yes.
5     MR. PEARSON:  Objection, form.
6  BY MR. RUFF:
7     Q.  Was there any objection to bringing that
8  entity in?
9     A.  No.
10    Q.  Did they suggest anybody else in that
11 regard?
12    A.  No.
13    Q.  Did their homeowner carrier suggest anyone
14 in that regard?
15    A.  No.
16    Q.  Finally, regarding admit by and through
17 Gerald Hayes was advised by the Stopkas after
18 December 1, 2008, that smoke odors remained at the
19 Goose Lake residence.
20       It's your position that they didn't remain
21 after that period of time, that's why you denied
22 it?
23    A.  Yes.
24    MR. PEARSON:  Objection, form.
                                                    229

1     MR. RUFF:  Okay.  That's all I have.  Thank
2  you.  Is there anything else?
3           FURTHER EXAMINATION
4  BY MR. PEARSON:
5     Q.  Mr. Hayes, you know what a reservation of
6  rights letter is, don't you?
7     A.  Yes.
8     Q.  You never wrote one on this case, did you?
9     A.  No.
10    Q.  You never wrote one to your insured,
11 Complete Flashing, right?
12    A.  No.
13    Q.  You never wrote one to the client, did
14 you?
15    A.  No.
16    Q.  In fact, you never wrote anything in
17 writing asserting the application of the policy
18 limits, did you?
19    A.  No.
20    Q.  And you would agree that it's best
21 practices in the insurance industry when there's an
22 issue with respect to application of policy limits
23 that a reservation of rights alerting parties to
24 that issue gets -- is issued by the carrier?
                                                    230

13  (Pages 227 to 230)

1    A.  Yes.
2    Q.  You're trained that way, aren't you?
3    A.  Yes.
4    Q.  So you chose not to do that in this case,
5  didn't you?
6    A.  I didn't think there was an -- an issue
7  with the policy limits.
8    Q.  And you -- but you agree best practice is
9  to issue such a letter, correct?  You know what one
10  looks like, don't you?
11    A.  Obviously.
12    Q.  Okay.
13        You testified a few moments ago about
14  American Family's taking control of the claim
15  actually helps the claimant.
16        How does American Family's taking control
17  help the claimant?
18    A.  They want to be back in their pre-loss
19  condition as quickly as possible so they can get on
20  with their life.
21    Q.  And if taking control of that claim is
22  done improperly, it wouldn't help the claimant,
23  wouldn't it?
24    A.  No.

231

1    Q.  Or if taking control of the claim means
2  that amounts are expended improperly that exhaust
3  available insurance limits, that wouldn't help the
4  claimant either, would it?
5    A.  No.
6    Q.  When you made the representation to
7  Mr. Wolowicki and Mr. Stopka that you intended
8  based on your experience to restore the Stopka
9  residence to the state it was in five minutes prior
10  to the fire, you knew full well what you were
11  representing to them, didn't you?
12    A.  Yes.
13    Q.  There were no ambiguity about that
14  representation in your mind, was there?
15    A.  No.
16    Q.  And did you believe when you made that
17  representation that you were going to perform on
18  this representation?
19    A.  Yes.
20    Q.  And you could perform on that
21  representation?
22    A.  Yes.
23    Q.  And you expected that the Stopkas and
24  Mr. Wolowicki would rely on that representation,

232

1  didn't you?
2    A.  Yes.
3    MR. PEARSON:  Okay.  That's all I have.
4        FURTHER EXAMINATION
5  BY MR. RUFF:
6    Q.  There's no ambiguity that taking control
7  meant taking control of remediating the situation,
8  correct?
9    A.  Correct.
10    Q.  And in same the vein, there was no
11  ambiguity whatsoever that you were going to pay
12  beyond the policy limits, true?
13    A.  True.
14    Q.  There was never any such agreement
15  regarding paying beyond?
16    A.  No.
17    Q.  And no ambiguity in that regard?
18    A.  No.
19    Q.  And nothing offered from Mr. Stopka to
20  suggest that if you go beyond the policy limits,
21  here's what I'll give you, right?
22    A.  No.
23    Q.  And counsel asked you a question that it
24  was your duty to see that -- that payments were

233

1  made were not paid incorrectly I think was his
2  terminology.
3        Do you recall that line of questioning?
4    A.  Yes.
5    Q.  Okay.
6        Have you seen anything in what has been
7  produced here that said you paid one thing
8  incorrectly?
9    A.  No.
10    Q.  You feel that -- did you receive any
11  complaints that, well, hey, you shouldn't have paid
12  $26,000 on this, you should have paid $25?
13    A.  No.
14    Q.  Any kind of complaints from Mr. Stopka or
15  Mr. Wolowicki during the course of your handling
16  the complaint -- the claim, any complaints
17  whatsoever about paying something incorrectly?
18    A.  No.
19    MR. RUFF:  That's all I have.
20    MR. PEARSON:  That's it.  Thank you.
21    THE VIDEOGRAPHER:  That concludes today's
22  deposition.  The time is 5:06 p.m.  We're off the
23  record.
24        (FURTHER DEPONENT SAITH NAUGHT.)

234

14  (Pages 231 to 234)