```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION
MICHAEL STOPKA, MARILYN  )
STOPKA, and CHATEAU      )
ARLINGTON, L.L.C.,       )
     Plaintiffs,         )
   vs.                   ) Case No. 10 CV 6034
AMERICAN FAMILY MUTUAL   )
INSURANCE COMPANY, INC., )
a Wisconsin Corporation, )
     Defendant.          )
```

The deposition of JAMES SALETRI, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before CHRISTINE M. PINA, a notary public within and for the County of Will and State of Illinois, at 123 North Wacker Drive, Suite 1800, Chicago, Illinois, on January 12, 2012 at the hour of 1:56 o'clock p.m.

Reported by: CHRISTINE M. PINA, CSR, RPR
License No.: 084-003785

1

APPEARANCES:

MECKLER, BULGER, TILSON, MARICK & PEARSON
BY: MR. CHRISTOPHER S. HENNESSY
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 474-7900
christopher.hennessy@mbtlaw.com
  on behalf of the Plaintiffs;

PRETZEL & STOUFFER, CHTD.
BY: MR. EDWARD B. RUFF, III
    and
    MS. SUZANNE M. CROWLEY
One South Wacker Drive, Suite 2500
Chicago, Illinois 60606
(312) 346-1973
eruff@pretzel-stouffer.com
scrowley@pretzel-stouffer.com
  on behalf of American Family Mutual
  Insurance Company, Inc.,

2

APPEARANCES: (Continued)

HOSCHEIT, MCGUIRK, MCCRACKEN & CUSCADEN
BY: MR. JOHN M. MCGUIRK
1001 East Main Street, Suite G
Saint Charles, Illinois 60174-2203
(630) 513-8700
jmc@hmcpc.com
  on behalf of Augustine Custom Homes.

3

INDEX

| WITNESS | EXAMINATION |
|---|---|
| JAMES SALETRI | |
| By Mr. Hennessy | 7 |
| By Mr. McGuirk | 124 |
| By Mr. Ruff | 130 |
| Further By Mr. Hennessy | 141 |
| Further By Mr. McGuirk | 144 |

EXHIBITS

| NUMBER | IDENTIFICATION |
|---|---|
| Plaintiff's Exhibit | |
| No. 9 | |
| No. 10 | |
| No. 11 | |
| No. 12 | |

4

1 (Pages 1 to 4)

**Page 17**

1 procedure that would eliminate that problem.
2    Q. Do you know when that procedure was put in
3 place?
4    A. I would say largely in the last two years.
5    Q. It's a procedure that was then
6 disseminated within the company including to field
7 adjusters?
8    A. Yes.
9    Q. And then field adjusters who violated
10 that -- is it fair to call it a policy, procedure,
11 what do you want, your choice?
12    A. I would say it's a policy.
13    Q. Claims adjusters who violated that policy
14 ran the risk of warning letters, et cetera?
15    A. Yes.
16    Q. Was that policy in place during the time
17 payments were being made in this case to emergency
18 services and other contractors after the loss?
19    A. No.
20    Q. How many field adjusters do you have
21 working for you right now?
22    A. Ten.
23    Q. The field adjusters you have working for
24 you now, how much authority did they have to make

**Page 18**

1 payments, settle cases, resolve things? What kind
2 of financial authority do they have?
3    A. At what time?
4    Q. At any time. Well, I guess my question,
5 does it change?
6    A. Yes. It has recently.
7    Q. Let's talk about right now.
8    A. Right now it's $50,000 maximum for a
9 senior adjuster.
10    Q. A senior adjuster does not have authority
11 to make any deal that would cost more than $50,000
12 without asking you first?
13    A. Correct.
14    Q. When did that policy go into effect?
15    A. About two years ago.
16    Q. Did it coincidently go into effect at the
17 same time of this policy about paying contractors
18 or were these things part of an evaluation about
19 the process of the way claims were being handled?
20    A. It was -- no, these weren't really the
21 same time. They were different programs.
22    Q. Back in 2008, the policy was not in effect
23 with respect to $50,000, right?
24    A. It changed around that time. It used to

**Page 19**

1 be 100,000 and was dropped to 50. I don't know the
2 exact date, but I would say right in that area.
3    Q. So, it could have been a little more than
4 two years ago then?
5    A. Yes.
6    Q. Because it's 2012, three-and-a-half years,
7 it could have been more than two years ago?
8    A. Uh-huh.
9 MR. HENNESSY: Is that a "yes"?
10 THE WITNESS: Yes.
11 MR. HENNESSY: That's one of those --
12 THE WITNESS: Yes.
13 MR. HENNESSY: You can't nod.
14 THE WITNESS: Okay.
15 BY MR. HENNESSY:
16    Q. Prior to it being $100,000, do you recall
17 what it was?
18    A. No.
19    Q. So, it had been $100,000 for at least a
20 little while?
21    A. Yes.
22    Q. Do you know why it went from 100 down to
23 50?
24    A. Yes.

**Page 20**

1    Q. Why is that?
2    A. Upper management, problems with profit and
3 property insurance, homeowner's and commercial
4 property, almost industrywide.
5    Q. People above your level?
6    A. Yes.
7    Q. You didn't have a hand in that decision?
8    A. No.
9    Q. You talked about emergency services. I
10 know you didn't have the benefit of hearing all of
11 Mr. Andersen's testimony, but one of the things he
12 talked about was certain aspects of work performed
13 immediately after a loss falling into the category
14 of like these emergency mitigation type services.
15 Is that a phrase used within American Family, a
16 phrase that he uses that you understand; where does
17 that fit?
18    A. It fits pretty well in the whole industry.
19    Q. So, what would fall into the category of
20 emergency mitigation services upon being notified
21 of a loss?
22    A. It depends on the loss. Could you be more
23 specific on --
24    Q. Sure. Let's go with a fire loss.

**Page 21**

A. All right. A fire loss, you would need someone to secure the property; it could be boarded up or whatever is needed. Once that's completed, if there's a fire, if there's water, and it's important that the water gets taken care of which could be drying also combined with tear-out of drywall or whatever is necessary or fire damaged things basically to get the property in a condition where it's ready to be rebuilt.

Q. So, like demolition type work, that would fit into this category of tearing down drywall?

A. Correct.

Q. Generally speaking, getting rid of all that which was damaged by the event?

A. Not necessarily. You could have smoke damage that's cleanable by a mitigation company.

Q. And that would not be included in emergency or would be?

A. Well, it would be, but everything isn't gotten rid of as far as tearing out. You might leave some things in there and just clean or dry is the point I was trying to make.

Q. Back in 2008, how much authority would Hayes have to engage emergency mitigation service

**Page 22**

contractors for a given fire loss?

A. At that time I believe he had 100,000.

Q. $100,000 for an -- per individual contractor or collectively?

A. Collectively.

Q. Once a reserve is set on a given claim, the authority to resolve that claim is determined based upon the reserve or they're separate evaluations?

A. Ask that again, please.

Q. Sure. There's a few different levels of evaluation that will go on when there's a loss; there's the reserve evaluation which I understand to be the maximum likely to potential exposure for a given loss, correct?

A. Correct.

Q. Separate from that, there is authority granted to individuals such as Hayes or individuals such as yourself of how much you can spend towards a given loss, correct?

A. Correct.

Q. The authority granted to you is not the same number as the reserve number, is that correct, necessarily?

**Page 23**

MR. RUFF: Can I have the question read back, please?

(Whereupon, the record was
read as requested as follows:
The authority granted to you
is not the same number as the
reserve number, is that
correct, necessarily?)

MR. RUFF: You're talking about him, right; is that what you're saying?

MR. HENNESSY: Yes.

MR. RUFF: Okay.

THE WITNESS: When we put a reserve up actually at this time, if it's approved through a committee and everything, that is -- I have authority to work within that amount and so would Mr. Hayes.

BY MR. HENNESSY:

Q. You have authority to work within the reserve amount?

A. Correct.

Q. Back in 2008, you believe that Mr. Hayes' authority was up to $100,000, correct?

A. Yes.

Q. What was your authority, which I take it

**Page 24**

would then be above that?

A. 250,000.

Q. Would that be then for a total potential of 350?

A. No.

Q. So, as long as expenses costs are within $100,000, the field adjuster level is within their authority, correct?

A. Correct.

Q. The area between $100,000 and 250, in other words, the next 150, that's your level of authority, correct?

A. Correct.

Q. And then above that, you have to go above you?

A. Yes.

Q. That $250,000 figure that you said was in effect in 2008, has that changed since then?

A. Yes.

Q. What is it now?

A. 150.

Q. So, the adjuster level was cut and the field manager level was cut?

A. Yes.

**Page 57**

1 to two million dollars, is that correct?
2   A. Inasmuch as I know, yes, that is correct.
3   Q. Certainly as of October 8, 2008, as
4 recorded within the committee notes,
5 American Family had taken control over this claim
6 and this loss, correct?
7   A. What do you mean by control?
8   Q. I mean I understand that 624 is also the
9 same report, right --
10  A. Right.
11  Q. -- as 5899 with the exception of that one
12 sentence that carries over, right?
13  A. Correct.
14  Q. So, we'll look at 5899. This is a
15 document that you drafted?
16  A. Yes.
17  Q. This is a document you created?
18  A. Right.
19  Q. So, the words on this document are yours,
20 correct?
21  A. Yes. So, what is my definition that I
22 would use for control?
23  Q. Well, I'm referring to your sentence
24 contained on 5899 in the middle of the largest of

**Page 58**

1 the paragraphs based on clear liability, comma,
2 Jerry took control of the claim.
3   A. Yes. What that means is it's a liability
4 claim. Many times negligence is not clear. Many
5 companies would stand back and just turn it over to
6 the direct damage company to take care of it. What
7 we did here was look at it, it was obvious to us
8 that this was caused by our insured. So, we
9 stepped forward, as we should, and said we would
10 handle the payment. So, as control of the claim,
11 yes, we controlled the payments. We don't do
12 repairs, we make payments for the repairs. And we
13 stepped forward and did that which we felt was good
14 policy in line with what we should do.
15  Q. But your summary of taking control doesn't
16 contain that explanation, it just simply indicates
17 that you took control; isn't that fair?
18  A. That's because this committee goes to our
19 people and we understand what that means, because
20 normally there are many cases where you don't step
21 up and get involved with payments on a liability
22 situation right out of the box.
23  Q. You certainly understood based upon the
24 clear liability of Complete Flashings that one

**Page 59**

1 avenue of recourse for the homeowner was to pursue
2 a claim against Complete Flashings directly,
3 correct?
4   A. Absolutely.
5   Q. The pursuit of that claim against
6 Complete Flashings could include a lawsuit against
7 Complete Flashings by the homeowners, correct?
8   A. Correct.
9   Q. You were aware of that possibility even
10 back in October of 2008?
11  A. Well, any claim that can happen, yes.
12  Q. So, certainly right away you're aware that
13 Complete Flashings considering their complete
14 liability is immediately exposed to a claim by the
15 homeowners that that claim could include a lawsuit,
16 correct?
17  A. Absolutely.
18  Q. And American Family stepped in and handled
19 payments on the claim in some respects to address
20 the issue before a claim was pursued against
21 Complete Flashings by the homeowners, correct?
22  A. Well, no. In response to a claim being
23 filed against Complete Flashings by the homeowners.
24 I mean someone had to make the claim to us. I mean

**Page 60**

1 a claim is filed against our contractor, our
2 insured. It comes into me, and then, we handle it.
3   Q. You consider these claims that were
4 generated as claims by the homeowners against your
5 insured?
6   A. I really don't know who called them in,
7 but they are called in to us. Someone has to call
8 in a claim, sometimes it's a claimant, sometimes
9 it's an insured. We don't just open claims on our
10 own. They have to be called in. Somebody makes a
11 claim and we respond to it and investigate it.
12  Q. So, if Complete Flashings picks up the
13 phone on the day of the fire and calls in a claim,
14 self-reports as it were --
15  A. Yes.
16  Q. -- is that a claim by Complete Flashings
17 or a claim by the homeowners?
18  A. That would probably -- that was called in
19 by our insured.
20  Q. So, that's a claim by Complete Flashings?
21  A. Yes. For their negligence, sure.
22  Q. When you prepared this summary which
23 appears at 5899 to 5900, was it basically a
24 ressertation of what took place during the

**Page 65**

1 them with information, you or someone like
2 Gerry Hayes to provide them with information about
3 loss payments?
4    A. Correct.
5    Q. Did you have communications with the agent
6 JoAnne Zielke regarding payments under the policies
7 here?
8    A. I met with her to talk about the claim
9 because she was upset.
10    Q. Why was she upset?
11    A. She thought she should have been contacted
12 more and have the situation explained to her about
13 how big this was and what was going on.
14    Q. Did she convey to you that she felt as
15 though you should have been meeting with her?
16    A. I think she was a little more upset that
17 Jerry didn't contact her or return some of her
18 emails or calls.
19    Q. What did you do, if anything, after this
20 meeting with her to address or correct the
21 situation?
22    A. I told Gerry to try and at least call her
23 back and let her know what he could. It's not
24 normal that from a claim standpoint we keep a

**Page 66**

1 running dialogue going with our agents on claims.
2 Many of them don't really even get involved at all
3 for the most part. So, it's unusual to have an
4 agent that wants to be kept informed, but we can
5 give them some information. So, I told Jerry at
6 least to contact her when she wants an answer and
7 try and help out, if possible.
8        (Whereupon, Plaintiff's
9        Deposition Exhibit No. 9 was
10        marked for identification.)
11 BY MR. HENNESSY:
12    Q. She's going to hand you what's been marked
13 Plaintiff's Exhibit 9; it's a two-page document,
14 AF5902 to 5903. The second page really is just the
15 continuation of the signature of the first page.
16    A. Sure.
17    Q. The substance is on 5902. This is an
18 email from Jerry Hayes to JoAnne Zielke dated
19 October 25, 2008; do you see that?
20    A. Yes.
21    Q. Do you see that you were copied on this?
22    A. Yes.
23    Q. Do you know why it is that Mr. Hayes
24 copied you on this message?

**Page 67**

1    A. Probably because an agent was involved; it
2 was a complaint.
3    Q. So, you would have received this message
4 on or about 7:48 a.m. on October 25, 2008, correct?
5    A. Yes.
6    Q. And you had said that in your meeting with
7 JoAnne Zielke she was questioning the size of the
8 claim and the amount of payments being made, is
9 that about right?
10    A. Yes.
11    Q. And Mr. Hayes articulates back to her in
12 response to her questions that based upon the
13 preliminary estimates and 35 years of experience
14 indicates that American Family would most likely
15 exhaust the 2,000,000 in coverage; do you see that?
16    A. Yes.
17    Q. Do you have a basis to disagree with that?
18    A. No.
19    Q. There's another document, it's actually
20 the very next one, Exhibit 6. You've got a
21 document marked Plaintiff Exhibit 6, it's a
22 three-page document, AF600 to 602; do you see that?
23    A. Yes.
24    Q. This is that Property Investigation Report

**Page 68**

1 that the adjuster would be preparing different from
2 the HDR that you would prepare?
3    A. Correct.
4    Q. This appears to be a Property
5 Investigation Report that Mr. Hayes would have
6 prepared on or about January 6, 2009?
7    A. Correct.
8    Q. Would Mr. Hayes have submitted this report
9 to you or posted it within ICS or both?
10    A. Normally it's posted in ICS. I can't
11 remember back at that time exactly how he did it.
12    Q. Down in the lower left-hand corner of each
13 of the pages, it certainly suggests based upon the
14 information there that this is some sort of an ICS
15 type posted document, right?
16    A. Right.
17    Q. After Mr. Hayes posts a report like this,
18 Property Investigation Report, do you get some sort
19 of notification that there's a new posting in ICS
20 with respect to the claim?
21    A. That can vary. I would say back then
22 probably not. I would probably just catch that,
23 but occasionally an adjuster would send -- you can
24 send a referral to me through the ICS system now

full limits?
A. Yes.
Q. Would Mr. Hayes have submitted this to you for review before he sent it to the homeowners or their representative?
A. No.
Q. He was authorized not only to draft it but to include the information and to issue it out to get resolved?
A. Yes.
Q. Is that because Dwight had already given the authority up to the full 2,000,000?
A. Yes.
Q. If you could turn your attention back to Exhibit 7, again, the committee summary that you prepared from March 9, 2009. There's a paragraph toward the bottom that begins with the interest, do you see that --
A. Yes.
Q. -- a couple of sentences there? If you could take a look at that, please.
A. Yes.
Q. So, you and Jerry had had a discussion about the interest on the construction loan for the

85

project, correct?
A. Correct.
Q. It was your discussion that you would evaluated the interest on the construction loan as loss of use, and, therefore, covered as property damage under the American Family policy, correct?
A. Correct.
Q. You recognized that the fire loss delayed the overall completion of the home, correct?
A. That's correct.
Q. And, therefore, during the time of that delay, that loss of use would be something that American Family was covering, correct?
A. Correct.
Q. Did you have any knowledge or understanding about the amount of that interest on a monthly basis?
A. I believe it was $14,000 a month.
Q. If Jerry Hayes' document showed a number closer to 15,000, you wouldn't have a real reason to argue with that, right?
A. No.
Q. But you certainly were aware that every additional month that the project was uncompleted

86

because of the fire, the Stopkas were incurring this 15 or so thousand dollars per month in interest?
A. Correct.
Q. Were you ever involved in any discussions with Mr. Hayes about categorizing or recharacterizing payments made under the policies as claim expenses instead of loss payments?
A. No.
Q. Would Mr. Hayes have had the authority to categorize or characterize certain payments as claim expenses to take them out of the loss payment total which I understand is counted against the limits of the policy?
A. No.
Q. Are there guidelines or instructions provided to field adjusters regarding what is properly characterized as a claim expense and what is properly characterized as a loss payment?
A. For the most part, yes. Occasionally we would have to -- some things come up. We would check with our staff personnel, with our experts in the company about which way they should be charged.
Q. If Mr. Hayes had a question about whether

87

something was appropriately characterized as a claim expense or a loss payment, would he come to you to have that question answered?
A. Yes.
Q. And at no point did he come to you on this case and ask about monies spent and how they should be categorized?
A. Not that I recall.
Q. When were you first advised or notified or told that the homeowners were smelling smoke inside the house?
A. The best I can recall it would have been when we were having trouble getting the release signed that that complaint came up.
Q. Do you recall when there were the first signs of trouble getting the release signed?
A. Not to a date I don't.
Q. Did Mr. Hayes -- well, before that, I take it, first of all, some time during 2009, correct?
A. Yes, I would think.
Q. Summer, maybe fall of '09?
A. Yes, I would -- I'm not sure, but it all depends when that release went out.
Q. Did Mr. Hayes come to you and tell you

88

**Page 117**

1  A. I don't recall.
2  Q. Was this a discussion that occurred in
3  person?
4  A. Which?
5  Q. This discussion with Hayes that you're
6  referring to. Your discussion with Hayes.
7  A. In-person? I don't recall.
8  Q. And certainly you were never present for
9  any discussion that Hayes had with the homeowners?
10  A. Never once.
11  Q. And never, in fact, met the homeowners?
12  A. Correct.
13  Q. Whose decision was it at American Family
14  to renege on the promise that Hayes made to the
15  homeowners to restore the home to its pre-fire
16  condition irrespective of the two million dollars
17  in limits of the policies?
18  MR. RUFF: Objection to the mischaracterization
19  and foundation.
20  MR. HENNESSY: Did you understand my question?
21  THE WITNESS: Yes. That never happened. None
22  of my people would ever do that. They know exactly
23  how this works, they would never do that.
24

**Page 118**

1  BY MR. HENNESSY:
2  Q. So, do you deny that Hayes made that
3  promise to the Stopkas to fix the home, restoring
4  it to its pre-fire condition irrespective of the
5  limits of the policies?
6  A. Absolutely.
7  Q. On what do you base that denial?
8  A. My confidence that my adjusters know
9  better. That's a basic premise of an adjuster. No
10  adjuster would make that promise.
11  Q. You and Mr. Andersen initially -- I'm not
12  sure exactly where it fit from the transition from
13  Andersen to Kinate. Certainly at the time when
14  Mr. Andersen was your immediate supervisor up until
15  May of '09, you and Andersen had empowered Hayes to
16  negotiate what he could negotiate and try to get
17  the best deal he could to get this resolved; is
18  that fair?
19  A. Well, a little outside of that wording,
20  but roughly, yes.
21  Q. Although initially -- and when I say
22  initially, let's define that. Let's talk about
23  September, October of '08. There was the initial
24  belief that this was a significant enough loss that

**Page 119**

1  the reserve went right to 2,000,000, right?
2  MR. RUFF: When are you going to stop
3  re-plowing it? I mean we're so many hours into
4  this, and I bet you if I have Christy searched
5  that, that question would come up at least a half a
6  dozen times already. Come on, get on to something
7  new, please.
8  MR. HENNESSY: Do you have an objection?
9  MR. RUFF: Yes. Asked and answered 1,000
10  times.
11  BY MR. HENNESSY:
12  Q. Do you understand my question?
13  A. Yes.
14  Q. But based upon communications you had with
15  Hayes and what he was reporting to you that he
16  thought he was capable of doing, the idea was it
17  was going to get done for less than that, right?
18  A. Yes.
19  Q. But then when he sat down and started
20  collecting all of the various payments and
21  realizing all of the money that had already gone
22  out, it had to get adjusted again?
23  MR. RUFF: It --
24  THE WITNESS: I --

**Page 120**

1  MR. RUFF: Wait, wait, wait.
2  THE WITNESS: Yes.
3  MR. RUFF: It, when, where. I mean I know
4  you're trying to go over the same things, but let's
5  be fair to the witness. The it is what and the
6  when is what?
7  BY MR. HENNESSY:
8  Q. You had testified that towards the end of
9  '08 the reserve got pushed down based upon things
10  that Jerry was telling you about what he thought
11  that he could pull off in terms of getting
12  everything wrapped up, right?
13  A. What he thought he could settle the claim
14  for fairly for all the damages, yes.
15  Q. Right. All payments, everything, right?
16  A. Yes.
17  Q. But then into early '09 that had to get
18  revised?
19  A. Yes.
20  Q. Did you ask -- and I think you had
21  testified that the reason it had to get revised is
22  because there were some payments that were out
23  there that once he sat down and kind of did all the
24  math and did all the numbers, he realized the

Page 133

1 direction what they wanted done per their general
2 contractor. But if there's something that came up
3 along the way that it would not be unusual to work
4 that out if Mr. Augustine noted something and
5 contacted Jerry in that regard?
6    A.  That's correct.
7    Q.  That would be normal standard operating
8 procedure?
9    A.  Yes.
10   Q.  Mr. Hennessy asked you some questions
11 about Exhibit 12. If we go to 6178 in there.
12   A.  Yes.
13   Q.  The process that I just described, I took
14 you through, if we look to the first paragraph on
15 there, the rest of the work was done by the
16 homeowners' general contractor, that would make
17 sense with your understanding of how this project
18 worked?
19   A.  That's correct.
20   Q.  And that we saw was Mr. Todd Augustine,
21 right?
22   A.  Correct.
23   Q.  It says here Jerry did not dispute the
24 scope of the repairs, went along with what the

Page 134

1 expert suggested, is that right?
2    A.  That's correct.
3    Q.  Is that consistent with American Family
4 following what the experts would say and not
5 directing or becoming a general in and of itself?
6    MR. HENNESSY:  Object to form.
7    THE WITNESS:  It's absolutely correct.
8 BY MR. RUFF:
9    Q.  Mr. Hennessy asked you some questions
10 about the second paragraph, no one mentioned this
11 at any time, the claims process per Jerry. It is
12 obviously not a constructive total in reviewing the
13 pictures in the file. Did I read that correctly?
14   A.  Yes, you did.
15   Q.  And that was something that Mr. Hennessy
16 asked you if that's what your understanding was.
17 This was not a constructive total, is that right?
18   A.  Correct.
19   Q.  But we look further in here on the fourth
20 paragraph in, the insureds' architect did the
21 drawings of what needed to be demolished and what
22 needed to be remediated. So, in essence -- first
23 of all, did I read that correctly?
24   A.  Yes, you did.

Page 135

1    Q.  So, what, in essence, was happening is
2 that precisely the outlines that you testified to
3 that American Family used the insureds' meaning --
4 the insured actually is a misstatement. It should
5 be the Stopkas, right, that's the claimant's
6 architect?
7    A.  Correct.
8    Q.  And that could be confusing where you're
9 talking about --
10   A.  Yes.
11   Q.  -- insured? That would be first party,
12 but you're actually dealing with the claimants'
13 architect, right?
14   A.  Correct.
15   Q.  That word should be claimants?
16   A.  Yes.
17   Q.  And so what was happening here is that the
18 claimants' architect, Mr. Stopka's and
19 Mrs. Stopka's architect, actually did the drawings
20 of what needed to be demolished and what needed to
21 be remediated indicating that they didn't think it
22 should be a destructive total either, right?
23   MR. HENNESSY:  Object to form and foundation.
24   THE WITNESS:  Correct.

Page 136

1 BY MR. RUFF:
2    Q.  In your review of this file, sir, and you
3 made some very strong comments in that regard and I
4 want to see if I can go back to that, do you
5 believe that Mr. Hayes, one of your field
6 adjusters, handled this file per policy and
7 procedure of American Family?
8    A.  Yes.
9    Q.  Did he contact all of the right people,
10 call the right people in to address this fire loss?
11   A.  Yes.
12   Q.  In taking control, what did
13 American Family do in terms of taking control?
14   A.  Took control because this is -- No. 1, we
15 were at fault; No. 2, it was a very difficult claim
16 to handle and important to do it correctly and get
17 this -- the right people in and get them in
18 quickly, and that will help mitigate the damage.
19 It helps us out, it also helps the homeowner out
20 because it would have been a bigger problem.
21   Q.  It also helps the homeowner out so that
22 the homeowner can deal directly with
23 Complete Flashings' insurer, and American Family
24 was stepping up in that regard?

| | |
|---|---|
| **Subject:** | 221-121546 |
| **Location:** | telephone |
| **Start:** | 10/8/2008 1:00 PM |
| **End:** | 10/8/2008 1:30 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Required Attendees:** | Gribble, Dwight E; Andersen, Jim R; Hayes, Gerald J; Smith, Alice A; Rosenberger, Terri M; Thompson, Sybil A; Saletri, James M |
| **Resources:** | telephone |

877-414-8326  pass code  409966

This is a 2 million dollar loss caused by our insured while doing torch work on gutters and flashing.



PLAINTIFF'S EXHIBIT #4

AF05898

**From:** Saletri, James M <JSALETRI@amfam.com>
**Sent:** Wednesday, October 8, 2008 3:42 PM
**To:** Gribble, Dwight E <DGRIBBLE@amfam.com>; Andersen, Jim R <JANDERSE@amfam.com>; Thompson, Sybil A <STHOMPS5@amfam.com>; Rosenberger, Terri M <TROSENBE@amfam.com>; Smith, Alice A <ASMIT2@amfam.com>; Hayes, Gerald J <GHAYES@amfam.com>
**Subject:**

---

COMMITTEE 221-121546 October 8, 2008

This is a large loss where our insured was doing torch work on flashing and gutters at an 8 million dollar home and started it on fire. The damages could reach our limit of coverage which is 1 million on the CPP and 1 million on the umbrella which has claim 221-129788.

Jerry Hayes explained the scope and cause of the fire. Our insured said they were doing torch work on the roof when the roof started on fire. They climbed down and got a fire extinguisher and went up to try and put it out, but it had spread too far. Insured then called the fire dept. Nationwide had a fire investigator out and he said not much doubt about what happened after talking to our insured employee. Jerry talked to the fire chief and gave him his card as the chief said he would send Jerry a fire report. It is not in the file, but Jerry will get it soon. Based on clear liability, Jerry took control of the claim, as the property owner was not confident in the adjuster for nationwide. Jerry secured the sight and had a temporary roof put on. He will get contractors sworn statements in a few days which should be accurate within 10%. Jerry has talked to the contractor and he said it should take 5 months to get the home back to pre-fire condition. The property owner pays 14,000 a month on a construction loan. We would also owe this loss of use of 70,000. Property owner has been very good to work with.

Underwriting stated we insure this insured under CPP, WC, and autos. This risk has been on the books since 99 and has been rated incorrectly all that time. In May of 2007 a loss control survey was done and it did not pick up what the actual work of this insured was, which should be rated as roofing. In July of 08 an audit was done which showed this insured has been acting as a general contractor. Underwriting will review account.

Jim Andersen suggested an excess letter be sent to the insured. Jim Saletri will help Jerry with the letter

Dwight Gribble asked if we have accepted liability for the claim. Jerry said not in writing, but we have taken control to mitigate the damage. It was decided we should keep control and not accept liability in writing at this time. We will pay the loss, but need to firm up everything as we will need a release for our insured. Jerry will let us know if it appears this will go over our limits. If it does, we will have to discuss the handling from that point on.

Dwight also asked we get a title search to find out who has an interest in the property, so we know who to pay at time of settlement. Jerry will contact SIU to help with this and also talk to the financial manager of the claimant.

AF05899

Reserve is now at 2 million. If it turns out to be less, we should adjust prior to the end of the year.


Jim Saletri, CPCU

Commercial Farm/Ranch Field Desk Manager

American Family Insurance

Phone: 1-(800) 260-1369 ext. 44030

Cell: (866) 537-4133

Email: jsaletri@amfam.com

Fax: (866) 537-4133

AF05900

**From:** Saletri, James M
**Sent:** Wednesday, October 08, 2008 3:51 PM
**To:** Saletri, James M
**Subject:** FW:

-----Original Message-----
**From:** Saletri, James M
**Sent:** Wednesday, October 08, 2008 3:42 PM
**To:** Gribble, Dwight E; Andersen, Jim R; Thompson, Sybil A; Rosenberger, Terri M; Smith, Alice A; Hayes, Gerald J
**Subject:**

COMMITTEE 221-121546 October 8, 2008

This is a large loss where our insured was doing torch work on flashing and gutters at an 8 million dollar home and started it on fire. The damages could reach our limit of coverage which is 1 million on the CPP and 1 million on the umbrella which has claim 221-129788.

Jerry Hayes explained the scope and cause of the fire. Our insured said they were doing torch work on the roof when the roof started on fire. They climbed down and got a fire extinguisher and went up to try and put it out, but it had spread too far. Insured then called the fire dept. Nationwide had a fire investigator out and he said not much doubt about what happened after talking to our insured employee. Jerry talked to the fire chief and gave him his card as the chief said he would send Jerry a fire report. It is not in the file, but Jerry will get it soon. Based on clear liability, Jerry took control of the claim, as the property owner was not confident in the adjuster for nationwide. Jerry secured the sight and had a temporary roof put on. He will get contractors sworn statements in a few days which should be accurate within 10%. Jerry has talked to the contractor and he said it should take 5 months to get the home back to pre-fire condition. The property owner pays 14,000 a month on a construction loan. We would also owe this loss of use of 70,000. Property owner has been very good to work with.

Underwriting stated we insure this insured under CPP, WC, and autos. This risk has been on the books since 99 and has been rated incorrectly all that time. In May of 2007 a loss control survey was done and it did not pick up what the actual work of this insured was, which should be rated as roofing. In July of 08 an audit was done which showed this insured has been acting as a general contractor. Underwriting will review account.

Jim Andersen suggested an excess letter be sent to the insured. Jim Saletri will help Jerry with the letter

Dwight Gribble asked if we have accepted liability for the claim. Jerry said not in writing, but we have taken control to mitigate the damage. It was decided we should keep control and not accept liability in writing at this time. We will pay the loss, but need to firm up everything as we will need a release for our insured. Jerry will let us know if it appears this will go over our limits. If it does, we will have to discuss the handling from that point on.

Dwight also asked we get a title search to find out who has an interest in the property, so we know who to pay at time of settlement. Jerry will contact SIU to help with this and also talk to the financial manager of the claimant.

Reserve is now at 2 million. If it turns out to be less, we should adjust prior to the end of the year.

*Jim Saletri, CPCU*
Commercial Farm/Ranch Field Desk Manager
American Family Insurance
Phone: 1-(800) 260-1369 ext. 44030
Cell: (866) 537-4133
Email: jsaletri@amfam.com
Fax: (866) 537-4133

AF 00624

http://ics/ics/claim/viewImage.do?claimNumber=00-221-121546&ecfId=56838424