---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, L.L.C., )
 Plaintiffs, )
 vs. ) No. 10-CV-6034
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC, )
a Wisconsin Corporation, )
 Defendant. )

The deposition of TODD AUGUSTINE, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Johnetta Stafford Taylor, a notary public within and for the County of Cook and State of Illinois, at One South Wacker Drive, Suite 2500, Chicago, Illinois, on January 16, 2012, at the hour of 10:00 o'clock a.m.

Johnetta Stafford Taylor
License No: 084-001583

---

**Page 2**

APPEARANCES:

 MECKLER, BULGER, TILSON,
 MARICK & PEARSON, LLP, by
 MR. STEVEN D. PEARSON,
 123 North Wacker Drive
 Suite 1800
 Chicago, Illinois 60606
 (312) 474-7889
  Representing the Plaintiffs;

 PRETZEL & STOUFFER, CHTD., by
 MS. SUZANNE M. CROWLEY,
 One South Wacker Drive
 Suite 2500
 Chicago, Illinois 60606
 (312) 346-1973
  Representing the Defendant;

---

**Page 3**

APPEARANCES: (Continued)

 HOSCHEIT, McGUIRK,
 McCRACKEN & CUSCADEN, P.C., by
 MR. JOHN M. McGUIRK,
 1001 East Main Street, Suite G
 Saint Charles, Illinois 60174
 (630) 513-8700
  Representing the Third Party
  Defendant; Augustine Custom Homes.

ALSO PRESENT:
 MR. JAMES GILLINGHAM.

---

**Page 4**

INDEX

| WITNESS | EXAMINATION |
|---|---|
| TODD AUGUSTINE | |
| By Ms. Crowley | 5 |
| By Mr. Pearson | 140 |
| By Ms. Crowley (Further) | 217 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Augustine Deposition Exhibit | |
| No. 1 | 40 |
| No. 2 | 60 |
| No. 3 | 66 |
| No. 4 | 78 |
| No. 5 | 83 |
| No. 6 | 85 |
| No. 7 | 90 |
| No. 8 | 103 |
| No. 9 | 105 |
| No. 10 | 118 |
| No. 11 | 122 |
| No. 12 | 122 |
| No. 13 | 124 |
| No. 14 | 132 |
| No. 15 | 136 |

---

McCorkle Court Reporters, Inc.
Chicago, Illinois (312) 263-0052

Exhibit G

1 the decorative pieces that go up on the top of
2 the house with gargoyles carved into them. All
3 that granite material came from China.
4 Q. And that granite material was sculpted
5 in China?
6 A. Yes. Carved.
7 Q. And imported by the Stopkas to the site
8 at the Stopka's cost, correct?
9 A. Yes.
10 Q. And that was damaged in the fire?
11 A. Some of that was damaged in the fire.
12 Q. Describe how it was damaged in the
13 fire.
14 A. Well, some of it because of the smoke
15 and the fire, it was not able to be cleaned.
16 Some of it was damaged due to, you know, the
17 fire department trying to get equipment in and
18 out. And some of it just had to be removed
19 because it was connected -- because it has to be
20 supported. So you had to connect it to portions
21 of structure that had to be replaced.
22 Q. The interior trim moldings, where did
23 that come from?
24 A. That came from Indonesia.

145

1 Q. And was shipped to the site by the
2 Stopkas at their cost, correct?
3 A. Yes.
4 Q. At the cost of both shipping and the
5 materials themselves, right?
6 A. Yes.
7 Q. How was that damaged in the fire?
8 A. A lot of it was literally burnt from
9 the fire. A lot of it was smoke damage that
10 couldn't be repaired or is what was determined
11 by Mr. Hayes and his team.
12 And then water damage --
13 Q. Let me interrupt you for a second.
14 The interior trim -- this is all wood,
15 correct?
16 A. Yes. Wood.
17 Q. How does the oak wood become smoke
18 damaged in such a fashion that it cannot be
19 repaired?
20 A. I'm not an expert in this. But my
21 understanding is that it's porous and it
22 absorbed smells and odors and so forth and then
23 that can't be removed from the wood.
24 Q. And is it true that Mr. Hayes made

146

1 determinations with respect to using the
2 interior trim as an example, some wood that was
3 not burnt but was smoke damaged but could not be
4 reused because of the smoke damage?
5 A. Yes.
6 Q. Is that also true with regard to the
7 doors?
8 A. Yes.
9 Q. The doors were all wood, correct?
10 A. Right.
11 Q. Where did the doors come from?
12 A. Those came from Indonesia also.
13 Q. The same question with respect to
14 those.
15 Those were shipped and paid for at the
16 expense of the Stopkas, correct?
17 A. Yes.
18 Q. The doors were damaged in the fire?
19 A. Yes. Water and wood do not typically
20 react well together. So there was water damage.
21 Q. Before I get to the water, just
22 focusing on burning or smoke damage.
23 Were the doors damaged in the fire?
24 A. Yes.

147

1 Q. Both by burning and through smoke?
2 A. Yes.
3 Q. And I take it that the burning was
4 obvious to the uninformed eye, correct?
5 A. Correct.
6 Q. The smoke damage, who made the
7 determination with respect to whether doors
8 could be salvaged?
9 A. My understanding was that it was
10 Brouwer Brothers. But Mr. Hayes was leading
11 those activities.
12 Q. Whether it was Brouwer Brothers or
13 Mr. Hayes, it was ultimately at Mr. Hayes's
14 direction. Correct?
15 A. Yes.
16 Q. The Brouwer Brothers never worked for
17 you, did they?
18 A. No, they did not.
19 Q. You never gave them any directions, did
20 you?
21 A. No.
22 Q. Stone on the floors and walls, you're
23 talking about hard stone like flooring tile or
24 granite; is that correct?

148

McCorkle Court Reporters, Inc.
Chicago, Illinois (312) 263-0052

**Page 153**

1 applying water to the house?
2 A. There was really only one snorkel that
3 was providing water. And because of access, the
4 back of the house, there's a lake, and they
5 could not get access to the back or the sides.
6 And there was one large snorkel fire truck that
7 was supplying water.
8 Q. And was that over -- was that snorkel
9 over the roof applying water to the entire roof
10 area of the home?
11 A. Primarily the front half, because they
12 couldn't get over the top because of the length
13 of the flames and so forth.
14 Q. Did you observe all of what you've just
15 described or did someone tell you this?
16 A. I observed it.
17 Q. How long did you observe them applying
18 water to the home?
19 A. Well, I was there approximately 11:30
20 in the morning and left somewhere in the
21 neighborhood of 6:00 or 7:00 o'clock. And they
22 were onsite the entire time. The last few hours
23 it was just primarily little spew-ups of fire
24 and smoke. But I'm not sure how long they were

**Page 154**

1 actually using the snorkel.
2 Q. Would you agree they were applying
3 water for at least four hours to the home?
4 A. Yes.
5 Q. Okay. And perhaps more?
6 A. Yes.
7 Q. Tell me the first time you actually
8 made your way into the home after the fire.
9 A. It was -- I believe it was the
10 following day. I believe it was the following
11 day that the fire department escorted us into
12 parts of the home.
13 Q. And who was "us"?
14 A. I know it was Mike Stopka. I believe
15 Jerry Wolowicki, and I believe there were a
16 couple of insurance people there.
17 Q. Mr. Hayes?
18 A. Yes. I believe Mr. Hayes was there.
19 Q. Anyone else that you can recall?
20 A. There was Mr. Stopka's agent. I don't
21 recall what his name was.
22 Q. And anyone else?
23 A. Not that I recall. There was, again,
24 some municipality personnel, fire department

**Page 155**

1 people and so forth.
2 Q. You had to be escorted into the house?
3 A. Yes.
4 Q. Who set up the appointment for this
5 meeting you just described?
6 A. I think it was Gerry Hayes.
7 Q. How did you learn of the meeting?
8 A. Through Mike Stopka.
9 Q. Why do you believe it was Gerry Hayes
10 who set up this meeting?
11 A. Because the prior day Gerry Hayes after
12 I believe consulting with the fire department
13 admitted full responsibility that his client was
14 at fault and that they would take control of the
15 entire scene.
16 Q. And when you arrived the day of the
17 fire, was Gerry Hayes already on the scene?
18 A. No.
19 Q. When did you first meet Gerry Hayes?
20 A. It was the following day.
21 Q. So Gerry Hayes's acceptance of
22 responsibility for the loss, how did that get
23 communicated to you?
24 A. Verbally at the site.

**Page 156**

1 Q. Did you witness Gerry Hayes say that?
2 A. Yes.
3 Q. What day did that occur?
4 A. I believe it was the following day.
5 Q. The day you were there with the
6 municipalities?
7 A. Yes.
8 Q. Who communicated to you to be at the
9 site that day with the meeting with the
10 municipalities so that you could enter the home?
11 A. Mike Stopka I believe had been
12 contacted by Gerry Hayes, and Mike contacted me.
13 Q. That day -- first of all, that day on
14 the site when you first made your way into the
15 home, describe what you witnessed.
16 A. Well, it was just an extreme amount of
17 damage. I mean it was just unbelievable. It
18 was still smoldering. We couldn't go into many
19 parts of the house because it was just unsafe.
20 You know, the entire roof was gone. The entire
21 third floor was gone. Part of the second floor
22 was completely gone. When I say "gone," you
23 could see through all the way to the sky. Water
24 was still dripping everywhere throughout the

**Page 157**

1 house.
2 Q. And when you say "dripping," dripping
3 from saturation from the fire hoses?
4 A. Yes.
5 Q. Was there standing water in the house?
6 A. Yes.
7 Q. Describe the standing water you
8 observed.
9 A. There was some standing water on the
10 second floor, large pools on the first floor
11 that were kind of captured between walls and
12 two-by-fours, you know, for interior walls that
13 were eventually dripping down into the basement,
14 which is living area in the garage.
15 Q. How much water was observed in the
16 basement?
17 A. Many, many inches of standing water.
18 The fire department had said that there was
19 something in excess of 100,000 gallons, I don't
20 recall exactly, gallons of water put on this
21 fire.
22 Q. And areas that were saturated, were
23 those areas limited to where there was obvious
24 smoke or char damage?

**Page 158**

1 A. No.
2 Q. Tell me what you observed in that
3 respect.
4 A. Well, the fire -- if you're facing the
5 front of the house, the fire is on the right,
6 right side and center of the home. The garage
7 was in the lower basement level on the left.
8 And the water was draining toward the garage.
9 So the water was draining from where the fire
10 was through the area of the house that had not
11 been quote/unquote damaged by fire all the way
12 through to the opposite end of the house.
13 Q. Was it -- strike that.
14     In putting out this fire, the fire
15 department couldn't distinguish between what was
16 actually being burned up and what was threatened
17 to be burned up when it was applying water.
18     Is that fair?
19     MS. CROWLEY: Objection. Foundation.
20     THE WITNESS: Yes.
21 BY MR. PEARSON:
22 Q. You witnessed that, didn't you?
23 A. Yes.
24 Q. And you witnessed that both when they

**Page 159**

1 were applying the water. Yes?
2 A. Yes.
3 Q. And you witnessed it based on the
4 results of that application when you toured the
5 home the following day.
6     Is that fair?
7 A. Yes.
8 Q. How long did that meeting take place
9 the day after the fire?
10 A. How long were we with the fire
11 department?
12 Q. Inside the house.
13 A. Inside the house it was fairly quick.
14 I don't recall exactly, but I would say it was
15 10 minutes, maybe 15 minutes. It was
16 unbearable. You couldn't be in there.
17 Q. Did they say they didn't want you in
18 there for very long for safety reasons?
19 A. They kept us in a very specific area
20 because of the safety of it. There were fumes
21 and so forth, so...
22 Q. What happened next that day?
23 A. We left the house and went out to the
24 street.

**Page 160**

1 Q. Who is the "we" you're describing?
2 A. Mr. Stopka, Mr. Wolowicki, Mr. Hayes
3 and the gentleman from Mr. Stopka's insurance
4 company. And at some point a representative --
5 or the owner from Minor & East was there also.
6 I don't recall if they toured -- I say toured.
7 If they went into the home with us or if they
8 went in after us with the fire department. But
9 they then also were a part of this small group
10 of people. And it was discussed, you know,
11 steps were discussed at that point.
12 Q. And what were you told was going to
13 happen at that point?
14 A. Well, I was told that Mr. Hayes stated
15 again that after speaking to the fire
16 department, there was no question on who was
17 responsible for the fire and that he would like
18 to take over the project, so to speak. He went
19 on to share what his expertise was, which is
20 large -- as he stated, it's large losses. He
21 had mentioned that he was just up at Milwaukee
22 for some church fire or something like that and
23 Indiana for some large fire down there. So his
24 expertise seemed to be -- he seemed to be well

**Page 161**

qualified for something like this project.
    And he asked that he be given by Mr. Stopka charge of at least getting the house demolished, remediation and secured. Because security was an issue the fire department had immediately.
    MR. PEARSON: Could I have just the last part of that answer back, please.
        (Whereupon, the record was read as requested.)
BY MR. PEARSON:
    Q. Was an agreement reached that you witnessed as to whether Mr. Hayes would assume control of what you just described?
    MS. CROWLEY: Objection. Form and foundation.
    THE WITNESS: It was discussed by Mr. Stopka and Mr. Wolowicki at the time, and they felt that he had -- that Mr. Hayes had the best qualifications for getting the house secured and tarped off, protected, and the demolition of it. And I had indicated that I had no expertise in this and that I didn't want to be a part of that at all.

**Page 162**

BY MR. PEARSON:
    Q. You were asked earlier today demolition -- there's different phases to demolition in a disaster like this; wouldn't you agree?
    A. Yes.
    Q. There's that which is immediately necessary to secure the location, correct?
    A. Yes.
    Q. And then there's demolition that's part of the rework, which is getting the house back to where it was the day before the fire.
        Is that fair?
    A. Yes.
    Q. And that's pretty much the way the two components were described in the Andersen & Fiene report.
        Would you agree?
    A. Yes.
    Q. Now, there's another piece of demolition that relates to -- and take out Exhibit 2, if you would.
        In fact, I'm going to put these in order for you so it will be easy for you to

**Page 163**

refer to these.
    I'll direct your attention to the third page of Mr. Fiene's report after the paragraph relating to severe damage.
    Do you see that?
    A. Yes.
    Q. Mr. Fiene goes on to say, "There are hidden areas which have been previously mentioned may be found to have water damage as well as fire damage."
    Do you see that?
    A. Yes.
    Q. Whose responsibility was it to determine whether these hidden areas of the home had water damage or fire damage?
    MS. CROWLEY: Objection. Form and foundation.
    THE WITNESS: Mr. Hayes.
BY MR. PEARSON:
    Q. Was there any doubt in your mind about that?
    A. Never.
    Q. Why not?
    A. I've never been involved in a fire

**Page 164**

project or restoration or remediation and have no experience. And I have a very honest relationship with Mr. Stopka, and I would never try to take something that is out of my -- take responsibility for something that is out of my realm of qualifications.
    Q. Did you make that clear to Mr. Hayes?
    A. Yes.
    Q. And, in fact, Mr. Hayes and his people came in and started ripping things out, didn't they?
    A. Yes.
    Q. They did the demolition work, didn't they? At least the original stage?
    A. Yes.
    Q. Did you have anything to do with that?
    A. No.
    Q. Were you consulted about any of that?
    A. No.
    Q. Were you asked for your opinion about any of that?
    A. No.
    Q. The manner in which the site was secured, Mr. Hayes and his people did that,

**Page 165**

1 correct?
2 A. Yes.
3 Q. Did you have anything to do with that?
4 A. No.
5 Q. Were you asked for your opinion about
6 that?
7 A. No.
8 Q. A lot of the materials that were fire
9 damaged were these materials that were supplied
10 by my clients at the home. We've discussed them
11 earlier, right?
12 A. Yes.
13 Q. Those were ripped out of the home.
14 Doors, right?
15 A. Yes.
16 Q. Molding, right?
17 A. Yes.
18 Q. Stone work?
19 A. Yes.
20 Q. Stone facade, right? All of the things
21 we talked about earlier?
22 A. Yes.
23 Q. Who made the decision whether those
24 were salvageable or not?

**Page 166**

1 A. Mr. Hayes and his team.
2 Q. Were you consulted about that?
3 A. No.
4 Q. Now, the decision whether to use those
5 materials or not again had nothing to do with
6 the initial demolition work to secure the site,
7 did it?
8 A. No, it didn't.
9 Q. That had everything to do with
10 restoring the home to its original prefire
11 condition, right?
12 A. Yes.
13 Q. And those judgment calls were being
14 made by Mr. Hayes and Mr. Hayes's people,
15 correct?
16 A. Yes.
17 Q. In fact, those were materials you had
18 nothing to do with providing to the site, right?
19 A. Correct.
20 Q. Were you ever asked by Mr. Hayes or any
21 of his people to express an opinion about the
22 usability of those materials that were damaged
23 during the fire?
24 A. No.

**Page 167**

1 Q. At the time of the -- strike that.
2 When you left the meeting the day after
3 the fire, did you have an understanding of
4 whether you would have a role going forward in
5 this project?
6 A. In the demo and remediation or in the
7 rebuilding?
8 Q. We've already covered the demo and
9 remediation.
10 But with respect to the rebuilding, did
11 you understand what your role was going to be
12 going forward?
13 A. Not at that point, no. Mr. Hayes had
14 suggested that a company by the name of Minor &
15 East be brought in to reconstruct the house.
16 Q. Then Mr. Hayes, in fact, he was pushing
17 the Stopkas to try to convince them to have them
18 do that work to the exclusion of you, right?
19 A. Yes.
20 MS. CROWLEY: Objection. Form.
21 BY MR. PEARSON:
22 Q. Did he communicate that directly to
23 you -- "he" meaning Mr. Hayes, communicate that
24 directly to you or did you overhear that in

**Page 168**

1 conversations between Mr. Hayes and either of
2 the Stopkas or Mr. Wolowicki?
3 MS. CROWLEY: Objection to form.
4 THE WITNESS: It was discussed in a group, in
5 a group manner.
6 BY MR. PEARSON:
7 Q. And was a decision made about your role
8 at that point in time or was that a waiting --
9 strike that.
10 When was the decision made whether you
11 would have a future role in the rebuild of this
12 home?
13 A. I don't recall exactly. But it was
14 sometime after the day after the fire.
15 Q. How was that decision communicated to
16 you?
17 A. I believe it was a verbal conversation
18 that I had with Mr. Stopka.
19 Q. Okay. So that was Mr. -- did
20 Mr. Stopka communicate to you at that point in
21 time it was his decision to use you and not
22 follow Mr. Hayes's suggestion going forward?
23 A. Yes.
24 Q. Did Mr. Stopka communicate to you that

**Page 177**

1  A. No, he did not.
2  Q. Did he ever give you any indication or
3  cause for concern that Mr. Hayes had any
4  limitation on his financial wherewithal in
5  repairing this home?
6  A. No.
7  Q. Did you ever have any conversations
8  with Mr. Hayes about the limits of insurance
9  available for this loss?
10  A. No.
11  Q. Would it be fair to characterize your
12  flow of communications with Mr. Hayes as poor?
13  A. Yes.
14  MS. CROWLEY: Objection to form.
15  BY MR. PEARSON:
16  Q. You've been in the construction
17  business how long, Mr. Augustine?
18  A. 1987.
19  Q. And you were asked questions earlier
20  about why you have certain copies of e-mails and
21  communications from Mr. Stopka in your file.
22  Do you recall those questions?
23  A. Yes.
24  Q. Isn't it likely that you asked for

**Page 178**

1  those because of the nature of the poor
2  communications with Mr. Hayes?
3  A. Yes.
4  Q. And isn't it likely as a result of
5  Mr. Hayes's pattern of poor communications, you
6  didn't know whether he had a complete file or
7  not.
8  Isn't that fair?
9  A. Yes.
10  Q. There were some questions earlier today
11  about the draw process. And I want to
12  understand the basic distinction between how the
13  draw process worked prefire and post fire.
14  Okay?
15  A. Yes.
16  Q. Prefire you had a draw process that was
17  set forth in your construction contract that's
18  been marked as Exhibit 1 with a schedule; is
19  that correct?
20  A. Yes.
21  Q. And let me step back even a little
22  further from that.
23  When a draw request is made in your
24  experience as a general contractor, you are

**Page 179**

1  making either an expressed or implied
2  representation and warranty that the work that
3  is the subject of that draw has been completed
4  to your satisfaction.
5  Isn't that fair?
6  A. Yes.
7  Q. And so in the prefire stages draws were
8  being made to your client -- draw requests were
9  being made to your client for approval and then
10  they would go on to the bank once general
11  contractor and Klein agreed with the draw
12  request. Fair?
13  A. Yes.
14  Q. Post fire, now Mr. Hayes and American
15  Family are introduced into the process, correct?
16  A. Yes.
17  Q. How did that draw process work with
18  regard to Mr. Hayes and American Family?
19  A. My understanding was I would prepare
20  the draw request based on the work that had been
21  completed, forward that via e-mail to
22  Mr. Wolowicki and Mr. Stopka, and then
23  Mr. Wolowicki would then forward it to Gerry
24  Hayes and we would wait for Gerry Hayes'

**Page 180**

1  approval or Mr. Wolowicki would wait for Gerry
2  Hayes' approval and then once he got that
3  approval back, then he would contact me to send
4  that draw request to the bank.
5  Q. And when you say, 'send that draw
6  request to the bank,' that was because -- strike
7  that.
8  What was Mr. Hayes's role in the draw
9  approval process if he was not the one cutting
10  checks for those draws?
11  A. He was approving the line items and the
12  costs associated with the rebuild.
13  Q. Do you know if in fact, Mr. Hayes and
14  American Family were paying those draws or
15  whether a bank was paying those draws?
16  A. I don't.
17  Q. You don't know?
18  A. No.
19  Q. So when you say they were being
20  forwarded on to a bank, do you know that for a
21  fact?
22  A. I was forwarding the draw request to
23  the bank.
24  Q. The post-fire draw requests?

```
 1    Q.  And you were asked a couple of
 2  different ways whether you were a consultant
 3  during that period.
 4        Do you recall those questions?
 5    A.  Yes.
 6    Q.  Is there any doubt in your mind that
 7  the time you spent during that 30-day window was
 8  as a direct result of the fire?
 9    A.  No.
10    Q.  Were you accomplishing anything with
11  regard to the reconstruction of the home moving
12  forward towards completion as if the home had
13  been restored to its prefire condition during
14  that 30-day window?
15    A.  No.
16    Q.  You understand my question, don't you?
17    A.  Yes.
18    Q.  Can you estimate the approximate amount
19  of time -- strike that.
20        You've heard the phrase, "two steps
21  forward and three steps back," right?
22    A.  Yes.
23    Q.  That's kind of what this project was
24  like, wasn't it?
                                              189
```

```
 1    A.  Yes, it was.
 2    Q.  And that's because of the nature of
 3  trying to rebuild something that's been so
 4  severely damaged.
 5        Is that fair?
 6    A.  Yes.
 7    Q.  Did there come a time during the
 8  rebuild process where the rebuild process was no
 9  longer taking backward steps, it was solely
10  moving forward?
11    A.  Yes.
12    Q.  When was that?
13    A.  I don't recall specifically.
14        Once I was able to get control of the
15  rebuild process, I think we -- excluding the
16  remediation work that still needed to be
17  approved by Mr. Hayes, I think we started moving
18  along and it kicked into high gear.
19    Q.  And one way to exclude the remediation
20  work was through coordination of the efforts so
21  that you weren't stepping on Mr. Hayes and his
22  contractors' toes, correct?
23    A.  Yes.
24    Q.  If Mr. Hayes and his contractors could
                                              190
```

```
 1  perform work that would not interfere with
 2  work -- what I'm calling the go-forward work,
 3  the actual productive rebuild work that you were
 4  responsible for, and that could be done in a way
 5  that you weren't stepping on each other's toes,
 6  no problems there.  Correct?
 7    A.  Correct.
 8    Q.  Sometimes that was hard to do, though,
 9  wasn't it?
10    A.  Oh, absolutely.
11    Q.  And describe if you would why that was
12  a difficult thing to do?
13    A.  It was oftentimes related to knowing
14  who he was going to have on site.  I think I
15  testified earlier that I was concerned about
16  safety.  And if I have people working up high
17  with a crane and with heavy material, not
18  knowing who was going to be two or three floors
19  below that was a great concern for me and also
20  the other subcontractors I had on site.  In
21  trying to get from him scheduling and when
22  people were going to be there and when people
23  weren't, made things somewhat difficult and time
24  consuming.
                                              191
```

```
 1    Q.  Because he didn't tell you that, did
 2  he?
 3    A.  Correct.
 4    Q.  And if these were all your people, the
 5  essence of what you do as a general contractor
 6  is coordinate and schedule all that work,
 7  correct?
 8    A.  Yes.
 9    Q.  For safety and efficiency reasons,
10  right?
11    A.  Yes.
12    Q.  And because it's all building blocks to
13  the completed process, correct?
14    A.  Yes.
15    Q.  And Mr. Hayes and his people would show
16  up with little or no communication to you,
17  correct?
18    A.  Correct.
19    Q.  And this is at a time when they're both
20  still either demolishing things or trying to
21  repair work and salvage it, correct?
22    A.  Yes.
23    Q.  The lumber in the home that was
24  exposed, they coated all of that lumber or tried
                                              192
```

**Page 193**

1 to; is that correct?
2 A. Yes.
3 Q. For what reason did they do that? Do
4 you know?
5 A. I believe it was to encapsulate any
6 odors and things associated with the fire.
7 Q. Because smoke gets in wood because it's
8 porous, correct?
9 A. Yes.
10 Q. It's kind of like the example you gave
11 of porous stone versus ceramic tile, right?
12 A. Yes.
13 Q. But if you took all the wood down, you
14 might as well take the whole house down, right?
15 A. Yes.
16 Q. So instead Mr. Hayes decided, 'We're
17 going to coat that wood'?
18 A. Yes.
19 Q. And that was the work that Brouwer
20 Brothers did, right?
21 A. Yes.
22 Q. They used a Kilz material? Is that
23 what they call it?
24 A. Some material that they had to be full

**Page 194**

1 blown covered, full suits and masks and other
2 people couldn't be around and so forth. Yes.
3 Q. Moon suits, correct?
4 A. Yes.
5 Q. How did you come to learn what it was
6 they were doing in that process?
7 A. People that were onsite that were
8 preparing to do the work, I asked them what are
9 they doing and when are they going to be here
10 and how long are they go to be here for and they
11 went on to explain what they were doing.
12 Q. So you had to ask them that because
13 Mr. Hayes never told you that. Fair?
14 A. Yes.
15 Q. So you were never given a plan by
16 Mr. Hayes that said, 'The guys with the moon
17 suits are going to be here spraying toxic
18 chemicals for "X" amount of period coating wood
19 and I need you and your people out of the site
20 for that same amount of period.'
21 That never happened, did it?
22 A. It did not.
23 Q. You would be on site with your people
24 trying to do productive work and I take it you

**Page 195**

1 and your people would have to be removed from
2 the site.
3 Is that fair?
4 A. Yes.
5 Q. That wasn't very helpful to the
6 construction project, was it?
7 A. No, it wasn't.
8 Q. While that work, focusing on the lumber
9 and the coating of the lumber -- and when we say
10 "lumber," we're talking about all the supporting
11 walls, structural supporting wood beams,
12 everything that's exposed. Right?
13 A. Everything.
14 Q. Because all the drywall's been taken
15 off, we're down to the studs, right?
16 A. Yes.
17 Q. And the insulation has been ripped out.
18 Right?
19 A. Yes.
20 Q. The same reason, because the insulation
21 would either be charred or smoke contaminated,
22 right?
23 A. Yes.
24 Q. So they coat that to their

**Page 196**

1 satisfaction, correct?
2 A. Yes.
3 Q. The home is open at this time, right?
4 A. Yes.
5 Q. One wouldn't really know whether that
6 effort is successful in eliminating a smoke
7 smell until the home is sealed up.
8 Wouldn't you agree with that?
9 A. Yes, sir.
10 MS. CROWLEY: Objection. Form and
11 foundation.
12 BY MR. PEARSON:
13 Q. Likewise, one wouldn't know how much
14 moisture is in the home until the home is sealed
15 up like it's typical living conditions, correct?
16 MS. CROWLEY: Objection.
17 MR. PEARSON: You can answer.
18 THE WITNESS: Yes.
19 BY MR. PEARSON:
20 Q. When did the home finally get buttoned
21 up?
22 A. Buttoned up being --
23 Q. Windows are in, doors are able to be
24 closed, there's not wind blowing through it?

**Page 197**

1  A. I want to say spring of 2009.
2  Q. When --
3  A. Roughly.
4  Q. When it was closed up in that fashion,
5  did you notice a smoke odor in the home?
6  A. Yes.
7  Q. Was that smoke odor unmistakable?
8  A. Yes.
9  Q. Who did you communicate that to?
10 A. Mr. Stopka.
11 Q. And did you ever communicate that to
12 Mr. Hayes?
13 A. Yes.
14 Q. When?
15 A. At on-site meetings that Mr. Stopka had
16 requested Mr. Hayes be present at.
17 Q. Who else was present at those meetings
18 besides yourself and Mr. Stopka?
19 A. Mr. Wolowicki, and there may have been
20 occasions -- there may have been an occasion
21 when a Brouwer Brother representative was there.
22 Q. And what representations did Mr. Hayes
23 make in your presence about remediating that
24 smoke odor?

**Page 198**

1  A. That he has extensive experience in
2  this and that there's equipment and methods that
3  can be used to remove the smoke odor up to the
4  point of completion of the home and that when
5  the home was done and they were out of there,
6  that there would be no smoke odors.
7  Q. The closer the home -- strike that.
8      The further the rebuild progressed, did
9  you begin to have increasing doubts as to
10 whether that smoke odor was going to be properly
11 remediated?
12     MS. CROWLEY: Objection to form and
13 foundation.
14     THE WITNESS: Yes.
15 BY MR. PEARSON:
16 Q. Why did those increase?
17 A. Partially because the equipment that he
18 had brought in up to that point and used had not
19 alleviated the problem.
20 Q. And was there any indication that he
21 was doing anything differently to try to
22 remediate this problem?
23 A. No.
24 Q. Take a look at Exhibit 4 if you would,

**Page 199**

1  please.
2      And if you'll turn to the second page
3  of that, that's a little easier to read than the
4  first one.
5      You were asked about this document
6  earlier today regarding your role in
7  "demolition" and asked if you had a role in
8  demolition.
9      Do you recall that question?
10 A. Yes.
11 Q. Isn't it a fact that this e-mail
12 exchange relates to your efforts monitoring what
13 was going on at the site post fire during the
14 time period that Mr. Hayes and his contractors
15 were doing the emergency demolition?
16 A. Yes.
17 Q. Any question in your mind about that?
18 A. No.
19 Q. Given the timing of this e-mail?
20 A. No.
21 Q. All right. And look at Exhibit 5.
22 Hold that in front of you and put Exhibit 5 in
23 front of you as well, please. And turn to the
24 second page. Again, that's the easy one to

**Page 200**

1  read. As of October 15, 2008, you were still
2  waiting for a letter confirming your go-forward
3  general counsel arrangement from Mr. Hayes.
4      Isn't that true?
5  A. General contracting.
6  Q. I said general counsel. I'm sorry. I
7  meant general contracting.
8  A. Yes.
9  Q. And you hadn't received it at that
10 time, correct?
11 A. Correct.
12 Q. And as of November 4, 2008, you hadn't
13 received that, correct?
14 A. Correct.
15 Q. And, in fact, you never got it from
16 Mr. Hayes?
17 A. I did not.
18 Q. In second item in your October 15, 2008
19 e-mail, you are looking from Mr. Hayes for an
20 inventory of the materials removed from the
21 site.
22     Do you see that?
23 A. Yes.
24 Q. These are all those expensive materials