IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, L.L.C., )
Plaintiffs, )
vs. ) Case No. 10 CV 6034
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., )
a Wisconsin Corporation, )
Defendant. )

The deposition of JAMES ANDERSEN, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before CHRISTINE M. PINA, a notary public within and for the County of Will and State of Illinois, at 123 North Wacker Drive, Suite 1800, Chicago, Illinois, on January 12, 2012 at the hour of 10:05 o'clock a.m.

Reported by: CHRISTINE M. PINA, CSR, RPR
License No.: 084-003785

APPEARANCES:

MECKLER, BULGER, TILSON, MARICK & PEARSON
BY: MR. CHRISTOPHER S. HENNESSY
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
(312) 474-7900
christopher.hennessy@mbtlawcom
on behalf of the Plaintiffs;

PRETZEL & STOUFFER, CHTD.
BY: MR. EDWARD B. RUFF, III
and
MS. SUZANNE M. CROWLEY
One South Wacker Drive, Suite 2500
Chicago, Illinois 60606
(312) 346-1973
eruff@pretzel-stouffer.com
scrowley@pretzel-stouffer.com
on behalf of American Family Mutual Insurance Company, Inc.,

APPEARANCES: (Continued)

HOSCHEIT, MCGUIRK, MCCRACKEN & CUSCADEN
BY: MR. JOHN M. MCGUIRK
1001 East Main Street, Suite G
Saint Charles, Illinois 60174-2203
(630) 513-8700
jmc@hmcpc.com
on behalf of Augustine Custom Homes.

INDEX

| WITNESS | EXAMINATION |
|---|---|
| JAMES ANDERSEN | |
| By Mr. Hennessy | 6 |
| By Mr. McGuirk | 150 |
| By Mr. Ruff | 152 |
| Further By Mr. Hennessy | 157 |
| Further By Mr. Ruff | 163 |

EXHIBITS

| NUMBER | IDENTIFICATION |
|---|---|
| Plaintiff's Exhibit | |
| No. 1 | 41 |
| No. 2 | 56 |
| No. 3 | 75 |
| No. 4 | 92 |
| No. 5 | 107 |
| No. 6 | 110 |
| No. 7 | 121 |
| No. 8 | 126 |

Exhibit H

consume the entire limits of the policies?
A. Boy, I don't know the answer to that. It would be depending on the situation. I'm sure there were some. For example, a total loss on a house, were we going to pay the policy limits. I don't know. I would have no way of knowing the answer to that.
Q. Is it a rare occurrence, and, therefore, it's hard for you to tally up the few of them or is it a more frequent occurrence and you can't keep track of them?
A. Well, 35 years is a long time, and it's a frequent occurrence, especially my current position, that a house would burn to the ground and, as a result, we pay the policy limits of that policy.
Q. A house that burned to the ground, is that your definition of a total loss?
A. Depending on -- the State of Wisconsin, yes. Yes.
Q. What about a house that burned somewhat to the ground? Where do you draw the line?
A. You have to take a look at individual cases and see the extent of the damage, whether the

29

building is repairable or is not repairable.
Q. Who makes that determination?
A. That would be the adjuster and then in counsel with the appropriate levels of authority as they review the file.
Q. So, the adjuster but not solely the adjuster?
A. That would be accurate, yes.
Q. The starting point is the adjuster?
A. Yes. Correct.
Q. When Jerry Hayes was working as a Field Adjuster on the particular claim that's at issue here during that time period, late '08 into '09, do you know how many years of experience he had in that role, Claims?
A. His totality of claims?
Q. Correct.
A. I do not know off the top of my head, no.
Q. Did you have daily interaction with Jerry Hayes on this claim or any other claim in your role as Operations Manager?
A. I would not have daily interaction with Jerry Hayes in my role as the Operations Manager, no.

30

Q. How often would you interact with him on claims, any claim, during your time as Operations Manager?
A. As the Operations Manager? Infrequently. I don't know how often it would be, but it would not be regular because I would not be his direct manager. His interaction on an individual claim would be through his direct manager at the time was Jim Saletri, not my level.
Q. Claims, however, would be brought to your attention when the claim itself reached a certain level or value, correct?
A. Correct.
Q. It was fairly evident from the beginning that this claim is one of those claims?
A. Yes, it was very evident from the beginning this claim would exceed Jerry's level of authority and Jim Saletri's level of authority, so I would be involved early on.
Q. During your 35 years with American Family, what is your experience with large fire losses?
A. Can you be a little bit more specific?
MR. RUFF: Regarding what?

31

BY MR. HENNESSY:
Q. Certainly during the course of your time at American Family you dealt with fire losses generally, correct?
A. That is correct.
Q. Where there was a fire, there was damage to something, a house, a commercial property, something, correct?
A. That is correct.
Q. Some of those fires are smaller than other fires; fair enough?
A. That is correct.
Q. Some of those fires, the way you described it, led to total losses, correct?
A. That is correct.
Q. I'm trying to understand your level of experience in the types of claims that either were total losses or approached what you would consider to be -- or what American Family would consider to be a total loss.
A. Okay. I don't know the number of claims I've handled that would approach those levels. I've handled fire losses from all the way up to 6 or $7,000,000 of damage. The numbers I have no

32

depending on the circumstances, we may have them in-person. The majority of them I would say are teleconferences where people call into a conference number.
Q. Do you recall how many committees were held on these claims?
A. I do not, no.
Q. Among the adjuster level, the unit manager level, operations manager level, who among those would call for a committee or suggest that a committee be convened?
A. The first line manager would be -- well, let me back up.
The actual request to have a committee would be something that would be generated by the operations manager because the committee begins once a file reaches the high-damage review threshold which, I think, actually in this case back then, although I'm not positive, I think the high-damage review amount on commercial claims at this time was $500,000. I know I referenced 300,000, but that's what my -- the current HTR level is. So, I believe at the time of this loss, I believe 500,000 was the threshold to have a

61

committee.
Q. You think that that threshold has now been lowered?
A. I do not know about commercial claims. I do know for the claims I handle currently in my position which are personalized claims that threshold is $300,000.
Q. Do you recall with respect to these claims calling for, requesting, asking for a committee to be held?
A. I do not recall.
Q. But if a committee were held, it would have been something that you would have requested as opposed to Saletri or Hayes?
A. Yes. Once a file would get to that threshold for the high-damage review, it would be my responsibility to then initiate and make the -- to set up the committee to review the file.
Q. You talk about it in terms of a file getting to a certain threshold, correct?
A. Yes, that's just my verbiage. If we recognize a claim, we believe a claim has a value over that level, in this case I think 500,000, that would then trigger okay, we need to have a

62

high-damage review, we need to involve people above my level to bring them up to speed on the status of this file.
Q. So, it's fair to say that from the very beginning this claim was at the threshold?
A. I would say it's fair on this claim we recognized this claim was certainly going to go over $500,000 in damages.
Q. And that was a recognition that occurred within a day of the loss?
A. I'm not sure when that was made.
Q. You toured the site within roughly two weeks or so of the loss?
A. Yes. I believe I was there September 30, 2008.
Q. At that time you determined that this loss was above a threshold, this definitely qualified for high-damage review?
A. I don't have a specific recollection that boom, this is going to be over $500,000, but I believe based upon prior conversations with Jim Saletri and probably the adjuster as well, and then, recognizing the property and the extent of damages, I certainly would have recognized this is

63

going to exceed that threshold.
Q. In that situation, you would then take on responsibility of calling a committee?
A. Yes. Yes.
Q. When the field adjuster is preparing their reports within the reporting guidelines, the various intervals you talked about, where are those reports saved or kept or maintained?
A. They should be maintained in ICS under a documents tab and then a sub-folder titled Reports.
Q. During the duration of a time that a claim is open, who has authority to go into ICS and delete entries or delete information?
A. I don't believe any information can be deleted via ICS. Once it's there, it's, I believe, a permanent record. I'm not aware of any method of deletion capabilities.
Q. So, if the individuals preparing reports and compiling their information with respect to a given claim in ICS are saving things in the manner they're suppose to be, it would be saved in a sub-folder within ICS, not subject to deletion?
A. That is accurate, yes.
Q. Have you taken any steps to determine

64

January 7 with the numbers that follow 09, colon, 01, colon, 11.71176; do you see that?
A. Oh, you're down there? I'm sorry.
Q. Do you see that entry?
A. Yes. That's Dwight Gribble's entry, yes.
Q. But there's a component of that which is yours, the part that comes after JRA002 escalate comments, colon, and there's a sentence that begins Dwight, right?
A. Yes.
Q. So, that's you?
A. That's me down there.
Q. And then it gets down to response by and this is where Dwight picks up, and now that part is Dwight, right?
A. That is Dwight Gribble, yes.
Q. So, just within the section that is yours of this entry, do you see that, the part that says Dwight and ends with your name, it looks about three or four sentences?
A. Okay.
Q. Do you see that?
A. What does it start with, the sentence?
Q. It says Dwight, comma, an updated report

is in the file.
A. Okay.
Q. That's you, right?
A. That's --
Q. And it continues those two lines up until it shows where your name is, right?
A. Yes.
Q. That's all you; that's your entry?
A. I believe so, yes.
Q. And then after that it's other people's entries or Dwight's entry?
A. Yes. Dwight's entry.
Q. So, based solely upon your entry within January 7, 2009 -- just concentrate on your section here.
A. Okay.
Q. By this point in time, January 7, you had recommended that Hayes be granted authority up to the limits in the current report; do you see that?
A. Yes.
Q. If we go back to Plaintiff Exhibit 6, this Property Investigation Report dated January 6, 2009; do you see that?
A. Yes.

Q. Is this the report to which you would have been referring?
A. Very possible. I don't know, but very possible.
Q. If you turn to Page 633 of Exhibit 3, the very last entry, December 19, 2008, that appears to be the entirety of which is your entry, correct?
A. Yes.
Q. So, by this point, December of -- this is now December of '08, right?
A. Correct, December 19.
Q. You had reviewed costs incurred and the reserves, right?
A. It appears so, yes.
Q. And sought a more recent updated report than whatever it was that you had been looking at, right?
A. It appears so, yes.
Q. And, again, back to Exhibit 6, the report January 6, 2009. Is this the type of report that Mr. Hayes could have completed to satisfy that request of yours?
A. Yes.
Q. You also noted back to Page 633 of

Exhibit 3, your entry, that at least one of the payments made of the payments that you had reviewed appeared to have been made to the insured; do you see that entry there? I'm sorry, it's the last entry on the page.
A. On the bottom?
Q. Yes. The entry of December 19, 2008 --
A. Okay.
Q. -- that paragraph which is yours.
A. Okay.
Q. And this comments or questions, this is a comment that you are making to Jim Saletri, right?
A. Yes, I believe that would be going to Jim Saletri. Yes.
Q. Because the first word of your paragraph is Jim?
A. Right.
Q. You've reviewed costs and reserves, et cetera, and you have noted that at least one of the payments that you saw appeared to have been made to the insured; do you see that there?
A. I don't think it was made payment to the insured, it was coded that way. It's just an internal coding. It does not indicate it was made

reported to Dwight Gribble, and I don't know his actual job title, but he was in some capacity of the staff area.
Q. Is he someone that reported to Dwight Gribble under a separate line of chain of command than you?
A. Yes. Terry, I believe, was involved with oversight of the -- like we had, I think, three staff people that helped with our coverage interpretations and policies and procedures. And so Terry was the party that historically we would send the HDRs, and then, he would distribute them to the appropriate parties.
Q. So, based upon your entry on March 9, you would have emailed an updated HDR to Terry?
A. It appears that's the case, yes.
Q. So, that would suggest to you that an updated HDR had been prepared some time in the vicinity of March 9, 2009, right?
A. I would agree with that, yes.
(Whereupon, Plaintiff's Deposition Exhibit No. 7 was marked for identification.)

121

BY MR. HENNESSY:
Q. You've been handed a document marked Plaintiff 7, a series of pages, the first three numbered sequentially AF5905 to 5907, the last page AF625; do you see that?
A. Yes.
Q. As with Exhibit 4, we have the initial page being the scheduling entry for the committee meeting, right?
A. Correct.
Q. Do you recall whether you created this scheduling entry?
A. I do not know.
Q. And then we move on, we have what appears to be in 5906 and 5907 a summary from the committee meeting of March 9, 2009 prepared by Saletri, correct?
A. That is correct.
Q. And distributed to Dwight Gribble to Hayes to you and to Kelley Hart; do you see that?
A. Yes, I do.
Q. Kelley Hart, did we talk about that? Who is Kelley Hart?
A. Kelley Hart was a -- he still is a

122

Commercial Farm Field Manager in our Denver office.
Q. Do you know why Kelley Hart had involvement in this claim?
A. I have no clue.
Q. If we turn then, if you could then, just to the last page of Exhibit 7, we've got Page 625. This appears to be the substance of the committee meeting summary which then appears within the body of the email that Mr. Saletri sent, in other words, the text is the substance of the email that's in 5906 and 07, right?
A. Yes.
Q. So, this date of March 9, 2009 coincides or corresponds with that entry of yours back in the claim notes about sending an updated HDR to Terry, right?
A. Yes. It appears to be, yes.
Q. In fact, it was probably a report that then led to this meeting?
A. I believe that would be accurate, yes.
Q. As of March 9, 2009, Dwight Gribble had given Hayes and Saletri and you full authority to $2,000,000, is that correct?
A. I don't know the answer to that.

123

Q. If you look on --
A. Do you have something that references that?
Q. Sure. On 5906, Page 2 of Exhibit 7, we've got -- in the first paragraph that starts with this is, and then, a larger paragraph Jerry reviewed; do you see that one?
A. I do see that, yes. I do see where Dwight gave authority up to $2,000,000.
Q. So, consistent with what you had testified to earlier, once Dwight has given authority of 2,000,000, you don't have to go back to Dwight for anything else nor does Saletri nor does Hayes, correct?
A. That is correct, yes.
Q. Do you recall participation in this committee from March 9?
A. In looking at this, Mr. Saletri indicated the attendees and I'm not listed, so apparently I was not involved in that.
Q. And, thus, your contact would have been the receipt of his summary later on, whatever, that morning or later on that day, correct?
A. Yes. That would be correct and accurate.

124

with your attorneys, were you made aware of reasons different than those reasons?
MR. RUFF: Yes. Objection, attorney-client privilege. You're trying to get at what was discussed.
BY MR. HENNESSY:
Q. So, do you understand the question I'm asking you about whether you were made aware?
A. I understand your question.
Q. And you're electing not to answer that question based upon Mr. Ruff's advice to you?
A. That is correct.
Q. Why was a total loss not considered in this case if the reserve was posted within the first few weeks immediately at $2,000,000?
A. Repeat that, please.
Q. Sure. Why was a total loss not considered in this case if the reserve was posted almost immediately at the full $2,000,000?
A. We would not determine this to be a total loss because the structure clearly was repairable, and throughout the entire process we believed and I continue to believe that this home could be repaired for less than our available policy limits.

Q. What factors did you consider in determining -- well, first of all, when did you determine that the structure was repairable?
A. I believe the determination was made -- from the standpoint of repairability, you're looking at the value of that house, the replacement of the entire structure versus what it would cost to repair it. So, the decision as far as whether was it repairable would have been something that would have been in concert with Mr. Hayes and myself and Mr. Saletri and more than likely the entire committee when those committees convened.
Q. When was that determination made?
A. I don't know the date of that.
Q. If the determination was made that the house was repairable, is that something that would have made it into one of the committee summaries or reports?
A. I don't know. It would depend upon who provided the report, who was updating that file.
Q. Did you perform any independent steps to determine the factors that you just talked about that went into that overall assessment about a total loss?

A. From the standpoint of liability claim, which is what this is, I don't believe I've ever had a conversation as far as a total loss on a liability claim. Using the verbiage of a total loss, that's something that's reviewed and analyzed on a first party claim whether the property is a total loss or not. From a liability standpoint, we're just looking at repairability in conjunction with our policy limits. And, again, we believe that we clearly could repair this property for less than the policy limits available.
Q. Why did American Family not advise the homeowners that American Family would fix their home but only if the fix was for no more than $2,000,000?
A. I can't answer why they weren't advised that. They may have been advised that; I don't know if they were not. Again, we were operating under the premise, and continued to, that the home can be repaired, was repaired for less than the $2,000,000 available limits.
Q. Whose decision at American Family was it to renege on the promise that Hayes made to the Stopkas, to the homeowners, to restore the home to

its pre-fire condition irrespective of the $2,000,000 limits of the American Family policies?
MR. RUFF: Objection to that characterization, foundation.
MR. HENNESSY: Do you understand my question?
THE WITNESS: Yes. I don't believe that conversation ever took place. I have no knowledge of that conversation.
BY MR. HENNESSY:
Q. Do you deny that Hayes ever made that promise to the homeowners?
A. I would have no basis to deny or affirm that. His standard procedure certainly would not be to make that statement. He understands clearly the policy limits, and he understands the committee process and the authority process, et cetera; that he certainly would never have authority nor do myself to pay in excess of policy limits on a file.
Q. But you have no basis, factual basis, to deny or affirm either way whether he made that promise?
A. That's correct. I certainly was not -- as I indicated previously, because I had never met the Stopkas, so I don't -- I have no knowledge of what

been paid in January of '09, and then, misleadingly asked assuming this was sent right after that January of '09 making the 1,965,000 sound as if it was fresh money; do you recall those kind of questions?

A. Yes, I do.

Q. What do you have to say about that?

A. Quite honestly, I was taken back by the question, a little bit stunned because I was -- it appeared to be in my opinion obvious that we were not going to be providing a check at that time for 1.9 million dollars after we already made prior payments in excess of $600,000.

Q. Is it an absurd proposition to suggest that this is fresh money?

A. That would be a very absurd position and almost laughable, quite honestly.

Q. Sir, by May, you were gone off this particular file, correct?

A. That is correct.

Q. So, is it conceivable that by September -- which both Mr. Stopka and his representative have stated that the remediation was done and in their view smoke odor still remained. Would it make

153

sense that at that juncture that at or about 9.65 million had been expended within the policy limits?

A. Yes.

Q. Was there anything in your review of the file that indicated to you whatsoever that there was any consideration of ever paying beyond the $2,000,000 policy limits to resolve the claim with the Stopkas?

A. Absolutely not.

Q. Sir, when the words are used in the claim file handle or control, what did you take that to mean based upon your knowledge and 35 years of training and experience with American Family and in the insurance industry?

A. Well, I take it to mean the initial investigation was at our policyholder, Complete Flashings was clearly at fault, and we were willing as a company to immediately step up and do everything we could within the policy limits to necessitate the repairs and help this customer, help the Stopkas get back on their feet and back into this house -- or into this house.

Q. So, American Family was stepping up

154

avoiding the Stopkas the necessity to either sue on their own or a third-party claim through their own insurer?

A. That is correct, yes.

Q. In your view of this, would it be an aid to the Stopkas that you were acting directly in that regard?

A. Absolutely.

Q. In your 35 years of practice, has it ever been the practice of a field adjuster when taking control of a claim as you've explained to ever commit a company to pay unlimited because they're taking control and trying to handle this in benefit of the third-party?

A. I have never seen that occur.

Q. Did Mr. Hayes have any authority to bind the company beyond the policy limits?

MR. HENNESSY: Object to form.

THE WITNESS: He did not.

BY MR. RUFF:

Q. Is there any indication in the file whatsoever that Mr. Hayes asked for or was given the authority to bind American Family beyond the policy limits?

155

A. None.

Q. Sir, counsel expressed a view regarding reserve. Just so we have it in the file, does reserve necessarily mean you're going to pay that particular amount?

A. No.

Q. Based upon your knowledge, training, and 35 years experience, what does that mean when a company sets a reserve?

A. Well, at American Family, we set the reserve based upon what we believe based upon the information available what the maximum that we would pay under our policies for the individual claim, and then, within that authority, the adjuster has the latitude and authority to settle based upon the discretion of the file.

Q. Is a reserve something you must do pursuant to the insuring practices of the states that you're licensed in to work?

A. That is correct.

Q. Did Mr. Hayes and is it the policy and practice of American Family to instruct contractors on how to do their work?

A. No, it is not.

156

Q. If Mr. Hayes was retaining contractors on behalf of the Stopkas, was he directing their work?
A. Absolutely not.
Q. Is there any indication that he was actually directing their work?
A. No, not in the file.
Q. Or ever indicating how to perform their work?
A. No.
Q. Based upon Mr. Hayes' knowledge, training, and experience, you think it was within his knowledge, training, and experience that he would let the experts do their thing?
A. Yes, he would.
MR. RUFF: That's all I have, sir. Thank you for your time.
THE WITNESS: You're welcome.
MR. HENNESSY: Just a few more questions.

FURTHER EXAMINATION

BY MR. HENNESSY:
Q. You were just giving an answer about explaining your -- it was your understanding in terms of control and what it means in terms of American Family stepping in; do you remember just

giving an answer a few seconds ago about that?
A. Yes.
Q. And you were talking about American Family stepping in and handling the claim, I'm pretty sure you said in your answer within the policy limits; do you remember that?
A. Yes. Vaguely, yes.
Q. But in this instance within the policy limits component of American Family's role was never conveyed to the homeowners, correct?
A. I can't speak to that. I did not convey it to the homeowners.
Q. You were also asked questions about, I guess, the affirmative nature of American Family's conduct, and I don't remember the exact phrasing of the question, but something about not requiring the homeowners to pursue a claim against Complete Flashings or a lawsuit against Complete Flashings; does that sound about right?
A. I don't believe there was reference to a lawsuit, but it was --
Q. Pursue Complete Flashings directly --
A. Okay.
Q. -- is that fair?

A. Okay.
Q. I think that the question was along the lines of by American Family stepping in and communicating directly with the homeowners, then the homeowners weren't in a position where they didn't have to go after Complete Flashings first; is that fair?
A. Yes. I believe American Family, again, stepped up, accepted the liability as the negligence of our policyholder and assisted the Stopkas appropriately.
Q. So, you recognized, as I think is fairly well-documented in the materials, that this was a case of clear liability of Complete Flashings, right?
A. I certainly, yes. Yes.
Q. And that one option that the Stopkas would have had, the homeowners would have had would have been to pursue claims directly against Complete Flashings, correct?
A. Yes.
Q. And that pursuit of claims could include pursuing a lawsuit against Complete Flashings, correct?

A. I believe that would be accurate.
Q. You talked about what a reserve meant, and I think you said it was what you believed the maximum would be for a given exposure; is that right?
A. Yes.
Q. It was fairly evident early on that the exposure for this particular loss could be $2,000,000, right?
A. I'm not sure what the timing of early on would be, but as the claim progressed, we certainly recognized that this was a significant loss and we reacted appropriately with our reserving and payments.
Q. Well, on Exhibit 4 we had the reserves on October 8, 2008 already at 2,000,000, and this is basically about a month from the loss.
A. Okay.
Q. So, does that correspond with fairly early on?
A. I would call that fairly early on, yes.
Q. If contractors -- when I say contractors, I mean contractors performing any kind of work on the project, but reconstruction work, not --

because remember we talked about the different categories, we talked about sort of the emergency mitigation work, and then, we talked about reconstruction work, right?

A. Correct.

Q. We talked about certainly Mr. Hayes had the authority to bring people in to do emergency mitigation work, right?

A. Correct.

Q. And then we talked, also, how there were separate people doing reconstruction work coming in actually performing work, building things back up again over the course of time, right?

A. Correct.

Q. If contractors performing that type of work, that reconstruction type of work were asking Mr. Hayes for permission to perform certain tasks or to incur certain costs, would that surprise you?

A. That would not surprise me. In general, part of the process is to get an agreement on the scope of damages. And it's certainly possible that Mr. Hayes or any adjuster in a claim of this magnitude may have, quote-unquote, missed something as far as damages, and the contractor may call and

161

say hey, there's some additional damage here, is it okay to do this or okay to do that and they would have a conversation. And the adjuster may go back to the scene and take a look at it or they may just give them the approval over the telephone from that standpoint.

Q. But Mr. Ruff was asking you some questions about Mr. Hayes and the possibility of him sort of supervising or managing the work being performed by these reconstruction contractors; do you remember those questions?

A. Yes, I do.

Q. I seem to recall your answer was that no, he wouldn't manage them, he would let the experts do what they do I think was the phrase, something along those lines; does that sound about right?

A. Yes.

Q. But Mr. Hayes would still be exercising veto power over certain tasks and costs, right?

A. I wouldn't call it veto power. That sounds a little bit extreme, but he certainly would do his -- part of his function would be to ensure that we paid what was appropriate; that wouldn't include managing or the oversight as you may have

162

indicated.

Q. But it wouldn't be surprising to you for a contractor to seek permission from Mr. Hayes to complete certain tasks or incur certain costs, Mr. Hayes then -- his permission must be sought in order for the authorization and ultimately, therefore, the payment, correct?

A. That would be correct, yes, again, up to the appropriate policy limits available.

Q. And, thus, if a contractor sought permission from Mr. Hayes to engage in certain work or incur certain costs and Mr. Hayes said no, the contractor runs the risk of not getting paid if they, in fact, perform their work nonetheless?

A. That would be accurate, at least getting paid from the insurance company.

MR. HENNESSY: Those are the questions I have. Thank you.

MR. RUFF: There was one more.

FURTHER EXAMINATION

BY MR. RUFF:

Q. If you could get out, counsel's questioning reminded me of this. Thank you for that, Exhibit No. 3.

163

A. Okay.

Q. If you go to Page 635 --

A. Okay.

Q. -- in the middle of the page, sir, it says -- it's an email that's been posted into claims notes itself?

A. Yes.

Q. We see here that -- and counsel for Mr. Augustine asked you some questions about Mr. Augustine. You see his name here?

A. Yes, I do, Todd Augustine.

Q. You may not have been aware specifically of Mr. Augustine's role in this case, right, it's been some time?

A. That is correct, I was not aware of his role.

Q. If I told you he was the general contractor hired by the Stopkas, would it be consistent with your understanding of how the claim was handled that Mr. Hayes performed the preliminary emergency remediation, and then, by November 3, Mr. Augustine, the general contractor for the Stopkas who was previously doing work had now taken back control of the project?

164