1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL STOPKA, MARILYN )
STOPKA, and CHATEAU )
ARLINGTON, L.L.C., )
   Plaintiffs, )
vs. ) Case No. 10 CV 6034
AMERICAN FAMILY MUTUAL )
INSURANCE COMPANY, INC., )
a Wisconsin Corporation, )
   Defendant. )

The deposition of SUSAN KINATE, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before CHRISTINE M. PINA, a notary public within and for the County of Will and State of Illinois, at 123 North Wacker Drive, Suite 1800, Chicago, Illinois, on February 28, 2012 at the hour of 10:20 o'clock a.m.

Reported by: CHRISTINE M. PINA, CSR, RPR

License No.: 084-003785

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Exhibit I

1   MS. CROWLEY: Can you read back the question
2   for me?
3             (Whereupon, the record was
4             read as requested as follows:
5             Anything else contained within
6             Exhibit 15 which relates to
7             the issue of making payments
8             in excess of authority which
9             contributed to the termination
10            of Mr. Hayes?)
11  THE WITNESS: I don't see, no.
12  BY MR. HENNESSY:
13      Q.  Any other documents contained in
14  Exhibit 15 which related to, impacted the
15  termination of Mr. Hayes? In other words, a
16  policy -- internal policy or procedure that he
17  violated which caused or contributed to cause his
18  termination?
19      A.  I wouldn't say a specific policy, no, not
20  in -- not documented in Exhibit 15.
21  MR. HENNESSY: You can set that one aside.
22  BY MR. HENNESSY:
23      Q.  I'd like you to take a look at Exhibit 16,
24  and, if you could, please, identify for me within

1  Exhibit 16 any internal policies and procedures of
2  American Family that Mr. Hayes was not following
3  which contributed to or led to his termination.
4     A. Well, his termination was based on his
5  written reminder because he was told not to be
6  making payments direct to contractors on
7  first-party claims, and that was the bases of his
8  written reminder.
9     Q. Well, let's jump to 11085. You see the
10 document contained in Exhibit 16 is AF11085?
11    A. Yes.
12    Q. This is the internal policy and procedure
13 of American Family with respect to payments to
14 contractors?
15    MS. CROWLEY: Objection, form.
16    THE WITNESS: No, this is not -- this is our
17 document from December of 2005. This was created
18 by his direct manager at that time.
19 BY MR. HENNESSY:
20    Q. Is it your testimony that AF11085 is not
21 an internal policy or procedure of American Family?
22    A. That would be an expectation of the direct
23 manager for that unit. This is not something that
24 all adjusters follow. This is not an official

38

1     Jim Andersen including Mr. Hayes, is a list of

2     requirements for that individual completing their

3     job, correct?

4       A. Correct.

5       Q. In other words, when Mr. Hayes is

6     reporting to Mr. Andersen, Mr. Hayes is obligated

7     to follow the guidelines contained in AF11085,

8     correct?

9       A. Correct. This was in 2005.

10       Q. Well, did this guideline change? Has this

11    guideline changed since December of 2005?

12      A. I don't know. This was something

13    individually created. We still follow the

14    guideline that you don't recommend con -- you can

15    give a few names to our insureds. And we don't

16    make payments to contractors because our contract

17    is with the insured.

18      Q. So, prior to December, 2005, the date

19    which is contained on 11085, is it fair to say that

20    it was the practice of American Family not to

21    provide names of contractors to insureds or

22    claimants?

23      A. I don't know.

24      Q. Prior to December 14, 2005, was it the

50

1     '08, even if the online form wasn't available in

2     2007, certainly under the terms of the 2007

3     Conflict of Interest policy, the disclosure would

4     still be required?

5     A. Yes.

6     Q. If you could turn your attention to, I

7     think it's a range contained in Exhibit 16, 11080

8     to 11081; do you see those documents there?

9     A. Yes.

10     Q. What is AF11080 to AF11081?

11     A. It's a written reminder to Jerry Hayes.

12     Q. What exactly is a written reminder?

13     A. It's documentation of performance

14     improvement process where there may be some areas

15     an employee needs to work on.

16     Q. Would a written reminder be considered

17     disciplinary action?

18     A. Yes.

19     Q. What was the impetus for the written

20     reminder 11080 to 11081?

21     A. The specific performance issues that are

22     listed.

23     Q. I understand that the first page, 11080,

24     there are general areas of concern; do you see

51

1 that?

2 A. Yes.

3 Q. And then it lists specific performance

4 issues, and there are four performance --

5 A. Right.

6 Q. -- issues identified?

7 A. Right.

8 Q. The first, files not being up-to-date,

9 payments without documentation, and notes not

10 edited in a timely manner; is that a fair summary

11 of the first performance issue?

12 A. Yes.

13 Q. The second performance issue, making

14 payments directly to contractors?

15 A. Yes.

16 Q. Third performance issue, making direct

17 referrals to individual contractors?

18 A. Yes.

19 Q. The fourth performance issue, making

20 payments over authority without approval?

21 A. Yes.

22 Q. And then, on the opposite side, there are

23 outlined expectations and improvement goals related

24 to each of the performance issues?

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

56

1   bulleted paragraphs; do you see that?

2   A.  Yes.

3   Q.  First paragraph appears to be information

4   not directly related to the written reminder, but

5   actually something that occurred after the written

6   reminder, is that correct?

7   A.  Yes, it occurred after the written

8   reminder.

9   Q.  In fact, why don't we turn to 11074 to 75;

10  do you see those?

11  A.  Yes.

12  Q.  This is an email that actually you

13  authored to Diana Cook and copied James Saletri,

14  correct --

15  A.  Yes.

16  Q.  -- dated February 28 which is a little

17  over a week prior to the March 7 memo to the file?

18  A.  Yes.

19  Q.  Is it fair to say that the factual

20  circumstances which ultimately led to the memo to

21  the file and the termination of Mr. Hayes are

22  outlined in 11074 to 75?

23  A.  Yes.

24  Q.  In other words, there was a complaint

67

1   A.  We did not have that as this all happened

2   and he was terminated because he already violated

3   these two, and I don't know that that was all

4   investigated.  He already violated his written

5   reminder on two situations.  And the Code of

6   Conduct, we don't know what the relationship was

7   there.  There was some thought, but the violations

8   were the payments directly to contractors and

9   referral to individual contractors.

10   Q.  Violation of the Code of Conduct in and of

11  itself could be grounds for termination, correct?

12   A.  It could.

13   Q.  As outlined in the memo to the file,

14  Mr. Hayes had not disclosed Brouwer Brothers on his

15  Conflict of Interest form, correct?

16   A.  Correct.

17   Q.  And at least in 2010 and 2011 payments

18  were made to Brouwer Brothers on claims handled by

19  Mr. Hayes, correct?

20   A.  Yes.

21      MR. HENNESSY:  Do you want to take a break?

22          (Whereupon, a short break was

23          taken.)

24

70

1    Q. And at the time Mr. Hayes was terminated,

2    he was notified that payments being made to a

3    contractor that employed his son was a Conflict of

4    Interest?

5    A. Yes.

6    Q. In addition, as you drop down to the last

7    full paragraph, it begins with while investigating;

8    do you see that paragraph?

9    A. Yes.

10    Q. There's a summary there of additional

11    investigation conducted by American Family with

12    respect to payments made to a contractor by the

13    name of Wright Line Builders?

14    A. Yes.

15    Q. It's fair to say that coinciding with the

16    termination of Mr. Hayes an investigation was

17    conducted concerning payments being made by

18    Mr. Hayes to certain contractors?

19    A. Just to clarify, his termination was based

20    on his written reminder, and that was a piece of it

21    as we found that a payment was made direct, and

22    this complaint came in, that's when Wright Line

23    Builders came in. Now, as far as a complete

24    investigation on that prior to his termination?

1    Q. And then his single sheet that we talked
2    about already --
3    A. Correct.
4    Q. -- 11095?
5    A. Correct.
6    Q. Was there anything else that he provided?
7    A. No. This looks to be all that was done.
8    It says Internal Audit Report, March 16, 2011;
9    that's John Mueller's summary.
10   Q. Once the determination was made that
11   Mr. Hayes would be terminated based upon the
12   reasons you've already testified to, what else, if
13   anything, was done with respect to investigation of
14   payments made to Wright Line Builders?
15   A. I wouldn't know.
16   Q. Would your answer be the same with respect
17   to Brouwer Brothers?
18   A. Correct.
19   Q. You already talked about within the Code
20   of Conduct policy the prohibition against the
21   employee influencing business involving a relative,
22   right?
23   A. Correct.
24   Q. And so certainly for claims that Mr. Hayes

1 is handling himself and on which Mr. Hayes is

2 making payments, the Code of Conduct policy would

3 prohibit him from making those payments where

4 there's a non-disclosed Conflict of Interest,

5 correct?

6    A. Correct.

7    Q. To the extent that Mr. Hayes persuaded

8 other adjusters to also use a non-disclosed

9 contractor without disclosing his Conflict of

10 Interest, would that conduct similarly violate the

11 Code of Conduct?

12    MS. CROWLEY: Objection, form, foundation.

13 You're asking her a hypothetical which has

14 absolutely no basis in fact in this lawsuit nor

15 does it have anything at all related to the Stopka

16 claim, which I think is the first time Stopka has

17 been mentioned in my objection. Over those

18 objections, if you can answer the question, please

19 go ahead.

20    THE WITNESS: I'm not aware of any of that kind

21 of --

22 BY MR. HENNESSY:

23    Q. That wasn't my question about whether you

24 were aware of it. I'm trying to understand -- the

1  dated March 7, 2011. If you'd like me, I can point

2  out the termination letter to Mr. Hayes which is

3  dated March 3, 2011. Objection, relevancy. Come

4  on, Chris.

5  BY MR. HENNESSY:

6    Q. Page 11058, this is the second page of the

7  memo, there's a paragraph there which references

8  the discussion held with Mr. Hayes at the time of

9  his termination on March 3, correct?

10    A. Correct.

11    Q. During the course of the discussion with

12  Mr. Hayes on March 3, he was specifically notified

13  that payments to a contractor that included his son

14  was a Conflict of Interest, correct?

15    A. Yes.

16    Q. In addition, the memo to the file outlines

17  a communication between Mr. Saletri and Mr. Hayes

18  as Mr. Hayes was departing the building on the day

19  of his termination, correct?

20    A. Where is that?

21    Q. The paragraph I walked Jerry.

22    A. I wasn't a part of that conversation.

23    Q. I understand that, but on behalf of

24  American Family, you can testify regarding the



March 7, 2011

Memo to the File

Re: Termination, Summary of Issues - Jerry Hayes

A call was received by the Agency Sales Manager on 221-218340 regarding concerns of the claim handling. According to the insured and agent, Jerry Hayes, who is the adjuster handling the file, came to the loss site and had a demolition contractor with him. The comment was that the insured was led to believe that the demo contractor was authorized by Jerry Hayes to begin the work. An estimate was completed by Jerry at approximately $105,000 and sent to the condo president, the insured felt the estimate was high as he is a contractor himself – apparently painting. The Sales Manager indicates normally he gets complaints of estimates too low and felt this was unusual to get a complaint of the estimate being too high. The insured was concerned as this affects his rates.

The Sales Manager questioned if it was normal for adjusters to arrive at a loss site with a contractor. The procedure is if the insured doesn't know who to use, we can provide a list of a few contractors in the area, however, it's up to the insured to choose their contractor and adjusters shouldn't be arriving with contractors.

After further looking into this matter, the following performance issues were discovered based on Jerry's Written Reminder in November 2010 where he was advised he must stop (1) making payments directly to contractors, (2) making direct referrals to individual contractors and (3) making payments over his authority.

- Multiple payments were made directly to a contractor, which should not be the case as Jerry was to name the insured and contractor on all payments. After further review, a payment of $10,000 was sent to Brouwer Brothers off an invoice his son, Brian Hayes had submitted for Brouwer Brothers. It was discovered this was sent overnight express with another payment of $18,846 on claim 221-213792 which also was made out only to Brouwer Brothers, Brian Hayes was on this invoice also. We normally would not express payments, especially to contractors. A payment run for 2010 and 2011 to date was requested regarding Brouwer Brothers payments, and the majority of payments issued were from Jerry Hayes in comparison to other adjusters. According to the Code of Conduct, this is a compliance issue. Jerry did not disclose Brouwer Brothers on his Conflict of Interest form as he has been working directly with his son who works for Brouwer Brothers.

- The insured and agent indicated on 221-218340 that Jerry recommended contractors for demolition and building damages, this is specifically addressed in his written reminder that he is not to influence the choice of contractors. If the insured needs assistance, Jerry is to provide a few names and the customer is to pick the contractor. We called the customer on 221-213792 and she indicated Jerry provided Brouwer Brothers as a recommendation and he had them call



Confidential - Subject to Protective Order AF 11057

her directly to get started on her claim. She specifically indicated she did not receive multiple names of contractors.

- Jerry presented the estimate of $105,000 to the insured without authority. Currently he has $5000 authority which was reduced at the time of his written reminder in November. Jerry should have sent a referral to his manager to review the file and provide authority and wait for the okay to proceed with discussing with the insured. Also, the bylaws should have been reviewed prior to finalizing the estimate as there may be items on the estimate which shouldn't be covered or items which should be added.

I met with Jerry in our Schaumburg legal office on Thursday the 3rd of March to discuss the above. My manager Sue Kinate was also in the meeting. I told Jerry we had to address the complaint on file 221-218340. I explained the District Sales Manager and the agent on this claim complained because Jerry brought a contractor along with him on the initial visit to the damaged building. Jerry said he called the insured first and got the permission to bring someone for emergency repairs and he does not consider this a contractor. I said it is a contractor and it was also his son, which is a conflict of interest. At this time I informed Jerry that his employment was being terminated. He was disappointed, but stayed calm through the entire meeting. He has been cooperative in getting his equipment and file material to us. Jerry also stated that he is used to handling claims in a certain way and had a hard time changing.

I walked Jerry out to his taxi and asked him why he would bring his son to help handle the claim, when he told me when we met about four years ago that his son worked for Brouwer Brothers and he never uses them as it is a conflict of interest. Jerry said he has been using his son on jobs for five years.

While investigating the claim in question we came upon another contractor called Right Line Builders. I had never heard of this contractor before in Chicago and looked them up on line. They are located in Downers Grove which is Jerry's home town. I checked with Tom Gleason, another of our Chicago adjusters, who likes to work with Brouwer Brothers, and asked if he knew a Right Line Builders. He said yes, Brian Hayes, Jerry's son had approached him about using them because they did good work and he also said the owner was related, like a brother-in-law or something. We then obtained a claims run on Right Line Builders using their tax ID number and came up with about 1.4 million dollars in claims over the last 3 years and every one had Jerry Hayes as the adjuster. About 90% of the checks were payable directly to Right Line Builders and about 5 were made out direct to the contractor after Jerry was put on written notice for paying direct to contractors. We did not use information about this contractor as a reason for terminating Jerry as we did not have time to research the full relationship between Jerry and this contractor. The checks he made out direct to Right Line Builders was a clear violation of his written warning.

Jim Saletri

Commercial Farm/Ranch Field Claims Manager

Confidential - Subject to Protective Order AF 11058

# Written Reminder
Performance Improvement Process

**Employee:** Gerald Hayes _file_

**Position:** Commercial Farm/Ranch Claims Field Senior Adjuster

**Department:** Commercial Farm/Ranch

**Manager:** Jim Saletri

**Date of Discussion:** 11-2-11

## Description
**General Area(s) of Concern:**

| Specific Performance Issues | Expectations & Improvement Goals |
|---|---|
| Claims files are not up to date. Payments are made with no documentation in the file to support the payment. Notes are not added in a timely manner to explain what is happening in the file. | Get your inbox caught up by updating files and adding documents and notes to explain and justify your claim decisions. All new assignments will be kept current by adding documents supporting payments prior to making a payment. Notes describing your actions in each claim must be added throughout the claims process. |
| Making payments directly to contractors. | Always name the insured on every draft, other than expense payments to vendors such as accountants and cause and origin experts. |
| Making direct referrals to individual contractors. | You can ask if insured needs help finding a contractor. If they say yes you can give them two or three names, but let them make the decision and the call. Do not throw contractors selected by the insured off the job, and do not influence the choice of the insured when picking one of the contractors you provide. |
| Making payments over your authority without approval. | All documents supporting payment must be in the file at the time authority is requested. Checks can't be sent prior to receiving authority through the ICS system. For the time being, your draft authority has been withdrawn. You must obtain approval first before making any payments. Review my October 6th email to you outlining my expectations. |

## Outcomes and Consequences
- It is expected that improvements are to be immediate and ongoing
- Repeated issues of this nature or any other substantiated performance problem will result in further corrective measures through our Performance Improvement Process up to and including termination of your employment.
- This will be a consideration in any future performance pay decisions
- A copy of this document will be placed in your HR file
- Other:

Confidential - Subject to Protective Order AF 11080

### Scheduled Follow-up
**A progress review has been scheduled to occur on: DATE  12/3/10**

### Manager's Comments
Jerry, I agree with your comments below and appreciate the effort you have made. It is important to remember that the whole job has to be completed. Make sure you are caught up and you close files in an appropriate time. Part of keeping up is to not take too much work, where the end product suffers. It is important that you communicate with me as far as your work load, and let me know if you are having trouble staying current in your files.

### Employee's Response
I have read the Reminder. I am thank full for a Second Chance however I would like to take this opportunity to remind everyone about my accomplishments since my transfer to CFR. I have been a Claim Super Star on two separate occasions. I have assisted several of my fellow adjusters in their assignments including traveling to northeast Wisconsin on a Sunday morning to assist Dan Angst with a large grocery store fire. Recently I traveled to Sheboygan Wisconsin and assisted Dave Moyer in a million dollar fire to an apartment building. I have gone out on several weekends to handle losses so that the insured's would not have to wait for Monday. In one such occasion I went on Sunday afternoon to a Doctor's Office that had a fire. The Doctor informed me that he had 200 patients lined up for Monday morning I was able to get a service company to come in isolate the fire area and clean the balance of the offices so that the Doctor could open Monday morning. The Doctor was so happy that he offered to do a TV commercial for the Company. I have gone to large losses when I have been scheduled for vacation. I had my knee replaced and I was off for three days and back to handling desk losses three days after the surgery. Everyone else in the Company that I have heard of with the same surgery has been off 4-6 weeks. All said I realize that my work has been less than perfect however I assumed that I was given some lea way  based on all I do for the Company. My attitude will not change and should the occasion arise I am still willing to assist the insured's on weekends and holidays. I also stand ready to help any of my fellow adjusters at anytime. Once again I thank you for the opportunity of having a 2nd chance.

### Resources
I am a resource for you and I will support you in any way that I can. Also, remember that LifeWorks, our employee assistance program (EAP), is available as well, if you believe it would be beneficial. Their contact information is:

Phone:      888.456.1324
            TTY/TDD: 800.999.3004
            Spanish: 888.732.9020

Online:     www.lifeworks.com, user ID: amfam, password 5440

### Acknowledgement
My manager has discussed the concerns and expectations contained within this Written Reminder. By returning this document to my manager, I acknowledge I have received a copy of it.

CC: Human Resources

Confidential - Subject to Protective Order AF 11081